# Citations

1. Steven Haist, Deposition, January 17, 2014 p.37 lines 21-24 & p.38 lines 1-4
2. Steven Haist, Deposition, January 17, 2014, page 38, lines 3-4
3. Gerald Dillon, deposition, January 17, 2014, page 22 lines 8-10
4. Janet Carson, Deposition, January 17, 2014, page 5-8
5. Complete transcripts are available to the court if needed, due to the number of pages from each witness only references portion has been enclosed
6. Gerald Dillon, Deposition, January 17, 2014, page 23 lines 8-10
7. Janet Carson, Esq., Deposition, January 17, 2014 page 15 lines 8-12
8. Gerald Dillon, Deposition, January 17, 2014 page 11 lines 9-17
9. Steven Haist, Deposition January 17, 2014, page 12 lines 22-24 and page 13 lines 1-2
10. Janet Carson, Deposition January 17, 2014, Page 9 Lines 22-24
11. Janet Carson, Deposition of January 17, 2014, Page 13, lines 17-24 and Page 14, lines 1-9
12. It should be noted that Defendant's attorneys put on records similar statements for all witnesses deposed on January 17, 2014.
13. Janet Carson, Deposition January 17, 2014, page 9 lines 20-22

Page 37

1    on the USMLE?

2                    MS. HOLLAND:   Objection for the reasons

3         stated before.

4    BY DR. THOMAS:

5         Q.    Who develops the validation exam?

6         A.    Test development.

7         Q.    Is there a specific validation exam as

8    compared to a normal exam where a student comes and

9    sits for the, exam?

10        A.    It's built to the same specifications.   It's

11   not a real common occurrence.   They're built to the

12   same specs.   I'm not sure of the other.

13        Q.    Mathew Thomas was given an exam December 31,

14   2007 and then told to take a validation exam in

15   September 2011.

16              Were you ever asked to create a validation

17   exam that was comparable to the exam that was done four

18   years prior?

19        A.    No, it was built to the specification of the

20   2011 USMLE exam.

21        Q.    My question is, were you asked to create a

22   validation exam that was comparable to 2007?

23        A.    It was comparable to -- no, it was comparable

24   to the 2011 USMLE exam.

Page 38

1          Q.   So, you're stating that the validation exam

2    was a 2011 exam.

3          A.   Yes, because anyone passing an examination in

4    2011 had to pass the 2011 examination specifications.

5          Q.   When was the first you were contacted

6    regarding Mathew Thomas' validation?

7          A.   I don't know.

8          Q.   Was it before or after the exam had taken

9    place?,

10         A.   My unit would have had to have been before.

11   Me personally, I don't remember.

12         Q.   Who in your unit would have been contacted?

13         A.   I'm not sure.

14         Q.   What would be the protocol for contacting your

15   department for a validation exam?

16         A.   Somebody in USMLE would have contacted

17   probably a managing editor of the particular step, but

18   I'm not sure.

19         Q.   Would you be able to say who the manager was

20   at that time?

21         A.   Yes: I think it was June Farrell, but I'm not

22   positive.

23         Q.   What would that manager do as his or her next

24   step?

Janet Carson, Esq.

Thomas vs. ECFMG, et al.

January 17, 2014

Page 8

1    -- how did you phrase it? -- that they found that there

2    would be an issue and they might need to be referred to

3    the committee for score validity.

4         A.   I really can't recall offhand.  We reviewed

5    scores and scores of files.  Certainly there were cases

6    that came before that staff group that did not result

7    in referrals to the committee on score validity and

8    some that did result in referrals.

9              I can't recall whether information regarding

10   every participant came before that staff group or not.

11        Q.   Could you tell me who ran the staff group?

12        A.   It was -- I don't remember all the

13   participants.  It included representatives of the

14   Educational Commission For Foreign Medical Graduates,

15   the Federation of State Medical Boards, and the

16   National Board of Medical Examiners.

17        Q.   Were there specific titles to be part of that

18   committee or --

19        A.   The individuals who participated were

20   designated by their organizations to be the

21   representatives at those discussions.

22        Q.   Were you ever part of that committee?

23        A.   I was present at the meetings of the

24   committee.

1    examinees, outlining the policies and procedures, and

2    the applicable information to respond to queries from

3    examinees as appropriate; and to attend the meetings of

4    the committee on score validity and to participate

5    and/or just review letters of advising examinees of the

6    outcomes of the committee on score validity's review.

7        Q.    Could you tell me approximately how many

8    students were found to have to go before the committee

9    for score validity?

10                    MS. HOLLAND:  Objection.  I object to

11              that question on the grounds that I've stated

12              before and I instruct the witness not to answer

13              it.

14                    DR. THOMAS:  Do we give the

15              instructions to her, or are you talking about the

16              prior witness?

17                    MS. HOLLAND:  I can give the

18              instructions again.

19                    My instruction, Ms. Carson, was that

20              based upon the NBME's need to protect the

21              integrity of the examination, and specifically

22              with regard to Dr. Thomas because there are

23              allegations, including his own admission last

24              Friday, that he's still in touch with individuals

Janet Carson, Esq.                                          Thomas vs. ECFMG, et al.

January 17, 2014

Page 15

1      have a background in that, but the analyses, as I

2      understood them and understand them currently, is that

3      they examine observable data, performance on two

4      subsets of test items, timings on two subsets of test

5      items, and report on that data as well as reporting on

6      data that would advise as to how unusual the observed

7      events were.

8          Q.    Do you know who was managing running that

9      data?

10         A.    I believe it was under the direction of Dr.

11     Dillon, but I'm not familiar with the specific

12     managerial roles in that regard.

13         Q.    Do you know if there was a specific committee

14     or department in charge of running the actual data?

15         A.    I do not know that.

16         Q.    Do you know if there was any computer program

17     that was used?

18         A.    I do not know that.  I presume computers were

19     involved.

20         Q.    Once the data was created and presented to

21     your department, was that data considered an analysis

22     or an observation?

23         A.    I'm a little confused by the question because

24     I don't think the data was created.  The data was there

Janet Carson, Esq.                                                Thomas vs. ECFMG, et al.

January 17, 2014

```
 1   BY DR. THOMAS:

 2        Q.   Can you tell me when the first student went

 3   before the score validity committee from Optima

 4   University?

 5                     MS. HOLLAND:  Objection on the same

 6             basis.

 7   BY DR. THOMAS:

 8        Q.   Can you tell me when the last student went

 9   before the committee on score validity?

10                     MS. HOLLAND:  Objection on the same

11             basis.

12   BY DR. THOMAS:

13        Q.   Were you ever given any information or notes

14   regarding the investigation done by any law enforcement

15   regarding a case against Optima University?

16                     MS. HOLLAND:  Objection on the same

17             basis as stated before.

18   BY DR. THOMAS:

19        Q.   In your role at general counsel; in your role

20   as part of the office of the secretariat, would you

21   have been privy to any requests made by an applicant to

22   the ECFMG regarding any waiver to the seven-year rule

23   or currently the six-attempt rule?

24        A.   I'm trying to recollect the extent to which
```

1      A.   So, could you ask the question again?

2      Q.   What steps would have had to have happened for

3  ECFMG to flag a student's account on Oasis?

4                  MS. McENROE:  Objection to form.  You

5           may answer.

6                  THE WITNESS:  We would receive

7           notification from the national board that they

8           were investigating the individual and request us

9           to flag their record.

10 BY DR. THOMAS:

11     Q.   And when you say "national board," you're

12 referring to NBME?

13     A.   Yes.

14     Q.   So, without NBME notifying you, would you have

15 flagged any students?

16                 MS. McENROE:  Objection to form.

17     A.   With respect to the Optima investigation, no.

18     Q.   And what would be the process to unflag or to

19 remove the flag from an Oasis account for a student who

20 went to Optima University?

21                 MS. McENROE:  Objection to form.

22     A.   Notification from the national board that its

23 investigation had been completed.

24     Q.   So, to clarify, the NBME must tell you to flag

Page 18

1    services. They can submit applications for examination,

2    request extensions of eligibility periods, see when

3    exam scores are released, access exam scores, see when

4    their ECFMG certificate was issued.  Those are some of

5    the things that come to mind.

6         Q.   Do you need Oasis, in any form, as part of the

7    ERAS application, ERAS being the residency application?

8                   MS. McENROE:  Objection to form.

9         A.   .Frankly, I don't know.

10        Q.   Do you know if the Oasis account of Mathew

11   Thomas, Jr. is currently flagged or unflagged?

12        A.   Yes, I do.

13        Q.   Is it flagged?

14        A.   Yes.

15        Q.   Do you know if Mathew Thomas passed the

16   validation exam?

17        A.   Are you referring to the validating

18   examination for the Step 2 CK that was rendered

19   indeterminate?

20        Q.   Yes, the Step 2 validation exam that was taken

21   in September 2011.

22        A.   I believe that our records show that we were

23   notified by the national board that that examination

24   .was not passed.

```
 1        Q.   So, based on what you've told me, should that

 2   account now be unflagged?

 3                   MS. McENROE:  Objection to form.

 4        A.   That's a possibility, yes.

 5        Q.   Does ECFMG send out a bulletin to all medical

 6   graduates via email or on their sites?

 7                   MS. McENROE:  Objection to form.

 8        A.   Could you clarify what you. . .

 9        Q.   Does ECFMG have any kind of newsletter or

10   announcement email that goes out to students or medical

11   graduates?

12        A.   We have a number of different communication

13   means, including an information booklet.  We do put

14   announcements on the website.  We have e-newsletters,

15   yes.

16        Q.   Did ECFMG ever post or send out any

17   information regarding the Optima University

18   investigation?

19                   MS. McENROE:  Objection to form.

20        A.   I don't recall.

21        Q.   When did you first become aware of the Optima

22   University investigation?

23        A.   I don't recall the exact date, no.

24        Q.   Could you tell me what year you were notified?
```

```
 1              (It is hereby agreed by and among
 2    counsel that signing, sealing, certification and
 3    filing are waived; and that all objections, except
 4    as to the form of the question, are reserved until
 5    the time of trial)
 6              MS. HOLLAND:  Before we start, I'd like
 7    to lodge the objection that I've lodged with the
 8    previous two witnesses on the record in front of
 9    Dr. Dillon. '
10              DR. THOMAS: Sure.
11              MS. HOLLAND:  Dr. Dillon, I have
12    instructed previous witnesses, for the purpose of
13    the integrity of the exam, that I will instruct
14    you as well not to answer any questions that would
15    compromise the integrity of the examination in
16    terms of test content or arriving at decisions
17    with regard to particular examinees.
18              In addition, because of concerns about
19    copyrighted material, and with particular concern
20    to Dr. Thomas, who has previously admitted that he
21    still has contact with students and employees from
22    Optima University, that due to those privacy
23    considerations I'm asking all witnesses not to
24    answer any questions that would identify test
```

```
 1    that time frame, to say that it was around the same

 2    time that they went to Optima and took the exam and,

 3    therefore, would have to move forward?

 4          A.    I don't know specific individuals.  It was my

 5    understanding it was something being handled, I think,

 6    mostly by our legal department with help from other

 7    departments, but I don't know any specific individuals.

 8    I don't know who they are.

 9          Q.    Were you ever part of a staff committee that

10    reviewed any students that went to Optima University

11    and had data given to that staff to determine whether

12    they should move forward to the Office of the

13    Secretariat for referral to the committee of score

14    validity?

15          A.    No. I was actually asked for some cases to be

16    involved in that process. I don't know that it was all

17    of them, but for some of them.

18          Q.    Was there a reason why you would be referred

19    to some but not others?

20          A.    No. I think this played out over a long period

21    of time, and each case had some slight variations in

22    it.  I don't know all of them necessarily called for

23    exactly the same steps and individuals being involved.

24          Q.    Were you involved in the committee that
```

Gerard F. Dillon, M.D.

Thomas vs. ECFMG, et

January 17, 2014

Page 22

1    exam?

2        A.    What you're describing is run was triggered by

3    the referral of individuals to the community on score

4    validity.

5        Q.    All right.  Would you say that the data that

6    is supplied on that letter is a complete analysis of a

7    student's performance?

8        A.    Well, it's not an analysis of a student's

9    performance, but it addresses and informs the question

10   being posed to the committee on score validity.

11       Q.    Do you believe other variables would affect a

12   person's performance besides those that would have been

13   put in that letter?

14       A.    Well, the letter, again, wasn't about their

15   performance.  It was intended to inform discussions

16   about whether or not there was comfort in the passing

17   outcome for individuals.

18       Q.    Okay.  Was there a threshold, from a licensing

19   perspective or from a committee perspective, that had

20   to have met to say that they were not comfortable that

21   this was a true passing score?

22       A.    There wasn't a set threshold, to my knowledge.

23   The committee was asked to consider a number of

24   variables, including the testimony of individuals who

Gerard F. Dillon, M.D.                                                Thomas vs. ECFMG, et al.

January 17, 2014

Page 23

1    chose to appear before them.

2        Q.    Could you tell me some of the other variables?

3        A.    Yes.  The evidence about them having been

4    connected with Optima, the timing of that connection;

5    the information about the USMLE performances, including

6    the passing outcome; and the data that you referred to

7    in terms of the agreement, performance and timing.

8              Again, there might have been additional

9    variables which would vary from case to case.  Again,

10   each case had unique features.

11       Q.    Would the unique features for each case be

12   specific to the validity of that exam?

13       A.    Can you ask that again?

14       Q.    In other words, the criteria when trying to

15   validate an exam, do you focus specifically on that

16   exam?

17       A.    Actually, I'm not sure how to even answer.

18       Q.    Let me rephrase:  Do prior attempts on an

19   examination factor into whether the passing score for

20   an individual is valid or not?

21       A.    I don't know that I can speak for the

22   committee, but really the intent is to try to get them

23   as much information as possible.

24              So, if there was a prior history for the

Steven A. Haist, M.D.                    January 17, 2014

Page 12

1       Q.   Could you identify what kind of material it

2   was?

3       A.   They were test questions.

4       Q.   Can you identify, was it test questions with

5   answers or just questions?

6       A.   Well, test questions with answers.

7       Q.   Do you know --

8       A.   At least a lot of the ones that I saw were.

9       Q.   .Can you tell me approximately how many

10  questions you saw?

11      A.   Hundreds.  I don't know an exact number, but

12  it's several hundred.

13      Q.   Is "several hundred" closer to under 500, or

14  is several hundred closer to a thousand?

15      A.   I don't know.  I don't know.  It was in

16  multiple different batches over a period of time.

17      Q.   Can you tell me in what format they were given

18  to you?

19      A.   Paper copies, photocopies.

20      Q.   Were you given anything electronic?

21      A.   I don't believe so.

22      Q.   Once given those questions, what was the role

23  you were supposed to play with them?

24      A.   I reviewed, you know, a number of them and

# Exhibit #1

## Amy Buono

**From:**      Gerry Dillon
**Sent:**      Friday, September 23, 2011 3:06 PM
**To:**        Steven Haist
**Cc:**        Amy Buono; Shelley Green
**Subject:**   Validating Examinee

Steve: We recently had an individual, indentified during the Optima investigation, who took a Step 2 examination to validate a previous fall. He was assigned a form from the current resource file and is now complaining that the validating exam is not comparable from a content perspective. We know that he has Drug Ads and Abstracts in the validating exam, and we will need to explain this but, besides this difference, I am hoping you or someone in TD can give me an assessment in terms of comparability. His specific claim is

"This exam was in no way similar to that exam. This exam was in the new format, with many more media questions, abstracts, and advertising. These are all items that were not used back in 2007, and I didn't prepare for them. Also, the subject matter was not proportioned as my 2007 exam, and the answer choices were in new phrases and different than anything I had studied in the past."

The original form was STP2C01607 from 2007, and the new one is STP2C02385.

We are not looking for an in depth analysis but rather TD's general assessment of whether our claim that the forms are comparable in terms of content are reasonable.

Thanks

Gerry

1



EXHIBIT
Exhibit-1
1-17-14
PENGAD 800-631-6989

NBME 00030

To: Amy Buono, Gerry Dillon, PhD

From: Steven Haist, MD, MS, FACP

Re: Comparison of Step 2 forms C01607and C02385

I have been asked to render a judgement regarding whether the above two Step 2 forms are comparable or not. The analyses were run by Technology, Training and Support staff (Deniz Bucak) and others involved in acquiring the information included Peg Johnson, Francine Rosenthal and Kathleen Short).

The Step 2 examination in 2007 was 368 items (46/hour) of which 288 items were live; in 2011, the Step 2 examination was 352 items (44/hour or 42/hour, if the hour block contained a scientific abstract or pharmaceutical advertisement, the block contained 2 fewer items) of which 280 are live.

The content below, only addresses scored items, and does not include pretest items. The Step 2 examination currently has 177 different exam content specifications, the examination in 2007, also had 177 (Patient Safety was added since 2007, and Heated Related Illness was combined with Pituitary, hypothalamic disorders, both of which were under Endocrinology. Thus instead of one item being from both Heat related illness _and_ one from Pituitary and hypothalamic disorders, 1 item is from Heat related illness _or_ one from Pituitary and hypothalamic disorders. Of the 177 categories in 2007, specifications changed in 18; because of the reduction in scored items on the examination, 288 to 280, the 8 items had to be removed from content categories, and this reduction was proportional as is our practice whenever there is such a change in specifications. Thus the change in the number of content categories in which there was a change was 10 (5.6%) for reasons unrelated to timing. Of the 18 content categories where there was a change, 14 of content categories decreased by 1 (6 of these went from 2 in 2007 to 1 in 2011; 2 went from 3 to 2; 3 went from 5 to 4; 1 went from 6 to 7 and 1 went from 7 to 8; and there was one content category, Heat Related Illness that was combined with another content area, Pituitary, hypothalamic disorders).

For 4 of the content categories, the number of items increased, 3 of them by 1 (Patient Safety had 2 subcategories and since they were new, the number of items in each went from 0 to 1; and interpretation of the literature increased from 3 to 4 items). Understanding statistical concepts of measurement in medical practice increased from 2 to 5. The Step 2 Committee approved this change in response to the Comprehensive Review of USMLE (CRU) recommendation of "Introduce a testing format designed to assess an examinee's ability to obtain, interpret, and apply scientific and clinical information needed to solve a clinical problem, i.e., to engage in evidence-based decision making."

By content specifications, the 2007 to 2011 examination were essentially the same (93.8% of the items in the 2007 examination were from the same specified content category as items in the 2011 examination) and there was only 1 new category (2 items in Patient safety, 2 subcategories, 1 item in each subcategory). The 93.8% should actually be higher since the number of items on the examination decreased by 8; the adjusted percentage of items that were from the same content category is 96.4%.

NBME 00013

There are 4 task codes; preventive, mechanisms of disease, diagnosis and management. The task code relates to the objective of the question (e.g. What is the most likely diagnosis?) The specifications in 2007 and 2011 for the categories were as follows: preventive, 32 in 2007 and 31 in 2011 (a change of 3.1%); mechanisms of disease, 65 in 2007 and 63 in 2011 (a change of 3.1%); diagnosis, 109 in 2007 and 104 in 2011 (a change of 4.6%); and management, 63 in 2007 and 59 in 2011 (6.3%). Again, these percentages need to be adjusted because of the reduction in the number of items on the 2 forms (2007 and 2011). The adjusted percentages would be 0%, 1.6%, 1.8% and 1.6%, respectively. There is no significant difference by task code between the 2007 and 20011 forms.

The types of MCQs did change as one might expect as an assessment organization evaluates new methodology and new technology but this change is of little importance. The single best answer with an option set after the text (A-type) was 20 more in 2011 (248 in 2007 and 264 in 2011); there were 40 R-types in 2007 (two or more items about a common theme with an extended option set presented first and then a vignette describing a particular patient presented after the option set) vs. 12 in 2011. In 2011 there were 4 F-types and 0 in 2007.  F-types are set of single best answer items that unfold over time. A type, R-type and the F-type are all single best answer thus little or inconsequential significance in the test forms.

The number of items with pictures increased as well. In 2007, 14 of 288 (4.9%) had associated pictures (e.g. Computerized Tomography [CT] images, x-rays, and electrocardiograms). The 2011 examination had 25 pictures (8.9%). Again, one would expect the number of images, photographs, electrocardiograms to increase on a medicine certifying examination keep pace with technology and advances in assessment. The targeted range in items for the 2007 examination was a minimum of 5 to a maximum of 16 and for the 2011 examination the targeted range was 21-36. There were 3 items (1.0% of the examination) that required the identification of heart sounds or murmurs in 2011. Within the item was an associated video of an avatar and a stethoscope that could be moved to different locations on the chest. The examinee would listen through ear phones to the particular heart sound. These items and the required technology have been introduced to the USMLE since the 2007 examination.

Overall, the 2007 Step 2 form STP2C01607 and the 2011 Step 2 for, STP2C02385 are very similar with differences which I would consider minimal. The changes noted above (more pictures and F-types and the inclusion of heart sounds) are changes consistent with the evolution of an examination over 4 years. The content is essentially the same except for the addition of 2 Patient Safety Items and an increase in the number of Biostatics and epidemiology items.

If you have any other questions please contact me.

NBME 00014

# Exhibit #2

$Ex \ \epsilon^2$

## United States Medical Licensing Examination (USMLE)
## Policies and Procedures Regarding Indeterminate Scores

Introduction

USMLE is an examination program that provides a common evaluation system for applicants for medical licensure in the United States. USMLE consists of three Steps, Step 1, Step 2, and Step 3. Results of USMLE are reported to medical licensing authorities in the United States for use in granting the initial license to practice medicine. Many medical schools in the United States require that students pass USMLE Step 1 and/or Step 2 prior to graduation. Graduates of foreign medical schools use USMLE Steps 1 and 2 for purposes of the medical science examination requirement for Educational Commission for Foreign Medical Graduates (ECFMG) certification, which is required to enter an accredited graduate medical education program in the United States. The following policies and procedures regarding indeterminate scores are intended to assure the validity of reported scores. Policies and procedures regarding suspected irregular behavior, which may or may not affect score validity, are described in another document, entitled *USMLE Policies and Procedures Regarding Irregular Behavior.*

A. Policies

1.  *Indeterminate scores* are passing level examination results that cannot be certified as representing a valid measure of an examinee's competence in the domains assessed by the examination. Aberrancy(ies) in performance for which there is no reasonable and satisfactory explanation result in passing scores being classified as indeterminate.

2.  Statistical procedures will be applied routinely, as well as in response to particular information, to identify scores that may be subsequently classified as indeterminate. Scores identified for potential classification as indeterminate may result from factors such as examinee illness during part of an examination, irregular behavior, or other factors. Classification of scores as indeterminate does not necessarily imply any inappropriate behavior by an examinee. Irregular behavior is not the only basis upon which scores may be invalidated.

3.  An examinee's scores will not be reported if the Committee on Score Validity finds that they cannot be certified as representing a valid measure of the examinee's competence in the domains assessed by the examination.

4.  If otherwise eligible, an examinee whose scores have been declared indeterminate by the Committee on Score Validity may take an examination, within a specified period of time, to validate the performance on the examination in question, unless the Committee on Irregular Behavior finds that irregular behavior occurred and the examinee is barred from future administrations of USMLE.

5.  If the Committee on Score Validity makes a decision to classify scores as indeterminate, an annotation to that effect will be entered on the USMLE record of the examinee and will appear on USMLE transcripts for examinees. Information regarding the decision of the Committee on Score Validity will be provided with transcripts and, upon request, to legitimately interested entities in accordance with the procedures on indeterminate scores.

B. Procedures

1.  These procedures are applicable to instances in which:

a)  the results of appropriate statistical analyses identify an aberrancy(ies) in performance, i.e., indicate that a score does not or may not represent a reasonable assessment of an examinee's knowledge or competence sampled by the examination. Such statistical analyses include, but are not limited to, analyses which (i) indicate that the pattern of scores for a given examinee is markedly nonuniform and one or more section scores for the examinee is below the passing level; (ii) indicate that the current scores for a given examinee show an unexpectedly large increase over the examinee's most recent prior scores on the same Step; or (iii) indicate that the degree of agreement that is observed between the wrong answers given by two examinees is unusually high as compared with the degree of agreement that would be expected to occur between two randomly selected individuals drawn from a comparison group of examinees; and

b)  there is no evidence of errors in scoring; and

c)  there is insufficient evidence available to conclude that the examinee's scores were distorted downward by factors under the control of the test administration entities; and

d)  the examinee's total score on the current examination is at or above the passing level.

2.  In such instances, staff will review any additional information available from examination records that may be helpful in explaining the aberrancy(ies) in performance and, if indicated and feasible, will conduct further investigation.

a)  For example, in the context of nonuniformity of performance, such further investigation might include, e.g., review of responses to determine whether large numbers of questions were omitted or answered randomly; review of test center administration reports to ascertain whether variation in testing conditions had occurred during the test; and review of any information obtained before or after the examination that might be relevant to his or her performance on the test.

b)  For example, in the context of an unexpectedly large increase over the examinee's most recent prior score, such further investigation might include review of the examinee's record to ascertain whether the previous examination was taken by the examinee

prematurely, i.e., prior to the completion of the medical school curriculum for the subjects covered in the examination; and review of the examinee's record to ascertain whether the examination was taken on multiple prior occasions and, if so, whether the examinee's score on one or more earlier attempts was higher than the examinee's score on the most recent previous examination.

c)  Staff will review the results of such investigation to determine whether a clearly reasonable and satisfactory explanation for the results of the statistical analyses has been obtained.

d)  When indicated and feasible, staff will conduct, or arrange for the conduct of, additional analyses. Such analyses might include, for example, a handwriting analysis to ascertain whether impersonation might be a possible explanation for the aberrancy(ies) in performance observed. Such additional analyses might also include further statistical analyses.

If such investigation and/or analyses produce non-statistical evidence of irregular behavior on the part of the examinee, USMLE Policies and Procedures Regarding Irregular Behavior will be invoked. Without non-statistical evidence of irregular behavior, the results of statistical analyses will not be used as the basis for referring a matter for further action under the policies and procedures for irregular behavior.

3.    If such investigation will not be concluded until after the typical period for the reporting of scores, the examinee and any other party to which scores would normally be reported will be notified that the reporting of scores in question is being delayed pending further review and/or analysis.

4.    If such investigation discloses an explanation for the aberrancy(ies) in performance, which explanation, in the judgment of staff, is clearly reasonable and satisfactory, staff will report the examinee's scores and no further action will be taken pursuant to these Procedures.

5.    If, at the conclusion of such investigation and the analysis of all available information, staff finds that a clearly reasonable and satisfactory explanation for the aberrancy(ies) in performance has not been disclosed, staff will withhold the scores, if not already released, for the examinee in question, and the evidence will be referred to the Committee on Score Validity, a committee that has been appointed by the Composite Committee. Evidence regarding each examinee with an aberrancy(ies) in performance identified by the statistical procedures referenced above or otherwise is referred to the Committee on Score Validity, if the evidence provides a reasonable basis to question the validity of the scores. Using the examinee's last known address, the examinee involved will be notified of the basis for questioning the validity of scores and will be given the opportunity to submit information for presentation to the Committee on Score Validity.  Staff will notify the examinee of the withholding of scores and will provide the examinee with a description of any statistical analyses employed. The examinee will be provided with a copy of the applicable USMLE policies and procedures and will be given an opportunity to provide an explanation for the findings that have been obtained and/or to present information relevant to the assessment of

the validity of the scores. The examinee may request the opportunity to appear personally before the Committee on Score Validity. In instances in which the examinee involved appears personally before the Committee on Score Validity, a stenographic or audio recording may be made of that portion of the proceedings during which the examinee is in attendance. The oral presentation will be made under oath.

6.   All pertinent information, including a description of any statistical analyses employed and any explanation of other information that the examinee may provide, will be presented to the Committee on Score Validity which is authorized to make a determination regarding the validity of the scores in question.

7.   In instances involving suspected irregular behavior which raise concerns about the validity of scores, the Committee on Score Validity and the Committee on Irregular Behavior may elect to review jointly the pertinent information presented to them and/or make a determination jointly regarding an examinee, or either the Committee on Score Validity or the Committee on Irregular Behavior may be the first of the two committees to review evidence and/or make a determination regarding a particular examinee.

8.   If, on the basis of the information presented to it, the committee is convinced that a reasonable and satisfactory explanation for the aberrancy(ies) in performance has been obtained, it will direct staff to report the examinee's scores and associated passing grade.

9.   If, on the basis of the information presented to it, the Committee on Score Validity is not convinced that a reasonable and satisfactory explanation for the aberrancy(ies) in performance has been obtained, it will classify the examinee's scores as indeterminate and will so advise the examinee and any other party that would normally receive a report of the scores in question. If the scores have been reported, the scores will be revoked and classified as indeterminate, and the examinee, and the entity to which the scores would normally be reported, will be notified. The examinee's record and transcript will have an annotation indicating indeterminate score. The examinee will be advised of the time period in which the decision of the Committee on Score Validity may be appealed to the USMLE Composite Committee, as provided for in Paragraph 12 below, and of the available options with respect to reexamination, as provided for in Paragraph10 below.

10.   Examinees whose scores have been classified as indeterminate and who have not been barred from the USMLE or applicable Step thereof, may elect to take a validating examination, as described below:

An examination comparable in content and in standards to validate the original performance will be made available without charge and must be taken within six months of the date on which the notification advising the examinee of the decision of the Committee on Score Validity was mailed to the examinee. Published limitations with respect to the timing and frequency of retakes of the applicable Step will be waived for purposes of scheduling the validating examination on any day that it is offered.



If the total test score that is obtained on the validating examination is at or above the passing level, the examinee's original scores and associated passing grade will be reported, and no record of the validating examination or annotation will appear on the examinee's transcript. If the total test score that is obtained on the validating examination is below the passing level, the examinee's original scores will not be reported. Scores obtained on the validating examination will not be reported, nor will there be a record of the validating examination.

If the validating examination is not taken within the specified time period or if the validating examination is taken and not passed, an annotation indicating indeterminate score will remain on the examinee's record and transcript, and information regarding the decision of the Committee on Score Validity and the basis for such decision will be provided with transcripts and to legitimately interested entities upon request. 

11.   If there is non-statistical evidence of irregular behavior on the part of the examinee, the Committee on Score Validity may decide to refer a matter to the Committee on Irregular Behavior, regardless of the determination by the Committee on Score Validity, or instead of or prior to a determination by the Committee on Score Validity.

12.   Provided that the examinee has not yet taken the validating examination, a decision of the Committee on Score Validity may be appealed to the USMLE Composite Committee if the examinee involved has a reasonable basis to believe that the Committee on Score Validity did not act in compliance with applicable USMLE policies and/or procedures or that the decision of such Committee was clearly contrary to the weight of the evidence before it. The request for such an appeal must be received within 90 days of the date on which the notification advising the examinee of the Committee's decision was mailed to the examinee. Notice that the matter is the subject of an appeal will be included with the USMLE transcripts during the pendency of such appeal. A written record, consisting of all information available to the Committee on Score Validity, the records of the Committee's meeting, a transcript of the recording made during the examinee's appearance before the Committee (if there was such an appearance), and the basis for appeal set forth by the examinee, will be reviewed by the Composite Committee. If the Composite Committee determines that the Committee on Score Validity did not act in compliance with applicable USMLE policies and procedures and/or that the decision of the Committee was clearly contrary to the weight of the evidence, the Composite Committee may reverse the decision of the Committee on Score Validity or remand the matter to the Committee on Score Validity for further consideration. If the Composite Committee reverses the decision of the Committee on Score Validity to classify the examinee's scores as indeterminate, all entities having received USMLE transcripts indicating indeterminate score will be notified of the decision of the Composite Committee and provided with updated transcripts. Otherwise, the determination of the Committee will stand. In this latter event, the validating examination, described in paragraph 10 above, must be taken within six months of the date on which the notification advising the examinee of the determination made by the Composite Committee was mailed to the examinee.

# Exhibit #3

I am writing to appeal the decision of the Committee on Score Validity that it could not certify the validity of my passing level results on the December 2007 Step 2 CK exam as outlined in the letter dated February 17, 2010. I appeal on the basis that (1) the Policies and Procedures Regarding Indeterminate Scores were not followed; and (2) the decision of the Committee on Score Validity was contrary to the weight of the evidence.

## I. PROCEDURAL BACKGROUND AND COMMITTEE ON SCORE VALIDITY FINDINGS:

In a letter dated September 15, 2009, Susan Deitch of the Office of the USMLE Secretariat (on page 2 of 5) she stated that "...an analysis of your performance on the December 31, 2007 Step 2 CK, along with your acknowledged presence at Optima, raises concerns about the validity of the passing level scores reported to you for that examination." Ms. Deitch cited two reasons for the decision; an "analysis" of my performance and my attendance at the Optima review course.

The letter went on to describe that certain percentages of test items that appeared on my Step 2 CK form "may have been subject to unauthorized reproduction and dissemination through Optima prior to December 2007." It is not fair or reasonable that the Committee could base its decision to invalidate my scores on a mere suspicion that certain test questions MAY have been exposed.

The letter also contains percentages of questions that were exposed and those that were not exposed and contains data on the length of time it took for me to answer each subset of questions on average.

In December 2009, I was given an opportunity to defend my position against these allegations. I took this opportunity and am confident that a careful and thoughtful review of the Transcript of Board Meeting on Irregular Behavior from December 16, 2009, will reveal that I clearly defined accurate, clear, and plausible reasons for any discrepancies questioned.

On February 17, 2010, a letter was written to me stating that "Following careful consideration of all of the available information, the Committee determined that it could not certify the validity of your passing level results on the December 2007 Step 2 CK."

The letter stated that the Committee reviewed the following items:
1- I attended Optima before my Step 2 CK in December 2007.
2- I passed my Step 2 CK on my sixth attempt.
3- Percentages of items correct in exposed verses unexposed question subsets.
4- Time spent in exposed verses unexposed question subsets.
5- Information I stated at my hearing:
   - I was at Optima for less than 5 weeks, after having done multiple review courses and study question banks.
   - I benefited from the intense study environment and study groups in Totowa, and used the test bank minimally.
   - I missed passing on my fifth attempt by one point, and kept focus on my weakest and only left starred subject, Obstetrics and Gynecology
   - I rushed at the end of blocks and that may have affected times.

The reasons given to me for not validating were as follows:
1- Even though my "performance on the subset of items for which there is no evidence of exposure (68% of the total number of scored items) was quite close to a level that would be considered

1

"passing" for that subset of items" ... "the Committee expressed concerns about using performance on a subset of items (non-exposed) as a basis for predicting performance on the entire examination."

2- "The Committee considered the reasonable possibility that familiarity with exposed items may enable an individual to respond, on average, more quickly to such items and produce a time advantage for the individual in considering and responding to the non-exposed items."

3- Given the differences in two subsets, the Committee found it could not presume validity based on my non-exposed percentages.

The following paragraphs will highlight the evidence and information supporting the only fair conclusion of my case, that my test scores should be **validated**.

## II: MY TEST SCORES SHOULD BE VALIDATED BECAUSE THE COMMITTEE ON SCORE VALIDITY DID NOT FOLLOW THE POLICIES AND PROCEDURES REGARDING INDETERMINATE SCORES AND THE WEIGHT OF THE EVIDENCE IS IN FAVOR OF VALIDATING MY SCORE:

### A.   The Policies and Procedures Regarding Indeterminate Scores were NOT followed.

#### 1.   Policies and Procedures Violated:

The following excerpts from the USMLE Policies and Procedures Regarding Indeterminate Scores are relevant to my appeal:

*Section A. Policies, policy #1 states "Aberrancy(ies)in performance for which there is no reasonable and satisfactory explanation result in passing scores being classified as indeterminate."          Policy #2 states "Statistical procedures will be applied routinely, as well as in response to particular information, to identify scores that may be subsequently classified as indeterminate."*

*Section B. Procedures, procedure #1 states "These procedures are applicable to instances in which: a) the results of appropriate statistical analyses identify an aberrancy(ies) in performance, i.e., indicate that a score does not or may not represent a reasonable assessment of an examinee's knowledge or competence sampled by the examination. Such statistical analyses include, but are not limited to, analyses which (i)indicate that the pattern of scores for a given examinee is markedly nonuniform and one or more section scores for the examinee is below the passing level; (ii) indicate that the current scores for a given examinee show an unexpectedly large increase over the examinee's most recent prior scores on the same Step;"*

*Section B. Procedures, procedure #2 describes areas in which staff will review any additional information available from examination records that may be helpful in explaining the aberrancy(ies), such as:*

       *a)   ...in the context of nonuniformity of performance, such further investigation may include, e.g., review of responses to determine whether large numbers of questions were omitted or answered randomly; ...; and review of any information obtained before or after the examination that might be relevant to his or her performance on the test.*

       *b)   ... in the context of an unexpectedly large increase over the examinee's most recent prior score, such further investigation might include...review of the examinee's record to ascertain whether the examination was taken on multiple prior occasions, and if so, whether the examinee's score on one or more earlier attempts was higher than the examinee's score on the most recent previous examination.*

       *c)   Staff will review the results of such investigation to determine whether a clearly reasonable and satisfactory explanation for the results of the statistical analyses has been obtained.*

*Section B. Procedures, procedure #5 talks about how an examinee will be notified if there is not enough evidence to validate a score and then the score gets turned over to the Committee on Score Validity. It continues to state "Staff will notify the examinee of the withholding of scores and will provide the examinee with a description of any statistical analyses employed." Procedure 6 states, "All pertinent information, including a description of any statistical analyses employed and any explanation of other information that the examinee may provide, will be presented to the Committee on Score Validity which is authorized to make a determination regarding the validity of the scores in question."*

### 2) *How the USMLE Policies and Procedures Were Violated in My Case*

The above procedures and policies clearly state that the beginning of any process to determine if a score is not a valid measure of an examinee's competence is a statistical analysis of the exam itself and the responses given. In the letter from Ms. Deitch, dated September 15, 2009, it was stated that evidence showed that 32% of my exam may have been exposed prior to my taking the exam, that I scored higher on this subset than the "non-exposed" subset, and that I was faster in the "exposed" subset compared to the "non-exposed".

I raised the validity of these finding with Ms. Janet Carson in a telephone conversation in late November 2009. I requested a stratification of the findings and contact information of the statistician who did the analysis, to obtain an official report from him. During this conversation, she told me that the analysis for which I sought a stratification was NOT an analysis, but an **OBSERVATION**. Therefore an analysis was not actually performed in my case. I brought this point up in my hearing (seen on page 16, line 11 onward and page 17, lines 15 onward), and there was no rebuttal to this statement by either the Committee or Ms. Carson. By not rebutting my challenge, they in essence agreed that this was an observation, and that the numbers were observed by NBME employees whose knowledge, qualifications, and background were not reviewed to see if they could make a professional, unbiased evaluation of the dataset. By this not being a statistical analysis, there is a violation of Policy 1.

I had also asked for a stratification of the subsets to verify the uniformity among the question types. I described my proficiency in subjects such as Psychiatry (I hold a Bachelor of Science in Psychology), as well as a weakness of knowledge in subjects such as Infectious Disease and Obstetrics and Gynecology. If there was a true analysis, these data sets would have been given to me or to the Committee when I defended myself with this logic. By not answering these requests and not providing specific data to me or to the Committee, there is a violation of Procedure 2c in that they did not "review the results of such investigation to determine whether a clearly reasonable and satisfactory explanation for the results of the statistical analyses has been obtained." In fact, I was denied any discovery to specific material pertaining to this observation.

I had also explained why certain questions took me a long time to do while others less time. One question took me four minutes to answer. I answered questions at the end of blocks quickly because I was running out of time and then went back to read them. These explanations were not considered. By not looking into this logic and analyzing the time spent when I was closer to the end of a block, there is a violation of Procedure 2a in that they did not adhere to the concept that "in the context of nonuniformity of performance, such further investigation may include, e.g., review of responses to determine whether large numbers of questions were omitted or answered randomly". Further investigation would have shown a true and reasonable cause for aberrancies in time and items being answered irrelevant of a subset.

By not giving me a clear description of what the observations meant, what they showed, which questions they referred to, and how they matched up against all other test takers, there is a clear violation of Procedure 5 and 6 which state staff "will provide the examinee with a description of any statistical analyses employed" and "All pertinent information, including a description of any statistical analyses employed and any explanation of other information that the examinee may provide, will be presented to the Committee on Score Validity" My points were "pertinent" and neither I nor the Committee was given a more in depth understanding of what the numbers really showed or compared, even after I had requested it weeks prior to the hearing and again during the hearing.

Policy 1 states that any analysis will be done routinely. This was not a routine analysis of scores. It was based on a court case against Optima University, one which is still pending six months AFTER my

3

hearing. In fact, when I took the exam in 2007, I received my score even with a history of prior attempts and with a jump in my score. If the score itself had an aberrancy irrelevant to attendance at Optima University, then an analysis whould have been warranted there. According to the policy, this would only be questioned if a "routine analysis" was done, not one which evolved from an open litigation against a review course. This is a further violation of Policy 1.

Procedure #1 states the procedures are applicable when the results of an "appropriate statistical analyses" identify aberrancy in performance, i.e., indicate that a score does not or may not represent a reasonable assessment of an examinee's knowledge or competence sampled by the examination. Ms. Janet Carson clearly stated that this was not a statistical analysis, but an observation. Two areas of concern to the board were the nonuniform scoring, and that I took the exam multiple times. With regard to the former, I have already established that not all necessary data was released for a proper analysis, and that there are many factors that were not further investigated which could have caused aberrancy. With regard to the latter, I made it clear in the hearing (Transcript page 10, lines 8 onward) that I took the exam multiple times, increasing my score each time. In the attempt before my pass, I had failed by only one point. This shows a pattern of continued improvement and that I was already bordering at the level to pass during my last attempt. I also stated on page 42, lines 1 to 6, that I took the exam multiple times when I was not ready for it because I had paid for it. If both of these points were that great of concern, NBME/USMLE should have called for an analysis BEFORE my score was reported to me, irrelevant of attendance at Optima University.

**In summary, the committee on score validity did not follow the proper policies and procedures.** The policy of the USMLE calls for a statistical analysis of my exam to validate scores. NBME officials stated the findings were not a statistical analysis, but an observation made by NBME employees who did not have a statistical proficiency. The observations must not be used in the decision making of this committee. Procedures also call for further investigation when there are possible causes for aberrancies. I raised many points to cause a need for further investigation, and the NBME/USMLE did not investigate more to clarify these queries. In addition, procedures call for a description of any statistical analyses and pertinent information to be disclosed. Even after multiple requests, complete descriptions of the pertinent information were not released for review. Finally, Policy 1 calls for review if a routine analysis finds an aberrancy. This was not a routine analysis, but one that was started based on unproven allegations against a review course. The analysis is illegitimate as the root is still unfounded.

### B. The Decision of the Committee on Score Validity was Contrary to the Weight of the Evidence.

The reasons given to me for not validating were as follows:
1- the Committee expressed concerns about using performance on a subset of items as a basis for predicting performance on the entire exam
2- The Committee considered a reasonable possibility that familiarity with exposed items may enable a person to respond, on average, more quickly to such items and gain a time advantage to responding to non-exposed items.
3- Given differences in two subsets, the Committee could not presume validity based on non-exposed percentages.

The Committee on Score Validity reviewed just 4 factors from my forty-five minute hearing as stated in their letter on February 17, 2010:
1- I was at Optima for less than 5 weeks, after having done multiple review courses and study question banks.

4

2- I benefited from the intense study environment and study groups in Totowa, and used the test bank minimally.
3- I missed passing on my fifth attempt by one point, and kept focus on my weakest and only left starred subject, Obstetrics and Gynecology
4- I rushed at the end of blocks and that may have affected times.

Throughout my hearing, I expressed concern about the findings in the observation held by the NBME/USMLE regarding exposed items on my exam. Janet Carson stated that they knew what Forms of the USMLE Optima University allegedly had access to and reproduced. They also claimed that they knew it was prior to my exam in 2007. On transcript page 34, lines 6 to 10, Janet Carson states "I referred to the fact that analyses for you were based on the forms of the exam exposed before you tested. I did not identify the point in time in which we learned of the exposures." This statement was in rebuttal to me stating that the NBME/USMLE should have pulled the exam forms before I tested if they knew they were exposed. One can see that the defensive statement shows that they knew about the exposure AFTER my exam. There were only a few instances when Optima materials were seized: all of them in May 2008 and after in Tennessee. I stated numerous times that the review question bank in Optima University was updated in March 2008. That was almost three months **after** I took my exam. If an "analysis" or comparison of my exam was done based on a bank obtained after that date, there could be questions that were never in the Optima bank at my time of being a student. However, NBME/USMLE found it acceptable to **PRESUME** I had access to these questions and use this presumption against me. Again, a stratification of the subsets could start a process by which to test this theory. Dr. Whelan states "...the fact that we know, we have – the confiscated files represent actual test data. So we know its there." (Transcript page 32, lines 4 to 6). If evidence exists, then there is a creation date of the file, and if created after my exam date, then we know I had no access. **NBME/USMLE refused to do this further investigation. They instead presume my guilt of exposure**.

As I stated earlier, I asked for a stratification of the observation at multiple times. There is a firm correlation between my areas of proficiency and my areas of weakness which affect my percentages of right and wrong. There is a direct correlation if they fell under the exposed or non-exposed subsets. This also affects the speed at which I would do a question. Speed is not determined just by previous exposure, but also by the strength of knowledge and recognizing key words. **They did not even consider this argument, notwithstanding that I provided clear support based on my test taking strategy and coursework strength.**

I stated that Optima University was focused on Step 1 students throughout 2007. During my short time period there, he had less than five Step 2 students since his inception in March 2007. There was a very minimal bank and the Step 2 students gained more from self study and group discussion (started by students and not part of his program) in a hard core environment other than any course material. We did more USMLEWorld questions than the Optima bank. Students also did NBME assessment exams. Students used a mix of the Optima bank, other question banks, review groups, lectures and assessment exams and books throughout the course. All factored into a student's performance. **This point was not considered relevant**.

I stated that I was one point from passing and that I had successively increased my score. The Committee has given more weight to my attempts and the presumed access to material than seeing my trend towards passing.

I stated that I was being compared to an average score of a control group of over 1000 students. They did not call me an outlier in any form. In fact, they did not address the points I made on Transcript page 18, line 1 onward, in which I asked about those students who had higher aberrancies of percentages

5

than me. Averages compare high scores and low scores. There was no clarification of my status in this observation. There was also no representation of the data sets in relation to my time on each question. The evidence presented against me was an **average** of time spent on each question, which needed further review. **They refused to show that this was a reasonable consideration.**

I stated that my focus was on Obstetrics and Gynecology because of the star on the left in my previous two exams, March and July of the same year as my passing score, 2007. This warranted a stratification of the exposed verses non-exposed to see how many questions fell in each subset. It also warranted a comparison to past performance to see if there was a uniform increase in productivity verses a profound spike in performance in Obstetrics and Gynecology. **The Committee didn't consider this possibility.**

I stated that the observations done were by NBME employees, and not by licensed or professional statisticians. They didn't consider that all relative angles were not being considered. They accepted the only means of aberration was that there existed an alleged subset of exposed verses non-exposed questions, and this candidate did better in one than the other. They didn't question stratification, comparison of the stratification to past experience, and what time during the test these questions were seen (beginning, middle, or end of a block). **The observations were flawed in both procedure and content, but this was not considered by the Committee.**

During the course of the hearing, other areas that were irrelevant to my Step 2 CK were brought into conversation by members present with the Committee. On page 42 of the hearing Transcript, Mr. Seeling brings up my Step 1 history. During different areas, others bring up my employment well after my exam date. They also bring up my transfers of medical schools, and my not taking Step 3 until 2009. **NONE of this has to do with my Step 2 CK in December 2007, but the negative connotations may have biased certain discussions which affected the fairness of a decision.**

I talked about the discrepancies of the numbers given. I stated that it was claimed that I did eight more questions correctly than the control group in the exposed group, and got 17 fewer questions correct in the non-exposed group. At the hearing, Dr. Grande tried state that you must take both aspects of the numbers which go against the candidate. This is unfair in practice as you should assume the same direction. If you give the benefit to the control group when they do better, then you should give the benefit to the candidate, especially when you will not stratify the question base. All in all, we are talking about me getting **1.2 more questions correct per block,** compared to the control group, which in itself is an average. **The Committee refused to accept this as needing clarification by a true statistician.**

The understood three digit score is based on a 288 question subset. Of all administered question in Step 2, 288 questions are actually used in scoring the exam. The number of questions right from this 288 is what your three digit score on the USMLE becomes. At the time of my exam, 184 was the passing score. That is getting approximately sixty-four percent (64%) of the questions correct. The observation stated that I received sixty-six (66%) on my non-exposed items. We should be able to accept that knowledge doesn't change toward the negative if two subsets are equal in nature. There is no stratification supplied. Sixty-six percent of 288 (a number confirmed to be the number of questions used in scoring my exam by Janet Carson in an email to me dated November 11, 2009) is 190.08. **This would be a passing score. The Committee states they cannot PRESUME the same level of achievement in the exposed subset. This is NOT taking the weight of my evidence into their decision.**

6

With that said, let me bring into proof three scenarios:

| Student | Exam Date | % Exposed | % correct exposed | % correct unexposed | Time spent exposed | Time spent unexposed | Committee Score Validity Decision |
|---------|-----------|-----------|-------------------|---------------------|--------------------|---------------------|----------------------------------|
| A | 12/31/07 | 32% | 84% | 66% | 59 sec | 73 sec | INVALID |
| B | 08/19/08 | 30% | 88% | 67% | 56 sec | 80 sec | **Valid** |
| C | 12/11/08 | 29% | 81% | 68% | 60 sec | 71 sec | **Valid** |

We have here three students from Optima. I know which student took what exam on which day, as a log was kept in New Jersey. All three students went before the Committee of Score Validity. Student B is a Step 2 student and Student C is a Step 1 student. This information can be verified by NBME based on test date and appearance before committee.

When applying the percentages to the number 288, we get the following:

| Student | Number of Questions Exposed Correct | Number of Questions Non-exposed Correct | Total Correct |
|---------|-------------------------------------|-----------------------------------------|---------------|
| A | 77 | 129 | 206 |
| B | 76 | 135 | 211 |
| C | 68 | 139 | 207 |

According to the decision letter against me, the Committee states they could not presumably validate my score based on my performance on the non-exposed subset because of the differences in scoring between my exposed and non-exposed subsets. My percentages were very similar to Students B and C. They have similar differences in scoring. Also, they both received a higher final score than me on the USMLE. Student B was even quicker than me on her exposed questions and took longer on her unexposed. She was also at Optima for well over six months, stayed after the FBI raid, and was the sister of the Optima owner's right hand man. Student C's time is almost identical as mine, and she was at Optima for well over 6 months, and was in both New Jersey and Tennessee. Ironically, Student B was seen the same day as me by the Committee, and therefore by the same Committee members. The number of questions which differentiate these three students is minute, yet the weight of the final decision is tremendous.

Neither Student B nor C has a passing score based just on non-exposed questions correct, so there must have been a PRESUMED level of achievement in the exposed Question set based on performance in the non-exposed. **There is clearly a discrepancy in how the Committee handled my case verses theirs, and a level of bias and discrepancy which could have resulted from the negative connotations of my work history and Step 1 history.**

**Clearly, the decision of the Committee on Score Validity was contrary to the weight of the evidence.** There was a double standard when the Committee heard my case versus the cases of other students. They took a harder stance against me and did not give proper review or consideration to the evidence presented before them by me. Instead, the NBME/USMLE presumes that I had access to all forms that Optima allegedly had access to, regardless of the fact that he did updates months after my exam. They also presumed that I had access to all forms that Optima allegedly had access to regardless of

7

the fact they did not get evidence of confiscated files until after May 2008. The Committee did not take into consideration that the observation was just that, an unprofessional observation and NOT a professional statistical analysis. A professional statistician was never utilized for an evaluation. The specifics of the data sets, as well as stratified question types directly affected performance measures and time validity. They also did not consider that the control group was an average and that my scores were not differentiated as to where they lie in that average. The Committee refused to acknowledge that my performance spike was more so in Obstetrics and Gynecology, and that improvement alone would give me a pass from my past exams, as well directly affect performance in exposed verses non-exposed items.

**Most importantly, the committee clearly stated in their <u>decision letter</u> that they could NOT presume performance in my case, but obviously did it for two other students with almost identical numbers. There was not a fair and equal hearing afforded to me compared to other students who were at Optima longer than me and who had had access and exposure to the complete question banks (after March 2008) which were seized in Tennessee.**

### III: CONCLUSION:

Upon review of this letter, the transcripts of my hearing and all documents and materials referenced in my prior correspondence, you will have the evidence to support that (1) the Policies and Procedures Regarding Indeterminate Scores were not followed; and (2) the decision of the Committee on Score Validity was contrary to the weight of the evidence. As such, I respectfully submit that the only fair and reasonable finding is that my USMLE Step 2 CK examination scores should be validated, and reported to all requesting institutions. Thank you for your consideration. I look forward to hearing of your decision.

Very truly yours,


Mathew Thomas, Jr., M.D., M.H.S.A.

Mathew Thomas, Jr.
USMLE ID#: 0-633-396-7

December 19, 2012

Office of the USMLE Secretariat
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104
Attn: Ms. Amy Buono

Dear Ms. Buono,

I am respectfully requesting that my file be re-opened for the purpose of reviewing the validation of my Step 2 exam by taking into account the following new evidence, including the legal proceeding that was brought by the National Board of Medical Examiners & Federation of State Medical Boards on February 23, 2009. The new information will be presenting what was completely missed during the committee's first review. I feel that my case should be given all and every piece of information to justify the validation of my scores.

The new evidence includes the violation of the policy and procedures regarding indeterminate scores. Section B, procedure 1, subsection (1), does not comply with my scores. During my attempts, my pattern of scores has increased with each attempt. In subsection (2) my current score does not show an "unexpectedly large increase" over the most recent scores of the same step. In fact, my previous score was 2 points shy of passing.

Section B Procedure 2 (a) discusses the non uniformity of performance, but I did not "omit or answer randomly", as proven through my exam.

Section B, Procedure 5, states that "staff will notify the examinee of the withholding of scores and will provide the examinee with a description of any statistical analysis employed." At no time did I receive a statistical analysis description. According to a letter I received on August 25, 2010, by NBME/USMLE, it was clear that I did not receive a statistical analysis as stated in your policy. The August

Page | 1

Mathew Thomas, Jr.
USMLE ID#: 0-633-396-7

25, 2010 letter, stated, "while the calculation of averages may not be regarded as a complex statistical analysis warranting a written report, the correspondence sent to you advised you a data source employed, the procedure applied and the results of calculation." With all due respect, I did not receive the procedure applied, data source or a statistical analysis.

My request for a statistical analysis was also requested at my December 16, 2009 hearing. I requested numerous times to receive a summary of how the percentage was calculated and at no time was a response presented to me. Instead, I received a response from Dr. Dillon stating, that he thinks there was a "message behind this information." This is evident on pages 15-17 of my transcript. This matter is not about a lesson learned for a student studying for his boards, but instead, it is about true facts that, if not carefully reviewed, will affect my future. Not receiving a true statisticalanalysis, but instead a "message", is not complying with your policy.

Section 8 procedure, 2(c), states, "...to determine whether a clearly reasonable and satisfactory explanation for the results of the statistical analysis has been obtained." In a letter received by Susan Deitch on February 17, 2010, page 4, it stated that "the Committee did not find it reasonable or appropriate to make presumptions about the validity of your scores on this examination based upon your performance on the non-exposed scored items." This statement is untrue, in fact a presumption was made when it was presented that the average of exposed questions spent by the test taker was 73 seconds. The committee has made an assumption that based on their presumption that I was exposed to a certain amount of questions based on how many seconds I spent on each question. The difference in time was pure seconds, not minutes. According to my hearing, I did not get all the questions correct that I was presumably "exposed" too. I was penalized because I spent an average of 59 seconds on presumably exposed questions. According to the committee'sexplanation,if I spent 73 seconds on an assumed "exposed" question, I would have received credit.Therefore, I should have received credit for the questions that I spent at or about 73 seconds from the question set that are presumably "exposed",

since an average of 59 seconds was used to make this decision, not a statistical analysis.  An average would mean that the time spent on questions was less than 59 seconds, as well as above 59 seconds.

According to the committee I scored 66%.  Again, due to the fact I don't have a clear analysis of where the 66% came from, I was forced to do my own math.  On page 14 of the transcript, I discuss what was presented to me by Janet Carson about the number of questions that were counted towards scoring.  Out of 346 questions, there were 288 questions in the Step 2 exam that were counted for scoring on the December 2007 exam that I sat for.  The passing score is 184.  66% of 288 equal 190.08, a passing score.  According to your reasoning a passing score is determined by showing, "presumption that the predicted performance provides a reasonable and appropriate level of confidence with respect to the validity and reliability of the reported results."  Obviously I had the majority of the questions correct even at the 66%.  With that being said, and not being provided with an actual statistical analysis, my scores were not validated in accordance to your section 8 procedure, 2 (c).

According to the civil action matter of case 1:09-cv-01043-JDB-cgc, NBME & Federation of State Medical Boards –v- Optima University LLC, etal., evidence of unethical activity was not confirmed until 2008. I took the exam December 2007. As I stated on page 12 of my transcript, Optima University updated their question bank in March 2008, after my exam.  Therefore, I had no exposure to those questions.  The lawsuit also mentions that there was suspicion in 2007 that an unethical matter may be occurring, but yet no precautions were taken so students like me would have notice and not be placing our career on the line.  There are a couple of legal proceedings filed on this matter and the common phrase is "multiple attempts." It is alluding to students who have taken the Step exam multiple times and making the assumption that they only passed because they participated in the Optima University review.  I feel that this assumption was made about me because I had numerous attempts and therefore not giving me a fair opportunity to validate my score. The difference for me is that I made consistent improvements with each attempt.

Mathew Thomas, Jr.
USMLE ID#: 0-633-396-7

    In conclusion, like the rest of the students whose scores were validated, I had no knowledge of any unethical matters that were occurring at Optima University.  Please accept this new evidence as proof of such.  I am more than willing to have a face to face meeting to discuss my case further. In fact, I would welcome such an opportunity.

    Thank you for taking the time to review my case to include this additional information.  I am confident that you will agree given the new information that my score is a true reflection of my own hard work.

Sincerely,

Mathew Thomas, Jr., MD, MHSA, CHC

Manu.Thomas.31@gmail.com

(917)856-0368

Mathew Thomas, Jr., MD
March 27, 2013

March 27, 2013

Re: Mathew Thomas, Jr. M.D./Request for a Waiver

USMLE/ECFMG ID no. 0-633-396-7

Dear Credentialing Committee,

Please accept this submission for the purpose of receiving a waiver to the 7 year rule,
whereby an applicant must pass all Step exams within 7 years of passing their first Step exam. I
would like the committee to take into account the following series of events that took place
regarding my file. As the records show, I successfully passed my Step 2CK exam in December
2007, which granted me my ECFMG certification. I registered for my Step 3 exam in mid 2009.
On July 27, 2009, I was sent a letter stating that my registration for the Step 3 exam was
cancelled due to an investigation regarding Optima University. The letter from the Federation of
State Medical Boards stated that my Step 3 application, "has been cancelled until this matter is
resolved." At that point, July 27, 2009 was the official date my file was placed on hold pending
the investigation, and my access to OASIS was locked. This meant that I could not register for
any USMLE Steps.

On December 16, 2009, I attended a hearing in front of the Committee of Score Validity
to give testimony in an effort to validate my Step 2CK score. On February 17, 2010, I received
the outcome of that hearing that my score for Step 2 would not be validated and was told that I
had until June 1, 2010 to submit my appeal. As anyone in my position would do I submitted an

Mathew Thomas, Jr., MD
March 27, 2013

appeal in June of 2010. USMLE/NBME responded to my appeal on August 2010 and stated that

their decision to not validate my score was upheld. I was advised to take the validation exam. In

October 2011, I received notification that I did not receive a passing score on my validation

exam and now could register to retake the Step 2CK via OASIS.

As the timeline shows, due to the loss of time because of the investigation, the hearing

process, the appeal process and the validation exam, I lost over 2 years within my 7 year window

to complete all my steps.

The July 2009 letter from the Federation of the State Medical Board stated that my

registration would be cancelled until the matter was solved. According to the attached

documents the matter was not resolved until October 2011. The process from beginning to end

was from July 2009 through October 2011, therefore not allowing me to have the applicable time

to take and pass all the exams within 7 years. These occurrences were beyond my control and I

should not be held accountable for the time lost.

Currently, I am preparing to retake my Step2CK. Based on the timeline of the

occurrences and the hold on my file pending the outcome of the investigation, I believe that the

time lost can be justifiability added to the end of my 7 year window, which would have stated

after passing my first Step exam. I ask that this committee look at the timeline and grant the

extension to the 7 year exam period, which started with the first step exam that I passed. Please

note that I am available for any questions. Thank you for your time.

Sincerely,
Mathew Thomas, Jr., MD