# Exhibit #8

# MATHEW THOMAS, JR TESTING HISTORY

| Exam | Date | Location | Score | Pass/Fail |
|---|---|---|---|---|
| Step 1 | 5/31/2002 | Manhasset, NY | 119 | Fail |
| Step 1 | 3/31/2003 | Queens, NY | 128 | Fail |
| Step 2CK | NO SHOW | REG DATE 1/31/2003 | | |
| Step 1 | 10/15/2003 | Fair Lawn, NJ | 152 | Fail |
| Step 2CK | 2/19/2004 | Staten Island, NJ | 125 | Fail |
| Step 1 | 6/30/2004 | Melville, NY | 153 | Fail |
| Step 2CS | 1/12/2005 | Houston | | Pass |
| Step 1 | 12/8/2004 | Chicago, IL | 169 | Fail |
| Step 2CK | 5/28/2005 | New York, NY | 161 | Fail |
| Step 1 | 10/31/2005 | Chicago, IL | 179 | Fail |
| Step 1 | 2/14/2006 | Chicago, IL | 184 | Pass |
| Step 2CK | 10/25/2006 | Brooklyn, NY | 172 | Fail |
| Step 2CK | 2/14/2007 | Fair Lawn, NJ | 174 | Fail |
| Step 2CK | 7/27/2007 | Warwick, RI | 182 | Fail |
| Step 2CK | 12/31/2007 | Clark/Union, NJ | Indeterminate | Did not pass validating exam |
| Step 3 | Terminated | REG DATE 7/31/2009 | | |
| Step 2CK | NO SHOW | Scheduled 6/30/2013 | | |
| Step 2CS | | REG DATE 1/2/2013 | Elig 1/2/13-2014 | |

## Step 1

| Step 1 | 5/31/2002 | Manhasset, NY | 119 | Fail |
|---|---|---|---|---|
| Step 1 | 3/31/2003 | Queens, NY | 128 | Fail |
| Step 1 | 10/15/2003 | Fair Lawn, NJ | 152 | Fail |
| Step 1 | 6/30/2004 | Melville, NY | 153 | Fail |
| Step 1 | 12/8/2004 | Chicago, IL | 169 | Fail |
| Step 1 | 10/31/2005 | Chicago, IL | 179 | Fail |
| Step 1 | 2/14/2006 | Chicago, IL | 184 | Pass |

# Exhibit #9

# Announcements

## Alert Regarding Optima Test Prep

**July 1, 2009**

A USMLE test preparation company that operates under the name "Optima University" has been :
Eihab Suliman, by the National Board of Medical Examiners and the Federation of State Medical Boards :
materials that were obtained illegally. An <u>announcement about the lawsuit</u> was posted previously.

Individuals <u>who attended</u> Optima's programs or are considering <u>doing so risk</u> having their USMLE scores
as indeterminate. They may also be subject to other consequences, including charges of irregular behavio
participation. The USMLE will post <u>further updates</u> concerning this matter.

**<u>View all Optima Update</u>**

# Exhibit #10

### USMLE and Appeals:
### The Hefty Burden Examinees Face in Appealing
### a USMLE Finding of Indeterminate Score or Irregular Behavior

by Sherri Katz and Bob Bennett[1]

The United States Medical Licensing Examination (USMLE) is one of the crucial gates an aspiring medical doctor must successfully enter to gain professional licensing, and in some cases, graduate from medical school. What happens, however, if two years after passing Step One, a doctor is notified that his or her is invalid and will published as an "indeterminate" score?  How does this impact a doctor's medical career, including residency and internships?

Recent developments have increased scrutiny of examinees' scores on the USMLE placing many examinees who acted in good faith and with complete propriety in jeopardy of having their scores labeled "indeterminate"[2], which is basically the same thing as invalidated or revoked.  The USMLE also has the power to have an examinee's score reports reflect "irregular behavior"[3], which could mean being barred from future testing, and forcing USMLE examinees to suffer collateral consequences such as delay in licensing, graduation, or participating in a residency program.

In addition, a recent development now includes a copyright infringement lawsuit[4] for damages and an injunction, filed by the National Board of Medical Examiners (NBME) and the Federation of State Medical Boards (FSMB) against Optima University, a popular test preparation course provider, its founder, Eihab Mohamed Suliman, and ten

---

[1] The Bennett Law Firm would like to acknowledge the contribution of Law Clerk Whitney Campbell's research for this article.

[2] See USMLE Policies and Procedures Regarding Indeterminate Scores

[3] See USMLE Policies and Procedures Regarding Irregular Behavior

[4] NBME and FSMB v. Optima University, et al, filed in the United States District Court, Western District of Tennessee, Cause No. 09-cv-1043-JDB.

John Doe defendants. This lawsuit was filed in federal court on February 23, 2009, and is still in the preliminary pretrial stage, as it appears that Defendant Suliman and his Optima University has not answered this lawsuit.

Because of the allegation that Optima University may have exposed its students to inappropriate or copyrighted USMLE test questions, at the present time, the USMLE is sending letters to students whom they have proof, or merely just suspect attending Optima. The USMLE is calling examinees before their Committee on Score Validity and/or their Committee on Irregular Behavior to ascertain whether examinees who attended the Optima University test preparation were exposed to questions, and thus should have their scores classified as "indeterminate", or their record reflect "irregular behavior". The USMLE is also making it clear to notified students that if a student denies attending Optima, and it is later determined that they in fact attended Optima, the student's dishonesty will likely result in an allegation of irregular behavior. Other allegations may be investigated as well.

These examinees, if called before the USMLE Committee on Score Validity or the USMLE Committee on Irregular Behavior, have the right to appear in person, with or without an attorney, to rebut the USMLE accusations against them, but they could face a tremendous presumption against proving their competency on the material tested by the USMLE step examination in question. The examinees can also waive any personal appearance, and merely submit information for consideration by the Score Validity committee, which presents certain pitfalls.

It has become apparent that if a student elects not to appear before the USMLE Committee on Score Validity in person, and decides to merely submit a letter and/or

supporting documentation for the committee's consideration, a finding of "indeterminate score" by the committee may be much more likely, thus requiring an analysis of whether to appeal the USMLE Committee on Score Validity's decision. This may be a disastrous course to take for a number of reasons.

Although contrary to traditional American notions of fair play and substantial justice, the accused examinee bears the full burden of proving their own innocence or competency by a standard of proof that is unclear and poorly defined. The USMLE and an accused examinee are in unequal bargaining positions. The USMLE exercises absolute power over the validation of an examinee's scores on the USMLE step examinations, and ultimately over the fate of the examinee's ability to obtain professional medical licensing in the United States. A student's may even not be allowed to match for a residency program if Step One is failed.

Competent and experienced counsel may be the only hope the unfortunate examinee can rely on in opposing such a hefty burden, whether during the initial appearance before the USMLE Committee on Score Validity, or on appeal to the USMLE Composite Committee. An attorney with experience before the USMLE Committee on Score Validity may be able to get the investigation quashed, if it can be shown that the student did not attend Optima. If the inquiry can not be dismissed, counsel will assist with the preparation of a response, and the appropriate presentation to the USMLE committee.

## General USMLE Procedural Background[5]

According to the *USMLE 2009 Bulletin of Information*, the USMLE "assesses a physician's ability to apply knowledge, concepts and principles, and to demonstrate fundamental patient-centered skills that are important in health and disease and that constitute the basis of safe and effective patient care." Likewise, the USMLE Mission Statement lists four goals:

1. To provide to licensing authorities meaningful information from assessments of physician characteristics – including medical knowledge, skills, values, and attitudes – that are important to the provision of safe and effective patient care.
2. To engage medical educators and their institutions, licensing authority members, and practicing clinicians in the design and development of these assessments.
3. To assure fairness and equity to physicians through the highest professional testing standards.
4. To continue to develop and improve assessments for licensure with the intent of assessing physicians more accurately and comprehensively.

The *USMLE 2009 Bulletin of Information* provides that the USMLE assures the validity of scores reported for USMLE examinations by every means available, and that scores may be classified as indeterminate if "the scores are at or above the passing level and the USMLE program cannot certify that they represent a valid measure of your **knowledge or competence** as sampled by the examination." *USMLE Bulletin*, page 32, emphasis added.

The *USMLE 2009 Bulletin of Information* provides the standard it uses as "a classification of indeterminate may result from irregular behavior or from other factors,

---

[5] For a general overview article of the USMLE and the current situation with the USMLE Committee on Score Validity, please refer to article: **When the Gatekeeper Challenges Your Test Scores: The High Stakes and Hefty Burden Examinees Face in Defending Their Scores on the U.S. Medical License Examination,** by Sherri Katz and Bob Bennett[5]

such as unexplained inconsistency in performance within a Step or Step Component or between takes of the same Step or Step Component." See *USMLE Bulletin*, page 32.

The *USMLE Policies and Procedures Regarding Indeterminate Scores* defines "indeterminate score" as "passing level examination results that cannot be certified as representing a valid measure of an examinee's **competence** in the domains assessed by the examination." The USMLE Policies goes on to state that "Aberrancy(ies) in performance for which there is no reasonable and satisfactory explanation result in passing scores being classified as indeterminate."

### Appearance before the USMLE Committee on Score Validity

The examinee, along with potentially thousands of other Optima University attendees, has the opportunity to appear before the USMLE Committee on Score Validity in an effort to confirm the validity of the score(s) through a hearing.[6] At this hearing, the examinee bears the burden of proving to the USMLE Committee on Score Validity's satisfaction that the examinee does possess the requisite knowledge and competence to have his Step scores validated. The examinee does have another option at his disposal: retake the questioned step examination(s).

The copyright lawsuit has certainly motivated increased scrutiny over test score validity and a larger number of "indeterminate" score classifications by the USMLE. The extent to which the Comprehensive Review of the USMLE has influenced the larger number of indeterminate scores is unclear. It is clear, however, that there is a wide range of stakeholder organizations, agencies, and education institutions relying on the validity

---

[6] The authors have recently learned that USMLE/NBME has widened its net to include foreign doctors or those who attended island schools and have had a number of attempts (10+) at Step One or Step Two. Those who passed during the active life of Optima may have their scores invalidated, without any proof that the foreign medial student even attended Optima, but merely because they had a large number of unsuccessful attempts before passing the step examination.

of the USMLE scores. The stakes are high for the USMLE because these stakeholders depend on the USMLE to help ensure the public welfare of medical patients in the United States.

### Test Preparation is a Legitimate Practice

Although never openly endorsed by standardized testing administrators, it is common for graduating professionals of all types to seek out preparation courses or materials for exhaustive licensing exams. This test preparation usually comes in the form of professional test preparation programs offered mostly by for-profit companies. There is no particular stigma attached to this practice. Law school graduates seek out test preparation services from BarBri and Kaplan, and many law students take a school taught bar preview courses in preparation for examinations for admission to state bar associations.

Teachers, pilots, engineers, nurses, and countless other professionals take preparation courses on the path to professional licensure. The general presumption is that course providers use authorized materials and prepare an individual for success, and are not in the business of teaching test takers how to cheat on the standardized test. These test preparation courses refresh areas of knowledge upcoming examinees may have not reviewed recently but have a foundation in already.

### Options:

If a student appears in person before the USMLE Score Validity Committee, with or without an attorney, or merely submits information for consideration by the committee and does not make a personal appearance, and a finding by the Score Validity Committee of an "indeterminate" score is made, there are four alternatives:

1.  Give up on a medical career

2.  Petition the USMLE Committee on Score Validity for a rehearing

3.  Appeal the "indeterminate" score finding to the USMLE Composite

    Committee or

4.  take a validating examination

### Appeal to the USMLE Composite Committee:
### General Procedures to Appeal
### Decision of USMLE Committee on Score Validity

According to the *USMLE Policies and Procedures Regarding Indeterminate Scores*, a decision of the Committee on Score Validity may be appealed to the USMLE Composite Committee if the involved examinee has a reasonable basis to believe that the Committee on Score Validity did not act in compliance with applicable USMLE policies and/or procedures or that the decision of such Committee was clearly contrary to the weight of the evidence before it.

Broken down and put in context, according to the *USMLE Policies and Procedures Regarding Indeterminate Scores,* Section B(12), a decision of the Committee on Score Validity may be appealed to the USMLE Composite Committee if the involved examinee has a reasonable basis to believe that:

1.  the Committee on Score Validity did not act in compliance with applicable USMLE policies and/or procedures **OR**
2.  that the decision of such Committee was clearly contrary to the weight of the evidence before it.

The six-month time period that is provided to an examinee to take a validating examination following a determination by the Committee on Score Validity that the scores at issue are indeterminate is tolled during the pendency of an appeal, reasonably presented upon one of the above-described bases. It should also be taken into account

just how often the USMLE Composite Committee meets: it met once at the end of

January 2010, and is presumably not scheduled to meet again until the summer of 2010.

Analyzing the information contained in the *USMLE Policies and Procedures*

*Regarding Indeterminate Scores,* as it pertains to appeals of a decision made by the

USMLE Committee on Score Validity, the USMLE Composite Committee can consider:

1.  written record, consisting of all information available to the Committee on Score Validity
2.  the records of the Committee on Score Validity's meeting (i.e. the notification letter from USMLE with decision of "indeterminate" score)
3.  a transcript of the recording made during the examinee's appearance before the Committee on Score Validity (if there was such an appearance – hence, the importance of a personal appearance: no appearance, no transcript)
4.  and the basis for appeal set forth by the examinee (which would be considered the examinee's "written appeal").

During the consideration of an appeal, if the Composite Committee determines that

either:

1.  the Committee on Score Validity did not act in compliance with applicable USMLE policies and procedures  and/or
2.  that the decision of the Committee on Score Validity was clearly contrary to the weight of the evidence…. then

the Composite Committee may either:

1.  reverse the decision of the Committee on Score Validity OR
2.  remand the matter to the Committee on Score Validity for further consideration.

If the Composite Committee reverses the decision of the Committee on Score

Validity to classify the examinee's scores as indeterminate, all entities having received

USMLE transcripts indicating indeterminate score will be notified of the decision of the

Composite Committee and provided with update transcripts.

Otherwise, the determination of the Composite Committee will stand. (In other

words, the decision is final and cannot be further appealed, and the examinee must take a

validating examination within 6 months if he/she wishes to have the USMLE transcript reflect a passing score). In addition, if the doctor has already commenced a residency program, their supervisor will presumably be notified that their score is invalid.

The six-month time period that is provided to an examinee to take a validating examination following a determination by the Committee on Score Validity that the scores at issue are indeterminate is tolled during the pendency of an appeal, reasonably presented upon one of the above-described bases.

### Initial Review by USMLE Committee on Score Validity

Typically, in the initial USMLE letter to a student, the USMLE will assert that the USMLE has information that the student participated in Optima review courses prior to taking a USMLE Step Examination, and that "this information, together with the date reported, raises concerns about the validity of the passing level scores reported to you for that Step administration."

In reading the typical initial USMLE letter in context, it most likely will appear from the letter that the investigation into whether the student's Step score will be deemed *indeterminate* will focus only on possible aberrancies or unexplained inconsistency. In support of the assertion of the possibility of making a finding of indeterminate scores, the USMLE will most probably cite the statistics of the student's scores, in context of the percentage of exposed and unexposed questions. Using these statistics, the USMLE will likely make a final assertion regarding the Step examination that the student's percent correct score on the exposed questions was higher than his percent correct scores on the unexposed questions, and/or that the average amount of time spent on the exposed

questions versus the unexposed questions was markedly different when compared with a group of other examinees.

## Representation of an USMLE examinee[7]

In a letter to a recent medical school graduate who attended Optima University and who took the Step 1 examination in 2007, the USMLE initially claimed that approximately 16% of Step 1 questions from the student's examination form were questions "subject to unauthorized reproduction and dissemination through Optima..." in its course materials. The USMLE relied on its alleged statistics that the student obtained 73.5% correct on "exposed" questions, versus 64.5% correct on "unexposed" questions. Additionally, the USMLE alleged that the student took 60 seconds to answer the "exposed" questions, versus 76 seconds to answer the "unexposed" questions.

## The doctor's response

The student, with the best of intentions, attempted to address the initial USMLE letter on the student's own, and submitted a letter or explanation on their own behalf. After all, the USMLE mission statement does state: "to assure fairness and equity to physicians...". The student also elected not to personally the hearing before the Committee on Score Validity, relying on the hope that the Committee would read the student's reply letter with supporting documentation and classify the student's questioned Step 1 score as valid.

In the student's initial response letter, submitted before consulting with an attorney about possible options, the student submitted attendance at the Optima test preparation course, an openly advertised course, in 2007 after one unsuccessful but close

---

[7] Some statistics have been altered to protect the identity of any student/doctor represented by the authors.

to passing first attempt of Step 1. The student chose to attend this course due to knowing other students who were also attending Optima.

In the student's response letter, the student further attempted to show the Committee on Score Validity that the percent correct on the 16% of exposed questions equaled 31.8 test items, as compared to the percent correct on the 16% of exposed questions for the comparison group which equaled 28.8 questions: for a difference of three (3) test questions. The doctor then continued the statistical analysis, including an analysis of the time spent on exposed v. unexposed questions, and concluded with the assertion that the 16% of exposed questions did not have a markedly great impact on the student obtaining an overall passing score.

The doctor also advised the Committee on Score Validity that on the first attempt at Step 1, before attending Optima, the student received a score which was about as close to passing as one could get. Likewise, the doctor advised the Score Validity Committee that research had discovered that, according to First Aid for Step 1, an individual who scores at a level which the doctor scored on his first attempt, has approximately an 80% chance of successfully passing on their second attempt.

In support of the request that the USMLE Committee on Score Validity validate the doctor's Step 1 score, the doctor also explained studying and successful passing of Step 2 without attending Optima, as well as attaching transcripts, Letters of Recommendation, NBME shelf scores, and residency rotation evaluations.

Because the doctor elected not to make a personal appearance, the USMLE Committee on Score Validity made its decision based only on the information submitted by the USMLE counsel, and on the response letter submitted by the doctor. The decision

that was made was a finding of "indeterminate" score on the Step 1 examination. After receiving the USMLE decision letter, the doctor contacted our firm to assist in an appeal of the decision. If the doctor had appeared before the Score Validity Committee, a transcript of the hearing would have been available. Having a transcript allows additional issues to be presented on appeal for score validation.

### USMLE Reasons for "Indeterminate Score" Decision

According to the decision letter from USMLE, the Committee on Score Validity allegedly considered the arguments presented by the doctor in the response letter. However, "after thorough review of the information presented, the Committee was unable to determine that there is a reasonable and satisfactory explanation for the difference in your Step 1 performance and timing on scored items believed exposed via Optima versus scored items for which there is no evidence of exposure." The letter also stated that "the Committee noted that it is the difference between your performance on the exposed subset of items versus your performance on the nonexposed subset that is a source of concern," rather than the scores of the comparison group, which is used by the Committee as a "context within which to view your performance differential."

The Committee also noted that the doctor's exposure to scored items prior to testing "could have made the difference in the pass/fail decision for this examination", noting that the doctor's percent correct on the 84% of the exam which was unexposed was "just barely at a level that would be considered 'passing' for that subset of items."

**APPEAL OF USMLE SCORE VALIDITY COMMITTEE DECISION:**

**Statistical Chart of Student Examinees and the USMLE Determination**

When filing an appeal of the USMLE decision to find the doctor's Step 1 examination score as "indeterminate", this firm utilized a statistical spreadsheet demonstrating the information known personally by the authors of this article, regarding individuals and their situation with the USMLE because of their attendance at Optima University.[8] As is evident by the chart, there does not seem to be a logical pattern as to why one student's score might be held to be "indeterminate" by the USMLE Committee on Score Validity, and another's score was validated by the USMLE Committee on Score Validity.

At first glance, it might appear that a student with an allegation of over 20% "exposed" question, or even as high as 32% "exposed" questions, might automatically have their score classified as "indeterminate", just for the simple fact that close to, or up to one-third of their entire Step examination is deemed to have been compromised and the student exposed to a large portion of the entire test questions.

However, upon review of the attached chart, it is clear that the USMLE Committee on Score Validity did validate one student's Step 2 CK score with an allegation of 30% exposed questions, and another student's Step 2 CK score with an allegation of 30% exposed questions. These step scores were found to be valid, rather than indeterminate, despite a percentage correct difference of 88% v. 67% on exposed v. unexposed questions for one student, and a percentage correct difference of 81% v. 68% for the second student. In addition, these two Step 2 CK scores were validated even with

---

[8] See Student Score Chart at the end of this Article.

a timing differential of 56 seconds v. 80 seconds on exposed v. unexposed questions, and 60 seconds v. 71 seconds on exposed v. unexposed questions for the second student.

In addition, a student in a similar situation with the example doctor, is also now in the doctor's residency, had the Step 1 score validated with 30% exposed questions, of which the doctor earned 81% correct on exposed questions and 68% correct on unexposed, with a time difference of 60 seconds on exposed questions versus 71 seconds on the unexposed questions. This student made a personal appearance before the USMLE Committee on Score Validity, and the student's score on the Step 1 examination was validated.

Likewise, for the two students who were facing only an allegation of 17% exposed questions and 14% exposed questions on their step examinations, their scores were also validated by the USMLE Committee on Score Validity, following their personal appearance before that Committee.

As an example, an analysis of Student F against Student G, clarifies the seemingly lack of standard guidelines used by the USMLE Committee on Score Validity, and makes it appear as though any student who chose not to make a personal appearance automatically had their scores labeled as "indeterminate", even if their percentage of alleged exposed questions was relatively low. This conclusion is derived by simply comparing the facts of Student F against the facts of Student G as follows:

**Student F:**

| | |
|---|---|
| Percentage of Exposed Questions: | 15% |
| % Correct on Exposed Questions: | 83% |
| % Correct on Unexposed Questions: | 67% |
| Time spent on Exposed Questions: | 43 seconds |
| Time spent on Unexposed Questions: | 74 seconds |
| Personal Appearance: | Yes |
| Score Validity Decision: | Validated |

**Student G:**
| | |
|---|---|
| Percentage of Exposed Questions: | 16% |
| % Correct on Exposed Questions: | 74% |
| % Correct on Unexposed Questions: | 64% |
| Time spent on Exposed Questions: | 59 seconds |
| Time spent on Unexposed Questions: | 76 seconds |
| Personal Appearance: | No |
| Score Validity Decision: | Indeterminate |

On its face, a good faith argument could be made that the only seemingly meaningful difference between the two students is the fact that Student F made a personal appearance before the Committee on Score Validity, whereas Student G elected to submit a written response and not make a personal appearance before the committee.[9] This is supported by the observations that Student F received a percentage correct of 16% higher on the exposed v. the unexposed questions, whereas Student G only received a percentage correct of 10% higher on the exposed v. unexposed questions, and Student F allegedly answered the exposed questions 29 seconds faster than the unexposed, but Student G only answered the exposed questions 17 seconds faster than the unexposed.

Granted, there are arguably other reasons why the USMLE Committee on Score Validity validated Student F's score, and found Student G's to be "indeterminate". This could very likely be due to the personal presentation made by Student F, and the student's convincing explanation to the committee as to why the student's score should be validated.

As such, in order to allow Student G the same courtesy as later students contacted by the USMLE regarding the validity of their scores after attendance at Optima, the USMLE Composite Committee should, at a minimum, refer Student G's case back to the

---

[9] An in-depth analysis of the due process implications regarding the information known by Student G and his ability to make a knowing and intelligent election of non-appearance is discussed in more detail, infra.

USMLE Committee on Score Validity for additional review. This was one of the many arguments made in Student G's Appeal. Another was to validate the score.

## Argument and Authorities

### A. Generally

As eloquently pointed out by Aaron E. Goldschneider, "we live in an age in which standardized testing has become the principal means to judge the capabilities, educational level, and potential of young Americans."[10]  In response to students' efforts to gain advantages on standardized tests either through sophisticated test-prep coaching or various forms of cheating, testing agencies have responded by reserving the right to invalidate scores they consider suspect, whether it is from evidence of actual cheating, or by evidence that a test taker may have been privy to leaked test questions or information gathered from prior tests.[11]

Because courts have traditionally given great deference to testing agencies, a test taker who wishes to challenge a testing agency's intention to invalidate test scores faces an extremely burdensome task. For example, as noted by Goldschneider, testing agencies have for many years been locked in intellectual property battles with traditional test prep organizations such as Kaplan and Princeton Review, and they have accused them of improperly using copyrighted materials from previous exams and even sending in dummy test-takers with the express purpose of copying questions from exams.[12]

On appeal, Student G did not question the USMLE's Committee on Score Validity overriding concern that the test score must reflect the doctor's knowledge and

---

[10] "Cheater's Proof: Excessive Judicial Deference toward Educational Testing Agencies May Leave Accused Examinees No Remedy to Clear Their Names", 2006 BYU Educ. & Law Journal 97 (2006).
[11] Id. at 100.
[12] See, e.g., *Educ. Testing Serv. v. Stanley Kaplan Educ. Ctr.* 965 F. Supp. 731, 734-35 (D. Md. 1997).

competence of the material covered in the Step 1 examination, and the doctor wished to cooperate fully and completely to answer the USMLE's questions regarding the doctor's knowledge of the material covered.

Student G requested that the USMLE Composite Committee validate the Step 1 score, or, as a lesser alternative, utilize the provisions of the *USMLE Policies and Procedures Regarding Indeterminate Scores* which allows a remand back to the USMLE Committee on Score Validity and refer the doctor's case back to the Score Validity Committee for reconsideration, given the circumstances of Student G's non-appearance before the Score Validity Committee.

Student G truly desired to show the committee possession of the knowledge and competence required for the USMLE Committee on Score Validity to validate the score on Step 1 without a ruling of "indeterminate" score.    In this endeavor, Student G is supportive of the proposition that the purpose of the USMLE examinations is integral to each state's effort to ensure that only competent and qualified individuals are licensed to practice medicine.

On appeal, Student G proposed to the USMLE Committee on Score Validity that he is qualified and competent to continue his pursuit of becoming licensed to practice medicine.  His passing score on Step 1 was the result of several factors, including his different approach to studying for the examination, and not directly the result of his attendance at the Optima course.

## B. Issues for Appeal

The two criteria for lodging an appeal of the decision of indeterminate score made by the Committee on Score Validity are:

I.    the Committee on Score Validity did not act in compliance with applicable USMLE policies and/or procedures **OR**

II.   that the decision of the Committee on Score Validity was clearly contrary to the weight of the evidence before it.

Given the fact that we have not received any transcript or information exchanged during the Committee on Score Validity's consideration of Student G's case (since there was no personal appearance), there is therefore a lack of evidence known to Student G or counsel that the Committee on Score Validity did not act in compliance with applicable USMLE policies and/or procedures.

Therefore, also given the fact that the Composite Committee has the authority to either outright reverse the decision of indeterminate score made by the Committee on Score Validity OR remand the case back to the Committee on Score Validity for further consideration, it was Student G's request on appeal that, at a minimum, the USMLE Composite Committee should refer the case back to the USMLE Committee on Score Validity.

## C. Burden of Proof – "clearly contrary to the weight of the evidence"

The phrase "clearly contrary to the weight of the evidence" is generally used to signify that proof on one side is greater than on the other side. In the situation with the appeal of Student G, given the inconsistent decisions handed down by the Score Validity Committee, the fact that Student G was not clearly aware of the importance of a personal appearance before the Score Validity Committee, the statistical analysis of the information regarding the student's Step 1 score, and the fact that the USMLE has

conceded that the doctor did in fact have a passing score on the 84% of the Step 1 examination which there was no evidence of exposure, an argument was made that the evidence supporting validation of the student's Step 1 score is greater than, or at least equal to, the evidence which supports a finding of "indeterminate" score. Therefore, this case, at a minimum, should be remanded back to the Score Validity Committee for reconsideration, and allow the doctor to make a personal appearance.

### D. Inappropriate Punishment & Inconsistent Decisions

The punishment handed down to Student G, i.e. the finding of "indeterminate" Step 1 score, following complete cooperation with the USMLE and the decision to not make a personal appearance, appears harsh compared to other students similarly situated. Clearly the USMLE Committee on Score Validity has previously, when hearing from a student in person and having the opportunity to hear how the student prepared for the examination, and how there was no unfair advantage for attending Optima, classified the student's score as valid, even when as much as 30% of the examination consisted of "exposed" questions.

The punishment of holding the doctor's score as indeterminate is further inappropriate punishment because the doctor took Step 1 in September 2007, over 2 years ago, and the score is now being reviewed after the doctor has already successfully passed the remaining step examinations, and is now months into a residency program. This finding of "indeterminate" score was made, even though Student G's examination consisted of only 16% "exposed" questions, and the doctor received a passing score on the 84% of the examination which is not alleged to have been exposed.

It must also be brought to attention that the alleged 16%" exposed" group is by no means a certainty. The findings by the Score Validation Committee clearly state in both letters in regard to the 16% exposure **"may have been** subject to unauthorized reproduction and dissemination through Optima prior to 2007." It appears by this wording the USMLE officials are not sure that the questions were exposed or not. This point cannot be emphasized enough since the statistical data that was used in concluding the doctor's score to be classified as indeterminate was based solely on these numbers.

The doctor only sought from Optima the claims that were being advertised back in 2007. For the doctor to have to take a validation exam for material learned in basic sciences almost 4-5 years ago is severe. The pressure to pass the validation exam now in the 6 months period would be enormous for any examinee placed in this unfortunate position. Understanding that a permanent indeterminate reading on a USMLE transcript could have serious repercussions and possibly jeopardize an applicant's opportunities in obtaining a medical residency of his or her choice or just as importantly a state licensure is a cause of concern.

In the doctor's appeal, it was argued that as the doctor explained in the initial response letter to the Committee on Score Validity, the doctor used other means to study for this Step 1 examination. This is evident as the doctor passed the exam with a lower "exposure" than other examinees who's scores were validated by the Score Validation Committee. To score only the "unexposed" subset as the sole means of determination of passing or failing gives students who received a higher percent of "exposed" an unfair advantage. They are graded on lesser subset of items then examinees that had smaller

"exposed" percentage. Fairness to all examinees is undermined by taking this above mentioned approach.

From the undersigned's personal representation of several students before the USMLE Committee on Score Validity, the following facts are undisputed regarding the following students, **who made a personal appearance**:[13]

> Student A: Step 1- 18% exposed - Validated
> Student A: Step 2 – 32% exposed - Indeterminate
> Student B: Step 2CK – 30% exposed – Validated
> Student C: Step 1 – 15% exposed – indeterminate
> Student D: Step 1- 31% exposed – indeterminate
> Student E: Step 1 - 29% exposed – Validated
> Student F: Step 1 - 15% exposed – Validated

Further, the undersigned represented two other students in addition to Student G, which include the decisions of the following students, who DID NOT make a personal appearance:

> Student G: Step 1 - 16% exposed – Indeterminate – appeal filed
> Student H: Step 1 - 14% exposed – Indeterminate – appeal filed
> Student I: Step 1 - 15% exposed – Indeterminate – appeal filed

A prima facie case appears to be that students who were allowed to make a personal appearance, and/or were not discouraged from doing so by the USMLE seem to be treated much more fairly than students who elected to just write a letter to the USMLE on their own behalf. This is interesting because the authors have received anecdotal evidence that students have been discouraged in hiring counsel and making a personal appearance.

---

[13] Some percentage and statistics have been altered to protect the identity of any student.

## Due Process Considerations Argued on Appeal

Arguably, the USMLE did not act in compliance with its policies and procedures and as such Student G was not afforded the fundamental fairness that requires the opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong* v. *Manzo,* 380 U. S. 545, 552 (1965).

Student G was not afforded fairness in the notice from the USMLE of its review regarding the validity of the student's Step 1 passing score. In its initial letter to Student G, USMLE did not properly inform the doctor of the options before the USMLE Committee on Score Validity conducted a review of the doctor's file, without a personal appearance. The initial USMLE notification letter gave Student G a very vague explanation of what rights could be asserted, including the right to be heard.

Although the USMLE letter stated that the doctor had "the opportunity to submit information relevant to the Committee's assessment of the validity of your scores, and have the opportunity to appear personally before the Committee, and to be accompanied by counsel, if you so wish", it did not give any explicit or clear directions or dates on how the doctor could exercise such options. Specifically, the letter did not provide the following information:

- the process by which the doctor may inform the USMLE of any decision to appear in person at the Committee's meeting
- an affidavit or option form that the doctor may sign to exercise the options or to inform USMLE of the doctor's intentions
- a deadline by which the doctor may inform USMLE of a decision to appear in person at the Committee's meeting
- a deadline for the submission of written information for an in-person meeting versus a deadline for submission of written information for non-in-person meeting
- whether the doctor had waived the right to an in-person meeting after the Committee's meeting, or by submitting written information by a date certain.

On appeal, the authors argued that Student G did not receive proper communication from USMLE on the above listed options. In less than a week, Student G submitted a response letter to USMLE. In it, the doctor did not explicitly express a desire to appear-in-person, nor did the doctor explicitly waive any right to appear-in-person at the USMLE Committee on Score Validity's meeting. At no point after receipt of this letter, did the USMLE ask or remind the doctor of the right to appear in-person, or in-person with an attorney at the Score Validity meeting. Nor did the USMLE provide Student G clear instructions on how to elect this right to appear, with or without an attorney.

By failing to properly inform the doctor of all rights and the proper manner in which the doctor may exercise such options, the USMLE did not provide the doctor an opportunity to be heard at a meaningful time and in a meaningful manner. Had the doctor been adequately advised that if an election was made not to appear personally in front of the Score Validity Committee that the doctor would never have an opportunity, the doctor would arguable have appeared in person. Therefore, Student G did not make a knowing and intelligent waiver, on the record, of the right to make a personal appearance before the Score Validity Committee.

The USMLE also did not provide the doctor with ample amount of time to submit proper information and contact counsel for representation. Student G had less than a month to obtain counsel and/or prepare for a meeting, and merely two weeks to respond in writing. Upon information and belief, the doctor was unsuccessful in attempts to contact the USMLE to find out further information as to available options prior to making an initial decision to write a letter to the Score Validation Committee. The doctor was

never aware that a written response and subsequent ruling would prevent the doctor from making an appearance at a later time if the decision by the Score Validity committee was negative.

Further, these procedures were not consistent with the procedures allocated to other examinees whose scores were under review by the USMLE. Our firm is aware that other examinees were provided with the above listed information and some were provided more time to respond and prepare for the Committee's meetings than others. For instance, while Student G was afforded merely two weeks to respond to the USMLE's investigation, student B was given proper notice of informing the USMLE of the student's decision to appear in-person, an Option Sheet to sign memorializing this decision, three months to prepare for an in-person meeting, more than a month to submit a response for a non-in-person review, and the other above listed information.

For detailed information on what the inconsistencies in the USMLE notification to students and the procedural posture which followed, see Inconsistency Chart at the end of this article. This chart illustrates the significant differences from one student to the next, which suggests that the USMLE did not act in compliance with its policies and procedures.

Further, such discrepancies in the USMLE's procedures on how examinees under investigation are treated are inconsistent and contrary to the notion of fundamental fairness required of agencies such as state medical boards as set out in federal case law. (See *Mathews v. Eldridge, 424 U. S. 319, 333 (1976)* , *Armstrong* v. *Manzo,* 380 U. S. 545, 552 (1965)).

### Fair Play and Substantial Justice

Although contrary to traditional American notions of fair play and substantial justice, the accused examinee bears the full burden of proving their own innocence by a standard of proof that is unclear and poorly defined. The USMLE and an accused examinee are in unequal bargaining positions. The USMLE exercises absolute power over the validation of an examinee's scores on the USMLE step examinations, and ultimately over the fate of the examinee's ability to obtain professional medical licensing in the United States.

No one questions the USMLE's Committee on Score Validity overriding concern that an examinee's test scores must reflect his or her knowledge and competence of the material covered in the examination(s). However, the USMLE Committee on Score Validity must also be aware of an examinee's concern that there are times when a testing agency's harsh determination can affect a person's entire future. An example of this is *In re Singh*, 576 S.E.2d 899, 900 (Ga. 2003), in which a Georgia Bar examinee contested the way examiner ACT rounded and scaled his raw scores on the Multistate Bar Exam, leaving him with a 269.9 total score, short of the 270 points he needed for admission to the bar. The Georgia Supreme Court simply found that "applicant Singh achieved a score of 269.9, not a passing score." Id.

In *Dalton v. Educational Testing Service (ETS)*, 87 N.Y. 2d 384 (N.Y. Ct. App. 1995), the plaintiff Dalton sued the ETS for failing to release his second SAT score. On his second SAT, Dalton scored 410 points higher than on his first attempt. Because Dalton's score increased by more than 350 points, his test results fell within Defendant ETS category of "Large Score Differences" or "discrepant scores". In accordance with

ETS policy, members of ETS reviewed Dalton's answers sheets, and found "disparate handwriting". Dalton was notified of this decision, and elected to provide evidence to support the validity of his second SAT score. The ETS ultimately continued to question the validity of Dalton's second score, so Dalton's father filed suit against ETS on his behalf. After a 12 day non-jury trial, the trial court found that ETS failed "to make rudimentary efforts to evaluate or investigate the information" furnished by Dalton, and thus concluded that ETS failed to act in good faith in determining the legitimacy of Dalton's score, thereby breaching its contract with Dalton[14]. As a remedy for the contractual breach, the trial court ordered ETS to release Dalton's second SAT score.

Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance. See *Val Valkenburgh, Nooger & Neville v. Hayden Publ. Co.*, 30 N.Y.2d 34, 45, cert denied 409 U.S. 875. Encompassed within the implied obligation of each promisor to exercise good faith are any promises which a reasonable person in the position of the promise would be justified in understanding were included, which embraces a pledge that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive fruits of the contract." *Kirke La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79, 87. Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion. See *Tedeschi v. Wagner College*, 49 N.Y.2d 652, 659.

Following appeals in the *Dalton* case, the New York Court of Appeals decided that the proper remedy was not to require Defendant ETS to release Dalton's test score, but rather, was to require ETS to make a good faith consideration of the material

---

[14] By accepting ETS' standardized form agreement when he registered to the SAT, Dalton entered into a contract with ETS. See *AEB &. Assocs. Design Group v. Tonka Corp.*, 853 F. Supp. 724, 732.

submitted by Plaintiff, stating that "public policy dictated that the court decline to interfere with the exercise of academic discretion." *Dalton* at 384.

It is understandable that public policy suggests concerns against directing a testing agency to release a questioned score. This is based, in part, on the notion that when a standardized testing service reports a score, it is certifying to the world that the test-taker possesses the requisite knowledge and skills to achieve the particular score. Like academic credentials, if courts were to require testing services to release questioned scores, "the value of these credentials from the point of view of society would be seriously undermined." *Matter of Olson v. Board of Higher Educ.* 49 N.Y.2d 408, 413. This public policy consideration was affirmed in *Dalton*, when the court states: "Given the reliance that students, educational institutions, prospective employers and other place on the legitimacy of scores released by ETS, requiring challenged scores to be reported would be contrary to the public interest and exceed the scope of ETS' promised performance." *Dalton* at 394.

Therefore, notions of fair play and substantial justice should make the USMLE Composite Committee recognize that the classification of indeterminate score made by the Committee on Score Validity when the student did not personally appear before it, even though the percentage of exposed questions is on the low end of other students, does not appear to be consistent with recent prior decisions by the Score Validity Committee wherein students' scores were held to be valid, with a much higher percentage of "exposed" questions. Based on this, it was proposed on appeal, that the USMLE Composite Committee has a duty to act in good faith and validate Student G's Step 1

score, or at a minimum, refer this case back to the Committee on Score Validity for reconsideration, at a hearing where the doctor can be present.

Because a primary obligation of USMLE as administrator of the USMLE Step 1, Step 2 CK, and Step 2 CS examinations is to certify that released scores accurately reflect the performance on the test by the identified test taker, the USMLE and NBME has established procedures that, presumably, aim to balance the harms to institutions and other medical school graduates of the release of possibly invalid scores against the detriment to students whose scores are challenged as potentially invalid or indeterminate.

The procedures established by the USMLE on their face appear to be fair, by allowing test takers the opportunity to present evidence in support of validation of their test scores.    However, in the present case, the concept of fundamental fairness necessitates validation of the Step 1 score based on the above and attached, or at a minimum, that the Composite Committee refer the case of Student G back to the USMLE Committee on Score Validity for reconsideration, and allow the doctor the opportunity to appear in person to address concerns about the validity of his Step 1 score.

### The Benefits of Professional Advocacy Before the Licensing Board: Eight Reasons to Hire an Attorney to Handle Your USMLE Appeal

If the USMLE or any other testing agency has called the validity of your test scores into question, either in a situation like the Optima University attendees, or through some allegation of misconduct, it is wise to consider the option of obtaining competent counsel to represent you before any hearing committee, and especially on appeal. Typically, you might receive a letter from the USMLE informing you that you have a right to a hearing on the issue or allegation, but you must usually request the hearing in writing.   In addition, if you want to present any additional evidence, you will probably

need to request a hearing. If you do not appear personally at a hearing, and the USMLE invalidates your step examination score, you will want to consider appealing this decision. At this point, the following top eight reasons you need an attorney may be helpful:

### #1: Knowing the System

Any process is easier when you know the system. Obtaining an attorney means you have the advantage of their previous experience. Your attorney will know where to be, who to talk to, and how to manage your appeal and any hearing. Try to find out how familiar your prospective attorney is with the USMLE appeal process. Does your attorney represent clients before similar boards or agencies on a regular basis? Do you really want to be making decisions on your own about what evidence to present in your appeal?

### #2: Organize Your Appeal

Properly preparing for your appeal and any appeal hearing is arguably the most important thing you can do. In some cases this can include gathering and presenting extensive amounts of materials to be presented to the USMLE as evidence or exhibits. In some cases it is also important to obtain witnesses, both lay and expert, who can attest to your character or your fitness or both. In most cases, the use of an expert should also be considered, especially when appearing before the USMLE Committee on Score Validity. An attorney will be able to properly organize your defense by helping you and any witnesses to be prepared for the possible questions that will be asked in your hearing. If you have never done this before, how do you know what questions any board member, hearing panel member, or the board staff attorney will ask you and what is the best way

to answer the tough questions? Further, an attorney will also know what kinds of evidence will be most appreciated by the USMLE.

### #3: Personal Relationships

One of the greatest advantages an attorney can offer you is the personal relationships he or she has built with the staff, attorneys, and USMLE committee panel members. Obtaining an attorney who is familiar with the people involved in this process is very important. A personal relationship with the USMLE staff attorney will help streamline the flow of information between parties, facilitate stipulations and agreements as to facts and help create a seemingly less hostile environment for your appeal. The professional relationship between the USMLE and your attorney built on handling cases together can act as a doorway to bring about a fair and desirable outcome.

### #4: Hiring an Attorney Demonstrates that You Take This Hearing Seriously

A hearing in front of the USMLE Committee on Score Validity or the USMLE Committee on Irregular Behavior is a serious matter, just as any appeal of any USMLE decision is an equally serious matter. The USMLE is charged with the mandate to protect the public from potential doctors who do not have the fitness or the requisite competence and knowledge to engage in their profession. Not only will an attorney help prepare your appeal or defense, the attorney's involvement will help to show the USMLE that you take the matter seriously, you do possess the requisite knowledge and competence in the subject tested by the USMLE examination, and that you are taking a proactive approach.

### #5: Emotion is a Factor from Start to Finish

Appealing a decision made by either the USMLE Committee on Score Validity or the USMLE Committee on Irregular Behavior can be stressful, especially in issues

pertaining to character and fitness or allegations of misconduct or cheating. This process will lead you to feel overwhelmed when you first receive the notification letter of a negative decision against you, and that feeling will not go away. You have probably spent years in undergraduate and graduate school, and your future career and livelihood is being decided on facts that may or may not have been within your control. Having an attorney help you appeal any negative USMLE decision can make sure the stress and the emotions involved do not harm the preparation that is necessary to properly present your side of the story on appeal.

# Exhibit #11

Mathew Thomas, Jr., MD
May 8, 2013

May 8, 2013

Re: Mathew Thomas, Jr. M.D./Request for a Waiver

USMLE/ECFMG ID no. 0-633-396-7

Attn: Mr. Walter Ramos, JD

Dear Mr. Ramos,

    I am currently in the process of completing all of my required Step exams in order to receive a certification through ECFMG, but due to certain circumstances I am in need of an extension to their 7-year rule. Please accept this submission for the purpose of receiving your assistance in receiving a waiver to the 7-year rule, whereby an applicant must pass all Step exams within 7 years of passing their first Step exam, as per the USMLE and ECFMG rules. I have recently requested the waiver through ECFMG and was declined because they felt I did not have a "compelling reason" for the request. My reason was simply that the facts I presented where beyond my control. I would like the committee to take into account the following series of events that took place regarding my file. You will see that my situation is extremely unique and the series of these events have been unjustifiable. As the records show, I successfully passed my Step 2CK exam in December 2007, which granted me my ECFMG certification, but due a situation beyond my control it was rescinded.

    The facts are as follows, I registered for my Step 3 exam in mid 2009. On July 27, 2009, I was sent a letter stating that my registration for the Step 3 exam was cancelled due to an investigation regarding Optima University. The letter from the Federation of State Medical

Mathew Thomas, Jr., MD
May 8, 2013

Boards stated that my Step 3 application, "has been cancelled until this matter is resolved." At that point, July 27, 2009 was the official date my file was placed on hold pending the investigation, and my access to OASIS was locked. This meant that I could not register for any USMLE Steps.

On December 16, 2009, I attended a hearing in front of the Committee of Score Validity to give testimony in an effort to validate my Step 2CK score. On February 17, 2010, I received the outcome of that hearing that my score for Step 2 would not be validated and was told that I had until June 1, 2010 to submit my appeal. As anyone in my position would do I submitted an appeal in June of 2010. USMLE/NBME responded to my appeal on August 2010 and stated that their decision to not validate my score was upheld. I was advised to take the validation exam. In October 2011, I received notification that I did not receive a passing score on my validation exam and now could register to retake the Step 2CK via OASIS.

As the timeline shows, due to the loss of time because of the investigation, the hearing process, the appeal process and the validation exam, I lost over 2 years within my 7 year window to complete all my steps.

The July 2009 letter from the Federation of the State Medical Board stated that my registration would be cancelled until the matter was solved. According to the attached documents the matter was not resolved until October 2011. The process from beginning to end was from July 2009 through October 2011, therefore not allowing me to have the applicable time to take and pass all the exams within 7 years. These occurrences were beyond my control and I should not be held accountable for the time lost.

Mathew Thomas, Jr., MD
May 8, 2013

In addition, I continue to believe that there were many policies that were violated within the USMLE and ECFMG process during my investigation, such as the violation of the policy and procedures regarding indeterminate scores. <u>Section B, procedure 1, subsection (1),</u> does not comply with my scores. During my attempts, my pattern of scores has increased with each attempt. In subsection (2) my current score does not show an "unexpectedly large increase" over the most recent scores of the same step. In fact, my previous score was 2 points shy of passing.

<u>Section B Procedure 2 (a)</u> discusses the non uniformity of performance, but I did not "omit or answer randomly", as proven through my exam.

<u>Section B, Procedure 5,</u> states that "staff will notify the examinee of the withholding of scores and **will provide** the examinee with a description of any statistical analysis employed." At no time did I receive a statistical analysis description. According to a letter I received on August 25, 2010, by NBME/USMLE, it was clear that I did not receive a statistical analysis as stated in your policy. The August 25, 2010 letter, stated, "<u>while the calculation of averages may not be regarded as a complex statistical analysis</u> warranting a written report, the correspondence sent to you advised you a data source employed, the procedure applied and the results of calculation." With all due respect, I did not receive the procedure applied, data source or a statistical analysis.

My request for a statistical analysis was also requested at my December 16, 2009 hearing. I requested numerous times to receive a summary of how the percentage was calculated and at no time was a response presented to me. Instead, I received a response from Dr. Dillon stating, that he thinks there was a "message behind this information." This is evident on pages 15-17 of my