# EXHIBIT 3

Confidential - Mathew Thomas, Jr., M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MATHEW THOMAS, JR.,      : NO.
Plaintiff                : 2:13-CV-03946-CMR
                         :
        vs.              :
                         :
NATIONAL BOARD OF        :
MEDICAL EXAMINERS and    :
EDUCATIONAL              :
COMMISSION FOR           :
FOREIGN MEDICAL          :
GRADUATES,               :
Defendants               :

                 - - -

          Friday, January 10, 2014

                 - - -

              CONFIDENTIAL
       Deposition of MATHEW THOMAS, JR.,
M.D. taken in the Offices of Golkow
Technologies, One Liberty Place, 1650
Market Street, Suite 5150, Philadelphia,
Pennsylvania, on the above date,
commencing at 9:35 a.m. before Lauren A.
Moore, Registered Merit Reporter and
Certified Realtime Reporter.

          GOLKOW TECHNOLOGIES, INC.

     877.370.3377 ph | 917.591.5672 fax

              deps@golkow.com

APPEARANCES:

MATHEW THOMAS, JR.
31 Roosevelt Avenue
Staten Island, NY 10314
dr.mathew.thomas.jr@gmail.com
-- Pro Se

HAMBURG & GOLDEN, P.C.
By: MAUREEN P. HOLLAND, ESQUIRE
1601 Market Street, Suite 3310
Philadelphia, PA 19103
215-255-8590
hollandmp@hamburg-golden.com
-- For the Defendant
National Board of
Medical Examiners

MORGAN LEWIS & BOCKIUS, L.L.P.
By: ELISA P. McENROE, ESQUIRE
1701 Market Street
Philadelphia, PA 19103
215-963-5917
emcenroe@morganlewis.com
-- For the Defendant
Educational Commission for
Foreign Medical Graduates

INDEX TO WITNESSES

| WITNESS | PAGE |
|---|---|
| MATHEW THOMAS, JR., M.D. | |
| By Ms. Holland | 11, 304 |
| By Ms. McEnroe | 233 |

INDEX TO EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE REFERENCED |
|---|---|---|
| EXHIBIT 1 | Complaint | 48 |
| EXHIBIT 2 | Amended Complaint | 48 |
| EXHIBIT 3 | USLME Polices and Procedures Regarding Indeterminate Scores Bates Stamp NBME 000401 through NBME 000405 | 160 |
| EXHIBIT 4 | Amended Notice of Deposition | 14 |
| EXHIBIT 5 | Order Granting Plaintiffs' Motion for Summary Judgment | 148 |
| EXHIBIT 6 | Mathew Thomas, Jr. Testing History, Bates Stamp NBME 00388 through NBME 00389 | 148 |
| EXHIBIT 7 | E-mail from Susan Deitch to Mathew Thomas, Jr., Bates Stamp NBME 00167 7/27/09 Letter from USLME to Mathew Thomas, Jr. Bates Stamp NBME 00197 through NBME 00198 | 149 |

INDEX TO EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE REFERENCED |
|---|---|---|
| EXHIBIT 8 | E-mail from Mathew Thomas, Jr. to Susan Deitch, Bates Stamp NBME 00132 and NBME 00133 | 150 |
| EXHIBIT 9 | E-mail from Mathew Thomas, Jr. to Susan Deitch, Bates Stamp NBME 00134 and NBME 00135 | 157 |
| EXHIBIT 10 | E-mail from Susan Deitch to Mathew Thomas, Jr., Bates Stamp NBME 00159 9/15/09 Letter from USLME to Mathew Thomas, Jr. Bates Stamp NBME 00199 through NBME 00203 | 159 |
| EXHIBIT 11 | E-mail from Mathew Thomas, Jr. to Susan Deitch, Bates Stamp NBME 00158 | 160 |
| EXHIBIT 12 | E-mail from Susan Deitch to Mathew Thomas, Jr., Bates Stamp NBME 00156 | 161 |
| EXHIBIT 13 | E-mail from Mathew Thomas, Jr. to Susan Deitch, Bates Stamp NBME 00136 through NBME 00137 | 148 |
| EXHIBIT 14 | FedEx Shipment E-mail Confirmation, Bates Stamp NBME 00153 | 162 |
| EXHIBIT 15 | E-mail from Mathew Thomas, Jr. to Susan Deitch., Bates Stamp NBME 00138 through NBME 00139 | 162 |
| EXHIBIT 16 | E-mail from Susan Deitch to Mathew Thomas, Jr., Bates Stamp NBME 00150 through NBME 00151 | 148 |

INDEX TO EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE REFERENCED |
|---|---|---|
| EXHIBIT 17 | E-mail from Mathew Thomas, Jr. to Susan Deitch, Bates Stamp NBME 00148 through NBME 00149 | 148 |
| EXHIBIT 18 | E-mail from Janet Carson to Susan Deitch, Bates Stamp NBME 00140 through NBME 00141 | 148 |
| EXHIBIT 19 | E-mail from Janet Carson to Mathew Thomas, Jr., Bates Stamp NBME 00142 through NBME 00144 | 166 |
| EXHIBIT 20 | E-mail from Emilie Babcox to Mathew Thomas, Jr., Bates Stamp NBME 00145 and NBME 00147 | 167 |
| EXHIBIT 21 | 12/16/09 Transcript of Mathew Thomas, Jr. | 28 |
| EXHIBIT 22 | E-mail from Susan Deitch to Mathew Thomas, Jr., Bates Stamp NBME 00130 through NBME 00131 | 172 |
| EXHIBIT 23 | E-mail from Mathew Thomas, Jr. to Susan Deitch, Bates Stamp NBME 00127 through NBME 00129 | 173 |
| EXHIBIT 24 | 2/17/10 Letter from USMLE, Bates Stamp NBME 00204 through NBME 00207 | 174 |
| EXHIBIT 25 | E-mail from Mathew Thomas, Jr. to Susan Deitch, Bates Stamp NBME 00126 | 178 |

Confidential - Mathew Thomas, Jr., M.D.

---

Page 6

1          INDEX TO EXHIBITS
2
                        PAGE
3    EXHIBIT      DESCRIPTION        REFERENCED
4    EXHIBIT 26  E-mail from Mathew Thomas, Jr.
                 to Susan Deitch, Bates Stamp
5                NBME 00390 through NBME 00392  178
6    EXHIBIT 27  E-mail from Emilie Babcox to
                 Susan Deitch and Janet Carson,
7                Bates Stamp NBME 00398 through
                 NBME 00400         180
8
9    EXHIBIT 28  6/24/10 Appeal Letter,
                 Bates Stamp NBME 00113
10               through NMBE 00120      180
11   EXHIBIT 29  8/25/10 Letter from USMLE to
                 Mathew Thomas, Jr., Bates Stamp
12               NBME 00121 through NBME 00125  181
13   EXHIBIT 30  Step 2 CK Scores,
                 Bates Stamp NBME 00152     130
14   EXHIBIT 31  E-mail from Amy Buono to
                 Janet Carston, Bates Stamp
15               NBME 00111 through NBME 00112  183
16   EXHIBIT 32  E-mail from Amy Buono to
                 Mathew Thomas, Jr., Bates Stamp
17               NBME 00108 through NBME 00110  185
18   EXHIBIT 33  E-mail from Amy Buono to
                 Mathew Thomas, Jr., Bates Stamp
19               NBME 00104 through NBME 00107  148
20   EXHIBIT 34  E-mail from Amy Buono to
                 Mathew Thomas, Jr., Bates Stamp
21               NBME 00100 through NBME 00103  186
22
23
24

Page 8

1          INDEX TO EXHIBITS
2
                        PAGE
3    EXHIBIT      DESCRIPTION        REFERENCED
4    EXHIBIT 44  E-mail from Mathew Thomas, Jr.
                 to Amy Buono, Bates Stamp
5                NBME 00040         148
6    EXHIBIT 45  E-mail from Mathew Thomas, Jr.
                 to Amy Buono, Bates Stamp
7                NBME 00038 through NBME 00039  148
8    EXHIBIT 46  E-mail from Amy Buono to
                 Mathew Thomas, Jr., Bates Stamp
9                NBME 00033         148
10   EXHIBIT 47  E-mail from Mathew Thomas, Jr.
                 to Amy Buono, Bates Stamp
11               NBME 00035 through NBME 00037  148
12   EXHIBIT 48  E-mail from Amy Buono to
                 Mathew Thomas, Jr., Bates Stamp
13               NBME 00031 through NBME 00032  148
14   EXHIBIT 49  Comparison of Step 2 Forms,
                 Bates Stamp NBME 00030,
15               NBME 00027, NBME 00013
                 through NBME 00014      148
16
17   EXHIBIT 50  10/17/11 Letter from USMLE,
                 Bates Stamp NBME 00026     148
18   EXHIBIT 51  E-mail from Amy Buono to
                 Mathew Thomas, Jr., Bates Stamp
19               NBME 00015 through NBME 00020  148
20   EXHIBIT 52  12/19/12 Letter from
                 Mathew Thomas, Jr., Bates Stamp
21               NBME 00005 through NBME 00008  209
22
23
24

Page 7

1          INDEX TO EXHIBITS
2
                        PAGE
3    EXHIBIT      DESCRIPTION        REFERENCED
4    EXHIBIT 35  E-mail from Amy Buono to
                 Mathew Thomas, Jr., Bates Stamp
5                NBME 00095 through NBME 00099  148
6    EXHIBIT 36  E-mail from Amy Buono to
                 Mathew Thomas, Jr., Bates Stamp
7                NBME 00089 through NBME 00093  148
8    EXHIBIT 37  E-mail from Amy Buono to
                 William Walsh, Bates Stamp
9                NBME 00088         148
10   EXHIBIT 38  E-mail from Amy Buono to
                 Mathew Thomas, Jr., Bates Stamp
11               NBME 00082 through NBME 00087  148
12   EXHIBIT 39  E-mail from Amy Buono to
                 Mathew Thomas, Jr., Bates Stamp
13               NBME 00075 through NBME 00081  148
14   EXHIBIT 40  E-mail from Amy Buono to
                 Mathew Thomas, Jr., Bates Stamp
15               NBME 00068 through NBME 00074  148
16   EXHIBIT 41  E-mail from Amy Buono to
                 Mathew Thomas, Jr., Bates Stamp
17               NBME 00060 through NBME 00067  148
18   EXHIBIT 42  E-mail from Amy Buono to
                 Mathew Thomas, Jr., Bates Stamp
19               NBME 00050 through NBME 00059  148
20   EXHIBIT 43  E-mail from Amy Buono to
                 Mathew Thomas, Jr., Bates Stamp
21               NBME 00041 through NBME 00049  148
22
23
24

Page 9

1          INDEX TO EXHIBITS
2
                        PAGE
3    EXHIBIT      DESCRIPTION        REFERENCED
4    EXHIBIT 53  E-mail from Amy Buono to
                 Salvatrice Scerbo, Bates Stamp
5                NBME 00009 through NBME 00012  210
6    EXHIBIT 54  E-mail from Amy Buono to
                 Salvatrice Scerbo and
7                Mathew Thomas, Jr.,
                 Bates Stamp NBME 00004     148
8
9    EXHIBIT 55  E-mail from Mathew Thomas, Jr.
                 to Amy Buono, Bates Stamp
                 NBME 00003         148
10
11   EXHIBIT 56  E-mail from Amy Buono to
                 Rebecca Robichaud, Bates Stamp
                 NBME 00001 through NBME 00002  214
12
13
14   (Exhibits marked before commencement of
15   deposition.)
16
17
18
19
20
21
22
23
24

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Mathew Thomas, Jr., M.D.

## Page 10

INDEX TO EXHIBITS

EXHIBIT    DESCRIPTION         MARKED

EXHIBIT 57   Documents with regard to Request
             for Documents from Amended
             Notice of Deposition Numbers 1
             through 13            147

EXHIBIT 58   ECFMG Medical Education
             Credential Committee Meeting -
             Exception Requests, Bates Stamp
             ECFMG 000627 through
             ECFMG 000646          236

EXHIBIT 59   E-mail from Rebecca Robichaud to
             Bill Kelly, Bates Stamp ECFMG
             000607 through ECFMG 000609   247

EXHIBIT 60   Letter from ECFMG dated 5/1/13,
             Bates Stamp ECFMG 000613 through
             ECMFG 000614          254

EXHIBIT 61   Letter from ECFMG dated 4/25/13,
             Bates Stamp ECFMG 000615   254

EXHIBIT 62   USMLE and Appeals: The Hefty
             Burden Examinees Face in
             Appealing a USMLE Finding of
             Indeterminate Score or
             Irregular Behavior    293

## Page 11

MATHEW THOMAS, JR., M.D.,
after having been duly sworn, was
examined and testified as follows:
                * * *
            EXAMINATION
BY MS. HOLLAND:
    Q.  Dr. Thomas, can you
introduce yourself for the record using
your first name and last name?
    A.  My name is Mathew Thomas,
M-A-T-H-E-W, Thomas, T-H-O-M-A-S.
    MS. HOLLAND:  And, for the
record, my name is Maureen
Holland, H-O-L-L-A-N-D, and I'm
here representing the National
Board of Medical Examiners.
    MS. McENROE:  And I'm Elisa
McEnroe, M-C-E-N-R-O-E, here on
behalf of the Educational
Commission for Foreign Medical
Graduates.
BY MS. HOLLAND:
    Q.  Now, Dr. Thomas, I
understand that you are not currently

## Page 12

represented by counsel.  Is that correct?
    A.  That's correct.
    Q.  And have you ever been
deposed before?
    A.  Yes, I have.
    Q.  About how long ago was that?
    A.  I actually had a deposition
about a little over a month ago.
    Q.  So I won't go through all
the rules in excruciating detail, but,
basically, at a deposition it's important
that one person speak at a time so that
the court reporter who is here can take
down everything everyone is saying.
        It's also important to give
audible verbal responses to questions, so
instead of nodding, make sure to say the
word yes or instead of shaking your head,
make sure to say the word no.
    A.  Okay.
    Q.  If you have any questions
about any of the questions that are asked
to you, if any of the questions seem
unclear, just simply ask for

## Page 13

clarification on that question, and we'll
be happy to clarify the question for you.
    A.  Okay.
    Q.  And it's perfectly fine to
take breaks during the deposition.  Just
let us know if you'd like to take a break
before our next question.  In other
words, while a question is pending we
don't want to say, all right.  Let's take
a ten-minute break.
        Do you understand everything
I said so far?
    A.  I do.
    Q.  And are you on any
medications that impair your memory,
speech or ability to concentrate today?
    A.  No.
    Q.  Is there any other reason
why you can't give truthful, accurate and
complete testimony today?
    A.  I did have one trauma
Sunday, slip and fall, hit my head, but I
don't think it will affect.
    Q.  Are you on any medications

4 (Pages 10 to 13)

Confidential - Mathew Thomas, Jr., M.D.

Page 14

1    for the slip and fall?
2         A.   No.
3         Q.   And you do understand that
4    you are under oath currently?
5         A.   I do.
6         Q.   And you understand your
7    obligation to tell the truth --
8         A.   I do.
9         Q.   -- today in your deposition?
10        A.   I do.
11        Q.   So, Dr. Thomas, you are
12   appearing here today pursuant to a notice
13   of deposition that was sent to you.  Is
14   that right?
15        A.   That is correct.
16        Q.   And in your exhibit book
17   that you have in front of you, I'm going
18   to ask you to turn to Exhibit 4, and
19   you're looking at the amended notice of
20   deposition.  Is that right?
21        A.   That is correct.
22        Q.   And on Exhibit 4 do you see
23   a list of items?  There are 13 items
24   enumerating things that we had asked to

Page 15

1    bring with you here today.  Is that
2    right?
3         A.   Yes.
4         Q.   Did you bring those items
5    with you?
6         A.   I did for most of them, and
7    I have a response to those that I do not
8    have.
9         Q.   Let's go through those in
10   turn then.  So starting with number one,
11   the score reports.  Did you bring those
12   with you today?
13        A.   I do have, I believe, more
14   of a list because I cannot access Oasis,
15   and I didn't keep all my score reports.
16   I have my score report from my 2000 -- my
17   Step 2, the pass.
18        Q.   Okay.
19        A.   I think I may have left that
20   in my car.  I had another binder with
21   other score reports in it.  I believe
22   that's in the car.  I'll have to bring
23   that back up to you.
24             MS. McENROE:  How about we

Page 16

1    take a quick break?  Let's go off
2    the record.
3         (A discussion was held off
4    the record.)
5         (A short break was taken.)
6    BY MS. HOLLAND:
7         Q.   Dr. Thomas, we took a short
8    break so that you could go down to your
9    car and retrieve some items.  I do want
10   to remind you that you're still under
11   oath.
12        A.   I understand.
13        Q.   I just want to go back to a
14   few things.  You said that you were
15   deposed about a month ago.  What was that
16   in reference to?
17        A.   That was for a car accident.
18        Q.   And are you a plaintiff or a
19   defendant in that lawsuit?
20        A.   I'm the plaintiff in that.
21        Q.   And where did that car
22   accident take place?
23        A.   New York City.  Manhattan.
24        Q.   Do you know the date?

Page 17

1         A.   November 12th, 2007, I
2    believe.
3         Q.   2007?
4         A.   I believe so.
5         Q.   Are you the plaintiff in any
6    other lawsuits?
7         A.   No.
8         Q.   Have you been in the past?
9         A.   Once in the past before
10   that.  It was another car accident.
11        Q.   And where was that one?
12        A.   That was in Queens, New
13   York.
14        Q.   And do you remember when
15   that was?
16        A.   It was in 2001, somewhere
17   around, first couple years in 2000.
18        Q.   And in what court did you
19   bring the first lawsuit, the one in
20   Queens?
21        A.   I believe it was through
22   Staten Island, but that case got
23   dismissed.
24        Q.   And did you sue in the name

Confidential - Mathew Thomas, Jr., M.D.

Page 18

1  Mathew Thomas, Jr.?
2      A.   Yeah.
3      Q.   And where did you bring the
4  second lawsuit that happened in New York
5  City?
6      A.   The second lawsuit started
7  out in New York City and then the lawyers
8  all changed the venue over to Staten
9  Island so, currently, it's pending there.
10     Q.   And did you have a lawyer
11 for -- that represented you in the
12 lawsuit connected to the Queens accident?
13     A.   Yes, I did.
14     Q.   Who was that lawyer?
15     A.   Matthew Santamauro.
16     Q.   And how about for the car
17 accident that happened in New York City?
18     A.   It was Louis Galgano.
19 Currently, it's John -- I have to check
20 my phone for the last name.  It's an
21 Irish name.
22     Q.   And how did you find those
23 lawyers for those lawsuits?
24     A.   The family lawyer is --

Page 19

1  Matthew Santamauro is a family lawyer,
2  and John I was referred, after I was
3  having issues with the other lawyer,
4  through co-workers.
5      Q.   When you say that Matthew
6  Santamauro was a family lawyer, what do
7  you mean by that?
8      A.   We've had other -- my uncle
9  is very good friends with him for all his
10 business needs so...
11     Q.   You also mentioned -- were
12 there any other lawsuits that you were a
13 party to?
14     A.   Not that I remember.
15     Q.   You also mentioned that on
16 Sunday, this past Sunday you were
17 involved in a slip and fall?
18     A.   Yes.
19     Q.   Where did that occur?
20     A.   In front of my house in
21 Staten Island.
22     Q.   And can you tell us whether
23 you sought any medical treatment?
24     A.   I did.  I went to the

Page 20

1  emergency room at Staten Island
2  University Hospital, had the cut managed
3  as well as a CT scan.
4      Q.   Have you gotten the results
5  of your CT scan back?
6      A.   Yes.  They were okay.
7      Q.   Did you experience any pain?
8      A.   Yes.
9      Q.   A lot of pain?
10     A.   Yeah.  Yes.
11     Q.   Are you prescribed anything
12 for that pain?
13     A.   No.  I declined.
14     Q.   Any follow-up treatment
15 other than the CT scan?
16     A.   No.  Just I haven't been at
17 work all week so it's just rest.
18     Q.   And do you plan to file a
19 lawsuit in that case --
20     A.   No.
21     Q.   -- in relation to the slip
22 and fall?
23     A.   No.
24     Q.   A few other preliminary

Page 21

1  questions that I want to ask you.  What
2  is your date of birth?
3      A.   November 28th, 1977.
4      Q.   And what's your home
5  address?
6      A.   31 Roosevelt Avenue, Staten
7  Island, New York, 10314.
8      Q.   Who do you live with?
9      A.   My spouse, my kids and my
10 parents.
11     Q.   How many kids do you have?
12     A.   I have a stepson and a son
13 and one on the way.
14     Q.   And what does your spouse
15 do?
16     A.   She's a housewife.
17     Q.   Is she the person that
18 attended the hearing?
19     A.   No.
20     Q.   Who was that person?
21     A.   That was a colleague of
22 mine.
23     Q.   A colleague from your
24 current work?

Confidential - Mathew Thomas, Jr., M.D.

Page 22

1    A.   Yes.
2    Q.   What is her name?
3    A.   Salvatrice Scerbo.
4    Q.   Where were you born?
5    A.   Staten Island, New York.
6    Q.   And so you're a United
7  States citizen?
8    A.   Yes, I am.
9    Q.   Are you a citizen of any
10  other country?
11   A.   I have an OCI card for
12  India.  It's not really dual citizenship,
13  but it gives me the right to own property
14  in India if I want.
15   Q.   Do you own any property in
16  India?
17   A.   No, I don't.  Currently, no.
18   Q.   Have you in the past?
19   A.   No.  My father has some
20  property that may wind up coming down to
21  me as time goes on.
22   Q.   Have you ever been arrested?
23   A.   Yes, I have.
24   Q.   Tell me about the first time

Page 23

1  you were arrested, when was that?
2    A.   If I may ask, what's the
3  relevance to the case?
4    Q.   Because there may be some
5  reasons under the rules of evidence that
6  it becomes important for the Court to
7  hear about any prior criminal contacts
8  that you've had.
9         You're going to be a witness
10  in the case, and your credibility is an
11  issue in the case.  Any person who is a
12  witness, credibility is an issue in the
13  case.  Okay?
14   A.   Okay.
15   Q.   So tell me about the first
16  time that you were arrested.  When was
17  that?
18   A.   I don't remember the exact
19  year.  It was driving under the
20  influence.
21   Q.   How about the second time
22  you were arrested?
23   A.   Again, driving under the
24  influence.

Page 24

1    Q.   Third time?
2    A.   Driving under the influence.
3    Q.   Is there a fourth time?
4    A.   No.
5    Q.   Were you ever arrested for
6  anything other than driving under the
7  influence?
8    A.   No.
9    Q.   And did all of those occur
10  in New York?
11   A.   Yes.  New York meaning Long
12  Island, New York, not New York City.
13   Q.   Right.  Were you convicted
14  of driving under the influence?
15   A.   I had one misdemeanor, two
16  violations.
17   Q.   One misdemeanor.  So two
18  misdemeanor convictions?
19   A.   No.  One was considered a
20  misdemeanor.  Two of them were considered
21  violations.
22   Q.   Did you lose your license?
23   A.   Yes, I did.
24   Q.   For how long?

Page 25

1    A.   I think six months and then
2  a year.
3    Q.   Did the DUIs occur while you
4  were in school?
5    A.   I don't believe so.  I think
6  they were all post graduation.
7    Q.   Post graduation from medical
8  school?
9    A.   From medical school.  I
10  think they were all after 2003.
11   Q.   You indicated that you don't
12  remember the exact year, but do you
13  remember the time when your license was
14  suspended?
15   A.   Well, I remember the last
16  one.  The last one happened in 2009.  The
17  two before that were well before that, so
18  I don't remember the exact dates.
19   Q.   So 2009 was the last one and
20  then the other two, were they --
21   A.   They were about five or so
22  years before that.
23   Q.   So maybe 2004?
24   A.   I think around three, four,

Confidential - Mathew Thomas, Jr., M.D.

Page 26

1    around, but I can't say with certainty.
2        Q.   Have you ever testified in
3    court before?
4        A.   Yes, I have.
5        Q.   And was that in reference to
6    the two cases that you told us about?
7        A.   That was in reference to the
8    last case, 2009.
9        Q.   Any other cases that you
10   testified in court before?
11       A.   No.
12       Q.   Have you ever filed for
13   bankruptcy?
14       A.   No.
15       Q.   And who, if anyone, have you
16   spoken to about your lawsuit in this
17   case?
18       A.   Nobody.  Only counsel.
19       Q.   When you say only counsel,
20   what do you mean?
21       A.   I have a lawyer.  I had a
22   lawyer, Rebecca -- I forget her last
23   name -- that I had hired out of the
24   Midwest and then another family lawyer

Page 27

1    that I sought advice.
2        Q.   But neither of those lawyers
3    are representing you?
4        A.   No.
5        Q.   Have you posted anything
6    online about the case?
7        A.   No.
8        Q.   Do you use Facebook?
9        A.   I do use Facebook.
10       Q.   Have you posted anything on
11   Facebook about the case?
12       A.   No.
13       Q.   How about any message
14   boards?
15       A.   No.
16       Q.   So in preparation for today
17   what did you do to prepare?
18       A.   Basically, went over just
19   the transcript from my hearing, went back
20   and forth with the letters that had been
21   written by Ms. Detich as well as my
22   appeal and, basically, that was it.
23       Q.   When you say you went over
24   the transcript, I'm going to ask you to

Page 28

1    look in your exhibit binder at Exhibit
2    21. Do you recognize Exhibit 21?
3        A.   Yes, I do.
4        Q.   What is that?
5        A.   This is the transcript to
6    the hearing that I had December 16th of
7    2009.
8        Q.   And do you remember
9    testifying at this hearing?
10       A.   Very much.
11       Q.   Were you under oath at this
12   hearing?
13       A.   Yes, I was.
14       Q.   And did you give truthful
15   answers at the hearing?
16       A.   I did.
17       Q.   Did you give accurate
18   answers at the hearing?
19       A.   I did.
20       Q.   As you read over the
21   transcript in preparation for today, did
22   you notice any mistakes in the
23   transcript, any typographical errors?
24       A.   There are some typographical

Page 29

1    errors.  I did notice some.
2        Q.   Did any of the typographical
3    errors that you noticed change the
4    meaning of any of your answers?
5        A.   No.
6        Q.   Did any of the typographical
7    errors change the meaning of any of the
8    questions?
9        A.   No.
10       Q.   Is it fair to say that all
11   of the -- all of the answers that you
12   gave to the questions in this transcript
13   are true?
14       A.   Yes.
15       Q.   Did you meet with an
16   attorney in preparation for today?
17       A.   For today?  No.
18       Q.   What do your parents do?
19       A.   Both retired.
20       Q.   And what did they retire
21   from?
22       A.   Dad was an electrician.
23   Mother was an LPN.
24       Q.   Do you have siblings?

8 (Pages 26 to 29)

Confidential - Mathew Thomas, Jr., M.D.

Page 30

1    A.   Yes, I do.  Two sisters.
2    Q.   What do they do?
3    A.   One is a social worker.  One
4  is in marketing.
5    Q.   Are you working now?
6    A.   Yes, I am.
7    Q.   Where do you work?
8    A.   I work for St. Barnabas
9  Hospital in the Bronx, but I work at
10  their off-site clinic, Southern Medical
11  Group.
12    Q.   It's called Southern Medical
13  Group?
14    A.   Yes.
15    Q.   What do you do there?
16    A.   I'm the site administrator.
17    Q.   What are the duties of the
18  site administrator?
19    A.   I run the whole center.
20    Q.   When you say you run the
21  whole center, what does the center do?
22    A.   I manage the center.  We see
23  patients in different specialties, so I
24  take care of both the registration, daily

Page 31

1  operations, billing, everything that's
2  involved in running a facility.
3    Q.   How big a facility is it?
4    A.   It's -- in terms of size or
5  in terms of patient volume?
6    Q.   In terms of patient volume?
7    A.   I would say we see close to
8  a thousand patients a month.
9    Q.   And how many people do you
10  supervise?
11    A.   Including physicians,
12  approximately 18 to 20.
13    Q.   About how many of those 18
14  to 20 are physicians?
15    A.   About five.
16    Q.   And are those all the
17  physicians on staff at the Southern
18  Medical Group?
19    A.   No.  There are other
20  physicians who rent space who report to
21  me indirectly, but they don't report to
22  me.
23    Q.   Do you provide any patient
24  care?

Page 32

1    A.   No.
2    Q.   Who is your
3  supervisor -- your current supervisor?
4    A.   It's the senior VP at St.
5  Barnabas for ambulatory care, Pat Belair.
6    Q.   How do you spell Pat's last
7  name?
8    A.   Patricia Belair,
9  B-E-L-A-I-R.
10    Q.   And how long have you worked
11  there?
12    A.   September 2012, so a year
13  and four months now.
14    Q.   Do you work anywhere else
15  now?
16    A.   Yes, I do.
17    Q.   Where else do you work?
18    A.   I work at Technical Career
19  Institute as an instructor.  I work at
20  St. Paul's School of Nursing as an
21  instructor, and starting next week I'll
22  be teaching at Metropolitan College of
23  New York, MCNY, also as an instructor.
24    Q.   You're quite busy.

Page 33

1    A.   I have no choice.  I have a
2  housewife.
3    Q.   I'm sorry.  You said
4  Metropolitan?
5    A.   College of New York.  MCNY
6  is what they go by.
7    Q.   Let me take these in turn
8  then.  So you told us about your
9  responsibilities at the Southern Medical
10  Group.
11         What will you be teaching at
12  the Technical Career Institute?
13    A.   This semester will be
14  medical/legal issues as well as
15  healthcare systems.
16    Q.   Have you taught there
17  before?
18    A.   Yes.  I've been teaching
19  there since 2010, I believe.
20    Q.   Continuously?
21    A.   Continuously.
22    Q.   Medical and legal issues.
23  Do you prepare the syllabus for that
24  class?

9 (Pages 30 to 33)

Confidential - Mathew Thomas, Jr., M.D.

Page 34

1      A.   The syllabus has kind of
2  been given to us by the department.
3  Those are the classes that I had this
4  semester and last semester.  Before that
5  I had different classes.
6      Q.   Do you have a supervisor at
7  TCI?
8      A.   Currently, no.  The dean of
9  our department basically has been
10 promoted and so they have a vacant
11 position for that dean position.
12     Q.   Who's the person that you
13 would say you report to at TCI?
14     A.   Honestly, I haven't had -- I
15 haven't had to report to anyone.  If I
16 had to talk to anyone, maybe the provost.
17     Q.   What's that person's name?
18     A.   It's Dean Dillon.  C. Dillon
19 would be probably the provost.
20 D-I-L-L-O-N.
21     Q.   So what exactly are medical
22 and legal issues?
23     A.   It's just ethics.  It's an
24 ethics class.

Page 35

1      Q.   And who takes the class?
2      A.   The students that register
3  for -- well, that's an HIT class so it's
4  healthcare and information technology so
5  students under that major.
6      Q.   Are they undergraduates?
7      A.   Yeah.  This would be an
8  associate's program.
9      Q.   An associate's program.  Do
10 you have any legal training?
11     A.   For...?
12     Q.   Just in general?
13     A.   Legal training, no.
14     Q.   You're not a lawyer or
15 anything?
16     A.   No.
17     Q.   Do you teach that course on
18 your own or do you co-teach it with
19 someone?
20     A.   On my own.
21     Q.   Moving onto St. Paul's
22 School of Nursing.  You indicated you're
23 an instructor there.  Can you tell us
24 what you teach?

Page 36

1      A.   I started last semester.
2  Just I'm a lab -- lab instructor for
3  anatomy and physiology I and II.
4      Q.   What kind of school is St.
5  Paul's School of Nursing?  In other
6  words, is it an associate's program?  A
7  graduate degree?
8      A.   I believe it's a bachelor's
9  in nursing.  The students who graduate
10 from there are able to take the night
11 class for the LPN and RN.
12     Q.   You said you started
13 teaching there in 2013?
14     A.   Yes.  September.
15     Q.   Who's your supervisor?
16     A.   Anne Lubrano.
17     Q.   How do you spell Lubrano?
18     A.   L-U-B-R-A-N-O.
19     Q.   And then finally, MCNY, the
20 Metropolitan College of New York.  Did
21 you say you're going to be an instructor
22 there?
23     A.   I'm going to be teaching
24 classes there.

Page 37

1      Q.   What class?
2      A.   I haven't got a finalized
3  schedule but, tentatively, it seems like
4  it's going to be medical terminology and
5  possibly anatomy and physiology.
6      Q.   Is that a bachelor's
7  program?  Associate program?
8      A.   That's a bachelor's program.
9  It's a four-year college.
10     Q.   How many hours per week do
11 you currently work?
12     A.   Right now?
13     Q.   Yeah.
14     A.   Officially or including time
15 that we put, like -- you know, I'm salary
16 so, basically, I'm going to put in more
17 hours than my regular 9:00 to 5:00.
18     Q.   Well, just approximate the
19 number of hours that you work total.
20     A.   Probably 12 to 14 a day.
21     Q.   Five days a week?
22     A.   Well, with the MCNY I'll be
23 teaching Saturday, too, so it will be six
24 days.

Confidential - Mathew Thomas, Jr., M.D.

Page 38

1       Q.   You mentioned that you're on
2  a salary.  What is your current salary at
3  St. Barnabas Southern Medical Group?
4       A.   It's approximately 92,000
5  and change.
6       Q.   And what's your salary at
7  TCI?
8       A.   We make 65 an hour.
9       Q.   So that one is hourly?
10      A.   Hourly, yes.
11      Q.   And St. Paul's School of
12  Nursing?
13      A.   Is 32 an hour.
14      Q.   And MCNY?
15      A.   I believe it's going to be
16  approximately 60.
17      Q.   Did you bring copies of your
18  tax returns?
19      A.   No, I did not.
20      Q.   So in your current positions
21  are you using your medical training at
22  all?
23      A.   No, I'm not.  Well, I can't
24  say that.  If I'm teaching anatomy

Page 39

1  physiology it would be part of my medical
2  training, and medical terminology would
3  also be part of my medical training.
4       Q.   In addition to working, are
5  you currently in any study courses for
6  the USMLE?
7       A.   No, I'm not.
8       Q.   I know that you didn't bring
9  your tax returns with you, but can you
10  estimate for us what your total income
11  was for last year?
12      A.   Approximately, maybe 115.
13  Somewhere between 110 and 115, I believe.
14      Q.   How about the year before
15  that?
16      A.   It was much lower.  It was
17  under a hundred thousand, I believe, the
18  year before.
19      Q.   So you're not enrolled in
20  any study courses for the USMLE
21  currently?
22      A.   No.
23      Q.   What have you done, if
24  anything, to prepare for the USMLE since

Page 40

1  this litigation began?
2       A.   I have not because I'm not
3  able to.
4       Q.   What do you mean you're not
5  able to?
6       A.   I'm not able to take the
7  test currently.
8       Q.   In your -- you told us about
9  your employment at St. Barnabas,
10  Technical Career Institute, St. Paul's
11  School of Nursing, Metropolitan College
12  of New York.  Are there any other jobs
13  that you had since medical school?
14      A.   Yes.
15      Q.   Where else have you worked?
16      A.   I worked at Kaplan in New
17  Jersey.
18      Q.   What did you teach at
19  Kaplan?
20      A.   I was a CS instructor,
21  clinical skills instructor and patient
22  note grader.
23      Q.   And how long did you work at
24  Kaplan?

Page 41

1       A.   I started, I believe, 2006,
2  and at some point I kind of -- they took
3  me off of payroll around -- I think about
4  a year or two ago.
5       Q.   Which Kaplan in New Jersey
6  did you teach at?
7       A.   Newark.
8       Q.   Any other employment since
9  medical school?
10      A.   I worked at New York City
11  Health and Hospital Corporation, HHC.
12      Q.   And when did you work there?
13      A.   I started in 2009 all the
14  way 'til 2012.
15      Q.   What did you do?
16      A.   I was first an
17  administrative assistant and then I got
18  promoted to compliance officer.
19      Q.   Compliance officer?
20      A.   Yes.
21      Q.   Any other jobs?
22      A.   I worked partially for
23  Optima.
24      Q.   When did you work for

11 (Pages 38 to 41)

Confidential - Mathew Thomas, Jr., M.D.

Page 42

1    Optima?
2        A.   2008.  For a couple months
3    throughout 2008.
4        Q.   And what was your job at
5    Optima?
6        A.   I just assisted students
7    when they first came in.  Basically
8    setting them up with a station for them
9    to study at as well as showing them the
10   system that they were supposed to use,
11   how to turn the computer on, how to log
12   in and then tell them they have to do a
13   hundred questions a day.
14       Q.   I'm going to go back to
15   Kaplan.  What was your salary or wage
16   when you worked at Kaplan?
17       A.   I think when I was a trainer
18   it was 14 an hour and as a patient note
19   grader, 11 an hour.
20       Q.   How about at New York City
21   Health and Hospital Corp.?
22       A.   I was salary there as well.
23   I started off at 70,000 and got promoted
24   up to about 85,000.

Page 43

1        Q.   And at Optima what were you
2    paid?
3        A.   It varied.  Whatever he
4    wanted to give me since I wasn't really
5    set with the daily schedule or anything.
6        Q.   About how much did you make?
7        A.   I honestly don't remember.
8        Q.   Did you file a tax return?
9        A.   No, I did not.
10       Q.   When you say "he," whatever
11   he wanted to give you, who is he?
12       A.   Suliman.  Dr. Suliman who is
13   the owner of the program.
14       Q.   And was he the person that
15   you reported to?
16       A.   Yes.
17       Q.   Was he the only person you
18   reported to?
19       A.   Yes.  Well, he had a wife,
20   also, so if she needed anything in his
21   absence, but direct report was basically
22   to him.
23       Q.   Who else worked there with
24   you?

Page 44

1        A.   At the time?  He had some
2    other instructors that were there.
3        Q.   Anybody else that did the
4    same job that you did?
5        A.   No.  They were actually
6    professors.  They taught.  I didn't
7    teach.
8        Q.   Can you estimate for us how
9    much money you made working at Optima?
10       A.   Maybe a couple thousand.
11       Q.   Were you working at Optima
12   at the same time you were working at
13   Kaplan?
14       A.   I was on payroll at Kaplan.
15   I don't remember what hours I was getting
16   at the time.  Kaplan doesn't run the CS
17   course all the time, so it's really only
18   when they run the course that you can
19   work.
20       Q.   So you were teaching courses
21   at Kaplan, but for Optima you were just
22   working the front desk?
23       A.   That's correct.
24       Q.   And did you have an

Page 45

1    arrangement with either Kaplan or Optima
2    where you were receiving test prep
3    services as well as being an employee?
4        A.   At the time of my
5    employment, no.
6        Q.   When you were employed at
7    Optima, you were still in the process of
8    taking the USMLE exams.  Is that right?
9        A.   I completed 1, 2 and CS.  I
10   had Step 3 pending.
11       Q.   And Optima
12   University -- well, what is Optima?
13       A.   Optima University was a
14   USMLE test prep course.  It basically
15   covered, basically, Step 1 and Step 2.
16       Q.   And when you say Step 2, do
17   you just mean Step 2 CK?
18       A.   CK.
19       Q.   Now, did Optima exist solely
20   as a test prep company for the USMLE?
21       A.   That was my understanding.
22       Q.   Did they teach any other
23   tests or subjects?
24       A.   I don't believe so.

12 (Pages 42 to 45)

Confidential - Mathew Thomas, Jr., M.D.

Page 46

1  Q.   Did the question bank have
2  questions from any other exams?
3  A.   Not that I know of.
4  Q.   And did the question bank
5  have -- were there separate question
6  banks for Step 1 and Step 2 CK?
7  A.   Yes, there were.
8  Q.   And when a person came to
9  Optima, did they bring with them their
10  own computer?
11  A.   No.
12  Q.   So they used an Optima
13  computer?
14  A.   Yes, they did.
15  Q.   Did Optima provide people
16  with any other study materials other than
17  the computer?
18  A.   Not that I -- I don't
19  believe so.
20  Q.   You mentioned that there
21  were people who taught classes.  What
22  were the classes that were taught?
23  A.   Honestly, I didn't get
24  involved in that.  If the students

Page 47

1  requested specific lectures on specific
2  topics, the instructors were told to make
3  a lecture based on those topics.  They
4  varied in subject matter.
5  Some days it may be -- there
6  was no real structure -- Kaplan has a
7  structured course.  There's a set lecture
8  set for every day of the week, set hours.
9  This was very basically ad hoc, as needed
10  or if the students had requested
11  something specific.
12  Q.   So the instructors that were
13  on staff were basically there to respond
14  to questions that arose from the
15  students?
16  A.   Yes.  The instructors
17  actually were added on in 2008.  Before
18  that when I was a student, Dr. Suliman
19  only did the lectures.  He was the only
20  one teaching.
21  Q.   And did you attend any of
22  those lectures?
23  A.   Yes, I did.
24  Q.   About how many?

Page 48

1  A.   I can't recall how many.
2  Q.   Dr. Suliman, was he a
3  practicing doctor?
4  A.   He was an M.D. is what he
5  told us.  I don't know if he practiced
6  prior, but while he was at the center,
7  no.
8  Q.   And do you know where he
9  went to medical school?
10  A.   Somewhere abroad.
11  Q.   I think what I'm going to
12  have you do is if you would, turn in your
13  exhibit book to Exhibit 1.  Do you see
14  Exhibit 1?
15  A.   Yes.
16  Q.   Do you recognize it?
17  A.   Yes, I do.
18  Q.   And that's the -- this is
19  the complaint that you initially filed?
20  A.   Yes.  The initial one.
21  Q.   And then turning to Exhibit
22  2?
23  A.   The amended complaint.
24  Q.   So I just wondered if you

Page 49

1  could walk us through your complaint and
2  amended complaint and tell us what it is
3  that you are asking for; what the
4  specific complaints are from a legal
5  standpoint that you're making against the
6  NBME and against the ECFMG?
7  A.   My specific complaint is
8  outlined in the amended complaint more
9  so, and I believe that the major issues
10  I'm having is that I believe I was
11  discriminated against based solely on the
12  fact that I was an employee at Optima;
13  that the evidence that was presented
14  before me was not complete.
15  There's more assumptions and
16  that word was basically -- even in the
17  hearing, was said to have been
18  observations, no real analysis,
19  statistical analysis.
20  I feel that it's more so
21  that my role post exam is why that I am
22  being told that my score is invalid with
23  actually no real proof or evidence
24  presented towards me of what they did and

Confidential - Mathew Thomas, Jr., M.D.

Page 50

1    didn't have at my time of the exam.
2         Q.   So discrimination, is that
3    the sole cause of action that you're
4    alleging?
5         A.   I believe I'm being falsely
6    accused, and I believe that
7    discrimination is a major portion of the
8    reasoning behind NBME's decisions against
9    me.
10        Q.   I just want to be sure that
11   we have everything, so discrimination and
12   false accusations?
13        A.   I believe there's a level of
14   defamation with that as well.
15        Q.   And tell me a little bit
16   more about the defamation claim.
17        A.   I believe that by going
18   forward and continuing to show that I was
19   involved in Optima and in the hearing as
20   well, Susan Detich went out of her way to
21   bring up my employment.
22             I think that they tried to
23   post a picture of me as being part of the
24   Optima University and, therefore,

Page 51

1    assumptions that I had access to
2    materials, whether I was a student or not
3    a student, that may have been copyright
4    infringement or stolen.
5             And I think by making me
6    look that way already, you put a
7    stereotype in a person's mind, including
8    the committee that day, because if it was
9    strictly regarding the score validity on
10   my exam, my employment never had to come
11   up.
12        Q.   Do you agree that you were
13   exposed to some of the test questions
14   that you saw on that December exam that
15   you passed?
16        A.   As I said in the past, I've
17   done all the question banks out there,
18   and maybe 20 questions seemed similar.  I
19   can't say if it was from Optima or USMLE
20   World and the Kaplan Qbank or the NBME
21   assessment tests, but outside of those
22   20, no.  I don't think that I saw
23   anything that was especially statistical
24   numbers that they gave referring to my

Page 52

1    exam.
2         Q.   And you did -- you said you
3    did all of the test banks out there.
4    Optima was not the only test prep company
5    that had a test bank.  Is that right?
6         A.   That is correct.
7         Q.   But Optima is one of the
8    test banks that you accessed?
9         A.   At the time I was a student
10   I did have access to the Optima bank.
11        Q.   So I just want to make sure
12   that we're clear.  So the defamation is
13   based on the statements that were made
14   about you in front of the committee on
15   score validity?
16        A.   I believe that's -- yes.
17        Q.   And is your claim for
18   defamation based on statements to anybody
19   else other than just with what happened
20   in that committee on score validity?
21        A.   Honestly, I cannot tell you
22   what NBME -- who they spoke to before
23   that committee, so I honestly can't say
24   if they spoke to anybody else, but I can

Page 53

1    go by what -- just like I said, at that
2    committee hearing, to have Ms. Detich
3    bring up my employment, going out of her
4    way to bring up my employment, it shows
5    she was trying to show and maneuver a
6    certain direction.
7         Q.   So we have discrimination
8    and we have defamation.  Are there any
9    other causes of action?
10        A.   I mean, I think with the
11   discrimination goes what I have written
12   here, basically that I'm falsely accused.
13   They tend to show a picture as if -- they
14   don't directly say.  They try to show me
15   as a picture of an accomplice to Dr.
16   Suliman.
17             And, basically, I do have
18   the right to be involved with anyone.  By
19   association, you're not guilty by about
20   what another person does, and I think all
21   that put together is basically where we
22   are today.
23             And I believe also there is
24   that one issue that I believe that if

Confidential - Mathew Thomas, Jr., M.D.

Page 54

1    NBME as well as -- or ECFMG at the point
2    had known about this course being suspect
3    or may have had certain questions from
4    the time they first found out, I believe
5    there was negligence on their part that
6    they did not let all students know that
7    either you shouldn't be going there or
8    that it was a questionable course.
9         They let students go there,
10   continue there for a long time and then
11   they came afterwards. So I think there's
12   a large level of negligence on NBME's
13   part.
14       Q.   So you think that the NBME
15   should have warned people that they may
16   be cheating on the exam?
17       A.   Yes.
18       Q.   When you used the question
19   bank at Optima, can you tell us what that
20   looked like? How you accessed it?
21       A.   You have a log-in. You're
22   basically given a log-in by him. You log
23   in and, basically, it lists down -- this
24   is basically an archaic-looking system.

Page 55

1    I think it was like a lightish blue
2    background, big, almost like -- what's
3    the word I'm looking for? Comic
4    lettering. It wasn't like Times Roman or
5    anything.
6        Q.   Like Comic Sans?
7        A.   Yeah. Kind of like, you
8    know, and, basically, it was a question
9    and you had the answer of choices. You
10   pick your choice, and the next page would
11   basically be the right answer and a
12   description of why that's the right
13   answer or why it would be wrong. Almost
14   like your USMLE World, similar thing, and
15   it was separated by subject matter.
16       Q.   When you use the word "he,"
17   you said when he would --
18       A.   Referring to Dr. Suliman.
19       Q.   And how many hours a day
20   would you say you spent at the question
21   bank?
22       A.   At the question bank or at
23   the centers? Two different things for
24   me.

Page 56

1        Q.   At the question bank?
2        A.   I did not spend as much time
3    at the question bank because I'm pretty
4    quick with questions so I just look at
5    them and I go. His question bank for
6    Step 2 at the time, I'd say anywhere
7    between 700 to a thousand questions, very
8    minimal. I spent a lot more time having
9    group conversations with people,
10   understanding material and then going to
11   lectures so that was basically that.
12       Q.   How many other students were
13   there at Optima when you were there?
14       A.   When I first started over
15   there, if I had to guess or take an
16   estimate, I would say there was less than
17   20 students, and of those, maybe six were
18   Step 2. The rest were all Step 1.
19       Q.   And did you review -- would
20   you say you reviewed all the 700 to a
21   thousand questions that were in the Step
22   2 CK bank?
23       A.   I did go through all the
24   questions at least once. Some sections

Page 57

1    more.
2        Q.   Did you review the questions
3    in the Step 1 bank, also?
4        A.   No. If you're in Step 2,
5    you don't get access to Step 1. If
6    you're in Step 1, you don't get access to
7    Step 2.
8        Q.   So just going back to the
9    causes of action. I just want to be
10   sure. We have discrimination, the breach
11   of the duty to warn, right, and then
12   defamation.
13       Are there any other causes
14   of action that you're alleging
15   against either the NBME --
16       A.   If you're looking for
17   something specific, I'd have to go
18   through each one again.
19       Q.   And I should add, and the
20   freedom to associate, right?
21       A.   Yeah.
22       Q.   So we're at four. We're at
23   four, and I'll just restate them, so
24   discrimination, duty to warn, freedom of

Confidential - Mathew Thomas, Jr., M.D.

Page 58

1    association and defamation?
2         A.   Falsely accused.
3         Q.   I thought that went with
4    defamation?
5         A.   That's what I'm saying.  I
6    don't know -- when you say it like that,
7    I don't know exactly how -- what you're
8    putting together.
9         Q.   I want you to tell me
10   because I want to make sure that I have
11   everything.
12        A.   Well, I believe, like I
13   said, that there is -- all the matters
14   were in my complaint, and it does go down
15   to the fact that I was falsely excused.
16   I don't believe I did anything wrong.  I
17   took the test legitimately.
18        Accomplice because they go
19   out of their way to show that I worked
20   with him.
21        Discrimination based on the
22   fact that I did work with him, and I do
23   have the freedom of association.
24        I don't believe -- I don't

Page 59

1    think this is a legal thing, but I don't
2    think the analysis was done even though I
3    was told that an analysis was done.  Ms.
4    Carson changed the wording.  Ms.
5    Carson changed the wording multiple
6    times.
7         There was negligence on part
8    of the NBME not warning students, so
9    there was a duty there.
10        Copyright infringement, even
11   at the last hearing you guys said I'm not
12   being thought of as having violated that,
13   but I think through association I think
14   there is an indirect thing; that if I am
15   associated with him and he's guilty of
16   that, that I'm being said that I'm part
17   of that as well.  And then defamation as
18   well.
19        Q.   So I noticed that you were
20   sort of going through Exhibit 2, the
21   amended complaint, and reading the
22   italicized words.  Do I take that -- am I
23   correct in taking that to mean that those
24   are your headings for the different

Page 60

1    causes of action?
2         A.   Yes.  Those are my main
3    points given the fact that Judge Rufe
4    wanted me to amend it.
5         Q.   Anything else from the
6    original complaint?
7         A.   I'd have to look over that
8    again as well.  I didn't separate it as
9    well as I did with the second one.  So as
10   I said, I wouldn't think those are the
11   only ones.  There might be more.
12        Q.   I want to make sure because
13   now is the time to do that.  Take as much
14   time as you need to look through Exhibit
15   1 and let us know.
16        A.   Are you asking just for
17   legal complaints?
18        Q.   Yes, for the causes of
19   action.
20        A.   I believe those are the main
21   ones.
22        Q.   I know those are the main
23   ones, but I want to make sure that we
24   have them all.  Are there any others that

Page 61

1    you want to add?
2         A.   I mean, I don't know if
3    there's a legal term to be putting for
4    the fact that I believe that the appeal
5    was not taken seriously.  The waivers
6    that were requested were not -- I think
7    they go back to the background.  There's
8    a stereotype against me.
9         And the fact that I've asked
10   for certain waivers that I believe were
11   justified, such as me taking the exam
12   2007 and them not doing any validation
13   until almost the end of 2011 and them not
14   extending my seven-year period being an
15   issue which I believe was a legitimate
16   request.
17        So I don't know how legally
18   that just -- I think it all falls back to
19   the discrimination and all the other
20   things that I mentioned.
21        Q.   Anything else that you want
22   to mention before we move on from this
23   topic?
24        A.   No.

16 (Pages 58 to 61)

Confidential - Mathew Thomas, Jr., M.D.

Page 62

1      Q.   I do want to talk to you
2   about damages.  So in Exhibit 2, the
3   second to last page, paragraph 28, you
4   write:  Plaintiff has suffered harm
5   through emotional distress, reputational
6   damages and pecuniary damages due to the
7   actions set forth by the defendants.
8           I want to take those in
9   turn.  What do you mean when you say
10  emotional distress?
11     A.   The emotional distress, the
12  drinking and all that other stuff was all
13  due to my -- the situation I was in.
14     Q.   Did you seek any assistance
15  from a psychiatrist or psychologist?
16     A.   I didn't have insurance at
17  the time so, basically, anyone I did talk
18  to was basically friends to kind of --
19  who just encouraging me to keep at it and
20  let it go through.
21          The emotional distress
22  because I was at Optima University and
23  there was no warning.  When the FBI came,
24  I was deposed by them almost

Page 63

1   two-and-a-half, three hours, having to
2   deal with all the students and all the
3   fallout afterwards, after all this
4   happened.
5           And the fact that even now,
6   after all that's going on, I'm still not
7   able to keep my score valid even though I
8   passed everything 2007, so now we're six
9   years later and I'm not a doctor
10  practicing.
11     Q.   What type of medicine were
12  you planning to practice?
13     A.   I would have taken anything.
14  Family practice would probably be my
15  fallback even though my interests were
16  ortho and rehab or psych.
17     Q.   As a medical student did you
18  attempt to match in the residency
19  program?
20     A.   After I passed 2007 I tried
21  to scramble.  It was a very bad scramble.
22  First time trying I became very,
23  very -- what's the word I'm looking
24  for -- discouraged about how the match

Page 64

1   went knowing that Step 3 was probably my
2   only last chance to try to get in if I
3   had passed it the first time around.
4      Q.   So you participated in the
5   scramble, but how did you get to the
6   scramble?
7      A.   The scramble is always post
8   match.  You just have to apply.  Since I
9   had finished Step 2 at the end of 2007,
10  then I went into the scramble in 2008.
11     Q.   And all that was happening
12  before the Optima raid, right?
13     A.   That was all before, yeah.
14     Q.   So I want to talk a little
15  bit about that.  You were ECFMG
16  certified?
17     A.   As of 2007, yes.
18     Q.   Right.  And that gave you
19  the ability to participate in the
20  residency match?
21     A.   That's correct.
22     Q.   And when you attempted to
23  match, how many -- how many choices did
24  you make?

Page 65

1      A.   You mean when I scrambled?
2      Q.   No.  You have to attempt to
3   match before you can scramble.
4      A.   No.  You have to buy a
5   token, but you don't actually have to be
6   in the match to match in order for you to
7   be in the scramble.
8      Q.   You did not participate in
9   the match?
10     A.   I did not because most
11  interviews start September, and since I
12  had not passed Step 2 and I had just
13  recently failed in July, I didn't
14  participate.
15          I believe one time I did the
16  match; and I don't remember exactly, I
17  think prior, I spent a couple thousand
18  dollars and got nowhere.
19     Q.   So about how many times did
20  you participate in the actual match?
21     A.   Honestly, I don't remember
22  the exact thing with the match, but I
23  believe I had tried once, but I may be
24  mixing the match and scramble together,

Confidential - Mathew Thomas, Jr., M.D.

Page 66

1 but I did spend a certain amount of
2 money. I don't remember if it was you
3 have to pay to be in the scramble or not.
4       Q.   Did you scramble more than
5 once?
6       A.   No. Just the one time
7 because 2008 came around. By the time
8 scramble came around the next time, we
9 were in the middle of the whole Optima
10 situation.
11      Q.   So, again, you scrambled,
12 and did you have any interviews as a
13 result of that?
14      A.   No.
15      Q.   So how did you lose out on a
16 bunch of money from scrambling?
17      A.   No. I'm saying I had spent
18 money -- I believe the one time I tried
19 to match. It's very expensive to apply,
20 and you just get a rejection letter
21 afterwards. It's like throwing money
22 away.
23      Q.   So you scrambled once and
24 matched -- tried to match once?

Page 67

1       A.   Yeah.
2       Q.   When you tried to match did
3 you have any interviews?
4       A.   No.
5       Q.   And what do you think the
6 reason was for you not having any
7 interviews when you tried to match?
8       A.   Multiple attempts.
9       Q.   At the exam?
10      A.   At the exam.
11      Q.   What do you think the reason
12 was when you attempted to scramble that
13 you didn't have any interviews?
14      A.   Well, the problem with
15 scramble is you can't get through to a
16 lot of people.
17      Q.   What do you mean?
18      A.   Everyone is calling. You
19 have thousands and thousands of students
20 trying to call all these programs that
21 have open vacancies so getting through is
22 hard enough. And then when you get
23 through to somebody, depending on what
24 they're looking for, if you get filtered

Page 68

1 out right away, you get filtered out
2 right away.
3       Q.   Other than your multiple
4 attempts at the exam, do you think there
5 were any other reasons why you didn't
6 match?
7       A.   My Step 1 score was not as
8 strong, was not that strong so that would
9 be another reason.
10      Q.   What do you mean when you
11 say multiple attempts?
12      A.   The amount of times I took
13 the step exam.
14      Q.   And all told, how many times
15 did you take Step 1?
16      A.   I passed Step 1 on the
17 seventh try. Even though I registered
18 seven times, I may not have sat for all
19 of them. Sometimes I sat just because I
20 paid. I figured why not just take it as
21 just a studying tool.
22      Q.   And with Step 2 CK, how many
23 times did you attempt?
24      A.   I passed it on the sixth

Page 69

1 time.
2       Q.   What's the reason that it
3 took you seven attempts to pass Step 1?
4       A.   I've never been a
5 standardized test taker.
6       Q.   Is that the same reason why
7 it took you six attempts to pass Step 2?
8       A.   That, also. Plus, the fact
9 that I never was studying the right way.
10 I was always doing multiple things at the
11 same time, so I was never really fully
12 focused just on the work.
13      Q.   Any other reasons why you
14 think you had a difficult time or were
15 unsuccessful in matching with a residency
16 program?
17      A.   No. I think it's just the
18 way the match is set up. If you're not
19 first attempt, high score, I think the
20 amount of applicants that apply for the
21 limited number of residency positions, it
22 winds up being a hard thing.
23      Q.   What makes you think that
24 the residency programs care about

18 (Pages 66 to 69)

Confidential - Mathew Thomas, Jr., M.D.

Page 70

1 multiple attempts?
2      A.   They've made it very clear.
3      Q.   How?
4      A.   Sometimes when you interview
5 with them, when you talk to people in
6 programs, the first thing they say is you
7 should make sure you pass first time,
8 high score.  You go to Kaplan, you go to
9 all these review courses, the professors
10 who teach tell you right away, don't take
11 the exam until you're ready.
12      Things have changed since I
13 first started med school to what it is
14 now.  Back then all you have to do is
15 pass.  The residency position is still
16 kind of available.  Now it's not the same
17 way.
18      Q.   I want to take you through
19 your educational history a bit.
20      A.   Sure.
21      Q.   Where did you go to high
22 school?
23      MS. HOLLAND:  This might be
24 a good place to take a little

Page 71

1 break.
2      MS. McENROE:  Let's go off
3 the record.
4      (A discussion was held off
5 the record.)
6      (A short break was taken.)
7 BY MS. HOLLAND:
8      Q.   So, Dr. Thomas, again, you
9 are still under oath.  You understand
10 that, correct?
11      A.   Yes, I do.
12      Q.   So where did you go to high
13 school?
14      A.   Monsignor Farrell High
15 School, Staten Island.
16      Q.   How do you spell Farrell?
17      A.   F-A-R-R-E-L-L.
18      Q.   Is it a Catholic school?
19      A.   Yes, it is.
20      Q.   What were your grades like?
21      A.   I was always above a hundred
22 average.  Cumulative average usually
23 ranged around 102 to 104 except towards
24 my senior year.

Page 72

1      Q.   What happened in your senior
2 year?
3      A.   They put me in Calculus BC
4 when I didn't want to be.
5      Q.   What's that mean?
6      A.   They put me in a high graded
7 AP course that I tried to get out of and
8 they refused, and that's the only class I
9 think that I did not do so well in.
10      Q.   When you say you had an
11 above a hundred average, how is that
12 possible?
13      A.   AP classes get weighted
14 higher because they are college level
15 courses to a point, so my GPA was always
16 very high.  So my cum going into my last
17 quarter I was ranked one.  I lost my rank
18 the very last semester of high school.
19      Q.   Your ranked one out of how
20 many students?
21      A.   Three-hundred and something.
22      Q.   Did you receive any honors
23 in high school?
24      A.   High honors all the way

Page 73

1 through.  Honor -- what's called Honor
2 Society last two years.
3      Q.   Any awards that you have?
4      A.   Honor Society stuff as well
5 as I was involved in a lot of
6 extracurricular activities, so I got an
7 award for that at graduation.
8      Q.   What kind of
9 extracurricular?
10      A.   You name it, I was in it.
11      Q.   Did you work during high
12 school?
13      A.   No.
14      Q.   Do you remember what you got
15 on the SAT?
16      A.   I took the SAT three times.
17 Ultimately, the last time I believe I
18 wound up with a 1270.
19      Q.   And that was out of 1600?
20      A.   Out of 1600.
21      Q.   What year did you take the
22 SAT?
23      A.   I graduated in '95, so it
24 had to be junior year so '94, '95, I

Confidential - Mathew Thomas, Jr., M.D.

Page 74

1  assume.
2      Q.  And tell me about applying
3  for college.  Where did you apply?
4      A.  I applied to CUNY, SUNY,
5  Johns Hopkins, a couple schools.  I don't
6  remember all of them.  I didn't really
7  know too much.  Since my parents were
8  first generation here, they really had no
9  idea how the college system works so,
10  basically, we just kind of went with what
11  we knew.
12     Q.  And where did you end up
13  going to college?
14     A.  I wound up getting a
15  scholarship to Johns Hopkins, refused it
16  and then wound up going to Europe for two
17  years.
18     Q.  What was the scholarship at
19  Johns Hopkins?
20     A.  It was for an electrical
21  engineering program, a five-year master's
22  program.
23     Q.  And when you went to Europe,
24  what made you decide to do that?

Page 75

1      A.  I had some friends that were
2  going there.  Figured it was a different
3  experience.  It was supposed to be for
4  premed.
5      Q.  What school did you study
6  at?
7      A.  It was called University of
8  Debrecen.  D-E-B-R-E-C-E-N.
9      Q.  In what country?
10     A.  In Hungary.
11     Q.  And what did you study
12  there?
13     A.  It was premed.
14     Q.  Did you earn a degree from
15  the University of Debrecen?
16     A.  No.  I came back two years
17  later.
18     Q.  And where did you go?
19     A.  I went to State University
20  of New York at Stony Brook.
21     Q.  And why did you decide on
22  Stony Brook?
23     A.  Why I decided on Stony Brook
24  or why I came back?

Page 76

1      Q.  Why did you come back?
2      A.  I came back -- the school
3  was doing some corrupt stuff where
4  students were buying their grades.  I
5  wasn't a big fan of --
6      Q.  The University of Debrecen?
7      A.  Yes.
8      Q.  I'm sorry to interrupt you.
9  What do you mean students were buying
10  their grades?
11     A.  Back then, because it's
12  Europe and their system is different,
13  they do a lot more oral exams.  It's oral
14  and written but more so oral and,
15  basically, we found out -- we were
16  approached about paying our way through.
17     Q.  Who's "we"?
18     A.  Me and other students.
19     Q.  Are you in touch with any of
20  those other students?
21     A.  I know them -- I know some
22  of them that are still here, but I didn't
23  really keep in touch as much, just people
24  I knew before.

Page 77

1      Q.  Did they also leave the
2  University of Debrecen?
3      A.  At that time, me and my
4  friend left and then maybe a year or so
5  later there was a major exodus from
6  Hungary to Poland.  A lot of students
7  that were in Hungary left over to Poland.
8  A lot of students stayed so it all
9  depended, I guess, what semester you were
10  in at the time.
11     Q.  What was the name of your
12  friend who you left the university with?
13     A.  That left there when I left?
14     Q.  Yeah.
15     A.  My friend Vinil.
16     Q.  V-I?
17     A.  V-I-N-I-L.
18     Q.  What's Vinil's last name?
19     A.  V-A-R-G-H-E-S-E.  He left
20  because he just wasn't feeling medicine
21  anymore.  He was my roommate at the time,
22  so he came back and did finance.
23     Q.  So you came back to the U.S.
24  did you withdraw from the University of

20 (Pages 74 to 77)

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Mathew Thomas, Jr., M.D.

Page 78

1  Debrecen or did you transfer?
2      A.  I transferred over because
3  SUNY at Stony Brook gave me credits for a
4  lot of classes, so they kept me at a
5  status of junior.  So since I didn't lose
6  any time, I switched right over to Stony
7  Brook.
8      Q.  Is that why you selected
9  Stony Brook?
10     A.  Yes.
11     Q.  When you studied at Stony
12 Brook were you living at home?
13     A.  No.
14     Q.  You lived on your own?
15     A.  I lived on my own.
16     Q.  So at Stony Brook what year
17 did you graduate?
18     A.  '99.
19     Q.  And what was your grade
20 point average?
21     A.  I think it was somewhere
22 around 3.0, I believe, give or take.
23     Q.  Did that take into account
24 your grades from Debrecen?

Page 79

1      A.  I don't remember how the cum
2  works.
3      Q.  Any awards or honors from
4  Stony Brook?
5      A.  I got on the Dean's List
6  once, I believe.
7      Q.  Is there a reason why your
8  grades were lower at Stony Brook than
9  they were in high school?
10     A.  I was working about four
11 jobs at the time.
12     Q.  Tell us where you were
13 working?
14     A.  I was working as security
15 for their parties.
16     Q.  Whose parties?
17     A.  For any Stony Brook parties
18 that were on campus.  I worked as an
19 overnight stocker at Edwards which was a
20 grocery store.  I worked at Options for
21 Community Living which was a community
22 residence, and I was working at the book
23 store at the campus.
24         And then towards the end I

Page 80

1  was working at -- I believe that was
2  called Waldron Center for the Aging which
3  is a nursing home as a dietary aide, and
4  I was taking 22 credits at the time.
5      Q.  Is there a reason why you
6  needed to work four different jobs?
7      A.  Paying for college.
8      Q.  So you didn't have student
9  loans?
10     A.  I did have some student
11 loans, but I wasn't taking anything from
12 my parents at the time so...
13     Q.  What did you major in at
14 Stony Brook?
15     A.  I started off with
16 electrical engineering.  Yeah.
17 Electrical engineering and then wound up
18 with psychology.
19     Q.  That's quite a dramatic
20 shift.  How did you settle on psychology?
21     A.  Just I wanted to graduate on
22 time, so I basically switched my major my
23 senior year, took all the classes I
24 needed and finished the degree off in a

Page 81

1  year.
2      Q.  Since you started off as an
3  electrical engineering major, did you
4  explore the possibility of going back to
5  Johns Hopkins?
6      A.  I did.  I did think about
7  going back for biomed engineering, but
8  then I got word there was schools in the
9  Caribbean, so I decided to go back to
10 medicine.
11     Q.  Did you minor in anything at
12 Stony Brook?
13     A.  No.
14     Q.  And when you took the MCAT
15 in college, what score did you get?
16     A.  I don't remember exactly
17 what the score was.  I took it once.
18 That also because at that time my
19 girlfriend wanted to take it, and she
20 kind of forced me into it because I
21 didn't really want to take it.
22     Q.  You didn't really have an
23 interest in practicing medicine?
24     A.  No, because MCATs were not

Confidential - Mathew Thomas, Jr., M.D.

Page 82

1    required in the Caribbean at the time.
2    Now they're more so required, so she
3    asked me to take it to try to get into
4    med school in the U.S., but I knew
5    already it wasn't going to be fruitful.
6        Q.   Did she end up going to med
7    school in the U.S.?
8        A.   No.  She wound up going to
9    psych and went on with her life.
10       Q.   Is that girlfriend the
11   person who's now your wife?
12       A.   No.
13       Q.   So tell me what made you
14   decide to go to medical school?
15       A.   I think -- I've always had
16   an interest in medicine.  I did like my
17   time when I was in Hungary.  When the
18   Caribbean came up and some of the
19   students that were in Hungary were in the
20   Caribbean at Ross, they basically told me
21   the islands are nothing like they were
22   over there, so you may want to try it
23   again, so I said all right.  What do I
24   got to lose?

Page 83

1        Q.   So when you say the
2    Caribbean came up, who was it -- whose
3    idea was it for you to go to medical
4    school in the Caribbean?
5        A.   No.  That was -- friends of
6    mine had told me they had transferred
7    over, people that I knew from Hungary
8    before, but, ultimately, it was my
9    decision to go down and do med school.
10       Q.   And was there any reason why
11   you didn't try to go to a medical school
12   in the United States?
13       A.   I didn't have the GPA in my
14   background.  I didn't do premed and the
15   MCAT scores was not high enough, so I was
16   not going to try to apply, because if I
17   had to try again toward the end of that
18   year, I probably would have wasted
19   another year before I got in because all
20   the applications were much earlier in the
21   year.
22       Q.   How many medical schools did
23   you apply to?
24       A.   For the Caribbean?

Page 84

1        Q.   When you first applied to
2    medical school?
3        A.   I never applied to a medical
4    school in the U.S.
5        Q.   No.  I mean, when you first
6    applied to medical school, period?
7        A.   Ross University is all I
8    looked for.
9        Q.   Is that R-O-S-S?
10       A.   R-O-S-S in Dominica.
11       Q.   In West Indies?
12       A.   I don't know if you consider
13   that West Indies or not.  Caribbean.
14       Q.   So when did you start
15   medical school at Ross University?
16       A.   September '99.
17       Q.   So you didn't take any time
18   from after you graduated Stony Brook;
19   next semester you were starting medical
20   school?
21       A.   Just the summer.  That's it.
22       Q.   And for how long did you
23   attend Ross University?
24       A.   Ross University, I was there

Page 85

1    for a year.
2        Q.   One year.  Did you
3    eventually leave Ross?
4        A.   I did leave Ross.
5        Q.   Why?
6        A.   Ross is considered a weed
7    out school.
8        Q.   What do you mean by that?
9        A.   Meaning, they'll start their
10   first semester with approximately three
11   to 500 students, and they only have room
12   for maybe 125 by their first semester
13   because of clinical rotations, so it
14   basically -- they basically figure a
15   cutoff and then they start having people
16   repeat.
17       Q.   So to get into Ross
18   University you didn't need an MCAT score?
19       A.   You did not need an MCAT
20   score.
21       Q.   And to get into that Ross
22   University medical school you did not
23   need to be a premed major?
24       A.   No.

22 (Pages 82 to 85)

Confidential - Mathew Thomas, Jr., M.D.

Page 86

1      Q.   Were there any prerequisites
2  in terms of your course work?
3      A.   At that time, I don't
4  remember exactly what it was.  They did
5  accept me so whatever I was doing was
6  considered enough.
7      Q.   How much did it cost?  Do
8  you remember how much it cost to go to
9  Ross University medical school?
10      A.   I don't remember.
11      Q.   So were you one of the
12  people that were weeded out then?
13      A.   The first semester I did not
14  do too well.  I was borderline.  I wound
15  up having to repeat my first semester.  I
16  passed my first semester the second time
17  around.  I passed my second semester.  I
18  was going into my third semester when I
19  decided to transfer.
20      Q.   Why didn't you do well in
21  your first semester?
22      A.   I think it was just the
23  experience of just going down to the
24  Caribbean for the first time.  I was

Page 87

1  still young.  I was only like -- what was
2  it?  '99, so I was only 22 years old, not
3  even 22 yet and just, you know, I didn't
4  take things as seriously as I should
5  have.
6      Q.   Were you asked to transfer
7  or --
8      A.   No.  I was never asked to
9  ever leave the school.
10      Q.   But you knew that you were
11  going to have to repeat?
12      A.   No.  I repeated my first
13  semester.  I passed my second semester,
14  so I was actually in my third semester,
15  about five days in when I decided to
16  switch.
17      Q.   So if you were on track,
18  what was it that made you --
19      A.   Well, one of my close
20  friends and one of my friends that I had
21  studied a lot with, she transferred over.
22  I found out about the school.  People
23  were saying the school is very good, so
24  at that time I just made a decision to

Page 88

1  make the move.
2      Q.   Okay.
3      A.   Once you -- go ahead.
4      Q.   So this friend that
5  you -- what was her name?
6      A.   Neeru.
7      Q.   How do you spell that?
8      A.   N-E-E-R-U.
9      Q.   What school did Neeru
10  transfer to?
11      A.   To St. Matthew's.
12      Q.   And where was that school?
13      A.   At that time it was in
14  Belize.  It was in San Pedro.  It was a
15  small island on the outside of Belize.
16      Q.   Was she your girlfriend at
17  the time or just a friend?
18      A.   No.  Just a friend.
19      Q.   And so you decided to
20  transfer to the same school?
21      A.   Yes.
22      Q.   And so you attended -- I'm
23  sorry.  Give me the full name of the
24  school?

Page 89

1      A.   St. Matthew's School of
2  Medicine.  Currently, they're in the
3  Grand Caymans.
4      Q.   But it was in Belize when
5  you went there?
6      A.   Yes.
7      Q.   So when did you start there?
8      A.   I started there September
9  2000.
10      Q.   Through?
11      A.   I believe it was either
12  December 2001 or January 2002.
13      Q.   Did they accept your credits
14  from Ross University?
15      A.   Yes, they did.
16      Q.   And when you were -- was
17  that also a weed out school, would you
18  say?
19      A.   No.
20      Q.   But there was not a need to
21  have a premed background?
22      A.   By that time I'm a transfer,
23  so I don't know what their requisites are
24  for first year students -- first semester

23 (Pages 86 to 89)

Confidential - Mathew Thomas, Jr., M.D.

Page 90

1    students.
2        Q.   But they didn't require MCAT
3    scores?
4        A.   I don't know.  I didn't need
5    one because I was transferring.
6        Q.   So why did you end up
7    leaving St. Matthew's University?
8        A.   So St. Matthew's after
9    finishing San Pedro where there was a
10   hurricane, we wound up getting all
11   evacuated to Orlando.  Orlando we did one
12   semester and then my fourth and fifth
13   semester was up in Maine.
14       Q.   Why Maine?
15       A.   Maine is where their U.S.
16   campus was.  They would do -- people who
17   were part of the master's program were
18   able to do the med school as well as the
19   master's program at the same time up in
20   Maine.
21            So while I was up there I
22   finished my fourth and fifth semester.
23   Then you go to clinicals.  I went to
24   England, Manchester, England to do my

Page 91

1    clinicals.  I went there in, I think,
2    late August, early September and then we
3    had the attacks, World Trade on 9/11
4    here.
5        Q.   What made you go to
6    Manchester, England for your clinicals?
7        A.   They were able to let me
8    start right away.  I didn't need to
9    finish my Step 1 first.
10       Q.   So when September 11th
11   happened you were in Manchester?
12       A.   I was in Manchester at the
13   time.
14       Q.   Did you return back to the
15   United States?
16       A.   I couldn't return back for a
17   couple days, could not communicate with
18   anyone downtown, my parents in Staten
19   Island.  My family worked and lived and
20   went to school downtown.  So, obviously,
21   after that happened, all the news and
22   everything, talk about new attacks and
23   all the other issues and, actually, in
24   England as well there were attacks

Page 92

1    happening.
2            Late December I got a call
3    from St. Christopher University.  I
4    didn't find them.  They found me.
5    Basically said that if you want to
6    transfer over, you can go to New York to
7    do some of your clinicals or we'll get
8    you back into the U.S. to do your
9    clinicals for the rest of your way.
10       Q.   Do you know how they got
11   your name?
12       A.   No idea.
13       Q.   Had you heard of them
14   before?
15       A.   St. Christopher's, actually,
16   I never really heard of them.  The name
17   had been out there.  They were more of a
18   newer school.  So when Dr. Leone called
19   me, he explained to me their office was
20   in Scotch Plains, New Jersey which is
21   right outside of Staten Island.
22            So I listened to what he
23   said, and the fact that he was willing to
24   take me back into the U.S. right away, I

Page 93

1    said, you know what?  I might as well go.
2        Q.   Did other people that you
3    know transfer from St. Matthew's to St.
4    Christopher?
5        A.   Honestly, I don't remember.
6        Q.   And St. Christopher, is that
7    St. Christopher Iba Mar Diop?
8        A.   Yes, it is.  Actually, Neeru
9    did transfer a little later into St.
10   Christopher's as well.
11       Q.   And St. Christopher's is
12   based out of Senegal.  Is that right?
13       A.   Yeah.  The charter of
14   Senegal.
15       Q.   And did you ever -- but you
16   never went to school in Senegal.  Is that
17   correct?
18       A.   No.  Their campus was in
19   England, right outside of London, but
20   that's basically the basic sciences, so I
21   never had to attend over there.
22       Q.   And did St. Christopher
23   accept your transfer credits from St.
24   Matthew's and Ross University?

24 (Pages 90 to 93)

Confidential - Mathew Thomas, Jr., M.D.

Page 94

1     A.    Yes, they did.
2     Q.    And when did you graduate
3  from St. Christopher?
4     A.    2003, June.
5     Q.    What were your grades like
6  in medical school?
7     A.    Well, basic sciences I did
8  very well towards my end.  I passed
9  pathophys., anatomy and physiology --
10  well, not anatomy.  Physiology,
11  psychology, pharmacology, all those I did
12  well.
13     Q.    What happened with anatomy?
14     A.    Just -- I just never really
15  got into it.  Now I teach it so it's kind
16  of ironic, but now I have a better grasp,
17  I guess.
18     Q.    Did you pass it in medical
19  school?
20     A.    I did pass it, yeah, my
21  second time.  That was one of the classes
22  I had messed up my first semester at
23  Ross.  That was mainly because of the
24  lab.

Page 95

1     Q.    Do you know what your grade
2  point average was for medical school?
3     A.    I don't remember.  They do
4  it a little differently because once you
5  get to clinicals, it's just pass or fail,
6  so I don't know the cum average.
7     Q.    At what point in time -- did
8  you do clinical rotations then?
9     A.    I did.
10     Q.    And where did you do the
11  clinical rotations?
12     A.    So like I said, I had
13  originally started my medicine rotation
14  and some OB-GYN in Manchester.  I did
15  psych in Atlanta.  I did surgery in
16  Connecticut.  I did pediatrics in New
17  York.  What am I missing?  OB-GYN was in
18  New York, Flushing and then I did all
19  my -- basically all my electives in
20  Connecticut and Northport, the VA
21  hospital.
22     Q.    In Connecticut?
23     A.    No.  In New York.  My
24  electives were between Connecticut and

Page 96

1  New York.
2     Q.    And where did you rotate in
3  Atlanta?  What was the name?
4     A.    Ridgeview Institute.
5     Q.    How about in Connecticut?
6     A.    Griffin Hospital in Derby as
7  well as Saint Raphael's in New Haven.
8     Q.    And how about in New York?
9     A.    Flushing Hospital was for
10  pediatrics and OB-GYN, and Northport VA
11  Hospital were some of my electives.
12     Q.    Did you have any jobs during
13  medical school?
14     A.    I was still working at the
15  nursing home as a dietary aide sometimes
16  while I was back in the country in
17  between semesters, so they left me on
18  payroll.
19     Q.    Any other employment?
20     A.    Not that I recall.
21     Q.    When did you begin studying
22  for the USMLE?
23     A.    It was throughout med
24  school.  I mean, I studied here and

Page 97

1  there.  Because I went straight from
2  first semester into clinicals, I never
3  really took my time to sit down and just
4  study Step 1, so I kept trying to do it
5  along the way which was a big mistake.
6     Q.    What study methods did you
7  use for Step 1?
8     A.    Basically, First Aid which
9  is a Bible for --
10     Q.    What's it called?
11     A.    First Aid.
12     Q.    First Aid?
13     A.    First Aid.  They call it the
14  Bible for med students for Step 1.  Did
15  some, I think -- the Kaplan review course
16  was part of the fifth semester at St.
17  Matthew's, meaning they gave us some
18  Kaplan materials so it covered through
19  that, some question banks, assessment
20  tests.
21     Q.    So First Aid, Kaplan.
22  Anything else?
23     A.    Like I said, the USMLE
24  World.  I don't know when that started.

Confidential - Mathew Thomas, Jr., M.D.

Page 98

1    Q.   Is that online?
2    A.   It was online.  NBME
3  assessment tests, Kaplan Qbank and then
4  some other review courses that were out
5  there.
6    Q.   What other review courses?
7    A.   I did PASS program which is
8  located in Illinois.  I did Northwest
9  Medical Review.  At that time it was in
10 Michigan, right outside of Michigan State
11 University.  I also did the Kaplan and
12 then I believe that was it for Step 1.
13   Q.   When you say you did PASS
14 program in Illinois, did you actually go
15 to Illinois?
16   A.   Yes, I did.
17   Q.   Did you live there?
18   A.   I did.  You have to stay
19 there to take the course.
20   Q.   And you said Northwest
21 Medical Review in Michigan.  Did you
22 actually live there as well?
23   A.   Yes, I did.
24   Q.   Kaplan question bank or

Page 99

1  Kaplan Qbank, is that an online system?
2    A.   They have an online as well
3  as a Q book.
4    Q.   Which did you use?
5    A.   I did both.  I had access to
6  both.  I didn't really complete all of
7  them but I did here and there.
8    Q.   The NBME assessment tests,
9  did you use an online system to access
10 that?
11   A.   Yes, I did.
12   Q.   And USMLE World, we already
13 covered that's an online system, right?
14   A.   That's right.
15   Q.   Did you study with Optima
16 University at all for your first --
17   A.   For Step 1, no.
18   Q.   Why not?
19   A.   I don't know about the
20 course, and I believe when I passed, he
21 wasn't even in existence yet.
22   Q.   When you say "he," you mean
23 Suliman?
24   A.   Optima University.  Dr.

Page 100

1  Suliman I believe started only in 2007.
2  I passed my Step 1 in 2006.
3    Q.   How did you learn about all
4  these other review courses that you took?
5    A.   You Google online.
6    Q.   What other -- were there any
7  available USMLE Step 1 prep courses that
8  you didn't take?
9    A.   Well, I don't know when
10 Falcon started.  I know that's one that's
11 out there right now.  Premier Review does
12 the Step 2, Step 3.  I don't know if they
13 do Step 1.  I guess that's it.  I don't
14 really know what else is out there.
15   Q.   And which exam -- or which
16 prep courses did your friends take?
17   A.   Most people took Kaplan.
18 That seemed to be the premier one that
19 most people liked to take.  As time went
20 on some people started with Falcon 'cause
21 Dr. Goljan who was with Kaplan left and
22 started on his own.
23   Q.   Do you still have any study
24 materials from any of those?

Page 101

1    A.   For which courses?
2    Q.   Any of those courses?
3    A.   I don't know.  Kaplan I, may
4  have some old books.  PASS program, I may
5  have my own notebook.
6    Q.   Among your peers that you
7  graduated with from St. Christopher, did
8  many of them pass the USMLE Step 1?
9    A.   I never really got close to
10 many people with my graduating class.  It
11 was a very small class.
12   Q.   How many were in it?
13   A.   Less than 25, I believe.
14   Q.   Do you know whether they --
15   A.   From what I've heard, I
16 mean, the one or two people I did know
17 were on the way to getting into residency
18 from what I understand.  I know Neeru,
19 she graduated.  She's finished residency
20 in Georgia so she's done, obviously, but
21 I don't know of anybody else.
22   Q.   Is she practicing medicine
23 now?
24   A.   She's kind of practicing

26 (Pages 98 to 101)

Confidential - Mathew Thomas, Jr., M.D.

Page 102

1   with her husband.  Her husband is an
2   orthopedic surgeon, so she's running his
3   clinic and having babies so...
4        Q.   Did you know anyone else who
5   had an indeterminate score on any Step of
6   the USMLE?
7        A.   Indeterminate meaning, like,
8   similar to mine where they had to
9   validate?
10       Q.   Right.
11       A.   Yes, I did.
12       Q.   Who?
13       A.   Any students who went to
14  Optima who got a letter kind of told me
15  their situation.
16       Q.   So did you become friends
17  with most of the other students at
18  Optima?
19       A.   I don't know if I was
20  friends.  I knew all the students because
21  they all had to come through me at some
22  point once I started working there.  A
23  lot of them wound up having to come to me
24  when the FBI came.

Page 103

1        Q.   What do you mean they had to
2   come to you?
3        A.   Well, Dr. Suliman was not in
4   the country at the time, so everyone who
5   was going through the situation, they
6   were asking what's going on.  So since I
7   was really the only one that was kind of
8   there, they all would come to me and ask.
9        Q.   During that time did Dr.
10  Suliman ask you to kind of take care of
11  things in the U.S. with the students?
12       A.   He didn't ask me.  In fact,
13  we didn't get communication with him for
14  a couple days after the FBI came.  A lot
15  of students left.  I didn't feel right
16  leaving other students behind, so I stuck
17  it out until he came back, basically.
18       Q.   What were your conversations
19  like with Dr. Suliman after the FBI
20  raided Optima?
21       A.   He basically told us that
22  there's nothing to worry about, that he's
23  done nothing wrong, that it's all a
24  racist thing because he's Muslim and not

Page 104

1   to worry about it; that everything will
2   get back to normal once he proved
3   himself, and he has his lawyers on it.
4        Q.   And did you believe him?
5        A.   I did actually believe him.
6        Q.   Even after you spent two to
7   three hours with the FBI?
8        A.   The FBI asked me the same
9   questions.  I told them everything I
10  know.  Basically, I took it for face
11  value.
12       Q.   Do you still believe Dr.
13  Suliman?
14       A.   Now that I've seen articles
15  and stuff; his wife is basically saying
16  she was doing it with him, then I have to
17  say that he was lying to all of us.
18       Q.   What do you mean his wife
19  said she was doing it?
20       A.   I'm sorry.  I think she
21  testified that she went in and videotaped
22  exams, at least this is what I've seen in
23  the articles.  I haven't talked to her
24  directly or seen direct transcripts from

Page 105

1   the case so I wouldn't know.
2        Q.   Did you know when you were
3   working there that people had videotaped
4   or photographed exams?
5        A.   No.  Never.
6        Q.   So how many other students
7   would you say you knew from Optima
8   University that had that indeterminate
9   designation on their USMLE record?
10       A.   I would say that well over
11  30 or so, but he had close to a hundred
12  students.
13       Q.   So 30 out of the hundred?
14       A.   Probably.  If we go back to
15  what you had said before in terms of
16  reputational damages and stuff, a lot of
17  students, once it got to that point in
18  Tennessee, stopped even contacting me,
19  and even when I reached out to them for
20  things that I needed, they refused to
21  take my call.  So, basically, the
22  association became me associated with
23  him.
24       Q.   And why would you have

Confidential - Mathew Thomas, Jr., M.D.

Page 106

1    reached out -- like for what sorts of
2    things were you reaching out to them?
3        A.   There were some students who
4    had lived in the apartment that I was
5    living in.
6        Q.   At Optima?
7        A.   At Optima. Other students
8    had left to Tennessee, and I would get
9    random calls about things and asking me,
10   do you know this? Do you know that? So
11   I'd reach out to other people who may
12   have been down there.
13           Plus, there are some that I
14   knew as friends. We would drink
15   together. We'd go out, hang out, have
16   dinner or whatever together and just
17   reaching out to reach out, birthdays and
18   stuff and just never got a reply back.
19       Q.   Did you feel that people
20   were angry with you?
21       A.   I don't think anyone was
22   angry with me because they all knew that
23   when he disappeared I was still there, so
24   I don't think anyone held me responsible

Page 107

1    for anything. But I think one went as
2    far as to say, you know, that when they
3    talked to NBME they were told that I
4    worked there and I worked with him, so
5    they felt they shouldn't talk to me
6    anymore.
7            So, to me, I mean, I think a
8    part of it was just by association. So
9    they were just -- they figured if they
10   talked to me then they didn't want to be
11   in that association as well, so they just
12   kept clear, which I can understand which
13   is why I don't really hold a grudge
14   against anyone.
15       Q.   Do you know of those 30
16   people that have the indeterminate -- or
17   about 30 people that have the
18   indeterminate designation, how many of
19   them took the validating exam?
20       A.   I only heard of, I think,
21   three people that took the validation
22   exam.
23       Q.   What did the rest of them
24   do?

Page 108

1        A.   I don't remember. I know a
2    lot of them went for hearings. Some were
3    considered indeterminate or invalid. I
4    don't know what happened after them
5    because, like I said, they stopped
6    contacting me. And then there was a
7    bunch that were basically let go and
8    they're in residency and done now.
9        Q.   Are you in touch with any of
10   those people?
11       A.   Off and on. I'll see some
12   of them at weddings and stuff, but I
13   don't keep in touch with anybody, really.
14       Q.   Can you give me the names of
15   anybody that you know that was in the
16   same situation you were in with regard to
17   having to validate their indeterminate
18   score?
19       A.   My friend, Reeju Thomas.
20       Q.   How do you spell that?
21       A.   R-E-E-J-U, Thomas. Samuel
22   might be in there also as a middle name
23   or last name. He was found
24   indeterminate. I believe he was actually

Page 109

1    the first student that NBME contacted.
2    He went through a whole ordeal, finally
3    took the exam, validated one and then
4    based on that validation, they validated
5    the other one without him having to
6    retake it.
7        Q.   Anybody else?
8        A.   I don't remember who
9    actually validated and who got off.
10       Q.   Well, just give us the names
11   of anybody who had that indeterminate?
12       A.   Farhana Chowdhury I know had
13   similar numbers to me and she was
14   validated.
15       Q.   She was validated. Anybody
16   else?
17       A.   There's a bunch of people
18   that had to go in. I don't remember all
19   the names.
20       Q.   Tell us as many as you do
21   remember.
22       A.   I know Samir did. I don't
23   know his last name. His sister was
24   there.

28 (Pages 106 to 109)

Confidential - Mathew Thomas, Jr., M.D.

Page 110

1     Q.   His sister was where?
2     A.   Also called in.  She was
3  also at Optima.  Manjit.
4     Q.   Do you know Manjit's last
5  name?
6     A.   A lot of them I know by
7  first name because, like I said, I don't
8  keep in touch with them, so I don't
9  remember.  If you give me a list then
10  it'd be easier for me to say names.
11     Q.   Did any of those -- well, do
12  you know anyone else who has sued the
13  NBME or the ECFMG?
14     A.   No.  I'm the only one.
15  Sandeep Shukla.
16     Q.   How do you spell his last
17  name?
18     A.   S-H-U-K-L-A.  And he worked
19  for Suliman, also, but he was validated;
20  I don't know how, and he's done residency
21  now.
22     Q.   What did he do for Suliman?
23  What kind of work?
24     A.   He was an original from the

Page 111

1  beginning of time.  Before I was working
2  there he'd be the go-to.  He helped them,
3  hooked them up with people, supplies.
4     Q.   Did he have kind of the same
5  role at the organization?
6     A.   He was kind of an indirect
7  role before I came and then even after I
8  came, then he started actually doing some
9  lectures, I believe.
10     Q.   So you sort of took the
11  position that he used to have?
12     A.   Well, he wasn't really given
13  a position.  He just helped because him
14  and Suliman were close and then I think
15  he started teaching a little bit, and
16  what else did he do?  He was at first
17  Step 1 and Step 2.
18     Q.   How did you first learn
19  about Optima?
20     A.   At that time my girlfriend
21  had a friend who went to the ladies' gym
22  that's right next door, and in the
23  doorway there was a poster that talked
24  about a review course.

Page 112

1     Q.   What was compelling to you
2  about Optima?
3     A.   The words guaranteed passing
4  or your money back.
5     Q.   How much did you pay to go?
6     A.   $5,000.
7     Q.   Did you get your money back?
8     A.   I passed.
9     Q.   So no?
10     A.   No.
11     Q.   How did you enroll?
12     A.   You go in and you talk to
13  him and he sets you up.  Dr. Suliman sets
14  you up.
15     Q.   Did you know other people
16  who enrolled, too?
17     A.   People who were in the
18  course, yeah.  My girlfriend was there.
19     Q.   What was your girlfriend's
20  name?
21     A.   Simin, S-I-M-I-N.
22     Q.   Last name?
23     A.   Huda, H-U-D-A.
24     Q.   Did she take Optima?

Page 113

1     A.   She took the course.
2     Q.   Same time you did?
3     A.   She did.  She failed her
4  Step 1.
5     Q.   Did she get her money back?
6     A.   No.  He never really gave
7  anyone their money back.  He kind of
8  convinced them to stay back on the course
9  again and most people didn't.
10     Q.   So it was like you can
11  either have your money back or you can
12  take the course for free until you pass?
13     A.   Basically.
14     Q.   And where was Optima located
15  when you went?
16     A.   It was in the business
17  building in Totowa, New Jersey.  It was
18  like a shopping complex right off of
19  Route 46.
20     Q.   Where were the dormitories?
21     A.   There were no dormitories.
22     Q.   You didn't live there?
23     A.   No.  I did.  People found
24  their own apartments throughout Paterson

29 (Pages 110 to 113)

Confidential - Mathew Thomas, Jr., M.D.

Page 114

1    and Totowa.
2        Q.   Did you live with other
3    Optima students?
4        A.   When I first started I
5    didn't live there and then as time went
6    on I moved out to Paterson and lived with
7    some other students.
8        Q.   Who else did you live with?
9        A.   At that time it was Cecil
10   Cherian, Toby, I think Matthews is his
11   last name.  I don't even remember.  Reeju
12   was living there off and on and then
13   there was some girls that were living
14   downstairs and some other people in the
15   area.
16       Q.   Where did Dr. Suliman live?
17       A.   No idea.  I think it was
18   Elizabeth.
19       Q.   And how often did you see
20   him?
21       A.   When he was in the country
22   he was there every day.  That was his
23   pride and joy.
24       Q.   How often was he in the

Page 115

1    country?
2        A.   He would leave randomly.
3    The majority of the time he was in the
4    center.
5        Q.   So what are the dates that
6    you were a student at Optima?
7        A.   I went in around November
8    15th, give or take a couple days, and I
9    took the exam December 31st.
10       Q.   So about a month and a half?
11       A.   Yeah, but I was out with
12   gastritis in the middle, and I missed
13   some of the holidays.
14       Q.   And what was the range of
15   dates that you were an employee at
16   Optima?
17       A.   I think I started some time
18   February, and I think it was until around
19   August.
20       Q.   Of that next year?
21       A.   Of 2008, yeah.
22       Q.   So you were a student from
23   about November 15th, 2007 to December
24   31st, 2007, and you were an Optima

Page 116

1    employee from February 2008 to August
2    2008?
3        A.   Approximately, yeah.
4        Q.   When's the last time that
5    you saw Suliman?
6        A.   On the day before he left to
7    Tennessee.
8        Q.   Are you still in touch with
9    him at all?
10       A.   No.
11       Q.   How did you contact him
12   after that?
13       A.   After he was still in
14   Tennessee for a while so he still had his
15   phone and everything.  When the whole
16   situation came when he was raided and
17   people getting called in, I tried to
18   reach out to him.  He didn't get back to
19   me until days later.
20       Q.   And when did Dr. Suliman go
21   to Tennessee?
22       A.   I think it was August,
23   September.
24       Q.   So shortly after?

Page 117

1        A.   No.  I was basically there
2    until the day he left, so I don't know
3    exact dates so I can't say.  I know it
4    was at the end of summer, into September,
5    so either August or September, I believe,
6    is when he left.
7        Q.   So when Dr. Suliman came
8    back to Optima that's when you left?
9        A.   I'm sorry.  Say that again.
10       Q.   When Dr. Suliman came back
11   to Optima in Tennessee, that's when you
12   left?
13       A.   Came back from...
14       Q.   I'm sorry.  Scratch that.
15            He came -- he was overseas
16   when Optima was in New Jersey and was
17   raided?
18       A.   In May.  In May of 2008.
19       Q.   Right.
20       A.   He came back some time, I
21   think, June.
22       Q.   And moved...?
23       A.   No.  He put back a skeletal
24   system for the summer, June, July,

30 (Pages 114 to 117)

Confidential - Mathew Thomas, Jr., M.D.

1     August.  He had everything up and running
2     again and then at some point he decided
3     he's moving to Tennessee.
4        Q.   Were you part of the move to
5     Tennessee?
6        A.   No.  I did not go to
7     Tennessee.
8        Q.   Why not?
9        A.   I was a New Yorker.  No
10    reason to go to Tennessee.  Plus, in 2008
11    I was doing some research as well, so at
12    that point my focus is to start studying
13    for Step 3.
14       Q.   What kind of research were
15    you doing?
16       A.   Health and Hospitals
17    Corporation had a research group.  I was
18    working on dialysis research.
19       Q.   And so when was Dr. Suliman
20    in Tennessee then?
21       A.   I know he left, like I said,
22    somewhere towards the end of summer, fall
23    and then I don't know when he was
24    actually shut down over there.  I heard

1    from students he got raided twice, so I
2    don't know what really happened with all
3    that.
4       Q.   Did you ever consider suing
5    Optima University or Dr. Suliman?
6       A.   When?
7       Q.   Ever?
8       A.   No.
9       Q.   Well, they -- you paid them
10    $5,000, right?
11       A.   Yes.
12       Q.   And now you know that they
13    gave you a question bank of stolen test
14    questions?
15       A.   And he still is a fugitive
16    and who's going to pay that?  So I don't
17    really see who I would be suing.  The
18    wife is in jail from what I understand,
19    and he's a fugitive somewhere out East.
20    So unless there's someone who would be in
21    charge of all that or we can get it back
22    from the government, I don't know of any
23    legal way to sue him.
24       Q.   Do you blame Optima at all?

1       A.   For...?
2       Q.   Everything that's happened?
3       A.   Did he steal the questions
4    based on what the evidence is?  Yes.  Do
5    I blame him for what I chose to do at
6    that time?  No, because I don't really
7    know.  He lied to everybody.  I don't
8    know what we're blaming him for.  The
9    situation everyone's in, I guess yeah.
10       Q.   When you say he lied to
11    everyone, what do you mean?
12       A.   Well, if you're telling me
13    that there's proof that he stole the
14    questions and he said he worked hard to
15    make the questions himself, then he was
16    lying.
17       Q.   But you don't hold him
18    responsible for that?
19       A.   For the situation I'm in
20    right now?  The situation right now, I
21    went in thinking that I was doing the
22    right thing.  The situation I am in right
23    now is NBME basically saying that they
24    have proof that I stole stuff I didn't

1    steal.
2       Q.   Right, but you're saying he
3    duped you?
4       A.   He duped all of us.  That's
5    fine, but, again, my situation right now
6    is not based on him duping me.  My
7    situation right now is that NBME claims
8    that I had access to questions that he
9    may or may not have had when I was there.
10       And I have already said
11    multiple times he had updates in March of
12    2008, and I have been given no proof that
13    what they're comparing my exam to was
14    there when I was there, so that's my main
15    thing.  And the statistical analysis I
16    keep asking for I have yet to receive it.
17       Q.   What does the statistical
18    analysis look like to you?
19       A.   I would actually like to see
20    the questions you compared against, and
21    if the questions are there in a data
22    file, you'll have the date that the files
23    were put into his system, and if you
24    compare those dates, I guarantee they're

Confidential - Mathew Thomas, Jr., M.D.

Page 122

1     not when I was there.
2          Q.   So let me just ask the
3     question in a different way.  When you
4     say statistical analysis, do you actually
5     mean that you want to see the questions?
6          A.   I actually do want to see.
7     That's part of my analysis of it, yes.
8          Q.   But let me just finish my
9     question before you answer.
10         A.   Sure.
11         Q.   When you say that you want
12    to see a statistical analysis, do I take
13    that to mean or do you mean by that that
14    you want to see the actual test questions
15    that were exposed test questions that
16    were stolen by Optima and that you
17    answered on the exam?
18         A.   Yes, I do.
19         Q.   In that statistical analysis
20    is that all that you're seeking?  Is that
21    the sum and substance of what you're
22    seeking?
23         A.   I'd also want to see the
24    date that it was added to his system and

Page 123

1     also the date that you guys ran the
2     analysis because if the analysis was run
3     two, three years later with his full bank
4     compared to my exam and nothing takes
5     into account when they were added into
6     his bank, then there's a faulty situation
7     right there.
8          Q.   So what you're saying is
9     that you want the NBME to tell you when
10    Dr. Suliman added those questions to his
11    question bank?
12         A.   I believe that's very
13    pertinent to my case and to my situation.
14         Q.   Do you realize that some of
15    those dates may not be available to the
16    NBME; in other words, the NBME may not
17    have knowledge of when Dr. Suliman added
18    questions or didn't add questions to his
19    question bank?
20         A.   If you have a data file and
21    it shows what's there, every added
22    document or every added thing should have
23    a date -- creation date.  So, in theory,
24    if you have what you say you have, then

Page 124

1     you should have it there.
2          Q.   And so is that what you mean
3     by the statistical analysis?
4          A.   That's the start of the
5     statistical analysis.
6          Q.   What's the rest of the
7     statistical analysis?
8          A.   The rest of it is comparing
9     it against my test to show that it does
10    match up and then seeing how many I got
11    right including the time stamps because
12    like I said in my hearing, at the end of
13    every block, if I wind up having ten
14    questions left with a minute left, I'm
15    not going to sit there reading them.  I
16    am going to click through.  That is going
17    to quicken my time, and if my exposed
18    versus unexposed are in that section, it
19    is going to affect my time.
20              Same way if a question winds
21    up being something difficult and I stare
22    at it for a long time, that's going to
23    wind up increasing my average time.  So
24    there is a big -- there is a lot to be

Page 125

1     said, not just, oh, well, this percent
2     was here and this is the time it took.
3              And as Carson said,
4     observation, not analysis.  She said it
5     multiple times to me.  So according to
6     the appeal and my rights according to the
7     bulletin, I'm due an analysis, and she
8     basically told me it was an observation,
9     not an analysis.  So already they went
10    against their own policies and procedures
11    which was part of my appeal process.
12         Q.   You had the opportunity to
13    take a validating exam?
14         A.   I did.
15         Q.   And you failed the
16    validating exam, correct?
17         A.   Yes.
18         Q.   There was also some time
19    that you could have signed up for and
20    taken Step 2 CK over again, correct?
21         A.   After the validation?
22         Q.   Right.
23         A.   Yes.
24         Q.   And you decided not to do

32 (Pages 122 to 125)

Confidential - Mathew Thomas, Jr., M.D.

Page 126

1    that?
2        A.   I did.
3        Q.   Why?
4        A.   Because as you notice from
5    before, I work a lot, and I was not able
6    to put the time in, and I could not risk
7    failing it again.  Plus, they came up
8    with the six-attempt rule and the
9    seven-year rule.  All that put together
10   put me in a very weird and bad situation.
11       Q.   But before the existence of
12   the six-attempt rule and before the
13   existence of the seven-year rule, you had
14   time to take Step 2 CK again?
15       A.   When would that be?
16   The validation exam was taken at the end
17   of 2011.
18       Q.   Right.
19       A.   And at that time I was
20   working multiple jobs, plus married with
21   a kid.  So the time to sit there and
22   study as I did when I passed would mean I
23   have to put everything aside and just
24   study.

Page 127

1        Q.   Well, you were already
2    studying for Step 3, right?
3        A.   I was studying for Step 3
4    until 2009 when they stopped me.  2011 --
5    from the time this whole ordeal started
6    with NBME to 2011 I wasn't studying for
7    Step 3 anymore.
8        Q.   I want to go back a little
9    bit to what we were talking about with
10   the statistical analysis and the
11   observation.
12            Can you define for me what
13   the difference is between an observation
14   and an analysis?
15       A.   An observation to me is
16   one's opinion of what they see and how
17   they determine what those numbers or
18   those words mean.  Statistical analysis
19   is based on fact and numbers and gives a
20   lot more detail as to what is there and
21   why it's there, what it means.
22       Q.   Didn't you register to take
23   Step 2 CK in September 2012?
24       A.   I did.

Page 128

1        Q.   And you canceled that
2    attempt?
3        A.   I canceled it because at the
4    time we were going through the
5    whole -- let me explain the situation.
6            September 2012 I registered
7    for Step 2.  At the time I was studying.
8    I was working.  I had a kid.  I was
9    working multiple jobs.  I did not get to
10   put the time in that I wanted.
11           If I had the opportunity to
12   continue taking the attempts, I probably
13   would have just not taken the exam at the
14   time and taken it at a later date.
15   However, with the seven-year rule, as
16   well as the six-attempt rule which is
17   relatively new, basically, if I fail it,
18   I'm done.  I wasn't about to risk that
19   again.
20           So I decided not to take it
21   because I had already six attempts, and
22   the six-year rule was going into effect,
23   I believe, January.  So had I taken the
24   exam and failed it, then I'm not even

Page 129

1    allowed to take another attempt.
2        Q.   But you were already at six
3    attempts?
4        A.   But I was allowed to
5    have -- that's why I was trying to
6    get -- because we had grandfathered in,
7    they were giving us an extension time
8    until whatever it was, January, which is
9    why I asked for the waiver to extend the
10   period given the fact that I had no time.
11   Two-and-a-half years is basically taken
12   away from me in the process of this whole
13   Optima situation.
14           So I had asked to extend my
15   seven-year period as well as extend my
16   validation time or waiver from the
17   six-attempt rule because of the time that
18   I had lost.  Had I been able to maybe
19   take those exams I may have passed.
20       Q.   But you did have time to
21   take those exams and you decided not to
22   take them?
23       A.   Between when and when?
24   Between 2011 -- well, first, I guess the

33 (Pages 126 to 129)

Confidential - Mathew Thomas, Jr., M.D.

Page 130

1    question is, when is it that the six-year
2    rule would have taken effect?  I believe
3    it's January 1st of 2013, so I had three
4    months from the time I registered.
5         And I'm saying I didn't have
6    the time to study the way I wanted to
7    study so, therefore, taking the exam and
8    failing it would have gotten me -- that's
9    it.  I'm done.
10        Q.   But you were in that
11   position anyway?
12        A.   Which is why I applied for
13   the waiver.  I understood the whole
14   situation which is why I asked for the
15   waiver for the seven-year and the
16   six-attempt rule.
17        Q.   The real issue was that you
18   hadn't studied for it the way that you
19   wanted to study for it?
20        A.   Yeah, because at the time we
21   were fighting the whole situation.
22        Q.   Can you look in your exhibit
23   book to No. 30?  You've seen this
24   document before, right?

Page 131

1        A.   Yes, I have.
2        Q.   And this is an analysis of
3    your Step 2 CK examination that you took
4    on December 31st, 2007 that you --
5        A.   This is what Janet Carson
6    called an observation.
7        Q.   She called that an
8    observation?
9        A.   Yes, she did, and I said
10   that in the hearing, and she did not
11   rebut me.
12        Q.   Let's take a look at it now.
13   This document records the percentage of
14   questions that were exposed and the
15   percentage of questions that you got
16   correct that were exposed, right?  It
17   also records the number of answers that
18   you got correct from unexposed questions.
19        A.   Okay.
20        Q.   So of the exposed test
21   items, you got 84 percent correct.  Of
22   the unexposed test items, you got 66
23   percent correct, and 32 percent of your
24   overall test had exposed items on it.

Page 132

1        A.   Allegedly.  Remember, I, to
2    this day, do not accept that I had that
3    many questions when I was taking this
4    course.
5        Q.   But regardless of what you
6    accept, this document is an analysis of
7    your scores as it -- it compares the
8    percentage correct that were exposed
9    versus the percentage correct that were
10   unexposed --
11        A.   Okay.
12        Q.   -- right?
13        A.   That's what you're saying,
14   yes.
15        Q.   No.  I'm asking you.
16        A.   Well, you're labeling it
17   that way, so I would have to assume yes.
18        Q.   I didn't create this
19   document.  You understand that, right?
20        A.   I understand, but I didn't
21   create the document, either.
22        Q.   But your position has been
23   that you want someone to show you an
24   analysis?

Page 133

1        A.   My position is there's a lot
2    of variables that go into these numbers,
3    and none of them have been labeled out to
4    me.
5        Q.   What are the variables?
6        A.   Variables, one, how many
7    questions are we talking about?
8        Q.   Do you know how many
9    questions --
10        A.   I had to ask Janet Carson
11   later because the test is 300-some
12   questions, but they only count a certain
13   number of questions as part of the actual
14   exam.
15        Q.   So now you have the answer
16   to that.
17        A.   Fine.  Then are these
18   questions considered at the beginning --
19   towards the beginning of a block or the
20   end of a block?  What are the subject
21   matters in these questions because
22   everyone has a different expertise and
23   different subject matter.
24        I'm great in psych.  I'm

Confidential - Mathew Thomas, Jr., M.D.

Page 134

1  great with anything with numbers, so I
2  may be quick like this to get them done,
3  but at the same time, if all the exposed
4  are all infectious disease, micro, stuff
5  that's harder, regardless, I'd be taking
6  more time with them. So it all depends
7  on what type of questions which is
8  another thing I requested and never was
9  given to me.
10      So, to me, an analysis is
11  not just a bunch of numbers with
12  percents. It's entire background to how
13  the numbers come about. That's the full
14  analysis to me.
15      Q.  What you're saying, though,
16  is not that you weren't presented with
17  this information; it's just that you
18  don't accept it as an analysis?
19      A.  Again, when this was
20  presented to me and I brought it up,
21  Janet Carson made it very clear that this
22  is an observation, not a statistical
23  analysis.
24      Q.  Do the NBME and ECFMG's

Page 135

1  labels matter to you or does it matter to
2  you what it is that you're given?
3      A.  I believe both matter to me,
4  and what I'm given is not a full
5  analysis. This is more like a summary
6  page. If I gave a summary page to a
7  research person, they would not take it
8  as valid without seeing all the backup
9  data to it. Same exact way. If you're
10  going to give me this as my analysis,
11  then I'd like to see where you got to
12  this point.
13      Q.  So if I understand you
14  correctly, the thing that is missing from
15  this that would make it an analysis is an
16  explanation of the subject areas that the
17  questions were in and the timing of the
18  questions, in other words, were they
19  toward the front of the block, the middle
20  of the block or the end of the questions?
21      A.  That would be part of it.
22      Q.  Okay. What else?
23      A.  The exact questions
24  themselves.

Page 136

1      Q.  Why do you need to see the
2  exact questions?
3      A.  Some questions are two
4  liners. Some questions are a full page
5  you have to read. It makes a difference.
6      Q.  So it's the length of the
7  question?
8      A.  Length of the question as
9  well makes a big difference. The type of
10  question makes a difference.
11      Q.  What do you mean by type of
12  question?
13      A.  Media questions versus
14  straightforward questions. Questions
15  that are in series. Questions that have
16  four choices versus questions that have A
17  through K.
18      Q.  So the length of the
19  question, the type of question, where it
20  was in the block and the subject area?
21      A.  And the number of answer
22  choices.
23      Q.  Number of choices. Anything
24  else?

Page 137

1      A.  That would be the ones that
2  come to my head right now.
3      Q.  I want you to think about
4  it. Are there any other pieces that
5  would make this document a statistical
6  analysis in your mind?
7      A.  You wrote subject matter?
8      Q.  Yes.
9      A.  In subject matter are you
10  describing that as the topic itself or
11  the subject, because within the subject
12  there are topics that take longer.
13      Q.  I'm not sure what the
14  difference is.
15      A.  Psychiatry is a subject to
16  me and a topic within psychiatry, let's
17  say, depression versus PTSD or
18  pharmacology of psychiatry makes a
19  difference.
20      Q.  So subject and topic?
21      A.  Yes.
22      Q.  What else?
23      A.  Other than -- the main thing
24  is, also, like I went back to is when

35 (Pages 134 to 137)

Confidential - Mathew Thomas, Jr., M.D.

Page 138

1    they found it in the bank and whether
2    they can show that it was -- I had access
3    to it because that makes a big difference
4    of exposed.
5            If you can't prove to me
6    that I saw all those questions and I'm
7    telling you that I didn't, then
8    honestly -- if you wind up getting his
9    question bank in 2008 or if the FBI or
10   whoever gets his question bank when he's
11   in Tennessee and he's added all his
12   updates and now his bank is 2,000
13   questions, NBME does not change their
14   exam questions every month.  They don't
15   change them every week.  They change them
16   over a long period of time.
17       Q.   How do you know that?
18       A.   Because they usually shut
19   down in the first two months and they say
20   questions are updated, so they go to the
21   pool.  Then of the 300-some questions,
22   the whole point is they put in these, I
23   guess, research questions type of things
24   to see whether or not enough people get

Page 139

1    them right to add them into the regular
2    bank versus getting rid of them as
3    something that's not going to be a good
4    gauge.
5            So if you're not updating
6    your question bank regularly and you're
7    getting his set in 2008 and now you're
8    comparing me to 2007, not knowing what I
9    had access to, yeah, a lot more of my
10   questions may look like I was exposed,
11   but, in actuality, I never saw them
12   because when I was there I had less than
13   a thousand questions to work with.
14       Q.   So it's a coincidence that
15   you performed significantly better on
16   those questions?
17       A.   It could be, but the point
18   is the number of exposed may be very
19   much.  You have to also understand that
20   I'm not -- I don't want to say I'm not
21   stupid, but I also have been studying for
22   the exam, so there is going to be basic
23   knowledge.  Whether they were in his bank
24   or not, I would have known the answer to

Page 140

1    questions, so are you not giving credit
2    to any medical students who have taken
3    the exam?
4            I missed passing the exam by
5    one point, so it's not like I jumped from
6    where I had, like, a 60-something and I
7    jumped to an 80-something.  I jumped from
8    a 74 to an 85, so there are going to be a
9    good number of questions that you may
10   find exposed that is general knowledge,
11   so then how is that taken into account?
12   So the questions themselves do make a
13   very big difference.
14       Q.   And you see on this analysis
15   here, it says comparison group, N equals
16   1162?
17       A.   Yes, I do.
18       Q.   That was explained to you
19   that that was the number of other
20   examinees whose tests were analyzed and
21   compared with yours in terms of how many
22   percentage of exposed and how many
23   percentage of unexposed they got correct?
24       A.   Okay.

Page 141

1        Q.   That was explained to you
2    before, right?
3        A.   I don't know if it was
4    explained that exact way, but we did
5    touch upon the 1162.  I remember that
6    from the transcript.
7        Q.   You spent a lot of time
8    thinking about the fairness of this exam,
9    right?
10       A.   Yes.
11       Q.   And you know that among
12   1,162 other examinees, they got 75
13   percent of the exposed correct and 75
14   percent of the unexposed correct?
15       A.   And every single time
16   there's a comparison group, there are
17   outliers.  This is the average which
18   means you will have a bunch of people
19   well above 75/75, and you will have many
20   people well below 75/75.
21           So if you want to put me in
22   comparison of all 1,162 on a piece of
23   paper and show me, then I'll take that as
24   something that I can go with, but just

Confidential - Mathew Thomas, Jr., M.D.

Page 142

1    giving me an average doesn't say anything
2    to me because there may be many more
3    people below me who did much more percent
4    correct as my exposed and much less than
5    my unexposed, and I guarantee you they
6    weren't brought in for validity.
7        Q.   How can you guarantee?
8        A.   Well, I can say that because
9    what I was told at my hearing is the
10   reason I went to Optima is why I was
11   brought in.
12       Q.   You were told that at your
13   hearing?
14       A.   I was told that at the
15   hearing.
16       Q.   So, Dr. Thomas, from what I
17   hear what you're saying, you were
18   presented with this, this piece of paper
19   here, this analysis of your score as
20   compared with 1,162 other people, but you
21   do not accept this as a statistical
22   analysis --
23       A.   I do not.
24       Q.   -- right?

Page 143

1        A.   A complete statistical
2    analysis.
3        Q.   So you do accept it as a
4    statistical analysis, just not a complete
5    statistical analysis?
6        A.   Well, statistics meaning
7    you're taking a group of questions you
8    say was exposed, comparing it to my exam
9    so that's a percentage and then telling
10   me what I got right and wrong on those
11   questions.
12           So do I accept that as being
13   some kind of analysis, it's some kind
14   of -- it's numbers, but I can't
15   necessarily say that it takes all
16   variables into account to be a true
17   statistical analysis.
18       Q.   So from your viewpoint as a
19   statistical analysis, this is a
20   statistical analysis; it just doesn't
21   take into account all the possible
22   variables?
23       A.   I think this is math.
24       Q.   What's the difference?

Page 144

1        A.   I think, like I said,
2    statistical analysis will take in all
3    variables.  Statistics in itself takes in
4    all variables.  This is just percentages
5    given based on what you guys call a
6    denominator and enumerator.
7        Q.   What do you think the
8    purpose is of the USMLE?
9        A.   It's to gauge whether or not
10   students are -- have the right level to
11   be a doctor.
12       Q.   And who do you think it's to
13   determine -- strike that.
14           When a person sits for the
15   USMLE, whose job is it to verify that
16   they are -- that their score is an
17   accurate measure of their ability?
18       A.   I think the test itself.  If
19   you pass the test you should
20   automatically -- it should be understood
21   that that means you're ready to take the
22   test -- you're ready to practice.
23       Q.   Doesn't that not account for
24   all the variables?

Page 145

1        A.   Well, then if you go by
2    that, I passed the test.  You're taking
3    this analysis or these numbers to say
4    that it was not valid that I passed the
5    test.  I passed the test on the day I
6    took it.
7            You're trying to claim or
8    NBME is trying to claim that because I
9    went to Optima I had access to certain
10   measures that they have yet to prove that
11   I had access to as a reason to take that
12   away from me.
13       Q.   Maybe you misunderstood my
14   question.  I'll ask it again.
15           When you take the
16   examination, whose job is it to determine
17   whether or not that score is a valid
18   measure of your ability?
19       A.   I'm not sure.  I would
20   assume whoever created the exam.  That
21   was all done before the exam was created.
22       Q.   And if the person whose
23   responsibility it is to verify that your
24   score is a valid measure of your ability

37 (Pages 142 to 145)

Confidential - Mathew Thomas, Jr., M.D.

Page 146

1    does not believe for whatever reason that
2    that score is a valid measure of your
3    ability, then what is that person to do?
4         A.   If a person believes that I
5    did not pass that exam legitimately, that
6    person has the ownership without a shadow
7    of a doubt to show and prove that I did
8    not.  And at this point, nothing has been
9    shown without a shadow of a doubt because
10   I've clearly stated what I saw and what
11   you guys measured it against are not the
12   same.
13        Q.   So you believe that the job
14   is -- of the test is to presume that
15   somebody who passes is prepared to
16   practice medicine?
17        A.   I believe so, unless you
18   directly notice that they were cheating.
19        Q.   How about a person who fails
20   that examination six times?
21        A.   I believe if everyone -- if
22   they continue studying, especially if
23   they know the focus area, they can
24   eventually pass.

Page 147

1         Q.   So everyone eventually is
2    qualified to practice medicine?
3         A.   You do not need to go to med
4    school to pass a medical school exam.  If
5    you take out your Kaplan medical books
6    and study on your own, you can pass an
7    exam.  It's like any other civil service
8    exam.  The clinical aspect, that is
9    something you learn in the clinical
10   setting.  So do I believe that anybody
11   continuously studying, studying, studying
12   eventually will pass an exam, I believe
13   so.
14        Q.   And by your measure, in your
15   words, if someone passes the exam,
16   they're qualified to practice medicine?
17        A.   I believe so.
18        Q.   Okay.
19             MS. McENROE:  Let's go off
20   the record.
21             (A discussion was held off
22   the record.)
23             (A lunch break was taken.)
24             (Whereupon, a document was

Page 148

1             marked for identification as
2             Exhibit NO. 57.)
3             MS. HOLLAND:  So, Dr.
4    Thomas, I want to remind you that
5    you are still under oath, and I
6    just want to put on the record
7    that in front of each of us, in
8    front of Dr. Thomas, myself and
9    Ms. McEnroe as well as the
10   stenographer we have a binder of
11   exhibits that are tabbed and
12   numbered 1 through 56.
13            In addition to those
14   exhibits, Dr. Thomas has brought
15   some items with him that we have
16   collectively labeled Exhibit 57
17   and will be using those numbers
18   for reference throughout the
19   deposition and have been using
20   those numbers throughout the
21   deposition to refer to different
22   documents.
23            THE WITNESS:  Okay.
24   BY MS. HOLLAND:

Page 149

1         Q.   With that in mind, Dr.
2    Thomas, could you turn with me to Exhibit
3    7?
4         A.   (Witness complies with
5    request.)
6         Q.   Do you recognize Exhibit 7?
7         A.   Yes, I do.
8         Q.   What is it?
9         A.   It's an e-mail from Susan
10   Detich to myself.
11        Q.   And I see on the to line it
12   says manu.thomas.31@gmail.  Is that you?
13        A.   That is me.
14        Q.   Do you go by the name Manu?
15        A.   Yes, I do.
16        Q.   And this e-mail was sent by
17   Susan Detich to you on what date?
18        A.   July 27, 2009.
19        Q.   And turning to the next page
20   of Exhibit 7, do you recognize this part
21   of the document?
22        A.   Yes, I do.
23        Q.   What is it?
24        A.   This is a letter sent from

38 (Pages 146 to 149)

Confidential - Mathew Thomas, Jr., M.D.

Page 150

1    Susan Detich to myself.
2         Q.   On what date?
3         A.   July 27th, 2009.
4         Q.   And did you receive this
5    letter?
6         A.   Yes, I did.
7         Q.   Now, that was on -- that was
8    sent to you on July 27th, 2009.  At that
9    point you were registered to take Step 3.
10   Is that right?
11        A.   I had registered for Step 3.
12   My registration, I believe, was not
13   completed because I received this letter.
14        Q.   And this letter basically
15   informed you that your scores on the Step
16   2 CK exam from December 31st, 2007 were
17   under investigation?
18        A.   That is correct.
19        Q.   Turning with me to Exhibit
20   8, please.  Do you recognize this?
21        A.   This seems to be an e-mail
22   from me to Ms. Detich in August.
23        Q.   And in this e-mail you
24   acknowledge the receipt of the letter

Page 151

1    from July 27th, 2009, correct?
2         A.   That is correct.
3         Q.   And then you have some
4    questions regarding the allegations and
5    your own investigation of the activities
6    regarding NBME and Optima?
7         A.   Yes.
8         Q.   What was your own
9    investigation?
10        A.   I believe I'm referring to
11   the FBI, sitting with the FBI and then me
12   given the timeline from which I had taken
13   the exam at the appointed time where they
14   finally told me there was a question with
15   my examination.
16        Q.   So when you say my own
17   investigation, you mean what you perceive
18   to be an investigation into you and your
19   conduct?
20        A.   Yeah.  Investigation in the
21   terms of my timeline of the activities
22   that took place leading up to the letter
23   that came in.
24        Q.   You don't mean that you

Page 152

1    conducted an investigation?
2         A.   No.  No.  At no time did I
3    conduct an investigation.
4         Q.   And you ask in this letter
5    about halfway down in this e-mail:  At
6    this time I would like to know what the
7    specifics are of the root of your
8    investigation.
9         A.   That's correct.
10        Q.   And you also say that you
11   sat with the FBI for almost three hours
12   in May 2008 regarding Optima and its
13   business plan.  You were as cooperative
14   as you could be and you were already
15   ECFMG certified.
16        A.   That is correct.
17        Q.   During that three-hour
18   meeting with the FBI, what did they ask
19   you?
20        A.   They asked me everything
21   from the daily activities of the day,
22   what students did from the time they got
23   in 'til the time they left, what my
24   function was on a daily basis.  They

Page 153

1    asked regarding the server, access to the
2    server, where the IT specialist was who
3    was handling the server.  They asked me
4    questions regarding the bank.
5         Q.   The question bank, you mean?
6         A.   The question bank.  They
7    asked me some background about Suliman,
8    about how students came to know about the
9    place, just all basic stuff.  A lot of it
10   was focused on the server and the
11   questions.
12        Q.   Did they interview anyone
13   else while you were there?
14        A.   I was not there when the FBI
15   originally came.  I was actually out on
16   an interview in the city for a job.  I
17   got a call as I was leaving the interview
18   to come back to the center.
19        Q.   Who called you?
20        A.   My girlfriend at the time
21   called me.
22        Q.   So she was there as well?
23        A.   She was there at that time.
24        Q.   Was she an employee, too?

39 (Pages 150 to 153)

Confidential - Mathew Thomas, Jr., M.D.

Page 154

1    A.   No, she was not.
2    Q.   So you went back to the
3  center.  You answered the FBI's
4  questions.  Was anyone else being
5  questioned during that time?
6    A.   When I got there, anyone
7  they had questioned had already been
8  done.
9    Q.   And do you know who else
10  they questioned?
11    A.   I don't know if they
12  formally questioned anyone or if they
13  just randomly were talking to students,
14  so I can't really say to who or what
15  happened before I got there.
16    Q.   Is it fair to say that no
17  one else was subjected to the kind of
18  long-term extensive investigation or
19  questioning as much as you were?
20    A.   Again, I don't know.  I
21  couldn't confirm that.
22    Q.   How many FBI agents were
23  there involved in the raid?
24    A.   There was -- I don't know

Page 155

1  how many were there at the beginning.  I
2  heard there were more there before I got
3  there.  When I got there I believe it was
4  maybe less than five; one, maybe two
5  talking to me and then there was a couple
6  of IT FBI agents trying to get into the
7  server.
8    Q.   Did they ask for your
9  assistance in getting into the server?
10    A.   They asked me and I had
11  nothing to offer because I had nothing to
12  do with the server.
13    Q.   What about your IT person
14  who was there?
15    A.   He wasn't to be found.
16    Q.   So when the FBI arrived at
17  Optima, tell us what that was like.  What
18  happened?
19    A.   I wasn't there.
20    Q.   So when you did get there,
21  were there any doors broken down?
22    A.   Not visibly that I could
23  tell.  The center is not locked during
24  the day.  It's wide open, so if they were

Page 156

1  to come in, they would have just come in
2  through the front, I assume.  The only
3  locked door is really the one that goes
4  into his office from the outside.
5    Q.   Suliman's office?
6    A.   Dr. Suliman's office.
7  Otherwise, it's an open entrance going
8  in.  So I don't -- I didn't see anything
9  broken, to tell you the truth.  The
10  server was out in the casing, and they
11  were trying to break into that.  That's
12  probably the only thing I saw that may
13  have been...
14    Q.   Can you tell me the name of
15  the IT person from Optima?
16    A.   I know him as Adrian.  He's
17  from abroad.
18    Q.   Abroad where?
19    A.   I believe it's Romania, if
20  I'm not mistaken.
21    Q.   Do you know his last name?
22    A.   I do not know his last name.
23    Q.   Did you have a cell phone
24  number for him?

Page 157

1    A.   Well, he was visiting in the
2  country at the time.  He's not from the
3  U.S.  He's actually from abroad, so at
4  that time I did have a local number that
5  he was using temporarily.
6    Q.   Did you call it to help the
7  FBI get him?
8    A.   I tried calling.  No answer.
9    Q.   Turn with me, if you will,
10  to Exhibit 9.  This is a series of
11  e-mails from August of 2009, and do you
12  recognize these e-mails?
13    A.   This is her response to my
14  response.
15    Q.   And do you see at the top
16  there, that first e-mail sent August
17  28th, 2009, 11:28 a.m.  Who wrote that
18  e-mail?
19    A.   That would be me.
20    Q.   And it says:  I appreciate
21  the quick reply and I look forward to
22  hearing the results of the USMLE
23  Committee on Score Validity and clearing
24  my name of any suspicious indeterminate

Confidential - Mathew Thomas, Jr., M.D.

Page 158

1    score or irregular behavior.  I want to
2    again state that I'm happy to prove that
3    I have no affiliation with Optima
4    University, its owner or its proprietary
5    information.
6           Do you see that?
7        A.   Uh-huh.
8        Q.   When you said that you had
9    no affiliation with Optima University,
10   you said that you were happy to prove
11   that.  What were you prepared to do to
12   prove that?
13       A.   That I would show my history
14   of not being there.  The only time I was
15   there was as a student as well as the
16   time -- the short time that I had worked
17   there.
18       Q.   And then later on that day
19   Susan Detich writes to you from the NBME:
20   Dr. Thomas, you will receive formal
21   notification within the next week or so,
22   and your performance on the December 2007
23   Step 2 CK has been referred to the USMLE
24   Committee on Score Validity.

Page 159

1           Turn with me, if you will,
2    to Exhibit 10.  Do you recognize the
3    first page of Exhibit 10?
4        A.   This is an e-mail from Susan
5    Detich to myself.
6        Q.   And how about the second
7    page and the rest of the exhibit?
8        A.   This is the official -- this
9    is the official letter that I received
10   from Susan Detich which broke down my
11   history with the exam as well as what
12   they said was the calculations about
13   exposed versus unexposed in my exam and
14   then giving me the options.  I believe
15   they gave me the options at the end.
16       Q.   And how many pages is the
17   letter that you were sent?
18       A.   This seems to be five.
19       Q.   Attached to this
20   letter -- let me find the paragraph here.
21   See at the bottom, it's a small number
22   NBME 201?
23       A.   Yes.
24       Q.   It says, as explained in the

Page 160

1    enclosed policies and procedures.  Is
2    that right?
3        A.   At the very bottom, yes.
4        Q.   And I want you to flip with
5    me to Exhibit 3 quickly.  Are these the
6    policies and procedures that were
7    attached to that letter?
8        A.   I believe so.
9        Q.   Let's turn now to Exhibit
10   11.  Do you recognize this?
11       A.   Another e-mail from me to
12   Ms. Detich.
13       Q.   And I notice that you signed
14   your name Mathew Thomas, Jr., M.D., MHSA.
15   What is MHSA?
16       A.   That's a master's in health
17   service administration.
18       Q.   Where did you earn your
19   master's in health services?
20       A.   Saint Joseph's College of
21   Maine.  That's what I was doing, the
22   master's, when I was up in Maine for two
23   semesters.
24       Q.   So that was before you went

Page 161

1    to medical school or after?
2        A.   No.  That was concurrent
3    with St. Matthew's University.
4        Q.   Let's turn to Exhibit 12.
5    Again, do you recognize this?
6        A.   This is a letter from Susan
7    Detich to myself and Janet Carson carbon
8    copied on it.
9        Q.   And this is discussing your
10   inability to open the pdfs and they're
11   mailing them to you, right?
12       A.   That is correct.
13       Q.   Let's go to No. 13.  No. 13,
14   again, we have a series of e-mails.  Do
15   you recognize these e-mails?
16       A.   Yeah.  This is in response
17   to Susan Detich's e-mail regarding the
18   pdfs not being able to be opened.
19       Q.   And you indicate that she
20   can mail the -- FedEx the documents to
21   your parents' house?
22       A.   That's correct.
23       Q.   And that's the same address
24   that you live at now, right?

41 (Pages 158 to 161)

Confidential - Mathew Thomas, Jr., M.D.

Page 162

1    A.   That is correct.
2    Q.   Do your parents still live
3  there?
4    A.   Yes, they do.
5    Q.   So your parents and your
6  wife and kids live there?
7    A.   Now, yeah.
8    Q.   Let's turn to Exhibit 14.
9  And this is a FedEx tracking slip.  Do
10 you notice the recipient information
11 about halfway down?
12   A.   To myself.
13   Q.   Let's turn to 15.  Exhibit
14 15 is also a series of e-mails.  Do you
15 recognize them?
16   A.   Yes.  This is, again, my
17 response to Susan Detich after she said
18 she's going to mail me the -- Federal
19 Express the letter to me.
20   Q.   And you write to Susan
21 Detich:  I'm in receipt of the FedEx
22 package today with the accusations
23 against me and the validity of my Step 2
24 score.  It will be my pleasure to defend

Page 163

1  my stance on the validity of my score as
2  I still stand steadfast on my original
3  letter to you.
4    A.   That's correct.
5    Q.   In the second paragraph you
6  write:  Unfortunately, as I mentioned in
7  the previous e-mail, I am supposed to go
8  abroad, and I'm unsure if I can make the
9  October 14th date.
10        What were you going abroad
11 for?  Do you remember?
12   A.   2009, I do not remember, to
13 tell you the honest truth.
14   Q.   Let's turn to 16.  This is
15 an e-mail, an e-mail string.  You see the
16 first e-mail there --
17   A.   Yes.
18   Q.   -- from Susan Detich?
19        Is that an e-mail that you
20 received?
21   A.   Yes, it is.
22   Q.   So it says:  Dear Dr.
23 Thomas, I have rescheduled this matter
24 for review on December 16th, 2009.  The

Page 164

1  deadline for submission of written
2  materials and/or notification that you
3  wish to appear in person is November 6th,
4  2009.
5    A.   That is correct.
6    Q.   Let's go to 17, and this is
7  an e-mail in which you say:  Thank you.
8  I will notify you on a timely basis.
9        Is that right?
10   A.   That's correct.
11   Q.   Let's go to 18.  So for No.
12 18, reading it from the bottom to the
13 top, on October 12th, 2009, 9:32 p.m.,
14 you are writing with regard to the
15 analysis that was provided to you.  Is
16 that right?
17   A.   Yes.
18   Q.   And you say:  As per the
19 letter sent to me dated September 15th,
20 2009, it was stated that 32 percent of
21 test items that appeared on the Step 2 CK
22 form taken by me in December 2007 and
23 that was used in, quote -- I'm sorry,
24 that was, quote, used in scoring the

Page 165

1  form, end quote, may have been subject to
2  unauthorized reproduction and
3  dissemination through Optima prior to my
4  exam date.
5        Then you ask for the number
6  of total questions that were used in
7  grading the exam.  Is that right?
8    A.   That's correct.
9    Q.   And then at the top of -- at
10 the top of the e-mails Susan Detich
11 writes back to you:  Dear Dr. Thomas, my
12 sincere apologies for my delay in
13 responding to your earlier e-mail
14 inquiries.  288 of the items from the
15 exam that was taken by you were scored.
16        And then she says:  Because
17 I did not respond more promptly to your
18 requests, the deadline for your
19 submission of any written information
20 will be extended until December 4th,
21 2009?
22        Is that right?
23   A.   That's correct.
24   Q.   So at that point, November

42 (Pages 162 to 165)

Confidential - Mathew Thomas, Jr., M.D.

Page 166

1    11th, 2009, you knew how many of the test
2    items were scored?
3         A.   That's correct.
4         Q.   Exhibit 19, this appears to
5    be an e-mail scheduling your review with
6    the Committee on Score Validity.  Is that
7    right?
8         A.   That's correct.
9         Q.   And it just states that the
10   date for your review will be December
11   16th, 2009?
12        A.   Excuse me?
13        Q.   December 16th, 2009 is the
14   date?
15        A.   That's correct.
16        Q.   About the middle of that
17   page there you write:  Ms. Carson, what
18   are the committee dates and times
19   available in December, and can I schedule
20   a phone conversation with you at some
21   point off the record, if possible?
22             What was your hope to
23   discuss off the record with Ms. Carson?
24        A.   I think I just wanted to

Page 167

1    find out exactly what it is that they
2    were looking for, and I think part of me
3    wanted to know whether or not they were
4    trying to find out all the students who
5    went there, but she never brought it up
6    so I never brought it up.
7         Q.   So you were worried that
8    they were going to use your appearance
9    before the Committee on Score Validity to
10   find out more information about Optima?
11        A.   Well, I knew they'd probably
12   bring up Optima.  I was under the
13   impression that Optima questions would
14   come up.
15        Q.   Were you surprised when more
16   Optima questions didn't come up?
17        A.   No.  I wasn't surprised
18   either way.
19        Q.   Let's go to Exhibit 20.  So
20   this exhibit contains two e-mails that
21   appear to be the same e-mail from Ms.
22   Babcox, B-A-B-C-O-X?
23        A.   That's correct.
24        Q.   And that's just scheduling

Page 168

1    your appearance before the USMLE's
2    Committee on Score Validity?
3         A.   Yes.
4         Q.   Around the time that the
5    Committee on Score Validity appearance
6    was being scheduled, do you remember
7    having a phone call with Ms. Carson?
8         A.   A phone call with Ms. Carson
9    regarding...?
10        Q.   Do you remember speaking to
11   Ms. Carson on the phone?
12        A.   I don't remember.  I've had
13   conversations on the phone with her.  I
14   don't remember if it was around the time
15   of the actual committee hearing.
16        Q.   Do you remember actually
17   calling Ms. Carson not only on the work
18   phone but also on her home phone?
19        A.   I called back the number she
20   had called me from.  I didn't know what
21   number that was.
22        Q.   So Exhibit 21, do you
23   recognize Exhibit 21?
24        A.   This is the transcript from

Page 169

1    my hearing.
2         Q.   Dr. Thomas, you indicated a
3    few times earlier that throughout the
4    Committee on Score Validity meeting, Ms.
5    Carson referred to the analysis that was
6    provided to you as an observation as
7    opposed to an analysis?
8         A.   No.  I stated that she had
9    told me in prior conversations that it
10   was an observation, not an analysis.  She
11   did not say it within this hearing, but
12   she did not rebut.
13        Q.   She did not rebut what?
14        A.   That I claimed that she
15   called it an observation.
16        Q.   Can you show me in this
17   hearing where you said that it was an
18   observation -- where you say that she
19   said it was an observation?
20        A.   Sure.
21        Q.   Maybe if I can help, Dr.
22   Thomas, if you look at small page 16,
23   line 12?
24        A.   Yes.  That's exactly where

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Mathew Thomas, Jr., M.D.

Page 170

1    it is.
2        Q.   So you say -- I'm just going
3    to start at the top of that paragraph
4    with line 1.  "Ms. Carson, if I could get
5    some kind of" -- this is your recalling a
6    prior conversation?
7        A.   Yes.
8        Q.   "Ms. Carson, if I could get
9    some kind of statistical analysis to show
10   what the question basis was.  That was a
11   big major thing to me.  For me, I'm here
12   at a hearing with the court reporter.  I
13   was allowed to have counsel.  I'm being
14   sworn under oath, and I said give me some
15   discovery as to the data against me so
16   that I can see what you're going by.  And
17   she said to me, and quote if I'm wrong,
18   she said that this is not a statistical
19   analysis, this is an observation.
20           These are observations made
21   by individuals in the National Board.  I
22   asked her for their qualifications.  She
23   said, we don't check their CVs.  I said,
24   let me get information for the board.

Page 171

1    I'll contact them to find out their
2    qualifications, and she says, we're not
3    going to give that information to you."
4           And then you later say:
5    "For me, if you had stratified and told
6    me, well, you know what, on the exposed
7    versus the unexposed, medicine, OB-GYN,
8    surgery, peds and psych, these are the
9    types of questions, and by far everything
10   is equal across-the-board --
11   across-the-board you -- you had scored
12   lower or higher, I could see."
13           Do you see that?
14       A.   Yes, I do.
15       Q.   So your recollection was
16   that you told the Committee on Score
17   Validity that Ms. Carson had told you
18   that it was an observation --
19       A.   Yes, it was.
20       Q.   -- right?
21           And your recollection is
22   correct because I just read that from the
23   transcript, right?
24       A.   Yes.

Page 172

1        Q.   Now, you're basing your
2    position that that was an observation on
3    the fact that Ms. Carson called it an
4    observation?
5        A.   She was very adamant that it
6    was an observation.
7        Q.   If she had said that it was
8    a statistical analysis, would it have
9    been a statistical analysis?
10       A.   No.  Then I would have
11   expected her to tell me who did the
12   statistical analysis and move from there.
13       Q.   So the fact that she said
14   that it was an observation was not
15   important?
16       A.   It was important considering
17   she's a secretary speaking on behalf of
18   the NBME and anything she says basically
19   would be her speaking for them.
20       Q.   So moving onto Exhibit 22.
21   This is an e-mail from Susan Detich to
22   you.  Is that right?
23       A.   That's correct.
24       Q.   And she says: The committee

Page 173

1    found it could not certify the validity
2    of your Step 2 CK scores and has deemed
3    them indeterminate unless and until you
4    pass a validating exam, right?
5        A.   That's correct.
6        Q.   And then she goes on to say:
7    Once you receive the committee's formal
8    decision letter, you will have six months
9    during which you may take the validating
10   exam.  Is that right?
11       A.   That is correct.
12       Q.   Let's go to Exhibit 23.  You
13   write: Please send all documents to the
14   PO Box.  I will most likely appeal.
15   Please realize that I will be out of the
16   country possibly until February 10th.
17   Please schedule me for the next appeal
18   committee date.
19           Now, at that point -- what
20   was the appeal committee that you were
21   hoping to appear before?
22       A.   Well, I didn't realize at
23   that point that the appeal committee is
24   not an in-person committee.  I was under

44 (Pages 170 to 173)

Confidential - Mathew Thomas, Jr., M.D.

Page 174

1  the impression it would be similar to the
2  other committee but possibly with other
3  people at a higher level.
4      Q.   I see.  Okay.
5          So Exhibit 24, do you
6  recognize this exhibit?
7      A.   Yes.  This is the -- I
8  believe the verdict that the Committee on
9  Score Validity came up with after my
10  hearing in December.
11     Q.   Well, this is actually a
12 letter, right?
13     A.   A letter, yes, stating their
14 stance.
15     Q.   And how many pages is this
16 letter?
17     A.   It says four.
18     Q.   Four pages, and about midway
19 through the first page it says:  During
20 the course of its deliberations the
21 committee discussed the following.
22     A.   Yes.
23     Q.   There are, I think, one,
24 two, three, four, five, six, seven,

Page 175

1  eight -- eight bullet points of pieces of
2  information that the committee
3  considered?
4      A.   Yes.
5      Q.   And among those eight bullet
6  points, the letter discusses that 32
7  percent of the test items that appeared
8  on the Step 2 CK form taken by you in
9  December 2007 and that were used in
10 scoring that form may have been subject
11 to unauthorized reproduction and
12 dissemination through Optima.
13     A.   May have been.
14     Q.   Right.  And the next part
15 says:  Your percent score on those scored
16 items believed to have been exposed was
17 higher than your percent scored correct
18 on items for which there is no current
19 evidence of exposure, right?
20     A.   That's what's written.
21     Q.   And it says:  The average
22 performance of a comparison group of
23 other examinees who took the same form
24 shows greater consistency in performance

Page 176

1  on those two sets of items.  Is that
2  right?
3      A.   That's what's written here.
4      Q.   In the next bullet point it
5  talks about the fact that on items that
6  were believed to have been exposed, you
7  spent an average of 59 seconds whereas on
8  items that were not believed to have been
9  exposed, you spent an average of 73
10 seconds?
11     A.   That's what's written, yes.
12     Q.   And, again, it talks about
13 the comparison group which spent an
14 average of 73 seconds on exposed and 76
15 seconds on nonexposed items.  Is that
16 right?
17     A.   Yeah.  That's what's written
18 here.
19     Q.   The next bullet point
20 discusses the fact that the committee
21 took into account your personal
22 appearance and the things that you stated
23 and testified to in front of that
24 committee and that they took into

Page 177

1  account.  Is that right?
2      A.   That's correct.
3      Q.   And then the last eight
4  paragraphs of the letter talk about the
5  committee's decision and their
6  consideration of all the information
7  available to them and their decision not
8  to certify the validity of your passing
9  result.  Is that right?
10     A.   That's correct.
11     Q.   Now, also, in this letter,
12 the committee discusses the procedure of
13 taking a validating exam?
14     A.   Yes.
15     Q.   When did you take that
16 validating exam?  Do you remember?
17     A.   I believe September 2011.
18     Q.   And what did you do to
19 prepare for the validating exam?
20     A.   Much the same, looked at
21 some question banks, some old notes,
22 books but nothing as intense as I had
23 what I was studying for in 2007.
24     Q.   Did you utilize the services

45 (Pages 174 to 177)

Confidential - Mathew Thomas, Jr., M.D.

Page 178

1    of Optima to study for the validating
2    exam?
3        A.   No, I did not.
4        Q.   Why not?
5        A.   It was closed.
6        Q.   Exhibit 25 is an e-mail
7    saying:  Please put me on the calendar
8    for the appeal.  Is that sent by you?
9        A.   Yes, it is.
10       Q.   Exhibit 26.  In Exhibit
11   26 -- this is a string of e-mails -- you
12   are asking Susan Detich if it's possible
13   to get an extension on the appeal
14   process.  You write:  I was distracted
15   with some issues and thought best to
16   inquire.
17           What was going on at that
18   point?
19       A.   I don't exactly remember.
20   Actually, that might have been around the
21   time from the arrest and everything
22   related to that.
23       Q.   And then Ms. Detich
24   writes -- or had written previous:

Page 179

1    Information on the appeal process.  The
2    appeal is a review of the written record
3    so your appeal would consist of the
4    following:  All of the materials reviewed
5    by the Committee on Score Validity, the
6    stenographic record of your personal
7    appearance, the committee's decision
8    letter and your own written appeal.
9        A.   That's correct.  May I just
10   ask why this says redacted and what that
11   means?
12       Q.   Redacted means that there's
13   information from this document that was
14   removed from it.
15       A.   For any specific reason?
16       Q.   In this case, the portion of
17   the information that was redacted was the
18   information that was forwarded to me.
19   Like, in other words, just the headers of
20   the e-mail.
21       A.   I understand.  Okay.
22       Q.   Just for ease of reading so
23   that everyone can tell when it was
24   originally sent.

Page 180

1        A.   Okay.
2        Q.   No. 27, Exhibit 27 is also a
3    series of e-mails, and in Exhibit 27 on
4    May 25th, 2010, this was an e-mail from
5    Emilie Babcox to Janet Carson and Susan
6    Detich, so you were not a party to this
7    e-mail, right?
8        A.   No.
9        Q.   But I am going to ask you
10   whether you remember leaving a voicemail
11   for Emilie Babcox that there was a death
12   in your family and that you'd like to
13   postpone your appeal?
14       A.   Most likely, I did.
15       Q.   And you also left a
16   different e-mail address to use than the
17   one that you had been using with the
18   committee before?
19       A.   That's correct.
20       Q.   Why did you change your
21   e-mail address at that point?
22       A.   I don't know.
23       Q.   Let's go to No. 28.  Do you
24   recognize Exhibit 28?

Page 181

1        A.   This was my appeal that I
2    submitted.
3        Q.   So you wrote this document?
4        A.   Yes, I did.
5        Q.   Go to the last page with me,
6    if you would?
7        A.   (Witness complies with
8    request.)
9        Q.   Do you see a date on this?
10       A.   June 24th, 2010.
11       Q.   Is that the date that you
12   submitted it?
13       A.   Yes.
14       Q.   And did you submit this as
15   part of your appeal?
16       A.   Yes.
17       Q.   That was your intention in
18   submitting this letter?
19       A.   This was number four on the
20   list that Susan Detich had said would go
21   towards the committee.
22       Q.   Let's go to No. 29.  So you
23   recognize Exhibit 29?
24       A.   This is the letter that came

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Mathew Thomas, Jr., M.D.

Page 182

1    back after my appeal was submitted, their
2    decision not to overturn the original
3    decision against my exam validity.
4         Q.    And at the end of this
5    letter, on the page that's numbered NBME
6    124, it says at the bottom:  Upon full
7    consideration of all of the information
8    available, the Composite Committee found
9    that the Committee on Score Validity
10   acted in compliance with applicable USMLE
11   policies and procedures and did not make
12   a decision that was clearly contrary to
13   the weight of the evidence before it.
14            Therefore, the Composite
15   Committee concluded that the
16   determination of the Committee on Score
17   Validity will stand.  Your Step 2 CK
18   scores remain classified as
19   indeterminate.
20            That wasn't the final step,
21   though, in the process, was it?
22        A.    For who?
23        Q.    For you?
24        A.    No.

Page 183

1         Q.    The next paragraph says:
2    The Step 2 CK validating examination
3    further discussed in Ms. Detich's letter
4    to you of February 17th, 2010 must be
5    taken within six months of the date of
6    this letter; i.e., on or before February
7    25th, 2011.
8             You did have until February
9    25th, 2011 to take the validating exam,
10   right?
11        A.    Yes, I did.
12        Q.    We've been over Exhibit 30,
13   so I think we can go to 31.  In No. 31,
14   this is an e-mail from Amy Buono to you.
15   Is that correct?
16        A.    That's correct.
17        Q.    And she says:  Dear Dr.
18   Thomas, please let me know what
19   three-month eligibility period you would
20   like that would allow you to schedule
21   your exam prior to the February 25th,
22   2011 validating exam deadline.  I will
23   then request a scheduling permit be
24   generated and sent to you via e-mail.

Page 184

1         A.    That's correct.
2         Q.    Thirty-two, about midway
3    through the first page you write:  Ms.
4    Buono, I would like to know how to obtain
5    an extension to my February 25th, 2011
6    validating exam deadline.  I have had
7    many personal issues and will not be
8    prepared by then.  Other students have
9    gone well past the six-month period, and
10   I would like the same courtesy extended
11   to me.  Please advise.
12        A.    That is correct.
13        Q.    I have a few questions about
14   that.
15        A.    Sure.
16        Q.    What were the many personal
17   issues that you had?
18        A.    I don't remember exactly
19   what they were.
20        Q.    And when you said other
21   students have gone well past the
22   six-month period and you would like the
23   same courtesy extended to you, what other
24   students were you referring to?

Page 185

1         A.    I don't remember exact
2    names, but there were students that had
3    taken the exam well after the six months.
4         Q.    And in response to your
5    request for an extension, at the top of
6    this page, first page of Exhibit 32, Amy
7    Buono writes back:  Dear Dr. Thomas, the
8    USMLE Composite Committee has given
9    permission to allow you the option of
10   taking your validating exam up to one
11   full year after the date on the decision
12   letter.  That letter was dated August
13   25th, 2010.  Therefore, you have until
14   August 24th, 2011 to test.  And then
15   again she says:  Please let me know what
16   three-month eligibility period you would
17   like.
18        A.    That's correct.
19        Q.    Thirty-three.  In this
20   e-mail Amy Buono says:  Dear Mat, please
21   try to give plenty of notice of your
22   intended eligibility period as during
23   busy times it may take a while for the
24   permit to be generated.

47 (Pages 182 to 185)

Confidential - Mathew Thomas, Jr., M.D.

Page 186

1      A.   Correct.
2      Q.   Exhibit 34, Amy Buono
3  says -- I'm sorry, midway through the
4  page, June 27th, 2011 so about a month
5  and a half before your deadline for
6  validation you write: Amy, as I approach
7  my deadline I need to be registered for
8  an exam date. I am going through some
9  medical issues right now. What happens
10 if surgery or treatment doesn't allow me
11 to take the exam in time? Mat.
12     What were the medical issues
13 you were going through?
14     A.   Does that stay confidential?
15     MS. McENROE: Let's go off
16 the record.
17     (A discussion was held off
18 the record.)
19 BY MS. HOLLAND:
20     Q.   Just confirming, Dr. Thomas,
21 that your answer to the following
22 question will be kept confidential.
23     What were the medical issues
24 that you were going through at that time?

Page 187

1
2
3
4
5
6
7
8      Q.   For yourself?
9
10     MS. McENROE: So those
11 previous two responses are the
12 only portion we've agreed to keep
13 confidential. Agreed?
14     THE WITNESS: Agreed.
15 BY MS. HOLLAND:
16     Q.   And then Amy Buono writes
17 back on July 6th: Dear Dr. Thomas, upon
18 careful consider of your request we
19 cannot grant you an additional extension.
20 She says: You must take the validating
21 examination on or before August 24th,
22 2011.
23     And then she says: If for
24 any reason you do not take your

Page 188

1  validating exam on or before August 24th,
2  2011 and wish to test after that date,
3  you may follow the standard registration
4  instructions for Step 2 CK as noted on
5  the ECFMG website.
6      A.   That's correct.
7      Q.   No. 35. You respond to that
8  e-mail on July 6th by saying:  I
9  appreciate the response. Please start
10 the process so I can reserve a test date.
11     And she writes back: Dear
12 Dr. Thomas, please tell me which
13 three-month eligibility period you would
14 like so I may order your validating exam
15 scheduling permit.
16     A.   That's correct.
17     Q.   No. 36, you respond: Since
18 I have to take it by August 24th, 2011,
19 it has to be July, August, September.
20     And then Ms. Buono writes
21 back: I will place the order for your
22 permit. As soon as it's available I will
23 send it to you via e-mail.
24     A.   That's correct.

Page 189

1      Q.   No. 37 we can skip. No. 38
2  we can skip. No. 39, you wrote back and
3  said -- on July 19th, 2011 you wrote:
4  Amy, my final date to take the exam is
5  coming on one month. I need that permit
6  to get a spot on the last possible day.
7  Please advise on how long it will take.
8  And Amy Buono writes back: I will check
9  into it.
10     Then you write back to her:
11 Good afternoon, Amy. I am now under one
12 month from when I have to take my exam,
13 and I still don't have a testing permit.
14 Please advise.
15     And she indicates that she's
16 unsure what's causing the delay and will
17 check on it again for you.
18     A.   That's correct.
19     Q.   Now, what was your reason
20 for requesting a permit on the last
21 possible day?
22     A.   Well, given all the issues I
23 was going through medically, I knew that
24 I needed every last day which is why I

48 (Pages 186 to 189)

Confidential - Mathew Thomas, Jr., M.D.

Page 190

1    originally asked for an extension of any
2    kind.
3        Q.   Turning to No. 40.  On
4    August 2nd, 2011 Amy Buono says:  Your
5    Step 2 CK validating exam scheduling
6    permit is attached.  Again, my apologies
7    for the delay.  As you are aware,
8    although the permit doesn't expire until
9    September 30th, you must test on or
10   before August 24th, 2011.
11       And then you write back:
12   Amy, thanks.  What happens if I can't get
13   a date on the 24th?  Amy Buono writes:
14   If you have difficulty scheduling a test
15   date on or before the 24th, let me know
16   as soon as possible.  Also, let me know
17   what area/test centers you are trying to
18   test in.  Thanks, Amy.
19       A.   That's correct.
20       Q.   Forty-one, midway down the
21   page there you write:  Amy, I checked for
22   locations near my current ZIP code and my
23   parents' ZIP code.  None of the centers
24   have August 24th.  The only

Page 191

1    available -- the ones available are
2    either September or next week.  This is
3    why I wanted the permit earlier.  Please
4    advise.
5        She writes back:  Hi, Mat.
6    I requested information on the test dates
7    and centers near the ZIP code you listed.
8    I know you would prefer to test as close
9    to the 24th as possible, but Prometric
10   cannot always accommodate the exact test
11   date an examinee is hoping for.
12       I was able to find the
13   following test dates and locations that
14   are convenient to your ZIP code and lists
15   a few different, one, two -- five
16   different test options for you.
17       A.   Correct.
18       Q.   Forty-two, the bottom of the
19   first page, August 3rd you write that
20   there are medical issues that you're
21   dealing with.  There's no way that you
22   can cut down on the days allowed to the
23   dates that were offered.
24       You write:  That delay is

Page 192

1    causing me not to be able to get a date
2    on the last possible date.  If I move the
3    dates up, I feel I won't be ready and
4    given all the events that got me to this
5    point, I can't risk that.
6        And then you ask what it
7    means when the committee says the score
8    is indeterminate.  Will there be an
9    asterisk?  And Amy writes back that there
10   are dates that are available and that no
11   score is reported in the event of an
12   indeterminate score.
13       A.   That's correct.
14       Q.   Forty-three, on August 7th
15   you write to Amy Buono:  Amy, can you
16   please clarify something for me?  I took
17   my exam on December 31st, 2007.  If I'm
18   not mistaken, the passing score has
19   increased since then.  I need to pass to
20   validate my exam.  Does that mean I need
21   to get the pass score from December 31st,
22   2007 or the new standard?
23       And she writes back:  The
24   passing standard that existed at the time

Page 193

1    you sat in 2007 is the one that will be
2    applied to you toward your validating
3    exam.
4        A.   That's correct.
5        Q.   Forty-four, August 17th,
6    bottom of the page:  Amy, my aunt passed
7    yesterday, August 16th, 2011.  You wanted
8    to know if you can get a one-week
9    extension for your exam date.
10       At the top of the page you
11   write:  Amy, I e-mailed with an extension
12   due to -- extension request due to a
13   death in the family, but I have not heard
14   any response as of yet, and then you give
15   the name of your aunt and the funeral
16   home where the funeral was.
17       A.   That's correct.
18       Q.   Had Amy asked for that
19   information or was that just something --
20       A.   I think I just offered to
21   show that it wasn't me just making up
22   stuff.
23       Q.   No. 45, in the middle of the
24   page Amy writes back she was out sick the

49 (Pages 190 to 193)

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 194

1  past two days.  She's sorry to hear about
2  your aunt, and she will grant you an
3  extension of one week.
4      A.   That's correct.
5      Q.   And then you write at the
6  top of the page:  I will take it by
7  August 31st.
8      A.   That's correct.
9      Q.   No. 46, middle of the page:
10  Amy, is there a way to get exempt from
11  the Prometric change fee, $117?
12      And at the top of the page
13  Amy Buono says:  Dear Mat, I'm sorry.  I
14  cannot waive a Prometric fee.  However, I
15  would encourage you to let them know that
16  you're changing your test date due to a
17  death in the family.  Perhaps they will
18  make an exception.  I do not know, but it
19  wouldn't hurt to ask.
20      A.   Correct.
21      Q.   Forty-seven, you write:  I
22  appreciate the feedback.  I'm up every
23  night looking for a date.  I may have to
24  fly out west to get one so saving that

Page 195

1  fee is big.
2      A.   Yes.
3      Q.   No. 48, middle of the page
4  you write:  Amy, I have a date available
5  to me on September 3rd.  Can I get the
6  approval to book it?  If not, I will try
7  every day for a date by the 31st.
8      So you were unable to find a
9  test date by August 31st?
10      A.   Yeah.  Once you get that
11  close with Prometric, especially at the
12  end of the month people are ending their
13  eligibility period, everything gets
14  booked up.
15      Q.   And Amy Buono says:  The 3rd
16  will be fine.  If you are unable to find
17  anything else, book it immediately.
18      We'll skip No. 50.
19  Actually, No. 50, let's go to the third
20  page of No. 50.  And at the bottom it has
21  a small number NBME 13.
22      A.   You mean of 49?
23      Q.   Of 49.  I'm sorry.
24      A.   What page number at the

Page 196

1  bottom?
2      Q.   Thirteen.  Do you recognize
3  this document?
4      A.   I saw it for the first time
5  when I was given the documentation in
6  discovery from NBME.
7      Q.   Have you read it?
8      A.   I have.
9      Q.   And this is a comparison of
10  your Step 2 CK validation versus your
11  Step 2 CK indeterminate test, right?
12      A.   That's correct.
13      Q.   And the conclusion is that
14  the examinations were substantially the
15  same.  Is that right?
16      A.   That's his conclusion.
17      Q.   Do you accept that
18  conclusion?
19      A.   Not entirely.
20      Q.   Why not?
21      A.   One of the biggest issues
22  that I have is his media questions.  I
23  think he specifically says on page NBME
24  00014, third paragraph down, number of

Page 197

1  items with pictures increased as well.
2  In 2007, 14 of the 288, 4.9 percent, had
3  associated pictures, CT exams, x-rays,
4  electrocardiograms.  The 2011 examination
5  had 25 pictures, 8.9 percent.  He writes
6  that one would expect the images to
7  increase on a medicine certifying
8  examination to keep pace with technology
9  and advances in assessment.
10      My issue is that when I was
11  told that I would take a validation, they
12  said it would be comparable to 2007.  In
13  2007 we did not have as many media, and
14  they changed a lot of media type of
15  questions which for someone who is not
16  expecting it, that would affect the
17  amount of time I had with the questions
18  as well as the exam.
19      Q.   But you realize that the
20  overall purpose of the USMLE is to make
21  sure that you have all the knowledge and
22  information necessary to practice
23  medicine?
24      A.   I understand, but then I

Confidential - Mathew Thomas, Jr., M.D.

Page 198

1    would have -- when I asked them whether
2    I'm getting an exam comparable to 2007
3    which is part of their policies and
4    procedures, then it should be comparable
5    to 2007.  They should have told me I
6    would have the most updated exam at the
7    time of the validation exam which is not
8    what they told me.
9        Q.   Didn't you actually ask
10   whether the score would be the same as
11   2007?
12       A.   I asked about the score, but
13   I also clarified by -- I believe I was
14   informed on the phone; I forget if it was
15   Detich or Amy, as to whether or not it's
16   comparable, but I took more of that from
17   the policies and procedures.  I believe
18   it says the validation is comparable to
19   the exam that you took.
20       Q.   Okay.
21       A.   So that -- and especially
22   because the media which is what I
23   referred to earlier, media questions make
24   a big difference in terms of length of

Page 199

1    time.
2        Q.   So you don't believe that
3    you should have been required to
4    have -- to be tested on any of the items
5    that were after 2007?
6        A.   Yeah.  I don't believe I
7    should have gotten any questions that
8    were added in over those four years.  I
9    believe I should have got comparable or
10   they should have given me fair warning
11   that the exam has changed so much and
12   you'll get the most recent type of exam,
13   because my studying was based on stuff
14   that I had studied from the past, not all
15   the new stuff, including, as I wrote in
16   my e-mail to her, even the wording
17   changed in terms of the way they
18   described certain questions and answers.
19       Q.   Do you have some reason to
20   believe that if you had answered more
21   media questions correctly that you would
22   have passed the validating exam?
23       A.   I can't say either/or
24   because I don't think it's so much only

Page 200

1    about answering it correctly, I think
2    it's answering it correctly, including
3    having more time for other questions I
4    think all around.  And since it's a
5    pass/fail and I get no kind of analysis
6    of where I did good or bad, I can't
7    really give a detailed response to that.
8        Q.   Now, the validating exam and
9    the exam, what the requirement is is that
10   they be comparable.  Is that right?
11       A.   Comparable to the exam I
12   took is what --
13       Q.   Right.  Comparable, not
14   exact?
15       A.   No.  Not exact.  I never
16   said exact.
17       Q.   Right.  So you reject this
18   statistical analysis saying that they're
19   comparable?
20       A.   I believe that -- I have to
21   go through it one more time, but I cannot
22   say that it was as comparable as they
23   make it seem.
24       Q.   Well, specifically on page 1

Page 201

1    of this, in the last paragraph it says:
2    By content specifications, the 2007 to
3    2011 examination were essentially the
4    same, in parentheses, 93.8 percent of the
5    items in the 2007 examination were from
6    the same specified content category as
7    items in the 2011 examination, and there
8    was only one new category.
9           Then he goes on to write:
10   The 93.8 percent should actually be
11   higher since the number of items on the
12   examination decreased by eight.  The
13   adjusted percentage of items that were
14   from the same content category is 96.4.
15       A.   Again, content category.
16   Very broad as to what he's talking about.
17   I can say content category.  Again, I can
18   say it's depression and he can touch on
19   any portion.  The exams and what is
20   focused on in terms of the review boards
21   and stuff focus on areas that they're
22   specific to.  So if they change over the
23   years as to what their focus is or change
24   medications or change whatever it may be,

Confidential - Mathew Thomas, Jr., M.D.

Page 202

1    it does make a difference.
2         Q.   So 96.4 percent in your mind
3    is not comparable?
4         A.   Again, I think I need more
5    specific as to what content category he's
6    talking about.  Obviously, the subjects
7    do not change in terms of -- going back
8    to the score reports.  It's still
9    medicine and peds and OB-GYN and
10   psychiatry and all the -- so if that's
11   what he's considering content as a
12   general, then yeah.  That's not going to
13   change.  So like I said, I would need
14   clarification as to what specifically he
15   means by content category.
16        Q.   So, again, even though he's
17   applied -- this letter is nine paragraphs
18   long, correct?
19        A.   That's correct.
20        Q.   And in this letter he talks
21   about the exam in its entirety, including
22   in the third paragraph very specific
23   types of questions and the content areas
24   like pituitary and hypothalamic

Page 203

1    disorders, heat-related illness.  It's
2    really a detailed analysis of those
3    examinations, right?
4         A.   Okay.
5         Q.   Well, I'm asking you.
6         A.   Well, he has a lot of
7    details.  Again, like I said, I can only
8    say that he has details in here, so I
9    can't really compare based on what he's
10   comparing.
11        Q.   Well, what would allow you
12   to compare?
13        A.   Him sitting down here and
14   explaining to me line by line what he
15   means.
16        Q.   Let's go to No. 50.  Do you
17   recognize No. 50?
18        A.   This seems to be -- this was
19   a validation exam results letter.
20        Q.   And you received this?
21        A.   Yes, I did.
22        Q.   In the third paragraph it
23   says:  After taking the validating
24   examination you expressed a concern about

Page 204

1    the comparability of the test form to the
2    test form that you originally took in
3    2007.  Please be assured that there were
4    only minor differences in the focus of
5    the content between these two
6    examinations, and the two test forms are
7    comparable.
8         Although the recent exam
9    included some relatively new testing
10   formats which required interpretation of
11   a small number of heart sounds,
12   pharmaceutical advertisements and medical
13   abstracts, your performance on these
14   formats did not have an impact on your
15   overall -- on your pass/fail outcome.
16        For your information, your
17   examination was scored using the
18   pass/fail standard that was in effect at
19   the time of your 2007 administration, not
20   the current higher standard.
21        So does that answer your
22   question as to the impact of those new
23   items?
24        A.   They, again, are saying

Page 205

1    there are items here that were not on my
2    exam which was my first complaint.  So if
3    I have never seen them and they show up
4    on my screen, they are going to hold me
5    back and hinder my moving forward.
6         Secondly, if you are going
7    to tell me that my original exam cannot
8    be validated because I had exposure and
9    therefore was quicker, then the opposite
10   should be true; that if I'm hit with this
11   many questions that are not something I
12   prepared for, they would hold me back and
13   prevent me from finishing in a timely
14   manner.
15        Q.   So they should have given
16   you extra time because you weren't
17   cheating?
18        A.   No.  They should have given
19   me an exam they told me I was going to
20   get which was the 2007 exam, not a 2011
21   exam.
22        Q.   So if they had given you a
23   2007 exam and scored it based on the 2007
24   standards, you're telling us that you

52 (Pages 202 to 205)

Confidential - Mathew Thomas, Jr., M.D.

Page 206

1    would have been satisfied with that?
2        A.   I would have been satisfied
3    with that.
4        Q.   Let's go to 51.  In this
5    string of e-mails you write with regard
6    to -- this is registering for -- after
7    you've not passed the validating exam,
8    registering for Step 2 CK over again,
9    right?
10       A.   That's correct.
11       Q.   And you say:  The only other
12   question I had is if the USMLE is offered
13   between January 1st and January 11th,
14   when do I have to apply to get a
15   December, January, February block, right?
16       A.   You jumped all the way to
17   the top.  Okay.
18       Q.   Yeah.  At the top.
19       A.   Okay.
20       Q.   Is that right?  You wanted
21   to get a December, January, February
22   block?
23       A.   I had to because if you go
24   further, the seven-year rule takes into

Page 207

1    effect basically because my CS was taken
2    January 5th, I believe, 2005 and going
3    into 2012 would have hit me at my seven
4    years and then I would have to wind up
5    taking the CS over again if I didn't take
6    the Step 2 before then.
7        Q.   Right.  So you wanted to get
8    the last possible Step 2 CK block that
9    would still allow you to use your Step 1
10   score?
11       A.   Yes.
12       Q.   On the bottom of the first
13   page, Amy Buono writes:  Dear Mat,
14   responses to your questions are in green.
15            These are questions that you
16   had asked after you learned that you
17   failed the validating exam --
18       A.   That's correct.
19       Q.   -- right?
20            Your first question was
21   could you get an actual score report of
22   the validation exam and the subject
23   breakdown to see my weak areas?
24            And the answer to that was

Page 208

1    that scores obtained on the validating
2    exam were not reported so no score report
3    or performance profile was available.  Is
4    that right?
5        A.   That's what's written.
6        Q.   Your second question is
7    about whether all of your attempts stay
8    on your transcript or whether you get a
9    fresh transcript with new attempts.  Is
10   that right?
11       A.   That's correct.
12       Q.   Your third question is if
13   you re-take the exam again, do you keep
14   the higher score or will it be treated
15   like a validating exam?
16            And Amy Buono writes back:
17   Yes.  If you test again it will not be a
18   validating exam so whatever score you
19   achieve is the one that will be part of
20   your record?
21            Fourth question:  Based on
22   the sixth attempt limit, does that mean I
23   get six new attempts for Step 2 starting
24   January 1st, 2013?

Page 209

1            And Amy Buono writes back:
2    No.  It means if you had six or more
3    failed attempts at a particular Step, you
4    will be not allowed to submit an
5    application after January 1st, 2013 to
6    take that Step.
7        A.   That's correct.
8        Q.   And the next one you write,
9    next question:  If I have to re-take Step
10   CS and Step 1 based on the seven-year
11   rule, is it a new set of six attempts or
12   do the old ones count against me?
13            And Amy Buono writes:  No.
14   You will not be allowed a new set of six
15   attempts.  See previous response.
16       A.   Correct.
17       Q.   Let's go to 52.  Do you
18   recognize Exhibit 52?
19       A.   This was me asking for -- to
20   relook into my case.
21       Q.   And when did you submit this
22   letter?
23       A.   At the end of December of
24   2012.

53 (Pages 206 to 209)

Confidential - Mathew Thomas, Jr., M.D.

Page 210

1      Q.   It's a four-page letter.  Is
2  that right?
3      A.   That's correct.
4      Q.   Let's go to 53.  On page
5  53 -- or Exhibit 53 there's a string of
6  e-mails that are between Amy Buono and a
7  woman named Salvatrice Scerbo?
8      A.   That's correct.
9      Q.   Is Salvatrice Scerbo the
10  person that you told us about before that
11  you had consulted with about your case?
12      A.   Yes, it is.
13      Q.   Is she an attorney?
14      A.   Yes, she is.
15      Q.   Where does she work?
16      A.   She's not working as an
17  attorney.  She works as a compliance
18  officer.
19      Q.   At St. Barnabas?
20      A.   In the Bronx.
21      Q.   And is she also the person
22  that attended the Rule 16 scheduling
23  conference with you?
24      A.   She is.

Page 211

1      Q.   And she also came with you
2  today, right?
3      A.   Yes.  She's somewhere around
4  here.
5      Q.   And in these e-mails, let's
6  go to the back first.  Actually, second
7  to the last page.  You write on December
8  13th, 2012: Hello, Amy.  Please take
9  this e-mail as an authorization for you
10  to speak with Salvatrice Scerbo, in
11  parentheses, Tricia, regarding all
12  matters related to my USMLE exams and
13  ECFMG certification.
14      You give your ID number and
15  then you write:  This e-mail also
16  authorizes Tricia to speak to anyone at
17  NBME/USMLE regarding my information and
18  exam history as she sees fit for her to
19  assist me in trying to appeal my exam
20  status.
21      Is that right?
22      A.   That's correct.
23      Q.   On January 14th, 2013 Ms.
24  Scerbo writes -- and this is on the first

Page 212

1  page -- to Amy Buono:  Good morning.  I
2  hope you had a wonderful weekend and all
3  is well.  Thank you again for reviewing
4  his file.  I had another request from
5  Mathew.  Is it possible for Mathew to
6  schedule a meeting with you and staff to
7  discuss his matter in person?
8      And then in response Amy
9  Buono writes back on January 14th:  Hi,
10  Tricia.  Staff does not customarily meet
11  in person with examinees.  Standard
12  practice is for communications to take
13  place by phone or in writing.  Also, I'm
14  unsure of what else there is to discuss
15  about Mathew's situation or how
16  discussing it in person would affect the
17  outcome.
18      I'm sorry, but if there's
19  new information Mathew would like to
20  present for consideration it should be
21  done in writing.  I regret I could not
22  respond positively to your request.  Best
23  regards, Amy.
24      A.   Correct.

Page 213

1      Q.   Were those e-mails shared
2  with you?
3      A.   It was not shared with me.
4  I was just told.
5      Q.   Let's go to 54.  This is an
6  e-mail from Amy Buono to Ms. Scerbo and
7  to you.  Is that right?
8      A.   Yes.
9      Q.   And the last paragraph on
10  Amy Buono's e-mail says:  After a
11  thorough review of our records and your
12  appeal documentation dated December 19th,
13  2012, senior staff determined that
14  there are insufficient grounds for a
15  reconsideration of your case.
16      Is that right?
17      A.   That's correct.
18      Q.   Let's go to 55.  February
19  8th, 2013.  The subject is legal
20  representation, and it's from you to Amy
21  Buono.  You write:  Amy, this e-mail is
22  to certify that Rebecca A. Robichaud --
23  and that's R-O-B-I-C-H-A-U-D -- is
24  authorized to speak on my behalf, and you

54 (Pages 210 to 213)

Confidential - Mathew Thomas, Jr., M.D.

Page 214

1  can release any information regarding my
2  case to Ms. Robichaud.  Thank you for
3  your cooperation.
4           Now, you write here in your
5  signature line, Mathew Thomas, Jr., M.D.,
6  MHSA, CHC.  What is CHC?
7       A.   Certified healthcare
8  compliance.
9       Q.   Exhibit 56.  In Exhibit 56,
10  this is Ms. Robichaud to Ms. Buono at the
11  bottom of the first page.  Ms. Buono,
12  thank you again for your time today.  I
13  want to try to summarize our conversation
14  from today.  She writes her understanding
15  is that the USMLE does not yet have a
16  formal waiver process in place for the
17  six-attempt limit.
18           She writes:  The USMLE will
19  accept requests from state licensure
20  boards to waive the six-attempt limit for
21  individuals and to date has granted those
22  requests specifically from New York and
23  Florida.
24           Based on this, should the

Page 215

1  New York licensure board request such a
2  waiver for Dr. Thomas for Step 1 and/or
3  Step 2, USMLE would, based on this
4  precedent, grant the waiver.
5           Also, from our discussion
6  it's my understanding the only thing
7  limiting Dr. Thomas from retaking Step 1
8  and/or Step 2 from USMLE's perspective is
9  the six-attempt limit.  The ECFMG has a
10  requirement that Step 1 and Step 2 be
11  taken within seven years of each other.
12           And then Amy Buono writes
13  back:  I'd like to make a clarification.
14  I cannot represent the USMLE would grant
15  a waiver of the six-attempt limit should
16  the New York licensure board request it,
17  only that USMLE would consider granting
18  the request.
19       A.   Correct.
20       Q.   Did the New York board ever
21  request a waiver on your behalf?
22       A.   We never went full force
23  with that.  We went instead with this
24  process.

Page 216

1       Q.   So did you contact anyone at
2  the New York board to see if they'd be
3  willing to advocate for you?
4       A.   I forget if Rebecca had
5  contacted anyone or not, to be honest.
6       Q.   Did you?
7       A.   There was one, I don't know
8  if it was an assemblyman or councilman,
9  that I sent a letter to, but I did not
10  get a response.
11       Q.   I want to talk a bit about
12  the future and what you envision for
13  yourself.  First, with regard to this
14  lawsuit, what exactly is it that you hope
15  to accomplish in filing this lawsuit?
16       A.   I would like my exam
17  validated from 2007 and, therefore, be
18  completely ECFME certified and not having
19  to re-take Step 1 or Step 2 CS.
20       Q.   If your exam was validated
21  as you said you wished, you recognize
22  that you would still have to take Step 3?
23       A.   I'm very much aware of that.
24       Q.   What have you done in the

Page 217

1  intervening time to prepare for the Step
2  3 examination?
3       A.   I have not done anything.
4  Once this whole process started I had to
5  stop everything.
6       Q.   When did you envision taking
7  the Step 3 exam?
8       A.   As of right now, I can't
9  unless I take my Step 2 which I can't
10  take because of the six-year rule and the
11  seven-year limit, so, basically, if I
12  don't win this case, I'm done.
13       Q.   Let's pretend for a moment
14  that your 2007 score is validated and you
15  do not have to re-take Step 1 or Step 2
16  CS, and your Step 2 CK is validated.
17  When would you anticipate taking Step 3?
18       A.   If I were to get everything
19  validated, it's now, what?  January.  The
20  match and the scramble process would be
21  at the end of March or middle of March.
22  I would be eligible to be part of that
23  scramble, and dependent on that, I would
24  see where that happens.

Confidential - Mathew Thomas, Jr., M.D.

Page 218

1      If that does not happen I
2  would try to take my Step 3 before
3  September because September is when you
4  start applying for the next year, 2015
5  match.
6      Q.   You had noted before in our
7  discussion that you had difficulty
8  matching or scrambling because of your
9  multiple test attempts?
10     A.   That is correct.
11     Q.   How do you see that being
12 different now?
13     A.   I have many more connections
14 now.  People know me on an individual
15 basis as well as a work ethic, and they'd
16 probably take the gamble on me.
17     Q.   Which places do you think
18 you'd be likely to match at?
19     A.   I prefer not to say, to be
20 honest.
21     Q.   Is there a reason why not?
22     A.   Just prefer not to say.
23 Nothing is written in stone.  It's just
24 my assumptions, so I don't want to put

Page 219

1  any assumptions on the record.
2      Q.   Are those places in New
3  York?
4      A.   Yes.  There are some in New
5  York.
6      Q.   Are they all in New York?
7      A.   No.
8      Q.   Where are the other ones?
9      A.   There's some, one or two in
10 Texas.
11     Q.   So you would be willing to
12 move your family?
13     A.   For my career, I would move.
14 My family would probably stay behind.
15     Q.   Your wife and your children
16 would stay behind?
17     A.   We have a stepson custody
18 situation.  She's not going to leave him,
19 so I would make the trips.
20     Q.   How much money would you
21 make as a resident?
22     A.   As a resident?  Not too
23 much.
24     Q.   How much do you think?

Page 220

1      A.   I think the range goes
2  anywhere from 35,000 to, like, 70,000,
3  depending, I think.  I mean, the numbers
4  have changed over the years.  I mean,
5  getting 52,000 a year was a big deal back
6  four, five years ago.
7      Q.   And so that would be
8  substantially less than money than you're
9  making now?
10     A.   Yes, it was, but in the
11 long-run, three years down the road I
12 make 150, 200,000 so...
13     Q.   So if you were to go into
14 residency, how long would residency last?
15     A.   If I do family
16 practice/internal medicine, three years.
17 If I specialize afterwards, two more
18 years.  If I get lucky and get into rehab
19 or one of the more specialized, three to
20 five years.  All depends on fellowship,
21 et cetera.
22     Q.   And what are some of the
23 hurdles that you expect to face now in
24 your journey to become a doctor?

Page 221

1      A.   What hurdles?  Obviously,
2  one, getting through this case; second is
3  having someone accept me with a residency
4  position and, obviously, Step 3.
5      Q.   Are you at all concerned
6  about the fact that you have not been in
7  school or studying medicine in any
8  formalized setting?
9      A.   I am not concerned about not
10 being in school.  I'm more concerned
11 about the amount of time given the jobs
12 that I take, but come -- if I were to go
13 down the road and get everything settled,
14 come the end of the semester, I would
15 take a leave of absence from all three
16 jobs and just focus on studying like I
17 did in 2007.
18     Q.   Are you at all concerned
19 about the medical school that you
20 graduated from not being recognized as an
21 accredited medical school?
22     A.   My understanding was that it
23 was part of the WHO book.  There are
24 students who have graduated and are done

Confidential - Mathew Thomas, Jr., M.D.

Page 222

1  their residency today or have completed
2  residency, so I don't find it to be an
3  issue unless there's something I don't
4  know about.  I haven't really followed
5  up.
6       Q.  Have you Googled your
7  medical school lately?
8       A.  No, I have not.
9       Q.  But you are aware that there
10 are some issues with regard to its
11 accreditation?
12      A.  I had no idea, to be honest.
13      Q.  You didn't have any idea?
14      A.  No.
15      Q.  Until I just said something?
16      A.  Until you just said
17 something.
18      Q.  So what did you understand
19 about the WHO book?
20      A.  That they've been in the --
21 WHO has the book and I've always seen it
22 in the book.  I mean, when I graduated
23 and looked up the school it was in the
24 book, so if it's been taken out since, I

Page 223

1  have no knowledge of that.
2       Q.  So you are not aware that in
3  some states it's not a recognized medical
4  program?
5       A.  No.  I guess that's a new
6  hurdle.
7       Q.  If you're not successful in
8  this case in convincing the Court that
9  you should have your Step 2 CK validated,
10 are you prepared to take that examination
11 again?
12      A.  I'd have to think it over
13 and talk to my family regarding that, to
14 be very honest.
15      Q.  And if Step 1 had to be
16 taken again, are you prepared to take
17 Step 1 again?
18      A.  With the new score being --
19 so, in other words, right now I have a
20 75, so if I did better I may be open to
21 it, but that basically means I'm doing
22 everything all over again.  So I don't
23 know if I have the ability with the full
24 family and kid on the way to have all the

Page 224

1  time to do all that all over again, to be
2  very honest.  It would be -- it would
3  have to be a discussion I take.
4       Q.  And do you have an alternate
5  plan?
6       A.  Well, right now, I'm
7  working.  Continue doing what I'm doing.
8       Q.  I'll just take you through
9  the documents that we brought, and we'll
10 call these Exhibit 57.
11      A.  I don't know what order
12 they're in, to be honest.
13      Q.  All of ours should be in the
14 same order.  The top is your response to
15 my notice of deposition?
16      A.  Correct.
17      Q.  So let's look at them
18 side-by-side.  So Exhibit 4, I believe it
19 was, is the notice of dep?
20      A.  Yes.
21      Q.  And on the second page of
22 Exhibit 4, number one is score reports?
23      A.  Which I have.  As I said
24 before, I don't know if all of them are

Page 225

1  here, but the majority of them should be
2  here for Step 1, Step 2 CK and Step 2 CS.
3       Q.  Number two, registration
4  materials that relate to exam steps, you
5  write:  Plaintiff does not have paper
6  copies of his registration.
7       A.  I don't keep any of that
8  stuff.  That's usually done online
9  anyway.
10      Q.  Number three, USMLE
11 transcript listing all Step attempts and
12 scores.  You never had a transcript?
13      A.  I never ordered a
14 transcript.  You have to order and pay
15 $50 for it.  Never did.
16      Q.  Number four, written
17 correspondence, you say see enclosed
18 correspondence?
19      A.  Yeah.  I put in the letters
20 in between us.  A lot of the stuff that's
21 in your...
22      Q.  Number five, written
23 communications aside from writings to
24 your lawyer pertaining -- not that you

57 (Pages 222 to 225)

Confidential - Mathew Thomas, Jr., M.D.

Page 226

1    have a lawyer but anyone you've consulted
2    with as a lawyer.
3        A.    I haven't talked to anyone
4    else regarding these issues.
5        Q.    Number six, application and
6    course registration materials to study at
7    any prep course?
8        A.    I have nothing that I kept.
9        Q.    And number seven, any
10   documents illustrating that Mathew
11   Thomas, Jr. has been or currently is
12   employed by Optima University including,
13   but not limited to, pay stubs.
14           You wrote you're not
15   currently employed, but what about with
16   regard to your prior employment then?
17       A.    He wasn't giving us pay
18   stubs.  He was basically just paying
19   us -- paid me cash or personal checks so
20   there was no stub attached.
21       Q.    Did you find that odd?
22       A.    No, because at that point,
23   honestly, I was a med student, no job,
24   broke.  You take what you can get so --

Page 227

1    and I wasn't working as a regular job
2    every single day so...
3        Q.    Right, but you were working
4    at Kaplan, though, right?
5        A.    I wasn't getting the hours
6    at that point because it was only
7    Saturdays, and because they don't run the
8    course all the time, especially towards
9    the summer, I wasn't really...
10       Q.    Did you pay income taxes on
11   the money that you made as a result of
12   working at Optima?
13       A.    No.
14       Q.    Number eight was Optima
15   promotion or study materials, you wrote
16   that you don't have any of those?
17       A.    He never gave out any
18   materials.
19       Q.    It was just a question bank?
20       A.    It was just a question bank.
21       Q.    Number nine, curriculum
22   vitae you've enclosed?
23       A.    Yes.
24       Q.    Number ten, a list of places

Page 228

1    that you've worked?
2        A.    That's all on CV.
3        Q.    Good.  Number 11, any and
4    all employment applications, you
5    indicated you do not have those?
6        A.    No.
7        Q.    And number 12, a list of
8    places that you were ever enrolled as a
9    student?
10       A.    Yeah.  There was one typo,
11   the master's, which I noticed right
12   before I came here, so I had to fix that.
13       Q.    Well, tell us about that.
14   You did.  You fixed it?
15       A.    I fixed it.  Yeah.  I guess
16   I didn't read it over when I printed it
17   out.
18       Q.    You wrote the word Joseph
19   instead of Matthew's?
20       A.    Yeah.
21       Q.    And number 13, federal
22   income tax returns, you wrote not
23   applicable or relative to the time frame
24   of this matter?

Page 229

1        A.    Yes.
2        Q.    What's the reason that you
3    wrote that?
4        A.    I'm not understanding why,
5    what it has to do with me validating or
6    invalidating my exam.
7        Q.    But regardless of that, you
8    did not bring those items with you?
9        A.    I did not.
10       Q.    So let's go through -- okay.
11   It looks to be your resume here?
12       A.    Yeah.  My CV.  The two
13   missing on the CV right now are the
14   nursing school and the MCNY because I
15   didn't really update it with those.
16       Q.    Is Optima University on
17   here?
18       A.    No.
19       Q.    Why not?
20       A.    Because I never took that as
21   a thing.  Plus, it's a negative.  It's a
22   negative thing.  I'm not trying to not
23   get a job if I'm putting my resume out
24   there.

58 (Pages 226 to 229)

Confidential - Mathew Thomas, Jr., M.D.

Page 230

1          Q.   Right.  Is there anything
2    else that's missing?  Any other
3    negatives?
4          A.   No.  I think all my
5    other -- I mean, like I said, like the
6    small jobs, like I said, when I was at
7    Edwards and doing the security job at
8    Stony Brook, those small jobs I haven't
9    put on here.
10          These are basically my
11    full-time regular jobs that have any kind
12    of experience that will give me a
13    possibility of employment, future
14    employment.
15          Q.   Have you ever had any
16    problems with discrimination in the
17    workplace?
18          A.   No.  I'm actually a very
19    good worker.  Most people like me.
20          Q.   But, I mean, you've never
21    had any grievances or anything like that
22    and complaints at work?
23          A.   The only grievance I had is
24    a union grievance at TCI basically

Page 231

1    because I wasn't given the amount of
2    hours I'm entitled to and seniority
3    issues with someone else who was given
4    classes before me even though I had
5    seniority.  Other than that, I don't
6    remember having any HR issues or
7    grievance issues.
8          Q.   So the next items appear to
9    be -- this appears to be the September
10    15th, 2009 letter, right?
11          A.   I think these are just the
12    letters that go back and forth.
13          Q.   Policies and procedures?  I
14    see that there's some handwritten notes
15    on here.  Are those notes that you made?
16          A.   Yeah.  Those are notes I
17    made as I was making my appeal.
18          Q.   Did anyone else make notes
19    on here or is it all your writing?
20          A.   No.  I think this is all my
21    writing where I focused on in my appeal
22    and then it goes into the appeal.
23          Q.   Right.  So you have on here
24    also the Federation of State Medical

Page 232

1    Boards?
2          A.   I believe that's the letter
3    that says -- yeah.  My Step 3 exam was
4    canceled in July.
5          Q.   And the February 17th
6    letter, March 4th letter?
7          A.   That's also the letter that
8    I got from ECFMG.
9          Q.   Then your written appeal,
10    right?
11          A.   That's correct.
12          Q.   In the margins of the August
13    25th letter what does that say?
14          A.   August 25th included who?
15          Q.   Oh, I see.  I think you
16    wrote may have.  It says there is
17    evidence that 32 percent of the scored
18    items may have?
19          A.   May have, yeah.
20          Q.   We see your score report
21    from December 31st, 2007?
22          A.   That was this.
23          MS. HOLLAND:  Let's take a
24    short break.

Page 233

1          (A short break was taken.)
2                    * * *
3          EXAMINATION
4    BY MS. McENROE:
5          Q.   Dr. Thomas, we've met
6    before.  Again, my name is Elisa McEnroe.
7    I represent the Educational Commission
8    for Foreign Medical Graduates also known
9    as ECFMG.  You understand that, correct?
10          A.   That's correct.
11          Q.   I'm going to try and not
12    cover too much of the same ground as
13    we've covered today but want to ask a
14    couple of questions to clarify some
15    things and also in particular with ECFMG.
16    Understand?
17          A.   Okay.
18          Q.   As a brief overview of the
19    sequence of events with respect to your
20    indeterminate Step 2 CK exam score, would
21    it be fair to say that you were given an
22    opportunity to appear in person before
23    the USMLE committee?
24          A.   Yes.

59 (Pages 230 to 233)

Confidential - Mathew Thomas, Jr., M.D.

Page 234

1      Q.   And it would be fair to say
2  that you were given the opportunity to
3  provide documentation to that committee?
4      A.   Yes.
5      Q.   Would it be fair to say you
6  were given an opportunity to bring
7  counsel to that appearance?
8      A.   Yes.
9      Q.   Following that appearance
10 you were informed that your score was
11 determined to be indeterminate.  Is that
12 correct?
13     A.   That's correct.
14     Q.   You were also then given an
15 opportunity to have a period initially of
16 six months in which to take a validating
17 exam.  Is that correct?
18     A.   I had the opportunity to
19 appeal before the validating exam.
20     Q.   And you did, in fact, appeal
21 the determination of the USMLE committee,
22 correct?
23     A.   Yes, I did.
24     Q.   And you were given the

Page 235

1  result of that appeal, correct?
2      A.   Yes.
3      Q.   Following that appeal, you
4  were then given six months to take the
5  validating exam, correct?
6      A.   That is correct.
7      Q.   Ultimately, you were given
8  over a year to take a validating exam,
9  correct?
10     A.   Yes.
11     Q.   That validating exam was
12 given to you without an exam fee.  Is
13 that correct?
14     A.   That is correct.
15     Q.   You failed the validating
16 exam, correct?
17     A.   That's correct.
18     Q.   You did not request a formal
19 exception from the USMLE for the
20 six-attempt rule with respect to Step 2
21 CS.  Is that correct?  CK, rather.  Is
22 that correct?
23     A.   I'm sorry.  Say that again.
24     Q.   You did not request an

Page 236

1  exception for the six-attempt rule from
2  USMLE for the Step 2 CK.  Is that
3  correct?
4      A.   It was discussed.  I don't
5  remember exactly if it was put that way.
6  I think it was just a generic six-attempt
7  and seven-year exception.
8      Q.   You did give a request to
9  ECFMG for an exception to the seven-year
10 rule.  Is that correct?
11     A.   That's correct.
12         (Whereupon, a document was
13     marked for identification as
14     Exhibit No. 58.)
15 BY MS. McENROE:
16     Q.   What I've just handed you
17 I've marked as Exhibit 58 for continuity
18 from what we marked as Exhibit 57.
19         You'll see it's a
20 document with a first -- we call Bates
21 stamp which is the little number on the
22 bottom.  That's ECFMG 000627 through 646
23 and it's double-sided.  Do you see that?
24     A.   Yes.

Page 237

1      Q.   At the top it says ECFMG
2  Medical Education Credentials Committee
3  meeting exception request and then it
4  says ECFMG Medical Education Credentials
5  Committee, April 17th, 2013.  Do you see
6  that?
7      A.   Where exactly are you
8  looking?
9      Q.   At the very top.
10     A.   Okay.  Yes.
11     Q.   This document was provided
12 to you from ECFMG in discovery in this
13 matter.  Is that correct?  Do you recall
14 having seen this before?
15     A.   I believe so.  I've looked
16 at so many different things.  Yes.
17     Q.   Well, let's walk through it
18 together, if you would.  At the top it
19 says name and USMLE/ECFMG ID number.  It
20 says Mathew Thomas.  That's you, correct?
21     A.   That's correct.
22     Q.   Then underneath it, it says
23 Ross University, St. Matthew's University
24 and St. Christopher?

Confidential - Mathew Thomas, Jr., M.D.

Page 238

1     A.   That's correct.
2     Q.   Is that information
3  contained in that box with the years
4  accurate?
5     A.   That is correct.
6     Q.   Thereafter, there's a box
7  that says ECFMG certification status, and
8  it says ECFMG certificate issued January
9  24th, 2008.  Does that sound right to
10  you?
11     A.   That's correct.
12     Q.   And then it says ECFMG
13  certificate rendered invalid March 4th,
14  2010.  Does that sound correct to you?
15     A.   I'm not sure exactly when
16  they invalidated.
17     Q.   Let's flip to within the
18  documents you provided to us today which
19  is Exhibit 57.  There's a letter dated
20  March 4th, 2010 from ECFMG.  Let me know
21  when you've found it.
22     A.   Sure.  Got it.
23     Q.   And that letter is addressed
24  to you?

Page 239

1     A.   Yes.
2     Q.   Dated March 4th, 2010?
3     A.   That's correct.
4     Q.   And it's signed by Ms. Kara
5  Corrado from ECFMG, correct?
6     A.   That's correct.
7     Q.   And this letter provides
8  that the USMLE has determined that your
9  Step 2 CK score from December 31st, 2007
10  was indeterminate, therefore, making your
11  ECFMG certificate invalid.
12     A.   That's what's written on the
13  bottom.  Is that what you're focusing on?
14     Q.   I was paraphrasing.  That's
15  the general content of the letter?
16     A.   Yes.
17     Q.   Going back to Exhibit 58.
18  Then you see it says ECFMG certificate
19  rendered invalid March 4th, 2010.  Does
20  that appear to be correct having looked
21  at that letter?
22     A.   That's correct.
23     Q.   Then under that there's a
24  request for exception and it reads:  Dr.

Page 240

1  Thomas is requesting an exception to the
2  ECFMG policy requirement that applicants
3  must pass those USMLE Steps and Step
4  components required for ECFMG
5  certification within a seven-year period.
6        Did I read that correctly?
7     A.   That is correct.
8     Q.   Is that consistent with what
9  you recall requesting an exception for?
10     A.   That was the first
11  exception, yes.
12     Q.   Have you had subsequent
13  exception requests?
14     A.   The intent was to also
15  request for the six-attempt as a second
16  waiver.
17     Q.   Do you understand that the
18  ECFMG has the seven-year rule, but NBME
19  has the six-attempt rule?
20     A.   Yes.
21     Q.   Have you made any additional
22  requests except for this present one
23  being discussed with respect to the
24  seven-year rule to ECFMG?

Page 241

1     A.   No.  This is the only one to
2  ECFMG.
3     Q.   A little further down you'll
4  see underneath those boxes on the first
5  page of the Exhibit 58 it says:  Dr.
6  Thomas is requesting an exception to the
7  ECFMG policy requirement that applicants
8  must pass those USMLE Steps and Step
9  components required for ECFMG
10  certification within a seven-year period.
11        Did I read that correctly?
12     A.   That's correct.
13     Q.   There's then a discussion of
14  the ECFMG policy.  Do you see where that
15  is?
16     A.   Yes, I do.
17     Q.   Can you please read that
18  paragraph to yourself and then let me
19  know if that's consistent with your
20  understanding?
21     A.   That coincides with what I
22  know.
23     Q.   So to paraphrase, it would
24  be fair to say that in order to become

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Mathew Thomas, Jr., M.D.

Page 242

1    ECFMG certified, an applicant needs to
2    pass Step 1, Step 2 CK and Step 2 CS
3    within a period of exactly seven years?
4        A.   Yes.
5        Q.   So within seven years of the
6    first passing date?
7        A.   Yes.
8        Q.   And you understood that at
9    the time when you were making this
10   request?
11       A.   Yes.
12       Q.   I'd like to direct your
13   attention ahead to the second page in
14   that exhibit where there's a chart of
15   your examination history?
16       A.   Yes.
17       Q.   Please take a look at that
18   chart and let me know if you see anything
19   that does not look accurate to you?
20       A.   That seems accurate.
21       Q.   So if I may summarize,
22   looking first at just Step 1.
23       A.   Yes.
24       Q.   You've taken Step 1 seven

Page 243

1    times, correct?
2        A.   Correct.
3        Q.   The first time was in May
4    2002 and the last time was in February
5    2006?
6        A.   Correct.
7        Q.   You ultimately passed on
8    February 14th, 2006, correct?
9        A.   That's correct.
10       Q.   As of this coming February
11   that will have been eight years ago.  Is
12   that correct?
13       A.   The Step 1.
14       Q.   For Step 1?
15       A.   That is correct.
16       Q.   Looking at Step 2 CS, it
17   appears you've taken that exam one time,
18   January 12th, 2005, and you passed that
19   exam.  Is that correct?
20       A.   That's correct.
21       Q.   So as of this coming January
22   12th, which is just two days from now,
23   that will have been nine years ago.  Is
24   that correct?

Page 244

1        A.   That's correct.
2        Q.   Looking at Step 2 CK, you've
3    taken that exam six times for what's
4    recorded here.  Is that correct?
5        A.   That's correct.
6        Q.   Would it be fair to say you
7    also took a validating exam?
8        A.   Yes.
9        Q.   So you've taken Step 2
10   CK -- you've sat for that exam seven
11   times?
12       A.   That's correct.
13       Q.   The only instance in which
14   you had a passing score reflected was on
15   the administration of Step 2 CK on
16   December 31st 2007.  Is that correct?
17       A.   That's correct.
18       Q.   And that's the score we've
19   been discussing today as having been
20   deemed indeterminate.  Is that correct?
21       A.   Yes.
22       Q.   And as of this past December
23   31st, that was just a couple weeks back,
24   that was about six years ago, correct?

Page 245

1        A.   That is correct.
2        Q.   And you have not yet taken
3    Step 3?
4        A.   No.
5        Q.   You indicated some intention
6    to practice medicine in New York --
7        A.   Yes.
8        Q.   -- in the future?
9        A.   Yes.
10       Q.   Do you have an understanding
11   of what New York State's requirements are
12   in order to become licensed with respect
13   to the USMLE?
14       A.   I don't know what the
15   current regs are.
16       Q.   You mentioned some intention
17   to become licensed to practice medicine
18   potentially in Texas?
19       A.   Yes.
20       Q.   Do you have any
21   understanding of what the State of
22   Texas's requirements are with respect to
23   the USMLE?
24       A.   I have not looked into it

62 (Pages 242 to 245)

Confidential - Mathew Thomas, Jr., M.D.

Page 246

1    recently.
2        Q.   What steps have you taken to
3    prepare for trying to enter the practice
4    of medicine?
5        A.   Well, I did look into these
6    things years ago, but since the rules
7    change all the time, I haven't updated it
8    because everything has been pending since
9    2000 -- basically 2008, 2009.
10       Q.   Have you taken any steps to
11   keep your medical knowledge up to date?
12       A.   Yes.  I do teach courses at
13   the nursing school as well as other
14   schools.  I do tutoring on the side
15   sometimes.
16       Q.   Have you done work to
17   prepare to have the knowledge that you
18   would need to have from, for example,
19   Step 1 of the USMLE?
20       A.   Recently?
21       Q.   Yes.
22       A.   No.
23       Q.   What about with respect to
24   Step 2 CK?

Page 247

1        A.   I think Step 2 CK I have the
2    knowledge because it's clinical, and
3    because I am surrounded in the hospital
4    setting, I do hear about cases and
5    discuss things, so I have somewhat of a
6    knowledge of some of the changes.
7        Q.   What about Step 2 CS?
8        A.   I still do clinical skills,
9    tutoring on the side sometimes if anyone
10   needs help, so those skills have stayed
11   intact.
12       Q.   We discussed just a little
13   while ago your request for an exception
14   to ECFMG's seven-year rule?
15       A.   Yes.
16       Q.   I'd like to walk through
17   that chronology.  I'm going to hand you a
18   document that I will be marking as
19   Exhibit 59.
20           (Whereupon, a document was
21           marked for identification as
22           Exhibit No. 59.)
23   BY MS. McENROE:
24       Q.   This is an e-mail chain

Page 248

1    which I would like to start at the back
2    of it which should be at the beginning of
3    the e-mail chain, so on the page with the
4    Bates stamp ending in 609.  See that at
5    the bottom?
6        A.   Yes.
7        Q.   There's an e-mail to Kara
8    Corrado from manu.thomas.31@gmail.com
9    which I believe we confirmed is your
10   e-mail address?
11       A.   Yes.
12       Q.   And it's dated February 8th,
13   2013 and you're copying Rebecca
14   Robichaud?
15       A.   That's correct.
16       Q.   The subject matter is legal
17   representation, and you write:  Kara,
18   this e-mail is to certify that Rebecca A.
19   Robichaud is authorized to speak on my
20   behalf, and you can release any
21   information regarding my case to Ms.
22   Robichaud.  Thank you for your
23   cooperation.
24           Is that correct?

Page 249

1        A.   Correct.
2        Q.   Who is Kara Corrado?
3        A.   Kara?  Kara works under Bill
4    Kelly from what I understand works at
5    ECFMG.
6        Q.   And you understood when you
7    were e-mailing her that she works at
8    ECFMG?
9        A.   Yes.
10       Q.   And you mentioned Bill
11   Kelly.  You also understood he works at
12   ECFMG?
13       A.   Yes.
14       Q.   Flipping to the first page
15   in this e-mail chain is an e-mail from
16   Rebecca Robichaud to Bill Kelly sent on
17   February 8th, 2013.  Do you see that?
18       A.   Yes.
19       Q.   And she writes:  Bill, thank
20   you again for taking the time to talk to
21   me today regarding Dr. Thomas.  As we
22   discussed, the key issue is that because
23   of his appeal pending with USMLE, Dr.
24   Thomas was unable to re-take his Step 2

Confidential - Mathew Thomas, Jr., M.D.

Page 250

1    examination and the appeal lasted over
2    four years.
3            This loss of time during the
4    appeals process has now affected Dr.
5    Thomas's ability to complete his Step 2
6    examination within seven years of passing
7    his Step 1 examination as required by
8    ECFMG.
9            It is my understanding from
10   our conversation that the only way to
11   obtain a waiver to the seven-year
12   requirement is by submitting a written
13   request to the credentialing committee of
14   ECFMG which does not meet again until
15   April 2013.
16           Did I read that correctly?
17       A.   That's correct.
18       Q.   And that's the request for
19   an exception to the seven-year rule we've
20   been discussing?
21       A.   That's correct.
22       Q.   And that was a request made
23   on your behalf, correct?
24       A.   Yes.

Page 251

1        Q.   Going back to what I had
2    given you as Exhibit No. 58 which is the
3    ECFMG document we were looking at?
4        A.   Yes.
5        Q.   Attached thereto is included
6    a letter dated March 27th, 2013.
7        A.   Yes.
8        Q.   Do you see that?
9            That begins on the page with
10   a Bates number ending in 630?
11       A.   That's correct.
12       Q.   And this is a letter from
13   you to the credentialing committee at
14   ECFMG.  Is that correct?
15       A.   That's correct.
16       Q.   And you included with that a
17   number of exhibits for attachments, if we
18   can take a look at the letter.  You'll
19   see you included a copy of your passing
20   Step 2 CK report, the letter from FSMB.
21       A.   Step 3.
22       Q.   The cover page from your
23   personal appearance at the USMLE
24   committee, the letter that you received

Page 252

1    dated February 17th, 2010 from USMLE, the
2    August 25th, 2000 letter from USMLE --
3        A.   Yes.
4        Q.   -- to you and, ultimately,
5    the October 17th, 2011 letter from the
6    USMLE indicating that you had not passed
7    the validating exam, correct?
8        A.   That's correct.
9        Q.   So your letter to the ECFMG
10   was dated March 27th, 2013, correct?
11       A.   I'm sorry.  Say that again,
12   please.
13       Q.   Your letter to the ECFMG
14   credentialing committee was dated March
15   27th, 2013, correct?
16       A.   That's correct.
17       Q.   I'm going to hand you what I
18   will mark as Exhibit 60.
19           (Whereupon, a document was
20           marked for identification as
21           Exhibit No. 60.)
22   BY MS. McENROE:
23       Q.   What I just handed you is an
24   April 1st, 2013 ECFMG letter to you,

Page 253

1    correct?
2        A.   Correct.
3        Q.   And it starts by saying:
4    Dear Dr. Thomas, this will acknowledge
5    receipt of your request for an exception
6    to the ECFMG policy requirements that
7    applicants must pass those USMLE Steps
8    and Step components required for ECFMG
9    certification within a seven-year period?
10       A.   That's correct.
11       Q.   And you received this
12   letter.  Is that correct?
13       A.   Yes, I did.
14       Q.   The letter goes on to say:
15   While you have not specified the length
16   of the additional time beyond seven years
17   you are requesting, it appears you is
18   asking for an additional two years and
19   three months, the amount of time you
20   write that you were prevented from taking
21   the USMLE exam due to an investigation by
22   the USMLE program surrounding the
23   validity of your score on the December
24   21st, 2007 Step 2 CK.

64 (Pages 250 to 253)

Confidential - Mathew Thomas, Jr., M.D.

Page 254

1          Did I read that correctly?
2      A.   That is correct.
3      Q.   Did you understand that to
4  pertain to your December 31st, 2007
5  score?
6      A.   Yes.
7      Q.   And is that indeed the
8  length of time you were requesting for an
9  exception?
10     A.   Approximately.
11     Q.   And do you have an
12 understanding that the ECFMG committee
13 did consider your request?
14     A.   Yes.
15     Q.   And what I have given you as
16 Exhibit 58 is information for the ECFMG
17 Medical Education Credentials Committee
18 regarding your request, correct?
19     A.   Yes.
20     Q.   And you will see that that
21 included your letter to ECFMG regarding
22 this matter dated March 27th, 2013?
23     A.   Yes.
24          (Whereupon, a document was

Page 255

1      marked for identification as
2      Exhibit No. 61.)
3  BY MS. McENROE:
4      Q.   I'm handing you what has
5  been marked as Exhibit 61.  And this is
6  an April 25th, 2013 letter from ECFMG to
7  you with a Bates number of ECFMG 615,
8  informing you that the ECFMG Medical
9  Education Credentials Committee has
10 completed its review of your request for
11 an exception to the ECFMG policy
12 requirement that applicants must pass
13 those USMLE Steps and Step components
14 required for the ECFMG certification
15 within a seven-year period.
16          The ECFMG committee reviewed
17 this matter at its April 17th, 2013
18 meeting.  Following careful review, the
19 ECFMG committee took action to deny your
20 request for an individual exception to
21 the ECFMG credential requirement that
22 applicants must pass those USMLE Steps
23 and Step components required for ECFMG
24 certification within a seven-year period.

Page 256

1          Did I read that accurately?
2      A.   Yes, you did.
3      Q.   Did you receive this letter?
4      A.   Yes, I did.
5      Q.   So it would be fair to
6  summarize that with respect to your
7  request to ECFMG for an exception to the
8  seven-year rule, you had counsel make
9  that request on your behalf?
10     A.   Yes.
11     Q.   You then wrote a letter
12 fully explaining your request and
13 attaching documentation?
14     A.   Yes.
15     Q.   That letter and
16 documentation and additional relevant
17 information including, for example, your
18 score exam history was provided to the
19 ECFMG Medical Education Credentials
20 Committee, correct?
21     A.   Yes.
22     Q.   The Medical Education
23 Credentials Committee then considered
24 your request, correct?

Page 257

1      A.   Yes.
2      Q.   And that exception was
3  denied?
4      A.   Yes.
5      Q.   I'd like to move briefly
6  through the claims you bring in this
7  case --
8      A.   Yes.
9      Q.   -- to make sure that I'm
10 clear on which claims you're bringing
11 with respect to ECFMG.
12          So earlier today we
13 discussed your complaint and your amended
14 complaint --
15     A.   Yes.
16     Q.   -- which are included in the
17 binder of documents in front of you at
18 tabs 1 and 2, and you articulated the
19 following claims.  First, you said
20 discrimination, correct?
21     A.   Yes.
22     Q.   And you said that that
23 discrimination was based on the fact that
24 you had been an Optima student, correct?

65 (Pages 254 to 257)

Confidential - Mathew Thomas, Jr., M.D.

Page 258

1     A.   Yes.
2     Q.   Are you saying that
3  discrimination is based on anything else?
4     A.   I think also it's based on
5  my test exam history, the amount of
6  attempts I've taken over the years.
7     Q.   Anything else?
8     A.   I guess to a point it may
9  also be the notion that I switched
10  schools so much, whether it's assumed
11  that it was because of reasons that they
12  kicked me out versus me choosing to
13  leave.
14     Q.   Anything else?
15     A.   No.  I think that's about
16  it.
17     Q.   So your discrimination claim
18  is based on your allegations that you
19  were discriminated against based on being
20  an Optima student, on your attempt
21  history of examination history, on your
22  having switched medical schools?
23     A.   And working for him.
24     Q.   And working for him?

Page 259

1     A.   Not just being a student but
2  I think predominantly working for him
3  after my exam.
4     Q.   And who are you alleging has
5  discriminated against you on these bases?
6     A.   I believe that the NMBE
7  definitely has.  The ECFMG may have to a
8  point given the request that was given
9  with all the attempts may have tainted
10  the opinion of the committee.
11     Q.   Would it be fair to describe
12  your discrimination complaint against
13  ECFMG as solely being related to the fact
14  that in connection with its consideration
15  of your request for an exception to the
16  seven-year rule, ECFMG was aware of your
17  exam history?
18     A.   You might have to rephrase
19  that.
20     Q.   Sure.  I don't mind asking
21  it again.
22        Would it be fair to say that
23  your discrimination claim against ECFMG
24  solely relates to the fact that the ECFMG

Page 260

1  Medical Education Credentials Committee
2  was provided with your accurate exam
3  history when considering your exception
4  request?
5     A.   I think also the fact that
6  ECFMG was present, had a member present
7  at the score validity exam.  All contents
8  that were said at that hearing including
9  my employment with Optima and me being a
10  student there may also have led
11  to -- because I'm unaware of who actually
12  sits on that committee, but I think Bill
13  Kelly may have even been at that initial
14  hearing.
15     Q.   Are you alleging that ECFMG
16  has done anything specifically to you to
17  discriminate against you?
18     A.   I think the decision was
19  made based on a discriminatory matter,
20  not personally to affect me, but the
21  decision they took in terms of extending
22  was based on the history, all the history
23  given.
24     Q.   Aside from the decision not

Page 261

1  to grant your exception request, are you
2  alleging that ECFMG discriminated against
3  you?
4     A.   No.
5     Q.   The next cause of action you
6  articulated earlier today was what you
7  described as false accusations?
8     A.   I believe that's more of
9  NBME.
10     Q.   The third cause of action
11  you articulated earlier today was
12  defamation.  Does that pertain to ECFMG?
13     A.   I think that's mainly NBME
14  as well.
15     Q.   The fourth cause of action
16  you articulated earlier today was with
17  respect to the First Amendment.  You
18  claimed a violation of your freedom of
19  association?
20     A.   I think there is a slight
21  stereotype based on that.
22     Q.   What do you mean by that?
23     A.   Meaning that if I was not an
24  Optima student nor had worked for Optima

Confidential - Mathew Thomas, Jr., M.D.

Page 262

1    and I had asked for a waiver based on the
2    fact that an appeal had taken, I think
3    ECFMG may have granted it.
4         Q.   Would it be fair to say that
5    your allegation against ECFMG with
6    respect to the alleged violation of your
7    First Amendment right to associate freely
8    pertains only to ECFMG's decision to deny
9    your exception request?
10        A.   Yes.
11        Q.   Anything else?
12        A.   No. I think that was
13   basically it.
14        Q.   Additional cause of action,
15   the fifth one you named earlier was
16   negligence for failing to warn about
17   Optima. Does that pertain to ECFMG?
18        A.   I think that was an NBME
19   issue as well.
20        Q.   The sixth you had mentioned
21   was what you described as guilt by
22   association?
23        A.   I think there's a slight,
24   again, in the decision-making. I think

Page 263

1    it comes up as a factor in their
2    decision.
3         Q.   What do you mean by that?
4         A.   Meaning that, again, had I
5    been an employee of just Kaplan
6    University asking, I don't think they
7    would have seen it as they saw it, me
8    being an employee at Optima.
9         Q.   Does that pertain -- strike
10   that.
11             Does your allegation against
12   ECFMG with respect to what you're
13   describing as guilt by association
14   pertain solely to ECFMG's decision not to
15   grant your exception request?
16        A.   Yes.
17        Q.   You mentioned earlier today
18   that you felt that your appeals were not
19   taken seriously. Is that true with
20   respect to ECFMG?
21        A.   I don't believe ECFMG was
22   involved in the appeal process from the
23   invalid score.
24        Q.   When you're saying appeal

Page 264

1    process, you're distinguishing that from
2    the exception request process. Is that
3    correct?
4         A.   That's correct. The
5    exception request all came to fruition
6    when the six-year rule came into effect,
7    and the dates kind of affected whether or
8    not I could retake the exam so that would
9    be late 2011.
10        Q.   As we just walked through
11   the chronology, you would agree that
12   ECFMG took your request for an exception
13   to the seven-year rule seriously?
14        A.   Yes, I do.
15        Q.   Besides what I've
16   articulated and that we've talked about
17   so far this afternoon, do you have any
18   other claims against ECFMG?
19        A.   No.
20        Q.   Are you seeking money
21   damages?
22        A.   I have yet to decide that.
23        Q.   Do you feel that you have a
24   monetary loss that you can quantify that

Page 265

1    you can tell me today how much money you
2    feel that you are owed?
3         A.   I feel if I had gone through
4    the process and gotten residency, I've
5    lost multiple years of salary and thus
6    residency thus and then into a
7    physician's career salary. To quantify,
8    I'm not really sure.
9         Q.   You would agree you've been
10   working consistently, correct?
11        A.   I have been working since
12   2009, yes.
13        Q.   Has there been a period of
14   unemployment during that time?
15        A.   No.
16        Q.   How long from now do you
17   anticipate entering the practice of
18   medicine?
19        A.   If everything was resolved?
20        Q.   Correct.
21        A.   Within two years. Possibly
22   within a year.
23        Q.   On what basis? What would
24   your plan be?

67 (Pages 262 to 265)

Confidential - Mathew Thomas, Jr., M.D.

Page 266

1          A.   My plan is to get in.  I
2    think my plan would be to reach out to
3    those people that I know in the business,
4    to reach out to the hospital which I'm
5    working for now and, basically, get my
6    foot in the door, start the process and
7    get whatever they say what I need to get
8    done, get it done.
9          So if they say we can help
10   you but you need Step 3 done, then focus
11   on Step 3.  If they say that's not a
12   problem; we can get you in, but within
13   the first year you have to get your Step
14   3 done, then take the position and then
15   get the Step 3 done in a timely manner.
16         Q.   You understand that even if
17   your December 31st, 2007 Step 2 CK score
18   were to be deemed valid by federal court,
19   your USMLE transcript would still reflect
20   your full examination history, correct?
21         A.   I understand.
22         Q.   You understand that would
23   include six attempts and fails of Step 1
24   before you passed on the seventh attempt?

Page 267

1          A.   Yes.
2          Q.   And that would include five
3    failures on the Step 2 CK?
4          A.   Yes.
5          Q.   Do you have connections with
6    any program directors for residency
7    programs?
8          A.   I know a lot of people.  I'd
9    have to reach out to see if anyone has
10   been promoted to that level.
11         Q.   Did you have any of those
12   connections back when you were ECFMG
13   certified?
14         A.   No.
15         Q.   How did you gain those
16   connections?
17         A.   Well, over the years we have
18   people -- obviously, 2007.  It's now been
19   six years.  Anyone who graduated from
20   there or got into residency is now done
21   with residency and practicing.
22         I've been working in HHC as
23   well as St. Barnabas so I meet people in
24   the hospital setting.  And then I have a

Page 268

1    lot more friends that are in residency or
2    finished, so they are willing to reach
3    out and talk on my behalf.  And sometimes
4    it's about who you know, not what you
5    know.
6          Q.   You would agree, however,
7    that you still need to have the requisite
8    knowledge to become a physician in the
9    United States, correct?
10         A.   I believe I have the
11   requisite knowledge to be a physician in
12   the United States.
13         Q.   But you'd have to pass Step
14   3?
15         A.   Yes.  That, I understand.
16         Q.   Do you anticipate that
17   entering a residency program in the
18   United States would be an easy thing to
19   do?
20         A.   Do you mean getting the
21   residency position or completing
22   residency?
23         Q.   Getting the position?
24         A.   I believe it's an uphill

Page 269

1    battle, but I think I would be able to
2    accomplish that given the opportunity.
3          Q.   On what basis do you think
4    you'd be able to accomplish that given
5    your exam history?
6          A.   As I said, more people have
7    seen me working in the work environment
8    outside of just a piece of paper that
9    says how I did on an exam, and so
10   knowledge is much different
11   from -- there's those who have clinical
12   knowledge and those who have book
13   knowledge, and I think based on that, a
14   lot more people recognize, when they see
15   you, work with you, exactly what you
16   have.
17         Q.   And you're not willing to
18   tell us who it is?
19         A.   No.
20         Q.   So we can't reach out to
21   those people and ask them?
22         A.   No.
23         Q.   So you're asking us to just
24   take your word for it?

68 (Pages 266 to 269)

Confidential - Mathew Thomas, Jr., M.D.

Page 270

1      A.   I think my validity,
2  validating the exam and me getting into
3  residency are two different avenues.
4      Q.   So you think that these
5  people would go out on a limb to give you
6  a residency program position that are
7  admittedly pretty competitive despite
8  your examination history, but you won't
9  tell us who those people are so we can
10  talk to them?
11      A.   Well, I've had conversations
12  with people over the last couple years,
13  people asking me when are you going to be
14  able to -- not trying to get into every
15  single detail regarding this case or what
16  I'm going through, so I haven't made it
17  public knowledge exactly what my status
18  is, so some have said they'll help.  Some
19  may not help.
20          I can't really take that
21  full force and try to see where -- what's
22  truth in the matter until all of this is
23  resolved.  So for that fact, yeah, I
24  can't say they will or won't, but I will

Page 271

1  take the assumption that they will try to
2  help if they said it in the past.
3      Q.   And you don't have anything
4  in writing committing anyone to help you?
5      A.   No.  I've never had anybody
6  commit anything to writing.
7      Q.   Have you ever had anyone
8  express an interest in assisting you in
9  overcoming administrative hurdles in this
10  action?
11      A.   Someone that would step
12  forward?  I've had some people when I was
13  in the city hospital say that, you know
14  what, first things first, get Step 3
15  done.  At that point, if you can do it
16  well, first attempt, high score, that
17  could be an avenue to look past all of
18  the attempts in 1 and 2.
19      Q.   And you won't tell us who
20  those people are?
21      A.   No.  Not at this point.
22      Q.   Do you plan to tell us at
23  all in this litigation?
24      A.   I don't think it's relevant

Page 272

1  to this litigation.  I think future is
2  irrelevant to whether or not this score
3  is going to be validated 2007.  If
4  they're not going to come through for me,
5  then even if I get a validated score, I'm
6  not going to be practicing medicine.
7      Q.   So you would want arguably
8  for the defendants in this case to be
9  financially responsible for your future,
10  whatever it may be, in terms of whatever
11  impact this might have, but you're not
12  willing to tell us how you think you can
13  get there?
14      A.   I think that if it comes
15  down to the point where financial
16  responsibility and who's responsible or
17  what is owed back to me becomes a
18  situation, then I would be at the point
19  of situation to release names; but until
20  we get to that point, I find no need to,
21  unless you guys are telling me that
22  financially ECFMG and NBME is going to
23  reimburse me for any losses I may have
24  incurred because of this.

Page 273

1      Q.   You should not take anything
2  we say today as any waiver of claims or
3  defenses we may have just for the
4  purposes of the record.
5      A.   No.  I understand.
6      Q.   In order to get into a
7  residency program you would agree that
8  you need letters of recommendation.  Is
9  that correct?
10      A.   That is correct.
11      Q.   Who would you anticipate
12  getting your letters of recommendation
13  from?
14      A.   I already have a clinical
15  letter of recommendation.  I can go out
16  on a limb now and possibly get letters of
17  recommendation from those supervisors
18  I've worked with over the last couple of
19  years.
20      Q.   Who's your clinical letter
21  of recommendation from?
22      A.   I had one from Dr. Gibson
23  who is an orthopedic physician.
24      Q.   At which hospital?

69 (Pages 270 to 273)

Confidential - Mathew Thomas, Jr., M.D.

Page 274

1     A.   He was working with me for
2  Center for Orthopaedics.  We worked out
3  of Saint Raphael's in Connecticut.
4     Q.   And what year is that letter
5  of recommendation?
6     A.   Those are all before.  That
7  was during my school times of 2002, 2003.
8     Q.   Any other letters of
9  recommendation you have?
10    A.   I think I had a letter of
11 recommendation from Carlo Hallak who was
12 the program director of Kaplan CS at the
13 time, so he was my direct supervisor in
14 terms of clinical skills and patient note
15 grading.
16    Q.   And he is your supervisor
17 from when you were working at the test
18 prep program at Kaplan?
19    A.   Yes.
20    Q.   He's not working with you in
21 a hospital setting?
22    A.   No.  He's not working with
23 me in a hospital setting.
24    Q.   And when was that letter of

Page 275

1  recommendation dated?
2     A.   It had to be after 2006
3  because I was working at Kaplan after
4  that so somewhere towards 2006 or 2007.
5  I may have used his letter as part of my
6  scramble application.
7     Q.   Any other letters of
8  recommendation?
9     A.   I do have another one.  I
10 forget who that is.
11    Q.   A clinical one?
12    A.   I do have a clinical one
13 from when I was in Manchester from Dr.
14 Doss, I believe it was.  He's a GI
15 hepatology doctor.
16    Q.   What year would you estimate
17 that letter was from?
18    A.   Well, I was there in 2001,
19 so it has to be from that time.
20    Q.   Any other letters of
21 recommendation you have?
22    A.   Currently, I don't recall
23 any other ones.
24    Q.   If you were to move into a

Page 276

1  residency program application process,
2  what, if anything, would you do with
3  respect to letters of recommendation?
4     A.   Well, letters of
5  recommendation, depending on what year
6  I'm doing it.  If it winds up being
7  something such as a scramble this year,
8  I'd probably get letters from my current
9  supervisors that I've worked with or my
10 former boss at HHC.
11         If it's something that's
12 going to be next year, I'd probably do an
13 externship or observership at the
14 hospitals to gain some newer letters of
15 recommendation.
16    Q.   So would it be fair to say
17 if you did the scramble this year, you
18 would not have any clinical letters of
19 recommendation updated?
20    A.   Updated clinical, no.  The
21 only one I could reach out to is I did an
22 externship over at Bayley Seton Hospital
23 in Staten Island with psychiatry, and I
24 could probably reach out over there to

Page 277

1  the director to get something.  That was,
2  I think, some time in the last -- it's on
3  the CV.  I forget what year it was.  It
4  was within the last couple years.
5     Q.   Let's take a look at your
6  CV.  That's within Exhibit 57.  Can you
7  point to your externships for me?
8     A.   Sure.  The one that I did
9  was in psych.  Let's see if it's listed
10 here.
11    Q.   On the last page you have
12 externship, New York Medical College,
13 Richmond listed?
14    A.   January 2009.
15    Q.   So that was from January
16 2009, so that's five years ago?
17    A.   That's still a couple --
18 yeah.  That's been about four, five years
19 ago.
20    Q.   Have you had any more recent
21 externships?
22    A.   No, because we were in the
23 middle of all of this, so at that point I
24 couldn't even really go into an

70 (Pages 274 to 277)

Confidential - Mathew Thomas, Jr., M.D.

Page 278

1   externship saying that I'm valid with the
2   exams.
3        Q.   When's the last time you've
4   seen a patient in a medical capacity?
5        A.   You mean --
6        Q.   As a medical student?
7        A.   -- actually treating?  It
8   would be 2009.
9        Q.   Do you have any plans to
10  apply for externships in the near future?
11       A.   If all this gets resolved,
12  then yes.  Basically, medicine would be
13  my main...
14       Q.   But in the last five years
15  you've not seen or treated any patients?
16       A.   I have not treated any
17  patients.  I know about cases because I
18  work in the facilities and cases may come
19  up that we discuss, but I have not been
20  the lead or even a participant in the
21  actual care of a patient.
22       Q.   You have not laid hands on a
23  patient?
24       A.   No.  I have not laid hands

Page 279

1   on any patients.
2        Q.   What would be involved in
3   getting prepared for taking Step 3?
4        A.   First things first would be
5   open up my entire schedule so I can do
6   Step 3 and only Step 3 and then it would
7   be basically putting in the time with all
8   the -- going through all the material in
9   terms of books, going through all the
10  question banks that are out there and
11  practicing for the clinical portion of
12  the Step 3.
13       Q.   How much time do you
14  anticipate you would give yourself to
15  prepare for Step 3?
16       A.   Since I haven't touched the
17  material, at minimum it would have to be
18  four months.  I'd say four to six months
19  probably give me okay.
20       Q.   Do you have plans to take
21  any prep courses for Step 3?
22       A.   Prep courses are offered at
23  different times.  I'd have to see the
24  schedule of the prep course and then go

Page 280

1   from there.
2        Q.   But is that yes, you would
3   plan to take a prep course?
4        A.   If it's something that I can
5   afford, if it's something that works into
6   my schedule, then yes.
7        Q.   Besides taking time off to
8   prepare and taking a prep course, what
9   else would you need to do to be ready for
10  Step 3?
11       A.   It has to be a lot of
12  questions, questions, questions,
13  questions.
14       Q.   So just practice?
15       A.   Just practice, yeah.
16       Q.   And you've mentioned today a
17  number of times your interest in passing
18  Step 3 on the first attempt.  Is that
19  correct?
20       A.   Yes.
21       Q.   Why do you think that's
22  important?
23       A.   I think that if you can pass
24  Step 3 on the first attempt and break 85,

Page 281

1   90, it can make up and give me enough of
2   a ground to justify the issues I have
3   with Step 1 and Step 2.  I'm more mature,
4   more knowledgeable, and, basically, I was
5   young back then taking it when I
6   shouldn't have taken it.
7            Half the times when I took
8   it just to see the test, if I had taken no
9   score, it would have been better for me,
10  but things changed over the years.  It
11  evolved to everything counts.
12       Q.   Would you agree that it
13  would be detrimental to your attempt to
14  get a residency program if you failed
15  Step 3 the first time?
16       A.   Yes.
17       Q.   What do you think would be
18  involved in getting ready to take Step 2
19  CK again?
20       A.   I think the same exact steps
21  as Step 3.  Again, taking the time off,
22  studying, going through all the question
23  banks, doing all the NBME assessment
24  tests, just time, practice, practice,

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Mathew Thomas, Jr., M.D.

Page 282

1    practice.
2        Q.   Sitting here today, you
3    don't think you could take Step 2 CK and
4    pass it?
5        A.   I could probably take it.
6    It's a matter of whether or not I can get
7    the time to do it.
8        Q.   I meant if you took Step 2
9    CK right now, do you think you would pass
10   it?
11       A.   No.  Probably not.  I think
12   there's a lot more you got to refresh on.
13       Q.   Does that hold true for Step
14   1 as well?
15       A.   Step 1 is a whole different
16   piece altogether.
17       Q.   And can you explain why that
18   is?
19       A.   Because clinically you see a
20   lot more things and you relate to a lot
21   more things from a CK perspective.  It's
22   patient care.  Step 1 is a lot of basic
23   sciences, nitpicking, little details.
24   You have to really get into the small

Page 283

1    stuff.  It's not big picture and it's not
2    really treating.
3            So it's understanding a lot
4    more intricate details versus taking a
5    patient and working through what they
6    have, symptoms and so forth.
7        Q.   Could you describe just
8    briefly the content of the Step 1 exam?
9    That's the basic science exam, correct?
10       A.   Yes.  That is the basic
11   science exam.  You have your anatomy,
12   physiology.  You have your pharmacology.
13   You have your pathology, immunology,
14   microbiology.  What else is on those?  I
15   think a little bit of psychiatry.  I
16   forget the other.
17       Q.   What would be involved in
18   getting ready to take Step 1 again?
19       A.   Everything.  It's like
20   learning -- you literally have to learn
21   five semesters of work all over again.
22       Q.   So how much time do you have
23   to take off?
24       A.   That, honestly, if I want to

Page 284

1    get a really good grade, it would take me
2    about a year.
3        Q.   If you had to, would that be
4    something you would be willing to do to
5    enter the practice of medicine?
6        A.   Honestly, if I'm going to
7    wind up trying to take my Step 1 and Step
8    2 and everything all over again, I would
9    need a guarantee of a residency at the
10   end of that rainbow.
11       Q.   So is that a no?
12       A.   It's not something I want to
13   do.  I mean, if that's the only way, then
14   the conversation would have to be had
15   because that basically means I have to
16   take myself out of working and out of
17   everything for a year for that and then
18   six months or so, and given my financial
19   state at home, it's not an option right
20   now.
21       Q.   Do you find your current job
22   fulfilling?
23       A.   It's very fulfilling in that
24   I'm in a healthcare organization.  It's

Page 285

1    very sad and depressing seeing patients
2    come in and out knowing that I should be
3    on the other side.  And the salary,
4    whatever the salary is, is really not as
5    great considering what I need to get done
6    because, trust me, I'd rather not be
7    working three jobs and spend time with my
8    little kids than be working all the time.
9        Q.   You're making over a
10   $115,000, correct?
11       A.   Well, I'm making 115 working
12   four jobs, and I'm still paying off
13   student loans, and I'm still paying off a
14   lot of the other debt that we had to
15   incur with other issues.
16       Q.   You testified early today
17   that you have not had contact with -- is
18   it Dr. Suliman?
19       A.   That's correct.
20       Q.   For quite some time?
21       A.   It's been years.
22       Q.   Have you had contact with
23   anybody else from Optima since 2009?
24       A.   In terms of students or

72 (Pages 282 to 285)

Confidential - Mathew Thomas, Jr., M.D.

Page 286

1    employees?
2         Q.    Anybody?
3         A.    Optima, students, if I see
4    them at wedding events, we don't talk
5    about Optima.  We talk about our regular
6    personal lives.  I did have a
7    conversation with the IT person who ran
8    his thing a couple weeks ago.
9         Q.    And who is that?
10        A.    Adrian.
11        Q.    How did you get in contact
12   with Adrian?
13        A.    I Facebooked him and had him
14   call me back.
15        Q.    Do you have Facebook on your
16   phone?
17        A.    No.
18        Q.    Does he have his last name
19   on Facebook?
20        A.    I don't know, to be honest.
21   I don't know if his name is there or if
22   he has -- a lot of people change their
23   names.
24        Q.    What was the nature of that

Page 287

1    contact you had a few weeks ago with
2    Adrian from Optima's IT?
3         A.    I basically wanted to know
4    whether or not he had any information
5    regarding when stuff was added to the
6    server, and he said he doesn't work for
7    Suliman anymore.  He hasn't been paid in
8    a long time.
9         So, basically, the server,
10   whatever he had, has been erased, but he
11   said he would look into it to see if
12   there was anything he could do to show
13   when it is that his bank was updated
14   versus when I took my exam.
15        Q.    Were these private messages
16   on Facebook?
17        A.    No.  He literally called me.
18        Q.    He called you.  You had a
19   telephone conversation?
20        A.    Yeah.  I sent him a message
21   saying I need to talk to you, so he got
22   back to me a couple days later.
23        Q.    How long did this telephone
24   conversation last?

Page 288

1         A.    Less than three minutes.
2    Three, four minutes.
3         Q.    And are you expecting him to
4    get back to you?
5         A.    He says he will.  I think
6    before I get that, I think I'm going to
7    have to reach out to him again.
8         Q.    Do you know where he's
9    physically located?
10        A.    I think he's in Romania.
11        Q.    Were you able to see the
12   return telephone number?
13        A.    No.  He called me at work.
14        Q.    On a landline?
15        A.    Landline.
16        Q.    How did he know to call you
17   at work?
18        A.    I told him to call me during
19   the day.
20        Q.    Did you just have one
21   Facebook message to him telling him to
22   call you?
23        A.    No.  I believe I tried to
24   reach out to him a couple weeks prior.

Page 289

1    He didn't get back to me and then at that
2    point -- actually, I think we might have
3    went back and forth a couple of times and
4    then I told him, I need to talk to you
5    regarding something.  Call me.
6         Q.    Did you, in the messages
7    going back and forth before you spoke on
8    the phone, say what you needed to speak
9    with him about?
10        A.    I basically said that I
11   got -- I had been invalidated, and I'm in
12   a situation where I'm about to try to get
13   myself fixed so I need to talk to you.
14        Q.    In the time between the 2009
15   time frame when things were going on and
16   just this last couple weeks when you
17   spoke with Adrian, have you had any other
18   contact with Adrian in between that?
19        A.    I don't believe so.  Unless
20   it was a hi, bye.  No conversations.
21        Q.    Do you know what Adrian is
22   doing?
23        A.    He's an IT person so
24   probably working doing something IT

73 (Pages 286 to 289)

Confidential - Mathew Thomas, Jr., M.D.

Page 290

1   related.
2       Q.   Have you reached out to
3   anybody else aside from Adrian for
4   information regarding this case?
5       A.   No.  I don't believe so.
6   One of my friends was at Optima, and I
7   spoke to him just briefly but nothing
8   regarding the case.
9       Q.   Who is that?
10      A.   Jijoe.
11      Q.   Can you spell that for me?
12      A.   J-I-J-O-E.
13      Q.   And what's his last name?
14      A.   Joseph.
15      Q.   And you said he was a friend
16  from Optima.  Was he an employee?
17      A.   He was a friend of mine
18  before Optima.
19      Q.   Did he attend Optima?
20      A.   He did not attend.
21      Q.   Did he work at Optima?
22      A.   He had done some lectures.
23      Q.   And when did you speak with
24  him?

Page 291

1       A.   Just we talk all the time
2   but not regarding this.  We're friends.
3       Q.   Did you speak with him
4   regarding your indeterminate score?
5       A.   Back then everyone spoke to
6   everyone about their indeterminate
7   scores, so there was no pinpointing him
8   over anyone else.
9       Q.   Have you discussed it with
10  him more recently?
11      A.   I told him that I've
12  gone -- I'm fighting it.  I didn't go
13  into any details of it.
14      Q.   When I was asking you about
15  anyone else you spoke with, you mentioned
16  Jijoe in particular.  Is there a reason
17  why?
18      A.   No, because you asked me and
19  I'm under oath.
20      Q.   Is there anybody else?
21      A.   I don't remember really
22  speaking about this case or anything to
23  anybody else.
24      Q.   Did you speak to anybody

Page 292

1   else in the last year, let's say, about
2   your indeterminate score, not necessarily
3   about this litigation in particular?
4       A.   Well, not this litigation.
5   As my process was going through, Reeju, I
6   had spoke to him because he had actually,
7   you know, taken the thing, done a
8   validation so I had mentioned to him.
9   Sometimes I vent.  He knows that I was
10  going to go, but he's moved out to Cali
11  since then so...
12      Q.   And this was Jijoe?
13      A.   No.  Reeju.  The name I had
14  given -- one of the names I gave before.
15      Q.   R-I?
16      A.   R-E-E-J-U.
17      Q.   And you said he moved to
18  California?
19      A.   He moved to California.
20      Q.   Do you speak with him by
21  phone?
22      A.   Sometimes phone.  Sometimes
23  text.
24      Q.   And do you speak with

Page 293

1   him -- have you spoken with him recently
2   regarding your indeterminate score?
3       A.   No.
4       Q.   When's the last time you
5   spoke with him about your indeterminate
6   score?
7       A.   I think the last time I told
8   him was when I finally got to see the
9   judge.  I told him that I did go before
10  the judge, so things are progressing
11  along and we'll see what happens.
12      Q.   But you've spoken to Reeju
13  about this case?
14      A.   He knows that -- again, he
15  knows that I'm fighting the case.  He was
16  actually from Pennsylvania, Philly, so in
17  my attempt to also try to find counsel, I
18  asked him does he know any lawyers.
19  That's kind of how the door opened, but,
20  again, we never got into any details
21  about what's going on or what approach
22  we're taking.
23          (Whereupon, a document was
24      marked for identification as

74 (Pages 290 to 293)

Confidential - Mathew Thomas, Jr., M.D.

Page 294

1       Exhibit No. 62.)
2   BY MS. McENROE:
3       Q.   Dr. Thomas, I'm handing you
4   what I've marked as Exhibit 62.  This is
5   a document headed "USMLE and Appeals:
6   The Hefty Burden Examiners Face in
7   Appealing a USMLE Finding of
8   Indeterminate Score or Irregular
9   Behavior."  Did I read that correctly?
10      A.   That's correct.
11      Q.    And this is written by
12  Sherri Katz and Bob Bennett?
13      A.   Yes.
14      Q.    And then there's a footnote
15  that says, The Bennett law firm would
16  like to acknowledge the contribution of
17  law clerk Whitney Campbell's research for
18  this article.
19           Do you see that?
20      A.   Yes.
21      Q.    I'd also like at the same
22  time to point your attention to your
23  amended complaint which is at tab 2.
24      A.   Yes.

Page 295

1       Q.    You'll see this is the
2   version of your amended complaint to
3   which NBME's counsel inserted paragraph
4   numbers, and I'd like to direct your
5   attention specifically at paragraph 16.
6       A.   Yes.
7       Q.    That is a quote and then
8   it's attributed to Bennett law firm.  Is
9   that correct?
10      A.   That's correct.
11      Q.    Is that the same Bennett law
12  firm as in Exhibit 62 I gave you?
13      A.   Yes, it is.
14      Q.   Do they represent you?
15      A.   No.
16      Q.    Are you personally
17  acquainted with anyone from the Bennett
18  law firm?
19      A.    No.  Bennett was known to be
20  the person who did a lot of hearings, and
21  I was actually going to consider taking
22  his representation, but his fee was way
23  too high during my initial hearing.
24      Q.    When you say your initial

Page 296

1   hearing, that's the USMLE score validity?
2       A.   Score validity, yes.
3       Q.    And in your amended
4   complaint you make references to a study
5   being conducted in paragraph 15?
6       A.   Yes.
7       Q.    And then in paragraph 16 you
8   cite to the Bennett law firm.  Is that
9   correct?
10      A.   Yes.
11      Q.    Is the study being conducted
12  the Bennett law firm document I'm looking
13  at as an exhibit?
14      A.   Yes, it is.
15      Q.    In particular, I'd like you
16  to flip to paragraph 19 of your amended
17  complaint, and you'll see you make
18  reference to a student F and a student G?
19      A.   Yes.
20      Q.    Simultaneously, please flip
21  ahead -- unfortunately, there aren't page
22  numbers on this, but you'll see that
23  there is a section that has information
24  for a student F and a student G that's

Page 297

1   single spaced in the Bennett law firm
2   Exhibit 62 I gave you?
3       A.   Yes.
4       Q.    For student F in Exhibit 62
5   it says percentage of exposed questions,
6   15 percent and that's what you have in
7   your amended complaint, correct?
8       A.   Yes.
9       Q.    Then for percent correct on
10  exposed questions for student F, both
11  documents have 83 percent; and percent
12  correct on unexposed questions, both have
13  67 percent; time spent on exposed
14  questions, both have 43 seconds; time
15  spent on unexposed questions, both have
16  74 seconds, correct?
17      A.    I'm sorry.  Are you looking
18  at the complaint?
19      Q.    I'm comparing the amended
20  complaint numbers to the numbers in
21  Exhibit 62.
22      A.    Okay.  So the percent
23  exposed, 15 to 16.
24      Q.   Yes.

75 (Pages 294 to 297)

Confidential - Mathew Thomas, Jr., M.D.

Page 298

1       A.   The...
2       Q.   Percent correct on exposed
3   questions.
4       A.   Where are you looking at
5   that on the other one?  Are you getting
6   that from --
7       Q.   Yes.  In this the pages are
8   not numbered.
9       A.   Maybe I'm on a different
10  page.
11      Q.   Yes.  You're on a different
12  page.
13      A.   What page are you looking
14  for?  The one that goes, on its face, a
15  good faith argument?
16      Q.   Yes.  We're in the same
17  place.
18      A.   All right.  These are the
19  exact students.
20      Q.   So student F from your
21  amended complaint is the same student F
22  as from the Bennett law firm document?
23      A.   That is correct.
24      Q.   And student G from your

Page 299

1   amended complaint is the same student G
2   from the Bennett law firm document?
3       A.   That's correct.
4       Q.   Have you ever discussed this
5   Bennett law firm document with the
6   Bennett law firm?
7       A.   I have not.
8       Q.   You mentioned that the
9   Bennett law firm was known to be the guy?
10      A.   Yes.  That's what I was
11  told.
12      Q.   Amongst whom?
13      A.   Students who went to Optima
14  who had to go before the hearing.
15      Q.   Do you have particular names
16  of individuals?
17      A.   I do not.
18      Q.   How did you get this Bennett
19  law firm document?
20      A.   It was actually posted on
21  their website for a long time.
22      Q.   What steps have you taken to
23  validate the information in this Bennett
24  law firm document?

Page 300

1       A.   I can't validate based on
2   the fact that the law firm would not be
3   able to give any information to specific
4   students, so I have to assume that
5   because they put it out there as their
6   way of trying to get students aware that
7   it's legitimate.
8       Q.   Do you know who student G or
9   F is?
10      A.   No.
11      Q.   You'll see some of the pages
12  have footnotes at the bottom?
13      A.   Yes.
14      Q.   Can you please flip to
15  footnote 7 in the Bennett law firm
16  document?
17      A.   (Witness complies with
18  request.
19      Q.   Footnote 7 reads:  Some
20  statistics have been altered to protect
21  the identity of any student/doctor
22  represented by the authors, correct?
23      A.   Yes.
24      Q.   Do you have any reason to

Page 301

1   believe that's not true?
2       A.   No.
3       Q.   I'd like you to look ahead
4   at footnote 13.  Footnote 13 reads:  Some
5   percentage and statistics have been
6   altered to protect the identity of any
7   student.
8            Did I read that correctly?
9       A.   Yes.
10      Q.   Do you have any reason to
11  believe that's not true?
12      A.   No.
13      Q.   Yet you cite to those
14  numbers in your amended complaint.
15  That's correct, right?
16      A.   Yes.
17      Q.   You made a personal
18  appearance before the USMLE committee,
19  correct?
20      A.   Yes, I did.
21      Q.   You had the opportunity to
22  bring counsel.  Am I correct?
23      A.   Yes.
24      Q.   You had the opportunity to

76 (Pages 298 to 301)

Confidential - Mathew Thomas, Jr., M.D.

Page 302

1  bring the Bennett law firm if you had
2  wanted?
3      A.  Yes.
4      Q.  You chose not to do that,
5  correct?
6      A.  I chose not to do that.
7      Q.  Are you familiar with the
8  term "irregular behavior"?
9      A.  Yes.
10     Q.  You understand that ECFMG
11 and USMLE each have policies and
12 procedures with respect to irregular
13 behavior?
14     A.  Yes, I do.
15     Q.  Have you been -- strike
16 that.
17         You have not been accused of
18 irregular behavior by ECFMG, correct?
19     A.  No, I have not.
20     Q.  You have not been accused of
21 irregular behavior by USMLE, correct?
22     A.  No, I have not.
23     Q.  You have not been accused of
24 irregular behavior by NBME, correct?

Page 303

1      A.  No, I have not.
2      Q.  You have an understanding of
3  the what the word "indeterminate" means?
4      A.  Yes.  I think so.
5      Q.  What is your understanding
6  of that word?
7      A.  That they can't determine.
8      Q.  Can't determine what?
9      A.  Well, according to this, if
10 we're talking about the value of the
11 validity of the exam, they're saying they
12 cannot determine whether the exam is
13 valid or not.
14         MS. McENROE:  Let's take a
15     quick break.
16         (A short break was taken.)
17 BY MS. McENROE:
18     Q.  Dr. Thomas, you understand
19 you've been testifying under oath today?
20     A.  Yes.
21     Q.  Have the answers you've
22 given us today been truthful?
23     A.  I believe so.
24     Q.  Do you wish to change any of

Page 304

1  the answers you've given?
2      A.  I don't think so.
3      Q.  You mentioned earlier today
4  that you had bumped your head this past
5  weekend?
6      A.  Yes.
7      Q.  Is that correct?
8          Did that impair your memory
9  in any way?
10     A.  I don't think so.
11     Q.  You were cleared having had
12 a CT scan by a doctor.  Is that correct?
13     A.  Yes.
14     Q.  Do you think that affected
15 your appearance today?
16     A.  I don't think so.
17     Q.  Do you have any reason to
18 believe it did?
19     A.  I just had some symptoms
20 yesterday, headache and everything, but
21 today I don't seem -- I seem fine today.
22              * * *
23         RE-EXAMINATION
24 BY MS. HOLLAND:

Page 305

1      Q.  Dr. Thomas, you used the
2  words "I don't think so," and I just want
3  to make sure that I'm distinguishing
4  between a figure of speech that you may
5  use and -- because these are important
6  questions.
7          Is everything that you've
8  told us here today the truth?
9      A.  I believe it is.
10     Q.  Okay.
11     A.  It is.
12     Q.  Is there a reason why you
13 qualify it by saying I believe it is?
14     A.  It is.  To my memory, it is.
15     Q.  And is there any reason why
16 your memory is incomplete or inaccurate
17 today?
18     A.  I don't believe so.
19         MS. McENROE:  So at this
20 point, we don't have any further
21 questions.  What we're going to do
22 is suspend the deposition, but
23 we're going to finish for today.
24         There are a couple of things

77 (Pages 302 to 305)

Confidential - Mathew Thomas, Jr., M.D.

Page 306

1    that we'd like to follow up with
2    you on and we'll do that in the
3    coming days with respect to, for
4    example, Adrian that you had
5    mentioned and so pending getting
6    more information on that that we
7    would need to re-open your
8    deposition, we don't have any
9    further questions today.  Do you
10   understand?
11        THE WITNESS:  I understand.
12        (Deposition was concluded at
13   3:39 p.m.)
14
15
16
17
18
19
20
21
22
23
24

Page 307

1         C E R T I F I C A T E
2
3        I do hereby certify that I
     am a Notary Public in good
     standing, that the aforesaid
4    testimony was taken before me,
     pursuant to notice, at the time
5    and place indicated; that said
     deponent was by me duly sworn to
6    tell the truth, the whole truth,
     and nothing but the truth; that
7    the testimony of said deponent was
     correctly recorded in machine
8    shorthand by me and thereafter
     transcribed under my supervision
9    with computer-aided transcription;
     that the deposition is a true and
10   correct record of the testimony
     given by the witness; and that I
11   am neither of counsel nor kin to
     any party in said action, nor
12   interested in the outcome thereof.
13
14
        WITNESS my hand and official seal
15   this 15th day of January, 2014.
16
17
18   _____
     Lauren A. Moore
19   Notary Public
20
21
22
23
24

Page 308

1          INSTRUCTIONS TO WITNESS
2        Please read your deposition
     over carefully and make any
3    necessary corrections.  You should
     state the reason in the
4    appropriate space on the errata
     sheet for any corrections that are
5    made.
        After doing so, please sign
6    the errata sheet and date it.  You
     are signing same subject to the
7    changes you have noted on the
     errata sheet, which will be
8    attached to your deposition.
        It is imperative that you
9    return the original errata sheet
     to the deposing attorney within
10   thirty (30) days of receipt of the
     deposition transcript by you.  If
11   you fail to do so, the deposition
     transcript may be deemed to be
12   accurate and may be used in court.
13
14
15
16
17
18
19
20
21
22
23
24

Page 309

1         - - - - - -
            E R R A T A
2         - - - - - -
3
4    PAGE LINE CHANGE
5    ____ ____ _____
6        REASON: _____
7    ____ ____ _____
8        REASON: _____
9    ____ ____ _____
10       REASON: _____
11   ____ ____ _____
12       REASON: _____
13   ____ ____ _____
14       REASON: _____
15   ____ ____ _____
16       REASON: _____
17   ____ ____ _____
18       REASON: _____
19   ____ ____ _____
20       REASON: _____
21   ____ ____ _____
22       REASON: _____
23   ____ ____ _____
24       REASON: _____

78 (Pages 306 to 309)

Confidential - Mathew Thomas, Jr., M.D.

Page 310

```
 1
 2          ACKNOWLEDGMENT OF DEPONENT
 3
 4          I,_____, do
 5    hereby certify that I have read the
 6    foregoing pages, and that the same is
 7    a correct transcription of the answers
 8    given by me to the questions therein
 9    propounded, except for the corrections or
10    changes in form or substance, if any,
11    noted in the attached Errata Sheet.
12
13
14    _____
15    MATHEW THOMAS, JR., M.D.        DATE
16
17
18    Subscribed and sworn
      to before me this
19    _____ day of _____, 20____.
20    My commission expires:_____
21
      _____
22    Notary Public
23
24
```

Golkow Technologies, Inc. - 1.877.370.DEPS