# EXHIBIT 5

Gerard F. Dillon, M.D.                    Thomas vs. ECFMG, et al.
                       January 17, 2014

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION
------
MATHEW THOMAS, JR.        : CIVIL ACTION
      vs.                 :
ECFMG, et al.             : NO. 13-3946

------

Friday, January 17, 2014

------

Oral deposition of GERARD F. DILLON, M.D., Ph.D.,

held at NATIONAL BOARD OF MEDICAL EXAMINERS, 3750

Market Street, Philadelphia, Pennsylvania, beginning at

approximately 3:15 p.m., on the above date, before

LANCE A. BRUSILOW, Registered Professional Reporter,

Approved Reporter for the United States District Court,

and Notary Public, there being present.

------

brusilow + associates
255 South 17th Street
Suite 1503
Philadelphia, PA 19103
215.772.1717
www.brusilow.com

------

Page 2

APPEARANCES

SOUTHERN MEDICAL GROUP
BY:  MATHEW THOMAS, JR., M.D.
326 East 149th Street
Bronx, NY 10541
ph: 718.585.6262
(mthomas1@sbhny.org)
Counsel for Plaintiff

MORGAN, LEWIS & LEWIS, LLP
BY:  ELISA P. McENROE, ESQUIRE
1701 Market Street
Philadelphia, PA 19103-2921
ph: 215.963.5917
(emcenroe@morganlewis.com)
Counsel for ECFMG and William C. Kelly, M.S.

HAMBURG & GOLDEN, P.C.
BY:  MAUREEN P. HOLLAND, ESQUIRE
1601 Market Street, Suite 3310
Philadelphia, PA 19103-143
ph: 215.255.8584
(hollandmp@hamburg-golden.com)
Counsel for Gerard F. Dillon, M.D., Steven Haist,  M.D.
and Janet Carson, Esquire

NATIONAL BOARD OF MEDICAL EXAMINERS
BY: SUZANNE WILLIAMS, ESQUIRE
3750 Market Street
Philadelphia, PA 19104-3102
Ph: 215.590.9538
(swilliams@nbme.org)
Counsel for NBME

Page 3

1        (It is hereby agreed by and among
2   counsel that signing, sealing, certification and
3   filing are waived; and that all objections, except
4   as to the form of the question, are reserved until
5   the time of trial)
6        MS. HOLLAND:  Before we start, I'd like
7   to lodge the objection that I've lodged with the
8   previous two witnesses on the record in front of
9   Dr. Dillon.
10       DR. THOMAS: Sure.
11       MS. HOLLAND:  Dr. Dillon, I have
12   instructed previous witnesses, for the purpose of
13   the integrity of the exam, that I will instruct
14   you as well not to answer any questions that would
15   compromise the integrity of the examination in
16   terms of test content or arriving at decisions
17   with regard to particular examinees.
18       In addition, because of concerns about
19   copyrighted material, and with particular concern
20   to Dr. Thomas, who has previously admitted that he
21   still has contact with students and employees from
22   Optima University, that due to those privacy
23   considerations I'm asking all witnesses not to
24   answer any questions that would identify test

Page 4

1   information, copyrighted information.
2        THE WITNESS:  I understand. Okay.
3        GERARD F. DILLON, M.D., Ph.D., having
4   been first duly sworn, was examined and testified
5   as follows:
6        (EXAMINATION)
7   BY DR. THOMAS:
8   Q.   Good afternoon, Dr. Dillon.
9   A.   Good afternoon.
10  Q.   Could you please state your full name for the
11  record?
12  A.   Sure: Gerard F. Dillon.
13  Q.   Could you please tell me your background and
14  educational training?
15  A.   My formal training is in educational
16  psychology.  I have a Ph.D. from Temple University.
17  That's my formal training.  I've also, of course, had a
18  lot of experience here with the national board.
19  Q.   Do you have any other degrees, licenses or
20  certifications?
21  A.   I do not.
22  Q.   Could you please state what your current
23  position is here at the NBME?
24  A.   I'm the vice-president for licensing programs.

1 (Pages 1 to 4)

Gerard F. Dillon, M.D.                              Thomas vs. ECFMG, et al.
                            January 17, 2014

---

Page 5

1      Q.  And as the vice-president of licensing
2    programs, could you please give me what your job
3    responsibilities are?
4          A.  Sure:  I'm responsible for the overall
5    coordination of the examination programs that were used
6    to make licensing decisions for several professions in
7    the United States.  The primary one is the medical
8    profession, so it's the United States Medical Licensing
9    Examination.  That's the main responsibility.
10         Also, I have some responsibility for
11   examinations that we produce that are used by
12   veterinarians to license vets and some other, smaller
13   programs that are used for some local licensing
14   decisions.
15         Q.  Are you a medical doctor?
16         A.  I am.
17         Q.  Does any of your training give you insight to
18   USMLE-type questions?
19         A.  Not in terms of the medical content.  I do
20   have training in testing, so I have insight into the
21   formats of test questions.
22         Q.  Prior to coming to the NBME -- before that,
23   how long had you been working for the NBME?
24         A.  It will be forty years in April.

---

Page 6

1      Q.  Where were you working before that?
2          A.  Before that I worked at a medical center in
3    Philadelphia briefly.
4          Q.  Before attaining your role of vice-president
5    of licensing programs, what was your role and how
6    long -- what was your role?
7          A.  I've been in my current role for twelve years.
8    Prior to that I worked in our psychometrics unit and
9    was responsible for the coordination of the scoring and
10   reporting of results for many of our examinations.
11         Q.  Were you involved with the actual scoring, or
12   just the information that came from the scoring?
13         A.  We were responsible for coordinating the
14   scoring, so we would establish the schedule, work with
15   the other units that actually did the scoring.
16         Q.  Were you privy to the programs that would do
17   the scoring for any exam?
18         A.  I was not directly involved with the programs.
19         Q.  Would you know the programs used for scoring
20   USMLE?
21         A.  No, not actually -- I don't have any direct
22   knowledge of it.
23         Q.  Are you familiar with the case against Optima
24   University?

---

Page 7

1      A.  I have some familiarity.
2          Q.  Could you tell me how many cases were filed
3    against Optima University by the NBME?
4                MS. HOLLAND:  Objection on the basis
5          that I stated before.
6                DR. THOMAS: To state how many cases?
7          It's public knowledge how many cases are. . .
8                MS. HOLLAND:  Oh, how many cases. . .
9                DR. THOMAS: How many cases are open or
10         how many cases --
11               MS. HOLLAND:  That's fine, I withdraw
12         my objection.
13               THE WITNESS:  I don't know the answer.
14   BY DR. THOMAS:
15         Q.  Do you know of any open case against Optima
16   University?
17         A.  I don't know that I understand what "open"
18   means.
19         Q.  Is there any case or cases pending in judgment
20   by a judge by NBME against Optima University?
21         A.  I don't know the answer.
22         Q.  Are you aware of any summary judgment made in
23   any cases by NBME against Optima University?
24         A.  I personally don't, no.

---

Page 8

1      Q.  Could you please tell me your involvement in
2    any case against Optima University by NBME?
3          A.  Well, in my role as the vice-president for
4    licensing programs, I would have general knowledge of
5    any issues that came up around security of the
6    examination, so I would have a general knowledge.
7          Another part of my responsibility is to
8    coordinate the activities that are associated with some
9    of our governing groups, which include the groups that
10   deal with score validity and irregular behavior.
11         So, I would have some involvement in
12   organizing those meetings and acting as a resource
13   person for that activity.
14         Q.  Are you an actual member of the committee for
15   score validity?
16         A.  No.
17         Q.  Are you an actual member of the composite
18   committee?
19         A.  I am not.
20         Q.  Could you tell me when you first came to know
21   about any issues regarding Optima University?
22               MS. HOLLAND:  Object to that question
23         on the grounds that I've stated before.
24               DR. THOMAS: Can I go off the record,

---

                                    2 (Pages 5 to 8)

Gerard F. Dillon, M.D.                                      Thomas vs. ECFMG, et al.
                              January 17, 2014

---

Page 9

1       please?
2               (There was a discussion held off the
3       record)
4               (The record was read by the court
5       reporter as requested)
6               MS. HOLLAND:  I object on the basis
7       that I objected before.
8               DR. THOMAS: You're instructing the
9       witness not to answer?
10              MS. HOLLAND:  That's correct.
11      BY DR. THOMAS:
12          Q.  What role did you play in determining whether
13      or not a student had to go before the committee for
14      score validity?
15          A.  Actually very little.  What would trigger an
16      individual going before the committee on score validity
17      would be evidence that would link them to the Optima
18      program, which was not something that was really done
19      within my unit.
20          Q.  Are you aware of a committee that would have
21      reviewed any potential exams taken by a student who
22      participated in Optima University that would have then
23      referred the case to the Office of the Secretariat?
24          A.  I'm sorry, I didn't quite understand.

---

Page 10

1           Q.  If a student was found to have gone to Optima
2       University, what is your understanding as to what would
3       be the next step with the test they took or the score
4       they received?
5           A.  I still -- I'm not quite getting the sequence.
6           Q.  A student is found to have attended Optima
7       University.
8           A.  Right.
9           Q.  That knowledge is given to or discovered by
10      NBME.  What is the next step?
11          A.  My understanding was that it may not have been
12      as simple as that they were connected -- that they were
13      known to attend Optima University.  I think it also had
14      to do with the timing of the attendance and so forth.
15              I think probably that was all dependent on
16      whatever went on to look at the test content that was
17      found at Optima.
18              But my understanding is, once there is a
19      connection made between the individual and the Optima
20      program plus their having taken USMLE, and if the time
21      was generally appropriate, then that person would be
22      referred to the committee on score validity.  That's my
23      understanding of the process.
24          Q.  Can you identify who would have determined

---

Page 11

1       that time frame, to say that it was around the same
2       time that they went to Optima and took the exam and,
3       therefore, would have to move forward?
4           A.  I don't know specific individuals.  It was my
5       understanding it was something being handled, I think,
6       mostly by our legal department with help from other
7       departments, but I don't know any specific individuals.
8       I don't know who they are.
9           Q.  Were you ever part of a staff committee that
10      reviewed any students that went to Optima University
11      and had data given to that staff to determine whether
12      they should move forward to the Office of the
13      Secretariat for referral to the committee of score
14      validity?
15          A.  No. I was actually asked for some cases to be
16      involved in that process. I don't know that it was all
17      of them, but for some of them.
18          Q.  Was there a reason why you would be referred
19      to some but not others?
20          A.  No. I think this played out over a long period
21      of time, and each case had some slight variations in
22      it. I don't know all of them necessarily called for
23      exactly the same steps and individuals being involved.
24          Q.  Were you involved in the committee that

---

Page 12

1       discussed the data given for the exam taken by Mathew
2       Thomas on December 31, 2007, Step 2 CK?
3           A.  I don't recall.  I'm saying no.  I just don't
4       recall.
5           Q.  Who would have determined the criteria for
6       whether or not a student would be referred forward?
7           A.  Part of it is established by policies that
8       govern cases that are thought to be related to either
9       score validity or irregular behavior.
10              So, there already are some fairly well-defined
11      policies that are established by our governance
12      committees outside of staff, so I think part of it
13      would be guided by that.
14              Typically for those kinds of decisions it
15      could involve several units. It almost always involves
16      our legal department.  It could involve people involved
17      in the USMLE program.
18              There is an Office of the Secretariat that
19      really is part of the USMLE program and it could have
20      involved others, including whether or not we need input
21      from people who know something about test development,
22      school rating and so forth.
23              So, it could involve different things, again
24      depending on the circumstances of the case.

---

                                                    3 (Pages 9 to 12)

Gerard F. Dillon, M.D.                              Thomas vs. ECFMG, et al.
                            January 17, 2014

| Page 13 |
|---|

1      Q.  Just to clarify, when you state "legal
2   counsel," are you including the secretariat as part of
3   that group or separate?
4      A.  Separate.
5      Q.  You say that the policies talk towards what
6   would determine indeterminate or irregular behavior.
7         Were there any specific numerical numbers in
8   terms of variations that are stated in the policies, to
9   your knowledge?
10     A.  The policies talked about the process to be
11  involved.  I don't know that there is a lot of detail
12  in terms of specific admission.  I don't recall
13  specific numbers.  I don't recall that there are
14  specific numbers.
15     Q.  If a student attended Optima University and
16  Optima University was alleged to have access to USMLE
17  questions, would you say that is enough to bring them
18  before the committee for score validity?
19     A.  Those would be part of the criteria.  They
20  would have to have taken USMLE, because remember, the
21  committee for score validity, their focus is on whether
22  or not -- actually, passing outcomes in USMLE are
23  really a valid representation of the true ability of
24  the students, so there also would have to have been

| Page 14 |
|---|

1   some test-taking that was involved in the USMLE that
2   would have occurred.
3      Q.  So, in theory, if a student is a first-time
4   test-taker after going to Optima University, would you
5   have done an analysis and then compared data, or would
6   you have said this is their first exam, so they don't
7   have to go before the committee on score validity?
8      A.  I don't ever remember there being any criteria
9   that had to do with first-taker versus repeater.
10        So, the answer is -- the first-takers I don't
11  think would be excused from consideration in terms of
12  whether or not they would go to any score validity
13  committee.
14     Q.  So, my next question would be, how would you
15  then determine -- you're given the data sets.  How do
16  you determine this one should go to score validity and
17  this one should not?
18     A.  Again, the criteria is still the same:  They
19  have to do, at least in this instance, with either
20  participation or some connection with the Optima
21  University.  The timing of that generally coincides
22  with when the material was available to Optima.  The
23  individual would have had to have taken USMLE and had a
24  passing outcome.

| Page 15 |
|---|

1      I think all those are basically the key
2   readings, I think, for cases that went before the score
3   validity committee, especially -- for Optima students,
4   that was probably all the ingredients for referral.
5      Q.  What about the actual data sets that are
6   given?  Did they have any bearing on whether or not
7   they went forward to the committee?
8      A.  I think the key reading was the passing
9   performance because that's really what the committee
10  was concerned about.
11     Q.  Could you elaborate a little bit more?
12     A.  In terms of focus on data, really the main
13  focus is going to be -- for example, if someone was a
14  failing examinee, that individual would not be referred
15  to the score validity committee because, at least by
16  policy right now, the main concern of that group is on
17  whether or not a passing outcome is really a valid
18  outcome.  That would be the key reading.
19     Q.  So, based on what you're saying, going to
20  Optima University, taking the exam, and coinciding with
21  the time they were at Optima University and a pass
22  score would be the criteria to bring you towards the
23  committee on score validity?
24     A.  I could say those are the key ingredients.

| Page 16 |
|---|

1   From case to case there could be differences where
2   other features might also come to bear on the referral.
3         It's difficult to sort of summarize those, but
4   I think we always recognize that there could be
5   variations from case to case.
6      Q.  Can you elaborate one or two examples of what
7   would say a person who hits those three key criteria
8   does not have to move forward to the committee of score
9   validity?
10     A.  No, I can't think of any examples, but I'm
11  just avowing to that possibility because no two cases
12  are ever quite exactly the same.
13     Q.  Is the burden of proof, then, on the
14  individual to prove that they had a valid exam?
15     A.  That's a little bit out of my area of
16  expertise.
17     Q.  I guess before the committee on score
18  validity, isn't the burden of proof on the person, the
19  student, or is the burden on the committee to prove
20  that the student did do something that was
21  inappropriate?
22     A.  I don't think I would use the word "prove."
23  Maybe it would be helpful for me to talk about what the
24  task of the committee is.

                                    4 (Pages 13 to 16)

Gerard F. Dillon, M.D.                                    Thomas vs. ECFMG, et al.
                            January 17, 2014

Page 17

1    Q.  Sure.
2    A.  Really, the main reason why -- the main focus
3  of the committee, and I've alluded to this before, is
4  to decide, and it's in their judgment to decide whether
5  or not there is any evidence that would make them want
6  to question or worry a bit about the validity of a
7  passing score, and that's really their main task.
8         They use all the data -- all the data we
9  talked about before is brought to their attention.  The
10  individual involved can also speak to the committee and
11  can be represented and so forth.
12         But really the notion -- really the task is
13  for them to decide whether or not there might be reason
14  to have the individual re-demonstrate their abilities
15  to validate that original score.
16         So, I don't know if it's really proof or not.
17  In terms of legal terms, that's outside my area of
18  expertise.
19    Q.  Okay.  You do have extensive experience with
20  exams, creating them and scoring them, yes?
21    A.  I have extensive experience with the testing
22  profession generally.
23    Q.  The testing profession.
24    A.  Yes.

Page 18

1    Q.  To the best of your knowledge, is it possible
2  for a person to fail an exam multiple times and then
3  pass?
4    A.  Yes.
5    Q.  Is it possible for an examinee to fail
6  multiple times and then do very well on an exam?
7    A.  I suppose it's possible.  It's probably less
8  common, I think.
9    Q.  But possible.
10    A.  Yes.
11    Q.  Is the only way for that to happen if a person
12  has access to the legal questions?
13    A.  No.
14    Q.  If a person -- would you say it's possible, if
15  a person focuses on material for longer periods of
16  time, especially weaker areas, that they could excel on
17  an exam?
18    A.  It is possible.
19    Q.  Just to go back:  As a VP of licensing
20  programs, when they do data matches on questions that
21  were said to be at Optima University in cases of
22  students who had a passing score, do you know who at
23  NBME would have run that analysis?
24    A.  Could you ask it one more time?

Page 19

1    Q.  A student goes to Optima University and passes
2  an exam.  Their exam questions and then the exams that
3  were retrieved from Optima University, who actually
4  does that comparison?
5    A.  The comparison would have been in terms of the
6  test-content match between the examination and what was
7  retrieved from Optima.
8         I don't know the individual person, but it
9  would likely be the responsibility of someone in our
10  test development unit.
11    Q.  Who heads that development?
12    A.  Currently it's Dr. Steven Haist.
13    Q.  After matching questions, who would be
14  responsible for seeing whether or not they were exposed
15  on a person-specific exam?
16    A.  Well, I'm not sure I know what you mean by
17  "exposed."  You mean did they actually just appear on a
18  form, on an exam?
19    Q.  Yes.
20    A.  Again, I don't know an exact person.  It
21  sounds like it would be a collaboration between the
22  test development unit I mentioned before and someone
23  who was involved in scoring the examination.
24         So, we have a scoring service unit, so it

Page 20

1  might be something that would be a collaboration
2  between those two units.
3    Q.  Can you say that again?  Scoring. . .
4    A.  Scoring Services.
5    Q.  Is that employed by NBME or outsourced to
6  somebody else?
7    A.  It's all part of NBME.
8    Q.  Part of NBME, okay.  So, the data given to
9  students regarding questions that were exposed and the
10  amount of exposure, how many they got right and the
11  time they took on those questions, would have been
12  reported forward by the scoring services unit and the
13  patient development test as their report?  Is that how
14  it works?
15    A.  What you described is something different.
16  First of all, we wouldn't give it to students, so it's
17  not something to give the students.  So, could you ask
18  your question again, please?
19    Q.  The Office of the Secretariat gives any
20  student who needs to go before the committee for score
21  validity a letter, and on that letter it outlines what
22  they said were exposed questions as well as the time
23  they took on each question and those that they got
24  correct.

5 (Pages 17 to 20)

Gerard F. Dillon, M.D.                    Thomas vs. ECFMG, et al.
January 17, 2014

Page 21

1        That data, who was the one who actually
2   creates or runs that data for NBME?
3        A.  It's going to get even more -- I'm going to
4   add even more departments because that report included
5   not only information on what was exposed and not
6   exposed, how well the student did, but also had some
7   timing information.
8        So, really, it could be -- and again, I don't
9   know the exact person, but that could potentially
10  include the test development department, our scoring
11  services unit.  We also have an operations research
12  unit which might have contributed; and a fourth unit,
13  which is Measurement Consulting Services.
14       Q.  Is that standard practice on every exam taken
15  by every individual?
16       A.  It doesn't occur with every exam.
17       Q.  So, when taking an assessment of all the
18  students or a control group, was this type of detail
19  given to all examinees?
20       A.  All examinees who have taken USMLE?
21       Q.  Yes, because you're saying it's not the
22  standard practice to do it for everybody, so my
23  question is:  If there is a control group of all
24  examinees who took it at that time, is it run on every

Page 22

1   exam?
2        A.  What you're describing is run was triggered by
3   the referral of individuals to the community on score
4   validity.
5        Q.  All right.  Would you say that the data that
6   is supplied on that letter is a complete analysis of a
7   student's performance?
8        A.  Well, it's not an analysis of a student's
9   performance, but it addresses and informs the question
10  being posed to the committee on score validity.
11       Q.  Do you believe other variables would affect a
12  person's performance besides those that would have been
13  put in that letter?
14       A.  Well, the letter, again, wasn't about their
15  performance.  It was intended to inform discussions
16  about whether or not there was comfort in the passing
17  outcome for individuals.
18       Q.  Okay.  Was there a threshold, from a licensing
19  perspective or from a committee perspective, that had
20  to have met to say that they were not comfortable that
21  this was a true passing score?
22       A.  There wasn't a set threshold, to my knowledge.
23  The committee was asked to consider a number of
24  variables, including the testimony of individuals who

Page 23

1   chose to appear before them.
2        Q.  Could you tell me some of the other variables?
3        A.  Yes.  The evidence about them having been
4   connected with Optima, the timing of that connection;
5   the information about the USMLE performances, including
6   the passing outcome; and the data that you referred to
7   in terms of the agreement, performance and timing.
8        Again, there might have been additional
9   variables which would vary from case to case.  Again,
10  each case had unique features.
11       Q.  Would the unique features for each case be
12  specific to the validity of that exam?
13       A.  Can you ask that again?
14       Q.  In other words, the criteria when trying to
15  validate an exam, do you focus specifically on that
16  exam?
17       A.  Actually, I'm not sure how to even answer.
18       Q.  Let me rephrase:  Do prior attempts on an
19  examination factor into whether the passing score for
20  an individual is valid or not?
21       A.  I don't know that I can speak for the
22  committee, but really the intent is to try to get them
23  as much information as possible.
24       So, if there was a prior history for the

Page 24

1   individual, all of that would have been shared with the
2   committee.
3        Q.  Does prior employment with the test-taking
4   course such as Optima University factor into whether or
5   not a test score is valid?
6        A.  One of the issues before the committee had to
7   do with evidence that suggested some nexus with Optima,
8   and that could have happened several different ways.
9   It could have someone being a student or being in
10  connection with terms of employment.
11       So, I believe all that information would have
12  been used with the committee and I think was probably
13  shared with them, if we had information.
14       Q.  Was the committee ever instructed that at the
15  time of the hearing for Mathew Thomas, which is
16  December 16, 2009, that Optima was yet to have been
17  found guilty of copyright infringement or having access
18  to questions that may have been on his exam?
19       A.  I don't know.
20       Q.  Does NBME have specific time-stamp data to
21  show when questions were added to the Optima test bank?
22       A.  I don't have any direct knowledge of that.  I
23  wasn't involved in that part of the process.
24       Q.  If there was such data, who would it go to

6 (Pages 21 to 24)

Gerard F. Dillon, M.D.                           Thomas vs. ECFMG, et al.
                          January 17, 2014

Page 25

1  first?
2      A.  I don't know about who it would go to first,
3  but again the individuals involved in that process
4  probably would have been members of our legal
5  department and our test development department.  That
6  would be my assumption.
7      Q.  Would they get such documents before you, or
8  would they go to you first before going to those
9  departments?
10     A.  It would not go to me first.
11     Q.  Okay.  When you created the criteria for
12 whether or not students get referred over to the
13 committee of score validity, were there specific
14 individuals that were responsible for determining
15 methodology to decide?
16     A.  Well, there is no methodology to decide.
17 Again, as I had mentioned before, there are overall
18 policies that describe what should occur.  But there
19 are lots of different situations where we could reach a
20 point where we questioned the validity of a testing
21 outcome.
22         And again, as I think I mentioned before,
23 these cases often differ in many ways.  It really isn't
24 a set methodology.

Page 26

1      Q.  My question is, when the data comes with
2  comparison of the test taken by a student versus the
3  Optima data bank and the data's given regarding
4  exposed, unexposed and the times, is it an individual's
5  opinion or observation that is then taken forward to
6  decide to move to the committee on score validity, or
7  was there some kind of real analytical number that
8  recommended moving forward to the committee on score
9  validity?
10     A.  I don't recall it ever unfolding like that.  I
11 don't know that I'm -- maybe I don't understand your
12 question.
13     Q.  In other words, was it an individual's opinion
14 that recommended moving it forward or a group of
15 individuals' opinion to move it forward, or was there a
16 set criteria on the basis of analysis that said move it
17 forward?
18     A.  It may have been any of those things.  Again,
19 the idea is, all the indications varied.  The strength
20 of the evidence varied.  The numbers would vary.  The
21 individuals involved, the different departments
22 involved could vary, so I don't know if there is any
23 one set process.
24         I think, of those involved, if there was any

Page 27

1  reason to believe that the USMLE program should
2  question the validity of the outcome, we would want to
3  rely, then, upon the expertise and wisdom of the
4  committee on score validity to deal with that.
5         And of course they could decide that a score
6  is indeterminate or not, but the idea would be to let
7  them make that decision.
8      Q.  To the extent of your knowledge for the
9  committee on score validity and in the case of Mathew
10 Thomas, how many individuals on that committee have a
11 statistical background or expertise?
12     A.  I don't recall who the members were and
13 wouldn't know that kind of background.
14     Q.  Okay.  Would you say you have analytic or
15 statistical expertise?
16     A.  I would say I have expertise in the
17 application of statistics.
18     Q.  So, given those data sets, you think that you
19 could apply them forward to the committee of score
20 validity?
21     A.  The data sets that I recall us producing, I
22 think, would inform the task for the committee on score
23 validity.
24     Q.  But I mean, before getting to the committee on

Page 28

1  score validity, you said a group of members decide to
2  move it forward, yes?  So, that group is my question.
3      A.  Again, I don't know if all the cases were
4  varied in all the ways I described already.  Whether or
5  not there was a group making a decision about an
6  individual, it's -- I don't recall.  I think that was
7  true for some cases.  I don't think it was true for all
8  cases.
9      Q.  Okay.
10     A.  And beyond what the process -- I don't recall
11 what the process was for your case.
12     Q.  So, in any case, would it go straight to the
13 Office of the Secretariat without that committee being
14 involved?
15     A.  I think probably that was true.
16     Q.  And in the case of Mathew Thomas, who would
17 know whether or not it went to a committee before it to
18 the Office of the Secretariat?
19     A.  I don't know.  I don't recall.
20     Q.  Would the Office of the Secretariat know that?
21     A.  They might.
22     Q.  In 2009 who would you believe would have been
23 the person that would have had firsthand knowledge
24 regarding that?

                                    7 (Pages 25 to 28)

Gerard F. Dillon, M.D.                              Thomas vs. ECFMG, et al.
                          January 17, 2014

| Page 29 | Page 31 |
|---|---|

Page 29

1      A.  I'm not sure.  Probably it would be in the
2  secretariat's records, but I can't identify any one
3  person.
4      Q.  Do you know approximately how many questions
5  were in the Optima database?
6      A.  No.
7      Q.  Do you know approximately how many questions
8  NBME deems was matching?
9           MS. HOLLAND:  Objection on the basis
10      I've stated before.
11  BY DR. THOMAS:
12      Q.  Do you believe that the data given was an
13  analysis?
14      A.  Yes.
15      Q.  Were you asked or was the committee on score
16  validity asked or the composite committee asked to give
17  a more detailed, stratified analysis of what they
18  presented to the committee by Mathew Thomas?
19      A.  If you're referring to specific requests by
20  Mathew Thomas, I don't recall.
21      Q.  The hearing for the committee on score
22  validity, Mathew Thomas brought out that certain topics
23  he would be faster in because the subject matter he was
24  an expert in versus those that he would have taken

Page 31

1      A.  It's possible.
2      Q.  When averaging time spent on questions, if a
3  student comes to the last two minutes, the warning that
4  is given during the examination, and they may have
5  five, ten questions left, if they just click an answer
6  all the way through, would that affect the overall time
7  that's considered average on a block?
8      A.  I don't understand.
9      Q.  In other words, you're taking an exam.  You
10  have ten questions left.  You're under two minutes and
11  you decide to click through.
12           Evidently you have only a couple seconds on
13  each question.  Does that have an effect on the average
14  time it takes on a group of questions?
15      A.  An average is really based upon more than one
16  person, so I think that's why I'm having trouble
17  answering your question.
18      Q.  The average of that block for that student
19  only.
20      A.  It shouldn't.  If they answered every question
21  in the allotted time, then the average amount of time
22  would be associated with the full length of time of the
23  block, if I'm understanding your question correctly.
24      Q.  So, when you have a set data set that has

Page 30

1  longer in because he may not be as strong.
2           In your expertise in developing exams, is that
3  a fair statement that could happen for a student?
4      A.  Yes.
5      Q.  Could a student have very good knowledge on,
6  let's say, something like psychiatry and get through
7  those questions very quickly?
8      A.  Yes.
9      Q.  Would that affect the time that a student
10  averaged on a set of questions?
11      A.  If it's material the student is familiar with,
12  there is a possibility they could move through them
13  quicker.
14      Q.  If there is material that a student was not
15  expecting on an exam or material that they did not prep
16  for because they were not told it would be on the exam,
17  would that entail a student to take longer on a
18  question?
19      A.  If it was material in an area the student was
20  not familiar with or material they're not familiar
21  with, then they could take longer on the question.
22      Q.  And if they took longer on a question, would
23  that affect them completing a block in the time that's
24  allowed to complete a block?

Page 32

1  exposed versus unexposed questions, and you decide to
2  run the average time that it took an individual to do
3  those set of questions, if any of those questions fall
4  in those ten questions I referred to before where they
5  just clicked through, would it make the person's
6  average time more or less?
7      A.  There is no direct answer.  One of the things
8  to realize is that if you're looking at averages of
9  different sets of questions, those questions appear
10  randomly throughout the sections.
11      Q.  I understand.
12      A.  So, any occasional impact of someone rushing
13  through questions will be distributed across the
14  questions, so I don't think it would necessarily have
15  an impact, big impact, in terms of being able to
16  interpret those data.
17      Q.  So, your understanding is that if there are
18  approximately fifty questions and if a person took one
19  minute for twenty-five of them and took less than ten
20  seconds on the other twenty-five because they rushed
21  through, it would have no bearing on the overall
22  average per question.
23      A.  That's not what I said.  But again, an average
24  is never based upon one person.

8 (Pages 29 to 32)

Gerard F. Dillon, M.D.                                    Thomas vs. ECFMG, et al.
                              January 17, 2014

Page 33

1     Q.  I understand.  But for the data set in query,
2  would those quicker times affect the overall time per
3  question?  Because it seems the data set was about it
4  took X amount of time per question, and that's what the
5  data was presented before the committee on score
6  validity.
7     A.  Again, if we deal with overall or averages,
8  it's never going to be based upon one individual.  If
9  you're talking about data from one individual, again
10  their average time won't be impacted.  But if you were
11  trying to do an average time per item, it would be
12  individual items that would have very short times.
13     Q.  So overall, if you have ten times that you're
14  querying, would rushing through half of them or some of
15  them affect the overall average of those items?  That's
16  my question.
17     A.  No, not necessarily.
18     Q.  Okay.
19     A.  That's -- okay.
20     Q.  That's fine.  Was any consideration or
21  analysis added in for questions that were not answered
22  at all?
23     A.  I don't think there was any additional
24  analysis.

Page 34

1     Q.  So, if a student did not finish a block, would
2  those questions still be part of the denominator?
3     A.  Yes.
4     Q.  And the time spent on those questions would be
5  zero?
6     A.  If we have a student who doesn't finish a
7  block, the amount of time is zero on the items that
8  they don't save.
9     Q.  Okay.  Were there specific time differences or
10  percentage differences that the committee would have
11  focused on?
12     A.  Yes.  As part of their deliberations they
13  would be looking for information that would indicate
14  that an individual could potentially have done better
15  on the items they thought were exposed than items they
16  thought were not exposed.
17         And again, the idea would be for those data to
18  inform the decision they need to make about whether or
19  not they think the passing outcome is a valid outcome.
20     Q.  So, the items that are exposed, is it safe to
21  say that a subject content that an individual was
22  stronger in would possibly go faster or have a higher
23  percentage correct?  Just based on the student's
24  general knowledge of the subject matter.

Page 35

1     A.  No.  There is no reason to believe that any
2  content area isn't evenly distributed across both
3  exposed and not exposed test questions.
4     Q.  My question is, though:  The exposed questions
5  that are being looked at, if a proportion of those
6  exposed questions is from a subject matter that is
7  strong for the individual -- that may have been what
8  their undergrad subject matter was -- is there anything
9  that says that they would not have known those question
10  types or question and answers and answered them quickly
11  and correctly, or it only because they were exposed?
12     A.  Now, what you've describe could occur, but it
13  could occur for both the exposed and non-exposed items.
14     Q.  So, for a student who is under there --
15  they're being questioned because they're saying they
16  exam is invalid and they ask for such breakdown, would
17  that not clarify the exposed versus unexposed much
18  better?
19     A.  No.
20     Q.  Do you believe that performance in certain
21  areas stays consistent through multiple attempts?
22     A.  I'm not sure.  Could you repeat the question?
23     Q.  In other words, if a student takes the exam
24  multiple times, do you believe performance in terms of

Page 36

1  time on questions and the percentage correct across
2  certain question types or question subject matter stays
3  consistent?
4     A.  I think it can probably vary depending upon
5  what the individual is doing, whether or not they're --
6  what happens during the intervening testing attempts in
7  terms of their studying or other activities.
8     Q.  Do you believe that a student could be strong
9  one exam and in the next exam be weak in that same
10  subject matter?
11     A.  I think there can be variations in
12  performance.
13     Q.  And the star reports on the back of any score
14  report would identify their strength on different
15  subject areas, yes?
16     A.  That's the intent of the performance profile
17  that's on the back of the score reports.
18     Q.  So, is it fair or safe to say that the star to
19  the left is a weaker performance and the stars to the
20  right are a stronger performance?
21     A.  It's a fair interpretation.  We caution that,
22  if the series of stars overlap each other in any way,
23  then you probably should not think there as being a
24  meaningful difference between the two.

9  (Pages 33 to 36)

Gerard F. Dillon, M.D.                                    Thomas vs. ECFMG, et al.
                              January 17, 2014

Page 37

1      Q.  But it is safe to say that a student could
2  have a subject matter where there are stars in the
3  right and past the median bar, and on the next exam it
4  could go left?
5      A.  They can move around, yes.
6      Q.  They can move around.
7      A.  Yes.
8      Q.  Does that mean that the student had more
9  knowledge the first exam versus the second, or was
10  better prepared for the exam?
11      A.  I don't know how to interpret it.  I think
12  each case would be different.
13      Q.  Can you say to when NBME was notified about my
14  participation in Optima University, or Mathew Thomas'
15  participation in Optima University?
16      A.  I can't.
17      Q.  Who would be the individual who would have
18  been notified of Mathew Thomas' participation in Optima
19  University?
20      A.  I don't know.  I can't speak to the
21  notification, but I think the department that probably
22  would most likely have had the earliest knowledge about
23  it would have been our legal department.
24      Q.  And once notified about a student's

Page 38

1  involvement with Optima University, what should have
2  been or would have been the time frame before they were
3  contacted or their data was brought forward to the
4  committee to evaluate?
5      A.  I don't really have an opinion about that.
6  Again.  Again, that's something that's going to vary
7  depending on the circumstances.
8      Q.  Do you believe that over six months is an
9  extensive period once notified or becoming aware of a
10  student's participation?
11      A.  No, I think it's going to vary based upon the
12  circumstances.
13      Q.  If a student called up and said that they went
14  to Optima University, should they have had their score
15  evaluated?
16      A.  I don't know.  You know, again, it would have
17  to be all the other circumstances that we talked about
18  before in terms of --
19      Q.  To clarify:  Not to go to score validity, but
20  to be evaluated by committee to look at the data sets.
21      A.  No.  Well, the committee that you're asking
22  about really only deals with individuals who have taken
23  USMLE, have had a passing outcome, and they're really
24  concerned about the validity of that outcome.

Page 39

1      Q.  In January 2009 I received a call, Mathew
2  Thomas received a call, that stated that he should call
3  NBME.  He then called NBME and spoke to Trish Weaver
4  and said that he received a call to call, and she said
5  no one called and then he said, "Well, I went to Optima
6  University.  Could it be regarding that?"  He then did
7  not receive any information regarding his score being
8  invalid until, I believe, July 2009.
9      So, now he's told somebody that he called,
10  that he went there.  Is that amount of time the
11  approximate time that all students would have gone
12  through?
13          MS. HOLLAND:  I'm going to object and
14  make a motion to strike that testimony.  It's the
15  witness here has who is being examined, not you,
16  Dr. Thomas.
17          So, on that basis I'm going to make a
18  motion to strike that from the record, that
19  question.
20          DR. THOMAS: Which question
21  specifically?
22          MS. HOLLAND:  The one you just asked.
23          DR. THOMAS: Can you read back the
24  question, please?

Page 40

1          (The record was read by the court
2      reporter as requested)
3          DR. THOMAS: So, we're striking all of
4      that?
5          MS. HOLLAND:  Yes.
6  BY DR. THOMAS:
7      Q.  If a student notified NBME that they went to
8  Optima University in January, what would be the
9  appropriate time for NBME to go through the processes:
10  They went to Optima University, they have a valid score
11  and it coincides, as you said before.
12          What would be the appropriate time for NBME to
13  start contacting them regarding the score?
14      A.  I don't think there is any set appropriate
15  time.  Again, it's depends upon the circumstances of
16  the case.
17      Q.  Who would make that determination?
18      A.  Again, I think -- I don't know who for certain
19  would do it as an individual.  It's something that
20  would involve certainly our legal department, at the
21  very least.
22      Q.  Can you tell me who in the legal department
23  would be responsible for such matters?
24      A.  Not an individual.  I don't know of any

                                        10  (Pages 37 to 40)

Gerard F. Dillon, M.D.                                Thomas vs. ECFMG, et al.
                            January 17, 2014

|  | Page 41 | | Page 43 |

**Page 41**

1   individual.
2       Q.   At that time who would have been in charge of
3   the legal department?
4       A.   At that time it is headed up by Janet Carson.
5       Q.   So, any notification of a student who went to
6   Optima University would have gone to Janet Carson?
7       A.   I would assume so.  There were many cases, and
8   again there might have been varying circumstances, but
9   I think by and large that probably would have been the
10  approach.
11      Q.   Can you state how many student exams were
12  reviewed for attending Optima University?
13           MS. HOLLAND:  Objection on the grounds
14           that were stated before.
15           DR. THOMAS: All right.
16  BY DR. THOMAS:
17      Q.   Could you tell me if student scores were done
18  on an individual basis, were evaluated on an individual
19  basis?
20      A.   I don't understand the question.
21      Q.   In other words, when the committee met to go
22  over it, did they go over multiple exams the same day,
23  or was it every time a student had a situation they
24  would meet and discuss it?

**Page 42**

1       A.   Are you asking about the committee on score
2   validity?
3       Q.   No, I'm talking about the committee that led
4   to the referral to the committee on score validity.
5       A.   Again, I do not know that there was a
6   committee that did that for each of the cases.
7   Certainly no group formed as a committee that I know
8   of.
9       Q.   If you found a student that had multiple
10  attempts, was any type of analysis done on prior exams
11  to see their time differences or how long they took on
12  questions, to answer questions?
13      A.   Not to my knowledge.
14      Q.   Do you know about the validation process if a
15  score is deemed indeterminate?
16      A.   Yes.  And again, this is defined in the
17  policies, but the individual has the opportunity to
18  retake that examination.  And if they pass that
19  validation, then the original examination in question,
20  the results are released.
21           If the person does not pass the validating
22  examination, then the prior examination on the question
23  becomes permanent and identified as indeterminate.  I
24  think that's the label used.

**Page 43**

1       Q.   What is your understanding about the exam
2   itself in terms of content for the person taking the
3   validation exam?
4       A.   It has to be the same exam sequence.  So, for
5   example, if it was a Step 1 examination, it would have
6   to be a Step 1 examination and typically the content is
7   comparable.
8           The minimum passing score that's applied would
9   have to be the same minimum passing score that was
10  being used for the examination that's in question.
11      Q.   So, the prior exam.
12      A.   Yes.
13      Q.   And when a student has to go for a validation
14  exam, is there a special request made to create a
15  validation exam?
16      A.   I think that will vary by case.  Often, I
17  think, what can be used as an existing test form, but
18  again this process comes up under a lot of different
19  circumstances, so I couldn't say that there aren't
20  times when a validating form has to be made, but I
21  don't know that that's always the case.
22      Q.   In your experience with the USMLE and
23  development in scoring, would you say that from 2007 to
24  2011 the exam changed?

**Page 44**

1       A.   In terms of the competencies being measured?
2       Q.   Just the exam itself, questions, types of
3   questions.
4       A.   Only in a minor way.
5       Q.   But did it change?
6       A.   Only in a minor way.
7       Q.   The question is did it change, yes or no.
8       A.   Well, I'm not going to answer yes or no.
9       Q.   Okay.  Would you say there were more or less
10  media questions compared to 2007 in the 2011 validation
11  exam?
12      A.   I can't recall the exact timing of the
13  introduction of media questions, but I think that they
14  certainly probably were in 2011.  I don't know how far
15  back they go.  Very few in the examination.  Students
16  see very few media questions.
17      Q.   Very few media questions in total or in
18  comparison to 2007?
19      A.   Again, I can't remember when the multimedia
20  were introduced, so I don't recall if it was in 2007.  I
21  just don't remember. But I meant, relative to the
22  entire length of the examination it's very few
23  multimedia questions.
24      Q.   Would you say that over the years media

11 (Pages 41 to 44)

Gerard F. Dillon, M.D.                                          Thomas vs. ECFMG, et al.
                              January 17, 2014

---

Page 45

1  questions have increased?
2      A.  A little bit.  Again, it still represents a
3  very, very small portion of the examination.
4              MS. HOLLAND:  This may be a good time
5  to take a break.
6              DR. THOMAS: That's fine.
7              (A brief recess was taken.)
8              DR. THOMAS: We're back on the record.
9  BY DR. THOMAS:
10     Q.  Are validation exams compared before a student
11  takes a validation exam for comparability?
12     A.  One of the requirements for allowing a form to
13  be used as a validating exam is some comfort amongst
14  staff that it's comparable to the original examination.
15             And again, I think the process that you have
16  to go through would vary by case, I think, and the
17  timing.
18     Q.  My question is, do you confirm that it's
19  comparable before you administer the exam to a student
20  who needs to validate?
21     A.  I'm not sure I would interpret the word
22  "confirm," but part of the decision-making process
23  would include making sure that the form being used is
24  appropriate in terms of its comparability in terms of

---

Page 46

1  content and statistical properties.
2      Q.  Did you ask Dr. Haist to do a comparability
3  review of the validation exam that Mathew Thomas took
4  September 2011 versus the December 31, 2007 exam?
5      A.  Yes, I did.  I'm not sure about the time of
6  it, but I know there was a request that went from
7  me to that unit to review the comparability.
8      Q.  So, my question is:  The type of detail or
9  review that he did, is it practice to do that before
10  administering a validating exam, to confirm that it's
11  comparable?
12     A.  It will vary depending upon the circumstances.
13  I think in this situation the amount of time was a
14  little bit longer than perhaps some other situations.
15  So, it wouldn't be routine.  Again, it would vary very
16  much by the case, I think.
17     Q.  In the case of Mathew Thomas, do you know if
18  it was requested before his validation exam was taken?
19     A.  Actually, I don't know.
20     Q.  Do you know why you would request such a
21  comparison to be done?
22     A.  My request was triggered by, I believe, a
23  question that came from Dr. Thomas about comparability.
24     Q.  So, then --

---

Page 47

1      A.  That was my recollection.
2      Q.  So, then it would be after he took the
3  validation exam.
4      A.  In this case what was done was after the
5  examination.  That's my understanding.
6      Q.  Okay, thank you.
7      A.  Sure.
8      Q.  In terms of students that had gone to Optima
9  University, was there ever any protocol set in place
10  for NBME as to how to manage them?
11     A.  I don't know what you mean by "manage."
12     Q.  In other words, were they automatically going
13  to be considered indeterminate until you could validate
14  the score, or was it they're valid until you deem them
15  indeterminate?
16             What would be the protocol that NBME would
17  take?
18     A.  I don't know that we would use any of those
19  phrases.  Again, if an individual attended Optima, if
20  the timing was right relative to when we thought the
21  material was at Optima, and if they took an examination
22  and they passed it, if all those things occurred, then
23  those individuals would be considered as cases that
24  should go to the committee on score validity.

---

Page 48

1      Q.  If information were to come forward regarding
2  students who went to Optima University that are
3  currently in residency or after residency, would steps
4  be taken by NBME to validate exams?
5              MS. HOLLAND:  Objection.  It calls for
6          speculation, but on the basis that I asserted
7          before, I instruct the witness not to answer the
8          question.
9  BY DR. THOMAS:
10     Q.  Is it the responsibility of NBME to keep
11  consistent with the integrity of the exam?
12     A.  I'm not sure what "consistent with integrity
13  of the exam means."  Can you explain further?
14     Q.  Is it the responsibility of NBME to keep the
15  integrity of the exam in that those who pass the exam
16  passed it fairly and without any extra assistance or
17  legal assistance?
18     A.  It's certainly our goal.
19     Q.  So, if information came regarding particular
20  students that may have went but are on residency now,
21  is it the duty of NBME to look into such matters?
22     A.  I'm not sure where someone is in the continuum
23  of training really would matter.  If there was an issue
24  about whether or not an outcome in USMLE was really a

---

                              brusilow+associates
brusilow.com                                                      215.772.1717

Gerard F. Dillon, M.D.                    Thomas vs. ECFMG, et al.
                        January 17, 2014

Page 49

1    valid outcome, we would still be concerned about it.
2        Q.   My question is, if you're given information
3    regarding someone in training who had a significant
4    increase in their scores who went to Optima University,
5    took the exam coinciding in that time frame, does NBME
6    have a duty to look into that matter, regardless if
7    they're in training or not?
8        A.   We'd have to sort of think about how clear the
9    information is and how clear the evidence is.
10       So, I think if the evidence was clear, was
11   supported, and the person had exposure to content they
12   shouldn't have seen, took the exam and passed it, I
13   think we probably would want to take action on that
14   individual.
15       But again, everything would have to line up
16   and everything would have to be clear, most
17   importantly.
18       Q.   Should I give you an example?
19       A.   No, not necessary.
20       Q.   My question, I guess, is:  If a student jumps
21   from multiple fails to a ninety and went to Optima
22   University and has done residency, would NBME have a
23   duty to look into that matter?  Clear evidence.
24       MS. HOLLAND:  I'm going to object to

Page 50

1        the legal conclusion of the NBME having a duty.
2        Having a duty is a legal conclusion.
3    BY DR. THOMAS:
4        Q.   To rephrase:  Does your department, as the VP
5    of licensing, have a responsibility to inquire into the
6    matter?
7        A.   The circumstances you're describing are not
8    particularly clear to me. It's very difficult for me to
9    answer the question.
10       Q.   If NBME is told about a test-prep organization
11   that may or may not have copyright infringement issues,
12   do you believe that the NBME has a responsibility to
13   let students know of an alleged or a possible issue
14   that could affect their medical career?
15       A.   You used the word alleged, so I guess my
16   concern would be, if there was overwhelming evidence
17   that test content had been stolen and compromised and
18   was being exposed to students, I think we would need to
19   act upon that.
20       Q.   Would you say what kind of action the NBME
21   would be at liberty to do?
22       A.   Well, I think we would be concerned -- well, I
23   don't know about "at liberty to do," but certainly we
24   would be concerned about the course continuing to share

Page 51

1    copyright material.  We would want to warn the students
2    to be careful about what kind of test-preparation
3    courses they select, which is the kind of message we
4    share often with students.
5        Q.   Are you familiar with the bulletin that NBME
6    releases on different NBME-related topics?
7        A.   No.
8        Q.   Did the NBME ever put any newscast or
9    statement regarding Optima University on their website?
10       A.   Yes, we do put USMLE postings on the website.
11       Q.   Was there anything regarding Optima University
12   posted?
13       A.   I think there was.
14       Q.   Who was in charge of that posting, or who
15   decides if the posting will happen and what that would
16   be?
17       A.   Like many of these issues, it's often several
18   units would be involved.  For something like that, it
19   probably involved our legal department, my department,
20   perhaps the secretariat.  There might have been others
21   involved.
22       Q.   So, any statement made regarding Optima
23   University, did you give the -- were you charged with
24   giving the okay to put it out there or to post it?

Page 52

1        A.   No, I'm not charged with it.  I think I'm one
2    of many perspectives that needs to be involved in a
3    decision to post that information.
4        Q.   Who is the ultimate person to decide yes or
5    no?
6        A.   There is no one person.
7        Q.   So, if half the people recommend it and half
8    do not recommend it, who makes that final decision?
9        A.   I think the group would probably recognize
10   that, if as many as half the people decide it was a
11   good idea, then we probably would do something.
12       Q.   So, it's a majority-group decision?
13       A.   Typically, yes.
14       Q.   Can you say what prompted the timing of the
15   notification regarding Optima University?
16       A.   I don't know.
17       Q.   Was there any specific trigger that prompted
18   the notification of Optima University?
19       A.   Again, I'm not sure what you mean by
20   "notification of Optima."
21       Q.   The posting that was made.
22       A.   I don't recall the details of the posting.
23   All I can acknowledge is that there was a posting about
24   Optima University.  So, I'm not even sure what the

13 (Pages 49 to 52)

Gerard F. Dillon, M.D.                                    Thomas vs. ECFMG, et al.
                              January 17, 2014

| Page 53 | Page 55 |
|---|---|

Page 53

1    timing was of that.
2        Q.  Did the posting -- or to your recollection,
3    did NBME ever ask students to come forward if they were
4    a student at Optima University?
5        A.  I don't recall, but I don't know if we did or
6    didn't. I just don't recall.
7        Q.  Would NBME have the capability to set such a
8    posting, to say any students that went to Optima
9    University should contact the office?
10       A.  Can you ask that again? I missed the
11   beginning.
12       Q.  Would NBME have the capability to put up a
13   posting that stated if you were an individual who
14   attended Optima University, you should contact the
15   office at NBME?
16       A.  We certainly would have the capability
17   technically to do it. I don't know if we would want to
18   do it. That would be a separate issue.
19       Q.  Would you not want to do it if you had know
20   that the course has alleged copyrighted material and
21   was giving them an unfair advantage? Because once that
22   student sits for the exam, they now have to go through
23   this whole process with score validity.
24       A.  I'm not sure I understand.  When you say would

Page 54

1    they not want to do it, can you. . .
2        Q.  Would the NBME want students to come forward
3    if they went to Optima University?
4        A.  I don't know.
5        Q.  Are you familiar with the seven-year rule for
6    ECFMG?
7        A.  I'm aware of it. I don't know very much of the
8    details.
9        Q.  Does NBME have any part in the seven-year rule
10   for ECFMG?
11       A.  My understanding is that that ruling really
12   relates to ECFMG certification, so we would not have
13   any direct connection with that.
14       Q.  Does USMLE have any suggestions or
15   recommendations regarding the seven-year rule in terms
16   of the policy at ECFMG?
17       A.  I don't think we have any formal
18   recommendation.
19       Q.  So, from a licensing standpoint, that is
20   strictly an ECFMG rule.
21           MS. McENROE:  Objection to form. Can
22       you restate the question?
23           DR. THOMAS: Yes.
24

Page 55

1    BY DR. THOMAS:
2        Q.  You're the VP of licensing.  Is there any rule
3    for NBME that says a person must pass all their exams
4    within seven years? Or USMLE.
5        A.  There is no USMLE-imposed rule that limits an
6    individual to completing an examination within a
7    seven-year sequence.
8        Q.  The six-attempt rule, whose rule that is?
9        A.  That's USMLE's.
10       Q.  So, the six-attempt rule grandfathered
11   students who had taken the exam multiple times until
12   2013.
13       A.  I don't know that I would call it
14   grandfathered.  I think it established a date where new
15   USMLE students -- where the six-attempt rule would
16   apply to them, and there was a transition period during
17   which people who were already involved in the process
18   could try to finish before the six-year rule.
19           It was about a year, I think, that the
20   transition went on.
21       Q.  So, to clarify your understanding:  If a
22   student who is a foreign graduate does not pass all
23   three exams within seven years, what happens if they
24   have more than six attempts on an exam that's pending?

Page 56

1            MS. McENROE:  Objection to the form.
2        You may answer.
3            THE WITNESS:  I didn't understand it,
4        so I can't.
5    BY DR. THOMAS:
6        Q.  A student has taken the exam and passed on the
7    seventh attempt.
8        A.  Seventh attempt, okay.
9        Q.  The seven-year rule -- now he's outside the
10   seven years and has to retake the exam.  Is he eligible
11   to retake the exam?
12           MS. McENROE:  Objection to the form.
13       You may answer.
14           THE WITNESS:  May I answer?
15           MS. HOLLAND:  Yes.
16           MS. McENROE:  Yes.
17           THE WITNESS:  The seven-year rule has
18       nothing to do with USMLE requirements.  Currently
19       there is a six-attempt limit, so individuals who
20       have taken the examination six or more times are
21       no longer eligible to sit for a USMLE examination.
22   BY DR. THOMAS:
23       Q.  To your understanding, if a student takes a
24   USMLE exam and seven years pass, what happens to that

                                          14 (Pages 53 to 56)

Gerard F. Dillon, M.D.                                    Thomas vs. ECFMG, et al.
                              January 17, 2014

---

Page 57

1  exam score?
2      A.  Nothing happens to it from a USMLE
3  perspective.
4      Q.  So, it's still a passing score.
5      A.  Whatever the score was, the score was.  It
6  still exists in the system.  It could have been a fail;
7  it could have been a pass.
8      Q.  Okay.  So, for a score to go invalid, that's
9  an ECFMG -- I mean expired, that would be an ECFMG
10  decision to make it expired past seven years.
11          MS. McENROE:  Objection to the form.
12          THE WITNESS:  And I can't speak to
13      ECFMG's position.
14  BY DR. THOMAS:
15      Q.  If ECFMG knew that an exam now expired, do
16  they communicate that with NBME?
17      A.  I'm not aware of ECFMG ever saying that an
18  examination is expired.
19      Q.  So, if a student takes an exam seven years
20  past, they have not completed all three, ECFMG will
21  expire an exam.  NBME is not notified of that, or is
22  NBME notified of that?
23          MS. McENROE:  Objection to the form.
24          THE WITNESS:  The premise to your

---

Page 58

1      question, I don't have knowledge about how ECFMG
2      does it and what they do with it, so I don't know
3      how to answer your question.
4  BY DR. THOMAS:
5      Q.  My question is, if I take an exam in 2006 --
6  it is now 2013 -- ECFMG is saying that it's now expired
7  in seven years because I have not completed.  Can a
8  student apply to retake the exam?
9          MS. McENROE:  Objection to the form.
10      A.  If an examinee has not passed the
11  examination --
12      Q.  He has passed the original -- I'll clarify.
13  The examinee passes Step 1 in 2000.  He has not
14  completed all three exams, Step 1, Step 2 CK, Step 2
15  CS, by 2007.  It is now 2008.
16      Can they now register and apply for Step 1
17  again?  Or are they required, from an NBME standpoint,
18  to retake that Step 1 exam?
19          MS. McENROE:  Objection to the form.
20      A.  I'm sorry, I still don't understand the
21  question.  It's very complicated. I just don't
22  understand what you're asking.
23      Q.  If a student takes an exam one day, are they
24  required by NBME to retake the exam on their eighth

---

Page 59

1  year to become eligible for ERAS and the match?
2      A.  Do we require someone to take an examination
3  in their eighth year?
4      Q.  Meaning a foreign grad, ECFMG has now made
5  seven years you have to pass everything, so the eighth
6  year does NBME require them to retake that exam?
7          MS. McENROE:  Objection to the form.
8          THE WITNESS:  We do not; NBME does not.
9  BY DR. THOMAS:
10      Q.  Does USMLE require them to take that exam?
11      A.  No.
12          DR. THOMAS:  That's it for me.
13          MS. HOLLAND:  I do have a few
14      questions.
15          (EXAMINATION)
16  BY MS. HOLLAND:
17      Q.  Dr. Dillon, I'm going to give you what I'm
18  marking as exhibit two.
19          (Exhibit No. 2 was marked for
20      identification)
21  BY MS. HOLLAND:
22      Q.  Dr. Dillon, do you recognize exhibit two?
23      A.  Yes, I do.
24      Q.  Can you tell us what it is?

---

Page 60

1      A.  It's the USMLE policies and procedures
2  regarding indeterminate scores.
3      Q.  To your knowledge, were these policies and
4  procedures presented to Mathew Thomas throughout the
5  course of his Step 2 CK score being reviewed?
6      A.  Yes, to my knowledge.
7      Q.  I'd like you to look under A, policies, number
8  two.  Can you read for me the first sentence of A2?
9      A.  Sure: It reads, "Statistical procedures will
10  be applied routinely, as well as in response to
11  particular information, to identify scores that may be
12  subsequently classified as indeterminate."
13      Q.  Okay.  Can you read, under B, 1a, the first
14  sentence there?
15      A.  ". . .the results of appropriate statistical
16  analyses identifying and aberrancy(ies) in
17  performance" -- actually, let me start over again
18  because really the sentence begins before that.
19      Q.  Above, right.
20      A.  The sentences reads, "These procedures are
21  applicable to instances in which. . . .the results of
22  appropriate statistical analyses identify an
23  insufficiency in performance, i.e., indicate that a
24  score does not or may not represent a reasonable

---

Gerard F. Dillon, M.D.                                    Thomas vs. ECFMG, et al.
January 17, 2014

Page 61

1  assessment of an examinee's knowledge or competence
2  sampled by the examination."
3       Q.   And then the next sentence there reads "Such
4  statistical analyses include, but are not limited to,"
5  and then there three items.  Can you read those three
6  items to us?
7       A.   Sure.  These would be analyses which, first,
8  "indicate that the pattern of scores for a given
9  examinee is markedly nonuniform and one or more section
10  scores for the examinee is below the passing level";
11  the second reads, "indicate that the current scores for
12  a given examinee show an unexpectedly large increase
13  over the examinee's most recent prior scores on the
14  same Step" or, the third, "indicate that the degree of
15  agreement that is observed between the wrong answers
16  given by two examinees is unusually high as compared
17  with the degree of agreement that would be expected to
18  occur between two randomly selected individuals drawn
19  from a comparison group of examinees. . ."
20       Q.   Okay.  That list of three items, is that an
21  exhaustive list or are those simply three examples?
22       A.   Those are three examples.
23       Q.   With regard to Mathew Thomas, I'm going to
24  show you what I've marked as exhibit three.

Page 62

1            (Exhibit No. 3 was marked for
2            identification)
3  BY MS. HOLLAND:
4       Q.   Taking a look at exhibit three, do you
5  recognize this?
6       A.   I do.
7       Q.   What is it?
8       A.   It's a document that was included with the
9  materials that were presented to the committee on score
10  validity for the Dr. Thomas case.
11       Q.   At the same time that the committee on score
12  validity was reviewing Dr. Thomas' Step 2 CK score, was
13  Dr. Thomas also provided with a copy of this document?
14       A.   It's my understanding that he was, yes.
15       Q.   Can you explain to us what this document is?
16       A.   Sure. The document's really intended to
17  address some fairly straightforward questions.
18            Once we had identified the test questions that
19  we believe were exposed in our test pool, we were able
20  for any one test form that was taken by an examinee to
21  essentially score that individual, that examinee, on
22  the items we believe were exposed versus the ones for
23  which we have no reason to believe they were exposed.
24            So, when you look at this sheet, you'll see

Page 63

1  percent exposed or percent unexposed.  That's really
2  what we mean by that those terms "exposed" and
3  "unexposed."
4            The dates they're representing here really
5  come from the test examination that was taken by Dr.
6  Thomas, and actually by an additional 1,100-plus
7  individuals who had taken this Step 2 CK.  They all had
8  the same test form as Dr. Thomas.
9            So, what's represented here is performance
10  information for Dr. Thomas on what we term the exposed
11  test questions and the unexposed test questions, and
12  then the same information in terms of the average
13  performance of the balance of the 1,100 individuals who
14  also took the same form in both of those same
15  categories:  The exposed category and the unexposed
16  category.
17            So, the top portion of this document really
18  represents the percent correct scores in those
19  categories.  The bottom part of the document still
20  addresses the same categories of test questions, the
21  exposed and non-exposed test questions, but represents
22  the average amount of time taken on those sets of test
23  questions.
24            And again, it's presented for both Dr. Thomas

Page 64

1  as an individual and then the average time spent on
2  these same questions by the full group of 1,100-plus
3  individuals who took the same test form.
4       Q.   Okay.  Is this form, exhibit three, the
5  statistical analysis that is referenced by the policies
6  and procedures in exhibit two?
7       A.   This represents the analysis that's alluded to
8  in the policies.  This is again an example of another
9  kind of analysis that could be done.
10       Q.   And what is the purpose of exhibit three?
11  What's the purpose of this one-page form?
12       A.   So, in a situation where an individual might
13  have had exposure to test content, in addition to all
14  the other information we would bring to the score
15  validity committee in terms of the evidence of that
16  nexus and the timing and so forth, there is an interest
17  in whether or not, if there was exposure, whether or
18  not the individual might have gained some advantage by
19  having had exposure in terms their performance on the
20  examination, and that might be represented a couple
21  different ways.
22            One way is pretty straightforward:  You would
23  just look to see whether or not the individual did
24  better on that content than in other areas, the areas

16 (Pages 61 to 64)

Gerard F. Dillon, M.D.                              Thomas vs. ECFMG, et al.
                        January 17, 2014

Page 65

1   that are not exposed;  and another approach to it would
2   be how much time does the individual spend on the test
3   question, with the theory being if an individual had
4   prior exposure to specific test questions, they are
5   likely to move through those questions and respond
6   quicker than they would with material that they had not
7   seen before.  So, that's really the intent of this.
8          The other piece of this that's important is
9   trying to get a sense for how big a difference is an
10  usually big difference.
11         So, the one thing we try to do is to give the
12  committee a sense for how frequently within the group
13  of 1,100-plus individuals who took the same form, how
14  often we saw the same size differences as we saw for
15  Dr. Thomas in both the performance category and the
16  timing category.
17     Q.  And with regard to that, how unusual was the
18  differential in Dr. Thomas' performance as compared
19  with the comparison form?
20     A.  In both the performance category and the
21  timing category, when we looked at all the other
22  individuals with the same test form, the difference
23  that we detected was really greater than at least
24  ninety-nine percent of the balance of the group, the

Page 66

1   group of 1,162 individuals.
2      Q.  In general, Dr. Dillon, what is the purpose of
3   the National Board of Medical Examiners?
4      A.  Well, the national board is essentially an
5   assessment organization.  We're non-profit. We create
6   assessment tools that are used by primarily the medical
7   professions to make decisions about individuals at
8   various levels.
9          It could be for decisions about progression
10  through medical school; it could be about the initial
11  granting of a license to practice medicine; it could be
12  about being credentialed as a specialist in some way.
13         So, we have a variety of clients that we work
14  with.  And really the idea is, we develop assessments
15  that inform those decisions about those individuals.
16     Q.  And in developing those assessments, what is
17  the ultimate aim of the National Board of Medical
18  Examiners?
19     A.  Well, I can speak specifically about USMLE, if
20  that would help.
21     Q.  Yes, that would help.
22     A.  As an example.  So, really the idea -- the
23  primary user of the information that comes from USMLE
24  is the state licensing authority.

Page 67

1          The license to practice medicine is granted by
2   each of the individual states, and each state has a
3   variety of requirements, but all of them, as part of
4   the variety of requirements, have some examination
5   requirement.
6          All the states accept USMLE, and really the
7   information we're trying to provide for them is some
8   indication as to whether or not the individual has sort
9   of the minimum competency, the minimum requirements in
10  terms of skills and knowledge, to begin the practice of
11  medicine.
12         And I think I may have said this already:
13  Currently all the individual states accept the USMLE
14  outcome for that decision.
15     Q.  You mean accept as in 'acc'?
16     A.  'Acc,' yes.
17     Q.  So, you told us the primary users of the USMLE
18  or the end user for the USMLE are the state licensing
19  boards.  Is that right?
20     A.  Yes.
21     Q.  What relationship does the NBME play with
22  regard to the protection of the public?
23     A.  Well, essentially, if you focus on the primary
24  users, the individual state, really the process they're

Page 68

1   going there through is, they're trying to credential
2   individuals and their focus is on patient safety, the
3   quality of patient care.
4          So, what we do is, we're informing the
5   decision we believe ultimately would impact the care of
6   patients, and really that's the focus when we're
7   developing our content.  It's what we have our item
8   writers and case developers focus on.
9          So, ultimately the impact is whether or not
10  the individuals would qualify to begin patient care.
11     Q.  Can you define for me what psychometrics are?
12     A.  Broadly defined, it's really the field that's
13  focused on testing generally.  So, a psychometrician,
14  for example, would be an individual knowledgeable about
15  test design, scoring, approaches to reporting, the
16  research that needs to be done in order to support the
17  validity of the scores and so forth.
18     Q.  What is the purpose of the USMLE committee on
19  score validity?
20     A.  Their primary purpose is to make decisions
21  about whether or not they believe a passing outcome is
22  really a valid outcome.
23         They don't focus on whether or not they think
24  there have been any irregularities that have occurred,

                                    17 (Pages 65 to 68)

Gerard F. Dillon, M.D.                                    Thomas vs. ECFMG, et al.
                          January 17, 2014

Page 69

1    and really purely focused on whether or not they can
2    support that label, that passing label, or not. That's
3    essentially the role of the committee.
4        Q.   When you say "irregularities," what do you
5    mean by that?
6        A.   That's the label we use broadly for any
7    incidents that occur that are in violation of our rules
8    and in violation of copyright and so forth.
9            So, examples would be of stealing test content
10   or producing fraudulent credentials, attempting to
11   remove information from a testing site. Those would
12   all be considered irregularities.
13           Those are not really the responsibility of the
14   committee on score validity. That's really focusing on
15   whether or not that passing outcome is a valid outcome.
16       Q.   Is there a different committee that deals with
17   allegations of irregularities?
18       A.   Through the history of USMLE, we consider
19   those are separate functions with separate policies.
20           There have been periods where we've asked the
21   same groups to try to perform the same activities and
22   times that we haven't, so that's varied a little bit.
23           But we think of them as -- they're certainly
24   different questions of policies and different purposes,

Page 70

1    but the individuals may have sometimes been the same or
2    may have been different at points in time.
3        Q.   Dr. Thomas in this case went before the
4    committee on score validity. At the time was that
5    separate from the committee on irregular behavior, if
6    you know?
7        A.   I think at that time it was the same group who
8    performed that function. That's my recollection.
9        Q.   Okay. When I showed you exhibit three before,
10   which is the one-page analysis Dr. Thomas' Step 2 CK
11   score, was this kind of document the same document that
12   was prepared with regard to anyone who came before the
13   committee on score validity at the same time as Dr.
14   Thomas or around the same time?
15       A.   Around the same time. It was primarily used
16   for individuals who were identified because of their
17   Nexus with the Optima program.
18       Q.   With regard to those individuals, were the
19   same policies and the procedures followed?
20       A.   Yes.
21       Q.   Were the outcomes of those policies and
22   procedures being applied the same for every individual?
23       A.   No. I'm sorry, by "outcomes," do you mean the
24   decision of the committee?

Page 71

1        Q.   Yes.
2        A.   The outcomes of the committees vary. They
3    weren't always the same decision.
4        Q.   Under the policies and procedures, is there
5    ever any other kind of statistical analysis other than
6    exhibit three that was presented and given for a
7    student for their exam?
8        A.   Again, are we -- if we're talking about Optima
9    students?
10       Q.   Right.
11       A.   There was no other analysis other than this
12   that was done.
13       Q.   Okay.
14           MS. HOLLAND: I do not have any further
15           questions -- oh, I do have one other question.
16           I'm sorry.
17   BY MS. HOLLAND:
18       Q.   If Dr. Thomas were to pass Step 1, Step 2 CS,
19   Step 2 CK and Step 3, would he automatically receive a
20   license to practice medicine?
21       A.   No. Passing the USMLE sequence doesn't result
22   in an automatic licensing.
23           Again, I mentioned before the licenses are
24   granted by the individual states. They have their own

Page 72

1    additional requirements beyond the examination
2    requirement. In fact, I think right now every
3    licensing jurisdiction requires some amount of
4    postgraduate training.
5            So, a person would have to also complete some
6    amount of postgraduate training and some states might
7    have some other requirements. But no, passing USMLE
8    doesn't immediately result in a license.
9            MS. HOLLAND: I don't have anything
10           else.
11           MS. McENROE: I have just a few
12           follow-up questions.
13           (EXAMINATION)
14   BY MS. McENROE:
15       Q.   Dr. Dillon, you had testified that the
16   seven-year rule that's been discussed here is an ECFMG
17   rule. Is that correct?
18       A.   Yes.
19       Q.   You said that USMLE does not impose a
20   seven-year rule. Does the USMLE recommend a seven-year
21   rule?
22       A.   Not for ECFMG certification, but we make a
23   recommendation to the state licensing authorities that
24   they consider as important the length of time it takes

18 (Pages 69 to 72)

Gerard F. Dillon, M.D.                          Thomas vs. ECFMG, et al.
                         January 17, 2014

Page 73

1    an individual to get through the USMLE sequence, and
2    some states have adopted a time limit for that and
3    others haven't.
4         So, we have a recommendation that there be an
5    amount of time. I think currently it's a seven-year
6    that period of time. There are also some individuals,
7    through the nature of their training, seven years is
8    not long enough, ones who are pursuing both an M.D. and
9    a Ph.D. at the tame same.
10        So, the state boards in those cases, you might
11   want to allow a longer period of time, but for most
12   cases we recommend the seven-year period.
13        Q.   Do you know why USMLE recommends a seven-year
14   period?
15        A.   It wasn't invented by us. The idea of there
16   being a limited amount of time to get through the
17   examination process has been around for many, many
18   years at the state board level, so many states have
19   done so for a long, long period of time. I think we
20   support it, which is why we wanted to explicitly make
21   it a recommendation.
22        And I think the idea is still that the notion
23   is, it's valuable to try to assess an individual on all
24   the competencies we're trying to assess within some

Page 74

1    limited amount of time. In other words, it shouldn't
2    take a long period of time to do that, and that's
3    really the motivation behind it.
4         Q.   There has been some discussion today about a
5    six-attempt rule. Would it be fair to describe that as
6    a USMLE rule?
7         A.   Yes.
8         Q.   What is the purpose of that rule?
9         A.   And again, it's a rule not unlike the one
10   before. It's not a rule that we invented. Again, this
11   is a rule that many of the individual states already
12   impose in terms of the numbers of the times a person
13   can take an examination.
14        And in fact, the number six is really -- of
15   all the states that have that requirement, we believe
16   that six is the highest number that any state uses.
17   So, that's a little background behind that number.
18        But again, the notion is that an individual
19   ought to be able to demonstrate their abilities with
20   some limited number of attempts to the examination.
21        To allow an individual to sort of an unlimited
22   number of attempts is in some ways sort of essentially
23   a disservice to the individual, but what you worry
24   about is whether or not at some point, just by chance

Page 75

1    alone, just because of some imprecision in the scoring,
2    an individual who isn't qualified might pass the
3    examination.
4         That's one of the reasons -- the other major
5    reason is, we worry about with the security of the test
6    content. The notion that the examination just can be
7    taken an unlimited number of times and have all that
8    exposure, we worry about it being stolen and somehow
9    being used to undermine the system. So, it's a variety
10   of reasons.
11        Q.   Dr. Dillon, would it be fair to say you
12   testified earlier that passing all of the USMLE steps
13   does not result in automatic licensure?
14        A.   Yes.
15        Q.   And you had mentioned, in connection with
16   that, that all states, at least to your knowledge,
17   require some sort of practical-experience component for
18   licensure?
19        A.   Actually, postgraduate training in an
20   accredited program.
21        Q.   Would it be fair for the layperson to call
22   that a residency?
23        A.   Oh, yes.
24             MS. McENROE:  I have no further

Page 76

1    questions. Thank you very much, doctor.
2             THE WITNESS:  Sure, thank you.
3             (The deposition was concluded at 5:00
4    p.m.)

                         brusilow+associates
brusilow.com                                        215.772.1717

Gerard F. Dillon, M.D.                              Thomas vs. ECFMG, et al.
                              January 17, 2014

Page 77

 1                    INDEX
 2
 3   WITNESS:  GERARD F. DILLON, M.D., Ph.D.
 4
 5   By Dr. Thomas:          Page 4
 6   By Ms. Holland:         Page 59
 7   By Ms. McEnroe:          Page 72
 8
 9
10             EXHIBITS
11   NO.        DESCRIPTION          PAGE
12   2  USMLE Policies and Procedures Regarding
13      Indeterminate Scores          59
14   3  Mathew Thomas Score Performance      62
15
16
17
18
19
20
21
22
23
24

Page 78

 1             CERTIFICATION
 2
 3         ------
 4
 5        I hereby certify that the testimony and
 6   the proceedings in the aforegoing matter are contained
 7   fully and accurately in the stenographic notes taken by
 8   me and that the copy is a true and correct transcript
 9   of the same.
10
11
12        _____
          Lance A. Brusilow
          Registered Professional Reporter
13        Certified Realtime Reporter
14
15
16        The foregoing certification does not
17   apply to any reproduction of the same by any means
18   unless under the direct control and/or supervision of
19   the certifying shorthand reporter.
20
21         ------
22
23
24

brusilow+associates

brusilow.com                                        215.772.1717